UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>The Diocese of Buffalo, N.Y.,<br><br>                Debtor. | Case No. 20-10322 (CLB)<br><br>Chapter 11 |
| The Diocese of Buffalo, N.Y.,<br><br>                Plaintiff,<br><br>v.<br><br>JMH 100 Doe, *et al.*[1]<br>                Defendants. | Adversary No. 20-01016 |

**DECLARATION OF JOHN M. SCHOLL REGARDING THE DIOCESE'S SELF-INSURANCE PROGRAM AND AVAILABLE INSURANCE COVERAGE**

Pursuant to 28 U.S.C. § 1746, JOHN M. SCHOLL, hereby declares and says as follows:

1. I am the Director of Insurance Services for The Diocese of Buffalo, N.Y. (the "Diocese"). In such capacity, I am the individual primarily responsible for the Diocese's risk management functions, including, without limitation, its insurance programs.

2. I have more than 40 years' experience working in the insurance and risk management industry, the last 21 in my current position at the Diocese. Prior to working for the Diocese, I worked for a combined 16 years with three major insurance carriers, Continental Ins. Co., Aetna and Travelers, as a commercial large account underwriter. I also spent 5 years as Large Commercial Account Manager for an insurance agency. I have bachelor's degrees in both statistics

---

[1] The defendants in this adversary proceeding are identified in Exhibit A to the complaint filed by The Diocese of Buffalo, N.Y.

3536733.3

and mathematics from the University of Buffalo as well as 2 years of master's degree courses in statistics, also at the University of Buffalo. I obtained my Chartered Property Casualty Underwriter (CPCU) designation in 1984 and served 6 years on the board of the Buffalo Chapter of the Society of CPCU. I also hold an Associate in Management designation (AIM) from the Society of CPCU. I have previously served as Vice President of The National Catholic Risk Retention Group's Board of Directors and Chairman of the Board of Governors of National Catholic Services, LLC, an insurance company providing liability insurance for 53 Catholic Dioceses/Archdioceses and the Christian Brothers Risk Pooling Trust.

3. I make this declaration based upon my own personal knowledge, information, and belief after having reviewed books, records and other documents created, maintained, and relied upon by the Diocese in the normal course of its business operations and consulting with appropriate Diocesan personnel and advisors.

**The modern self-insurance program**

4. Beginning on or about July 1, 1973, and at all times thereafter, the Diocese has maintained a joint self-insurance program (the "SIP") which provides comprehensive risk management services and insurance coverage for the Diocese and also for parishes, schools and other Catholic ministry entities and institutions within the geographical territory of the Diocese (the "SIP Participants.") The Diocese implemented the SIP as a means of ensuring that SIP Participants have adequate insurance protection at a reasonable price by spreading risk among a large pool of participants and leveraging their collective buying power to secure excess coverage at favorable rates.

5. Under the SIP, the Diocese coordinates and administers self-insurance coverage, subject to applicable excess policies, for (i) direct and indirect property loss, business interruption

and equipment breakdown (ii) general liability, bodily injury and property damage claims, including personal injury, employee benefits, sexual misconduct, employment practices, directors and officers, school board legal liability, cyber liability, errors and omissions, as well as automobile liability and physical damages, and (iii) workers' compensation. The SIP also provides first dollar coverage for New York statutory disability and paid family leave.

6. The SIP utilizes third party insurance brokers to assist the Diocese in purchasing appropriate excess coverage and to administer various risk management programs.

7. The Diocese funds the SIP primarily by billing each SIP Participant a ratable portion of the projected overall cost of administering the program and paying claims, using allocation methodologies which take into account numerous different ratable exposure bases. The Diocese strives to achieve a consistent and fair allocation of premium costs among the SIP Participants. For fiscal year 2019-2020, the Diocese has budgeted approximately $7.4 million in premium revenue related to the SIP. This premium revenue is used to pay administrative costs of the program (including, where applicable, defense costs), to pay claims for losses, and to pay premiums for excess coverage. If there are surplus SIP Funds remaining at the end of a fiscal year after payment of all costs and expenses related to the program, such surplus funds are deposited by the Diocese into a segregated reserve account and used to offset future obligations under the program.

8. By order entered April 21, 2020, the Court authorized the Diocese to continue to maintain the SIP during this Chapter 11 Case and to pay claims, premiums, defense costs, obligations and administrative costs of the SIP in the ordinary course of business consistent with its prepetition practices [Docket No. 253].

9. Since the inception of the SIP in 1973, the Diocese has continually maintained policies of excess insurance covering general liability claims against the SIP Participants (including claims for personal injury, sexual misconduct, and errors and omissions). Under the SIP, the Diocese is responsible for coordinating the defense of, and paying all defense costs and claims for losses by any SIP Participant, up to the point of available excess coverage. The Diocese reviews and adjusts the excess coverage under the SIP on an annual basis. Under the current formulation of the SIP, the Diocese is responsible for paying a self-insured retention of up to $250,000 for general liability claims. Above the self-insured retention, the Diocese maintains general liability excess policies with National Catholic Risk Retention Group ("National Catholic") and W.R. Berkley with limits of $14.75 million and $25 million respectively.

10. Historically, the SIP has maintained general liability excess policies with the following carriers: Continental Insurance Co., Exchange Mutual Ins. Co., Employers of Wausau, Catholic Mutual Ins. Co., Sphere Drake and National Catholic.

## Pre-1973 insurance coverage

11. Prior to the implementation of the SIP in 1973, each of the SIP Participants was responsible for securing its own liability insurance coverage. In response to recent litigation alleging abuse claims dating back many decades, the Diocese has undertaken efforts to confirm the existence of coverage for each of the SIP Participants prior to July 1, 1973 when the SIP became effective. The Diocese engaged the Insurance Archaeology Group ("IAG") to assist it in locating copies of such policies and/or secondary evidence of the existence of such policies. On or about March 10, 2020, the Diocese located in its archives a number of records which identify in reasonable detail secondary proof of pre-1973 policies that provide liability coverage to various SIP Participants. Upon information and belief, copies of the relevant policies are in the possession

4

3536733.3

Case 1-20-01016-CLB, Doc 5, Filed 05/02/20, Entered 05/02/20 12:25:44, Description: Main Document , Page 4 of 8

of the respective carriers and may also be contained in the records of the various SIP Participants. Unfortunately, the social distancing and stay at home orders issued by state and local authorities in response to the recent novel coronavirus pandemic have temporarily stymied the search for additional records with respect to pre-1973 insurance coverage. Nevertheless, based upon my review of the available records, my knowledge of the relationship between the Diocese and the other SIP Participants, and my experience in the insurance and risk-management industry, upon information and belief prior to the 1973 implementation of the SIP, each of the SIP Participants maintained liability insurance policies and each of those policies would have included the Diocese as an additional named insured.

### The impact of the CVA Cases on the Diocese's insurance coverage

12. On August 14, 2019, civil actions premised on allegations of child sex abuse which were previously barred by the applicable statute of limitations in New York ("CVA Cases") were revived for a one-year window ending August 13, 2020.

13. As of February 28, 2020 (the "Petition Date"), the Diocese had been named as a defendant in more than 250 CVA Cases. The vast majority of those lawsuits also named one or more SIP Participants as additional defendants. In a few instances, plaintiffs have filed separate CVA Cases alleging identical facts and claims against the Diocese and against SIP Participants. The core allegations in the CVA Cases for the most part are either (1) focused on the conduct of the Diocese, or (2) make no distinction between the conduct of the Diocese and the conduct of the other SIP Participants.

14. In its capacity as the administrator of the SIP program, the Diocese has taken the lead role in defending itself and the other SIP Participants in the CVA Cases. Among other things, the Diocese has coordinated the retention of joint defense counsel, responded to the overwhelming

5

majority of discovery requests and coordinated with insurance carriers. Prior to the opening of the one-year window to bring CVA Cases, the Diocese also authorized and funded the payment of approximately $18 million in voluntary settlement payments to abuse claimants as part of the Diocese's Independent Reconciliation and Compensation Program.

15. Despite the fact that the CVA Cases are now stayed against the Diocese, the Diocese is still responsible under the SIP to provide a defense for other SIP Participants. In the event plaintiffs are allowed to continue to prosecute the CVA Cases against the SIP Participants, the Diocese will be required to expend significant time and money responding to the CVA Cases both in its capacity as the risk manager and insurance coordinator for the SIP Participants and simply to protect the Diocese's own legal interests which could be jeopardized by continued prosecution of the CVA Cases.

16. Even absent the Diocese's obligations under the SIP to provide a defense to the other SIP Participants with respect to the CVA Cases, the Diocese would be required to monitor and participate in the CVA Cases, notwithstanding the bankruptcy automatic stay, because the claims asserted against other SIP Participants are so closely intertwined with the claims asserted against the Diocese that the Diocese may be exposed to collateral estoppel, adverse precedent, vicarious liability, or imputed admissions if the litigation continues. In these circumstances, the Diocese will have no choice but to participate in the CVA Cases, thus diverting significant resources from the pursuit of a plan of reorganization and vitiating the efficacy of the automatic stay.

17. Each of the SIP Participants has the same rights as the Diocese to coverage under both the SIP and any pre-1973 policies on which they are co-insureds. Accordingly, the applicable SIP reserves and policy limits are shared between the Diocese and the other SIP Participants. The

reserves the Diocese holds to administer the SIP, as well as the excess insurance coverage available under the SIP and/or any pre-1973 coverage is finite. To the extent a claim remains unstayed, the SIP will be required to expend its reserves to fund defense costs. Moreover, with respect to any claim which is successfully prosecuted against a SIP Participant, plaintiffs undoubtedly will look directly to any shared insurance to satisfy any judgment, thereby depleting, dollar-for-dollar, proceeds which would otherwise be available to the Diocese's bankruptcy estate. Accordingly, continuation of the CVA Cases against the SIP Participants will have an immediate adverse economic consequence for the Diocese's estate.

18. Lastly, continuation of the CVA Cases will divert critical resources away and likely distract Bishop Sharfenberger, Charles Mendolera, the Diocese's Executive Director of Financial Administration, myself, and other key personnel and advisors from focusing on the Diocese's reorganization efforts. It is the Diocese's hope and expectation that a consensual plan of reorganization can be formulated which will address not only the Diocese's liabilities with respect to any CVA Cases or other abuse claims, but also those of each of the SIP Participants. I respectfully submit that staying the continued prosecution of the CVA Cases will allow all parties in interest to focus on participating in settlement negotiations in good faith and will promote an environment most likely to produce a global compromise and resolution on fair and equitable terms.

[*signature page follows*]

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on April 30, 2020

                                          /s/ John M. Scholl
                                          JOHN M. SCHOLL, CPCU, AIM