it IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

_____

In re:                                                           Chapter 11

The Diocese of Buffalo, N.Y.,                    Case No. 20-10322-(CLB)

                   Debtor,

_____

The Diocese of Buffalo, N.Y.,

                   Plaintiff,                     **DECLARATION**
     v.
                                 Adv. Pro. No. 20-01016

JMH 100 Doe, *et al.,*

                   Defendants.

_____

     **JEFFREY F. REINA**, **ESQ.,** under 28 U.S.C. § 1746 and subject to the penalties for

perjury, hereby declares and states as follows:

     1.     I am an attorney at law duly licensed to practice in the State of New York and a

senior partner with the law firm of Lipsitz Green Scime Cambria, LLP, attorneys for LG 1 DOE,

LG 2 DOE, LG 3 DOE, LG 4 DOE, LG 10 DOE, LG 11 DOE, LG 12 DOE, LG 13 DOE, LG 14

DOE, LG 15 DOE, LG 16 DOE, LG 17 DOE, LG 18 DOE, LG 19 DOE, LG 20 DOE, LG 21

DOE, LG 22 DOE, LG 23 DOE, LG 24 DOE, LG 25 DOE, LG 26 DOE, LG 27 DOE, LG 28

DOE, LG 29 DOE, LG 30 DOE, LG 31 DOE, LG 36 DOE, LG 45 DOE, and LG 49 DOE

(hereinafter referred to collectively as "LG Victims").  LG Victims are Plaintiffs in pending actions

filed in New York State Supreme Court against the Diocese of Buffalo, N.Y.'s (hereinafter "the

Diocese" or the "Debtor"), and where applicable, non-debtor catholic entities and the individual

1

child molesters. LG Victims have been identified by the Debtor as Defendants in the Adversary Proceeding captioned above.

2.      I submit this Declaration on behalf of LG Victims, in opposition to the Diocese's motion for entry of an order enjoining the continued prosecution of Child Victims Act cases pursuant to 11 U.S.C. Sections 105(a) and 362 (hereinafter referred to as "Diocese Injunction Motion"), and for entry of an order authorizing service of process on counsel for the LG Victims (hereinafter referred to as "Diocese Service Motion"). LG Victims join in the The Official Committee of Unsecured Creditors' Opposition to Debtor's Motion for an Entry of an Order Pursuant to Sections 105(a) and 362 of the Bankruptcy Code Enjoining the Prosecution of Certain Lawsuits Against Non-Debtors (Adv. Proc. Doc. No. 13) and adopt the legal arguments set forth therein.

3.      The procedural posture and brief factual background of LG Victims pending New York State actions commenced pursuant to the Child Victims Act are as follows:

- LG 1 DOE was a child parishioner of Holy Apostles Roman Catholic Parish of Jamestown f/k/a SS Peter & Paul Roman Catholic Church, when he was sexually abused by a priest, Mark M. Friel from approximately 1985 through 1986. An action was commenced on LG 1 DOE's behalf on August 30, 2019 in the Supreme Court of the State of New York, County of Erie, against the Diocese of Buffalo, Holy Apostles Roman Catholic Parish of Jamestown f/k/a SS Peter & Paul Roman Catholic Church, and Mark M. Friel. The Diocese of Buffalo and Holy Apostles Roman Catholic Parish of Jamestown filed an Answer. Pursuant to an Order issued January 24, 2020, Mark M. Friel has been found to be in default; however, the entry of judgment against Mark M. Friel is stayed until the conclusion of a trial or disposition of the matter with the Diocese of Buffalo and Holy Apostles Roman Catholic Parish of Jamestown. A copy of said Order is annexed hereto, made part hereof, and designated as **Exhibit 1**.

- LG 2 DOE was a child parishioner at Blessed Mother Teresa of Calcutta Parish f/k/a St. James Roman Catholic Church, when he was sexually abused by a priest, Gerald Jasinski beginning in or about the summer of 1978, and continuing through on or about the end of the summer 1979. An action was commenced on LG 2 Doe's behalf on September 3, 2019 in the Supreme Court

2

of the State of New York, County of Erie against The Diocese of Buffalo and Blessed Mother Teresa of Calcutta Parish and Gerald Jasinski. The Diocese of Buffalo and Blessed Mother Teresa of Calcutta Parish filed an Answer. Pursuant to an Order issued January 24, 2020, Gerald Jasinski has been found to be in default; however, the entry of judgment against Gerald Jasinski is stayed until the conclusion of a trial or disposition of the matter with the Diocese of Buffalo and Blessed Mother Teresa of Calcutta Parish. A copy of said Order is annexed hereto, made part hereof, and designated as **Exhibit 2**.

- LG 3 DOE was a child parishioner at St. Martin of Tours, when he was sexually abused by a priest, Louis Hendricks beginning on or about the 1st day of January 1981, and continuing through sometime in 1982. An action was commenced on LG 3 DOE's behalf on September 5, 2019 in the Supreme Court of the State of New York, County of Erie against The Diocese of Buffalo and St. Martin of Tours. The Diocese of Buffalo and St. Martin of Tours filed an Answer.

- LG 4 DOE was a child parishioner at St. Aloysius Church of Springville, when he was sexually abused by a priest, James Spielman, beginning in approximately 1971 and continuing through approximately or about 1974. An action was commenced on LG 4 DOE's behalf on September 6, 2019 in the Supreme Court of the State of New York, County of Erie against The Diocese of Buffalo, St. Aloysius Church of Springville, and James Spielman. The Diocese of Buffalo and St. Aloysius Church of Springville filed an Answer. LG 4 DOE filed a motion for default against James Spielman, and he subsequently filed an Answer. The Court denied LG 4 DOE's motion for default and it is pending appeal.

- LG 10 DOE was a child parishioner at Assumption of Blessed Virgin Mary Church, when he was sexually abused by a priest, Mark M. Friel, beginning on or about 1971 and continuing through 1973. An action was commenced on LG 10 DOE's behalf on September 17, 2019 in the Supreme Court of the State of New York, County of Erie against The Diocese of Buffalo and Mark M. Friel. Pursuant to an Order issued January 24, 2020, Mark M. Friel has been found to be in default; however, the entry of judgment against Mark M. Friel is stayed until the conclusion of a trial or disposition of the matter with the Diocese of Buffalo. A copy of said Order is annexed hereto, made part hereof, and designated as **Exhibit 3**.

- LG 11 DOE was a child student at SS Columba-Brigid, f/k/a St. Ann's, when he was sexually abused by the assistant principal, John Curtin, beginning in or about 1988 and continuing through 1989. An action was commenced on LG 11 Doe's behalf on October 30, 2019 in the Supreme Court of the State of New

York, County of Erie against The Diocese of Buffalo and SS Columba-Brigid.  The Diocese of Buffalo and SS Columba-Brigid filed an Answer.

- LG 12 DOE was a child student at SS Columba-Brigid, f/k/a St. Ann's, when he was sexually abused by the assistant principal, John Curtin, beginning in or about 1988 and continuing through 1989. An action was commenced on LG 12 DOE's behalf on October 30, 2019 in the Supreme Court of the State of New York, County of Erie against The Diocese of Buffalo and SS Columba-Brigid.  The Diocese of Buffalo and SS Columba-Brigid filed an Answer.

- LG 13 DOE was a child student at SS Columba-Brigid, f/k/a St. Ann's, when he was sexually abused by the assistant principal, John Curtin, beginning in or about 1988 and continuing through 1989. An action was commenced on LG 13 DOE's behalf on October 30, 2019 in the Supreme Court of the State of New York, County of Erie against The Diocese of Buffalo and SS Columba-Brigid.  The Diocese of Buffalo and SS Columba-Brigid filed an Answer.

- LG 14 DOE was a child student at SS Columba-Brigid, f/k/a St. Ann's, when he was sexually abused by the assistant principal, John Curtin, beginning in or about 1988 and continuing through 1989. An action was commenced on LG 14 DOE's behalf on October 30, 2019 in the Supreme Court of the State of New York, County of Erie against The Diocese of Buffalo and SS Columba-Brigid.  The Diocese of Buffalo and SS Columba-Brigid filed an Answer.

- LG 15 DOE was a child student at SS Columba-Brigid, f/k/a St. Ann's, when he was sexually abused by the assistant principal, John Curtin, beginning in or about 1988 and continuing through 1989. An action was commenced on LG 15 DOE's behalf on October 30, 2019 in the Supreme Court of the State of New York, County of Erie against The Diocese of Buffalo and SS Columba-Brigid.  The Diocese of Buffalo and SS Columba-Brigid filed an Answer.

- LG 16 DOE was a child student at SS Columba-Brigid, f/k/a St. Ann's, when he was sexually abused by the assistant principal, John Curtin, beginning in or about 1988 and continuing through 1989. An action was commenced on LG 16 DOE's behalf on October 30, 2019 in the Supreme Court of the State of New York, County of Erie against The Diocese of Buffalo and SS Columba-Brigid.  The Diocese of Buffalo and SS Columba-Brigid filed an Answer.

- LG 17 DOE was a child student at SS Columba-Brigid, f/k/a St. Ann's, when he was sexually abused by the assistant principal, John Curtin, beginning in or about 1988 and continuing through 1989. An action was commenced on LG 17 DOE's behalf on October 30, 2019 in the Supreme Court of the State of New

4

York, County of Erie against The Diocese of Buffalo and SS Columba-Brigid. The Diocese of Buffalo and SS Columba-Brigid filed an Answer.

- LG 18 DOE was a child parishioner at St. Gabriel of Our Lady of Sorrows Church, when he was sexually abused by a priest, Daniel J. Palys, in approximately 2001. An action was commenced on LG 18 DOE's behalf on September 19, 2019 in the Supreme Court of the State of New York, County of Erie against The Diocese of Buffalo, St. Gabriel of Our Lady of Sorrows Church, and Daniel J. Palys. The Diocese of Buffalo and St. Gabriel of Our Lady of Sorrows Church have filed an Answer. Daniel J. Palys has not filed an answer or otherwise appeared in this action.

- LG 19 DOE was a student at Immaculate Conception School when he was abused by Monsignor Michael Harrington, beginning on or about the 1st day of January 1978 and continuing through sometime in 1981. An action was commenced on LG 19 DOE's behalf on September 19, 2019 in the Supreme Court of the State of New York, County of Erie against The Diocese of Buffalo. The Diocese of Buffalo filed an Answer.

- LG 20 DOE was a child parishioner at Immaculate Conception Church, when he was abused by a priest, Howard Slack, between approximately 1964 and 1965. An action was commenced on LG 20 DOE's behalf on September 19, 2019 in the Supreme Court of the State of New York, County of Erie against The Diocese of Buffalo. The Diocese of Buffalo filed an Answer.

- LG 21 DOE was a child parishioner at Our Lady of Czestochowa Church, when he was abused by a priest, Stanley Idziak, beginning on or about the 1st day of January 1963 and continuing through sometime in 1973. An action was commenced on LG 21 DOE's behalf on September 19, 2019 in the Supreme Court of the State of New York, County of Erie. An Amended Summons and Amended Complaint was filed on November 15, 2019, against the Diocese of Buffalo, Our Lady of Czestochowa Church and the Society of the Catholic Apostolate. The Diocese of Buffalo and Our Lady of Czestochowa Church filed an Answer. The Society of the Catholic Apostolate has yet to answer or otherwise appear in this action.

- LG 22 DOE was a child parishioner at St. Andrew's Parish, when he was sexually abused by a priest, Joseph Schieder, in approximately 1968. An action was commenced on LG 22 DOE's behalf on September 20, 2019 in the Supreme Court of the State of New York, County of Erie against The Diocese of Buffalo and St. Andrew's Parish. The Diocese of Buffalo and St. Andrew's Parish have filed an Answer.

Case 1-20-01016-CLB, Doc 29, Filed 05/19/20, Entered 05/19/20 13:48:41, Description: Main Document , Page 5 of 42

- LG 23 DOE was a child parishioner at Our Lady of Czestochowa Roman Catholic Church of North Tonawanda, f/k/a St. Joseph's Parish, when he was sexually abused by a priest, Louis Dolinic, beginning approximately in 1977 and continuing through approximately or about 1978. An action was commenced on LG 23 DOE's behalf on September 17, 2019 in the Supreme Court of the State of New York, County of Erie against The Diocese of Buffalo, Our Lady of Czestochowa Roman Catholic Church of North Tonawanda and Louis Dolinic. The Diocese of Buffalo, Our Lady of Czestochowa Roman Catholic Church of North Tonawanda and Louis Dolinic have filed Answers.

- LG 24 DOE was a child parishioner at Holy Family of Jesus, Mary & Joseph Parish, f/k/a St. Joseph's RC Church, when he was sexually abused by two priests, Joseph A. Schuster and Fred D. Ingalls, beginning on or about the 1st day of January 1976 and continuing through sometime in 1979. An action was commenced on LG 24 DOE's behalf on September 30, 2019 in the Supreme Court of the State of New York, County of Erie against The Diocese of Buffalo, Holy Family of Jesus, Mary & Joseph Parish and Fred D. Ingalls. The Diocese of Buffalo and Holy Family of Jesus, Mary & Joseph Parish have filed an Answer. Fred D. Ingalls has not filed an answer or otherwise appeared in this matter.

- LG 25 DOE was a child student at The Sisters of Saint Mary of Namur Incorporated, f/k/a Annunciation School, when he was sexually abused by a priest, Douglas Faraci, from Our Lady of Hope Parish, f/k/a Annunciation Church, beginning in approximately 1974 and continuing through approximately or about 1978. An action was commenced on LG 25 DOE's behalf on September 30, 2019 in the Supreme Court of the State of New York, County of Erie against The Diocese of Buffalo, The Sisters of Saint Mary of Namur Incorporated, Our Lady of Hope Parish and Douglas Faraci have filed Answers.

- LG 26 DOE was a child parishioner at St. Raphael Roman Catholic Parish f/k/a St. Teresa of the Infant Jesus, when she was sexually abused by Richard P. Judd between approximately 1973 or 1974 through 1975. An action was commenced on LG 26 DOE's behalf on October 23, 2019 in the Supreme Court of the State of New York, County of Erie against The Diocese of Buffalo and St. Raphael Roman Catholic Parish. The Diocese of Buffalo and St. Raphael Roman Catholic Parish have filed an Answer.

- LG 27 DOE was a child parishioner at St. John XXIII Parish f/k/a St. Bonaventure Parish, and was a student at Notre Dame Academy, f/k/a St. Bonaventure School, when he was sexually abused by Donald W. Becker, beginning on our about the 1st day of January 1970 and continuing through sometime in 1972. An action was commenced on LG 27 DOE's behalf on

October 11, 2019 in the Supreme Court of the State of New York, County of Erie against The Diocese of Buffalo, St. John XXIII Parish and Donald W. Becker. All parties have filed an Answer.

- LG 28 DOE was a child parishioner at St. John Gualbert Church and Diocesan Shrine, when he was sexually abused by Norbert F. Orsolits, beginning on or about the 1st day of January 1971 and continuing through sometime in 1972. An action was commenced on LG 28 DOE's behalf on October 23, 2019 in the Supreme Court of the State of New York, County of Erie against The Diocese of Buffalo, St. John Gualbert Church and Diocesan Shrine and Norbert F. Orsolits. The Diocese of Buffalo and St. John Gualbert Church and Diocesan Shrine have filed an Answer. Pursuant to an Order issued March 2, 2020, Norbert F. Orsolits has been found to be in default; however, the entry of judgment against Norbert F. Orsolits is stayed until the conclusion of a trial or disposition of the matter with the Diocese of Buffalo. A copy of said Order is annexed hereto, made part hereof, and designated as **Exhibit 4**.

- LG 29 DOE was a child parishioner at St. Teresa R.C. Church, when he was sexually abused by a priest, Basil A. Ormsby, between approximately 1962 through 1963. An action was commenced on LG 29 DOE's behalf on October 24, 2019 in the Supreme Court of the State of New York, County of Erie against The Diocese of Buffalo and St. Teresa R.C. Church. The Diocese of Buffalo and St. Teresa R.C. Church have filed an Answer.

- LG 30 DOE was a child parishioner at Transfiguration Parish, when he was sexually abused by a priest, Florian Jasinski, between approximately 1972 through 1974. An action was commenced on LG 30 DOE's behalf on October 24, 2019 in the Supreme Court of the State of New York, County of Erie against The Diocese of Buffalo and Transfiguration Parish. The Diocese of Buffalo and Transfiguration Parish have filed an Answer.

- LG 31 DOE was a child parishioner at St. Joseph Catholic Church, when he was sexually abused by a priest, Edward Walker, between approximately 1958 through 1960. An action was commenced on LG 31 DOE's behalf on October 31, 2019 in the Supreme Court of the State of New York, County of Erie against The Diocese of Buffalo and St. Joseph Catholic Church. The Diocese of Buffalo and St. Joseph Catholic Church have filed an Answer.

- LG 36 DOE was a child parishioner at Coronation of the Blessed Virgin Mary Church, when she was sexually abused by a priest, John J. Sardina, beginning in or about 1969 and continuing through sometime in 1971. An action was commenced on LG 36 DOE's behalf on November 6, 2019 in the Supreme Court of the State of New York, County of Erie against The Diocese of Buffalo,

Coronation of the Blessed Virgin Mary Church and John J. Sardina. All parties have filed an Answer.

- LG 45 DOE was a child student at Bishop Fallon High School, when he was sexually abused by a teacher, Donald J. Joyce, in approximately 1963. An action was commenced on LG 45 DOE's behalf on December 9, 2019 in the Supreme Court of the State of New York, County of Erie against The Diocese of Buffalo and the Missionary Oblates of Mary Immaculate and Donald J. Joyce. The Diocese of Buffalo filed an Answer. The Missionary Oblates of Mary Immaculate have yet to file an answer or otherwise appear in this matter. Upon information and belief, Donald J. Joyce is deceased.

- LG 49 DOE was a child parishioner at Church of the Assumption when he was sexually abused by a priest, Father John Lewandowski, in approximately 1965. An action was commenced on LG 49 DOE's behalf on February 14, 2020 in the Supreme Court of the State of New York, County of Erie against The Diocese of Buffalo and Church of the Assumption. The Diocese of Buffalo and Church of the Assumption have not filed an answer or otherwise appeared in this action.

4. The non-debtor, co-defendants in the LG Victims pending Child Victims Act cases,

Holy Apostles Parish of Jamestown f/k/a SS Peter & Paul Roman Catholic Church, SS Columba

Brigid f/k/a St. Ann's, St. Gabriel Of Our Lady of Sorrows Church, Blessed Mother Teresa of

Calcutta Parish f/k/a St. James Roman Catholic Church, Our Lady of Czestochowa Church,

Catholic Apostolate Center, Inc., St. Andrew's Parish, Our Lady of Czestochowa Roman Catholic

Church of North Tonawanda f/k/a St. Joseph's Parish, Holy Family of Jesus, Mary & Joseph Parish

f/k/a St. Joseph's RC Church, Our Lady of Hope Parish f/k/a Annunciation Church, The Sisters of

Saint Mary of Namur Incorporated f/k/a Annunciation School, St. Raphael Roman Catholic Parish

f/k/a St. Theresa of the Infant, St. John XXIII Parish f/k/a St. Bonaventure Parish, Notre Dame

Academy f/k/a St. Bonaventure School, St. John Gualbert Church and Diocesan Shrine, St. Teresa

R.C. Church, St. Martin of Tours, Transfiguration Parish, St. Joseph Catholic Church, Coronation

of the Blessed Virgin Mary Church, St. Aloysius Church of Springville, Missionary Oblates of

Mary Immaculate, and Church of the Assumption, are collectively referred to herein as "non-debtor Catholic Entities".

5.     The non-debtor, co-defendants in the LG Victims pending Child Victims Act cases, Mark M. Friel, Daniel J. Palys, Gerald Jasinski, Louis S. Dolinic, Fred D. Ingalls, Douglas Faraci, Donald W. Becker, Norbert F. Orsolits, John J. Sardina and Donald J. Joyce, are collectively referred to herein as "The Child Molesters".

6.     Each of the LG Victims pending State Court Actions are in the early stages of litigation, and discovery between the parties has not yet transpired.

I.     **THE DIOCESE'S SERVICE MOTION REQUESTING AN ORDER TO SERVE LG VICTIMS THROUGH COUNSEL SHOULD BE DENIED**

7.     The Diocese advances three arguments in support of its Motion requesting an order to effectuate service upon Child Victims Act claimants of the Adversary Summons and Complaint, by mailing papers on the Child Victims Act claimants counsel of record in the Child Victims Act cases: (1) the address of each Child Victims Act claimant is not readily available to the Diocese; (2) in many cases the identities of Child Victims Act claimants are not readily available to the Diocese as the cases were filed under pseudonyms; and (3) serving the child victims personally could have the unintended effect of re-traumatizing and confusing the claimants. *See* Diocese Service Motion, ¶ 19.

8.     For the reasons set forth below, none of those claims are persuasive.

9.     The Diocese makes the unsupported claim that providing direct notice to the child victims could "re-traumatize" the claimants. This argument not only lacks merit and is disingenuous, but shows an appalling lack of judgment on the part of the Diocese. Nothing can compare to being sexually assaulted as a child by a member of the clergy or other church employee. Receiving notice from a bankruptcy court and/or from the attorneys for the Diocese

Case 1-20-01016-CLB,  Doc 29,  Filed 05/19/20,  Entered 05/19/20 13:48:41, Description: Main Document  , Page 9 of 42

stating that the Diocese is seeking to prevent the child victims from prosecuting their civil claims against the local non-debtor Catholic Entities for their negligent conduct in causing their victims to be sexually assaulted by priests, is not even comparable.

10.     With respect to LG Victims specifically, our office has previously provided counsel for the Debtor in the underlying State Court Actions with the names, current addresses and other identifying information for the following LG Victims: LG 1 DOE, LG 2 DOE, LG 3 DOE, LG 4 DOE, LG 10 DOE, LG 11 DOE, LG 12 DOE, LG 13 DOE, LG 14 DOE, LG 15 DOE, LG 18 DOE, LG 19 DOE, LG 20 DOE, LG 21 DOE, LG 22 DOE, LG 23 DOE, LG 25 DOE, and LG 45 DOE.[1]

11.     To whatever extent the Diocese lacks the addresses and identities of any other LG Victim, Lipsitz Green Scime Cambria, LLP, will provide that information if demanded and/or ordered, so the Diocese can serve each of the victims with the Summons and Complaint and any other papers filed in this Adversary Proceeding.

12.     The Diocese has the name and current address of the majority of LG Victims, and presumably, the majority of the Child Victims Act claimants, as that information was required to be provided to Debtor's counsel within thirty (30) days after service of Answer or upon request of defense counsel, pursuant to Justice Chimes Case Management Order Against Religious Institutions and Clergy, (V)(A), a copy of which is annexed hereto, made part hereof and designated **Exhibit 5**.

---

[1] This information was provided to Debtor's counsel in a signed Plaintiff's Statement pursuant to Judge Chimes Case Management Order and an agreement by Debtor's counsel keep said information confidential.

10

13.     Thus, there is no factual basis for the Court to find that proper service on a Child Victims Act claimant is "impracticable" as required under New York Civil Practice Law and Rules § 308(5).

14.     Furthermore, the factually unsupported statements made by the Diocese that proper service on Child Victims Act claimants will "re-traumatize" victims, is not a basis for finding service "impracticable", and the Diocese cites to no case law or statutory authority for the Court to dispense with the statutory requirements that defendants in an Adversary Proceeding be served in conformance with Rule 7004(b) of the Bankruptcy Rules, Rule 4(e) of the Federal Rules of Civil Procedure, and the applicable rules governing service in the New York Civil Practice Law and Rules, on that basis.

15.     Thus, the Diocese's motion for entry of an order authorizing service in this Adversary Proceeding on the individual Child Victims Act claimants through service upon recorded counsel in the pending Child Victims Act cases should be denied in its entirety and the Diocese should be directed to serve each Child Victims Act claimant in accordance with New York Civil Practice Law and Rules.

II.     **THIS COURT LACKS JURISDICTION OVER ANY CHILD VICTIM IDENTIFIED AS LG DOE IN A PENDING NEW YORK STATE TORT ACTION**

16.     As set forth above, the law firm of Lipsitz Green Scime Cambria, LLP represents a number of child victims in pending tort claims in New York State Court and those plaintiffs were identified in the summons and complaint as LG DOE numbers.

17.     To date, no LG DOE child sexual abuse victim client has authorized the law firm of Lipsitz Green Scime Cambria, LLP to accept service for them in this bankruptcy proceeding, and do not consent to this Court's jurisdiction.

11

18.    Additionally, no proof of claim has been filed in the bankruptcy proceeding on behalf of any LG DOE child victim client.

19.    The Debtor admits that it did not serve any papers filed in this adversarial proceeding upon any child victim represented by Lipsitz Green Scime Cambria, LLP in a pending state action.

20.    As set forth in greater detail above, the Diocese has the name and current address of the majority of LG Victims, and to the extent the Debtor lacks the true name and/or current address of any plaintiff designated as LG Doe in the State Court action, the true name and address of that individual will be revealed to the Debtor provided the Debtor signs a stipulated order to not publicly reveal the name and address of that individual or the Court issues an order on that issue. Therefore, the Debtor would be fully capable of serving any LG Doe plaintiff in a New York State claim with any papers filed in an adversarial proceeding.

21.    The Debtor is spending millions of dollars in this bankruptcy proceeding but argues it is too costly or burdensome to discover the names and addresses of plaintiffs in pending child victim lawsuits and thereafter serve those victims with the adversarial proceeding in accordance with the Bankruptcy Rules, Federal Rules of Civil Procedure and New York Civil Practice Law and Rules.

22.    That conclusory statement by the Diocese lacks merit and has no factual support.

23.    Even if this Court were to issue an order on May 20, 2020, permitting the Diocese to serve the motion for a stay of State Court tort actions involving child victims of sexual assault, with respect to the non-bankrupt defendants, the service of that motion upon Lipsitz Green Scime Cambria, LLP on May 11, 2020, was lacking judicial authority and the motion must be denied without prejudice to the Diocese refiling and then permitting each child victim represented by

12

Lipsitz Green Scime Cambria LLP to file opposing papers. *See In re Teligent, Inc.*, 485 B.R. 62, 68 (Bankr. S.D.N.Y. 2013), *citing Omni Capital Intern., Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97 (1987) (In a case involving the issue of whether a party was properly served with an adversary proceeding complaint, the court stated that "[b]efore a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied"); *Santos v. State Farm*, 902 F.2d 1092, 1094 (2d Cir. 1990) ("Service of process on an attorney not authorized to accept service of process for his client is ineffective"); *In re Cruisephone, Inc.*, 278 B.R. 325, 333-34 (Bankr. E.D.N.Y. 2002) (the Court granted the motion to dismiss for improper service because the attorney on whom service was made was *not* authorized by the client to do so, and provided, "[a]n attorney does not become his client's agent for service of process solely by reason of serving in the capacity as attorney" and determined that service of process is "a separate prerequisite to obtaining jurisdiction over a party, one that is independent of due process considerations." The court further stated, "[a] bankruptcy court's power to adjudicate the rights and liabilities of a defendant is dependent not only on compliance with due process, but also on compliance with the technicalities of Bankruptcy Rule 7004").

III.    **THE RELIEF REQUESTED BY THE DIOCESE IN ITS INJUNCTION MOTION IS IN DIRECT CONTRAVENTION TO THE PURPOSE OF THE CHILD VICTIMS ACT**

24.    The direct effect of the Diocese's requested relief in its Injunction Motion would be to benefit the 405 non-debtor, separately incorporated Catholic parishes, churches, schools, and other Catholic entities, identified collectively as "Additional Stay Parties" by the Debtor, and the individual child molesters, with the protection of a bankruptcy stay, while the child victims of sexual assault are estopped from pursuing litigation against any responsible party. *See e.g.,*

Exhibits 1-4, Court delayed entry of judgment against the defaulting child molesters until the action is resolved as to all named defendants in the action.

25.    This is in direct contravention to the Child Victims Act, which was enacted in New York State on February 14, 2019, and in relevant part, extended the statute of limitations to bring a civil action for the sexual abuse of a child until the victim reaches fifty-five (55) years old, and opened a one year window from August 14, 2019, for previously time-barred actions for child sexual abuse victims. CPLR §§ 208, 214-g.

26.    The Legislative Memorandum for the Bill, which was later passed into law as the Child Victims Act, sets forth the justification for the Child Victims Act, and the injustice it was designed to remedy as follows:

> New York is one of the worst states in the nation for survivors of child sexual abuse. New York currently requires most survivors to file civil actions or criminal charges against their abusers by the age of 23 at most, long before most survivors report or come to terms with their abuse, which has been estimated to be as high as 52 years old on average. Because of these restrictive statutes of limitations, thousands of survivors are unable to sue or press charges against their abusers, who remain hidden from law enforcement and pose a persistent threat to public safety.
>
> This legislation would open the doors of justice to the thousands of survivors of child sexual abuse in New York State by prospectively extending the statute of limitations…
>
> Passage of the Child Victims Act will finally allow justice for past and future survivors of child sexual abuse, help the public identify hidden child predators through civil litigation discovery, and shift the significant and lasting costs of child sexual abuse to the responsible parties.
> Legislative Mem, L 2019, ch 11, McKinney's session Laws of NY Advance Sheets at A-39.

27.     The New York State Legislature tirelessly toiled for approximately thirteen years to provide the victims of child sexual abuse with the ability to sue their abusers, and any other responsible party in a court of law.[2]

28.     The Diocese has been recognized as the most sued entity in New York State under the Child Victims Act[3] and by seeking to enjoin prosecution of Child Victims Act cases pending against 405 non-debtor defendants in Child Victims Act cases, it unjustly deprives hundreds of victims of child sexual abuse, from their statutory right to now seek justice against abusers and the entities which protected child molesters at the expense of innocent children.

29.     The Diocese of Buffalo's explicit goal in this bankruptcy proceeding is to force the victims of sexual abuse to agree to a "global resolution" of all sexual abuse claims. *See* Diocese Injunction Motion, ¶ 1.

30.     The Diocese seeks to accomplish that goal by robbing child sex abuse victims across the Western New York region from their choice of forum, and have all pending abuse action cases resolved through the bankruptcy process, not only as they pertain to the debtor, the Diocese, but all non-debtor, separately incorporated, "Additional Stay Defendants". *See* Diocese Injunction Motion, ¶ 1.

31.     Moreover, the preliminary injunction effectively deprives LG Victims of their rights under CPLR 603 to file motions seeking to sever the non-debtor Catholic Entities and The Child Molesters in the pending New York State Supreme Court Actions.  *See* the Diocese's

---

[2] Elizabeth Joseph, *"This is society's way of saying we are sorry," New York Governor tells survivors of sex abuse before signing Child Victims Act into law*, CNN (Feb. 14, 2019), https://www.cnn.com/2019/02/14/us/new-york-child-victims-act-signed/index.html.
[3] Charlie Specht and Eileen Buckley, *Facing 250 Sex Abuse Lawsuits, Diocese of Buffalo Declares Bankruptcy*, WKBW (Feb. 28, 2020), https://www.wkbw.com/news/i-team/facing-250-sex-abuse-lawsuits-diocese-of-buffalo-declares-bankruptcy.

proposed Injunction Order prohibiting and enjoining all Child Victims Act claimants from continuing to prosecute any action or claims against the Diocese or "Additional Stay Parties", through further prosecution of any Child Victims Case in any manner.

32.     The undisputable hardship that LG Victims will face if their cases are enjoined from prosecution of non-debtor co-defendants, without even being given a chance to make a motion to sever in the pending New York State Supreme Court Actions is insurmountable and irreparable, and in direct odds with the New York State Legislature's justification in passing the Child Victims Act.

33.     By granting the relief requested by the Diocese of Buffalo, the over a decade of work by the New York Legislature and survivors to pass the Child Victims Act will be for naught, and the hundreds, if not thousands, of child sexual abuse victims will be foreclosed from ever seeing their abusers and responsible entities brought to justice.

IV.     **LG VICTIMS CONTINUED PROSECUTION OF ITS CASES AGAINST NON-DEBTOR, CO-DEFENDANT CATHOLIC ENTITIES IN THE PENDING NEW YORK STATE SUPREME COURT ACTIONS DOES NOT VIOLATE THE BANKRUPTCY CODE'S AUTOMATIC STAY**

34.     Contrary to the claim by the Diocese, a continuation of lawsuits against the non-debtor, separately incorporated "Additional Stay Parties", will not deplete the assets of the Diocese.

35.     For the reasons set forth below, the arguments advanced by the Diocese are flawed and are a thinly veiled attempt to protect the assets of the non-bankrupt "Additional Stay Parties" all to the detriment of child victims of sexual assault.

36.     In order to assist the Court in making an informed decision and understanding the arguments advanced by LG Victims, certain general and fundamental aspects of a tort claim and liability insurance must be set forth below in detail.

16

37.     First, LG Victims have no direct claim against any insurance company.  Rather, the local non-debtor Catholic entities have contractual indemnification claims against their insurance carriers to pay for any money judgments entered against them which would be covered by the insurance policy.  Therefore, it would be the local non-debtor Catholic Entities that are depleting any assets of the Debtor's bankruptcy estate through insurance coverage.

38.     If the Diocese wants to use its insurance policies to compensate child victims of sexual assault by its clergy or employees, then it should make a motion for a stay against the local churches and parishes to exclude them from drawing upon that insurance coverage.  Otherwise, it is clear that the Injunction Motion by the Diocese to obtain a stay against the non-bankrupt local churches/parishes is simply an effort to limit a child victim's ability to collect against the parishes to whatever insurance is available through the Diocese and the bankruptcy proceeding only.

39.     If a child victim of sexual assault obtains a jury verdict against a non-bankrupt local Catholic entity and enters a money judgment against that entity, the child victim does not have a direct action against the insurance policy or the insurance company – the child victim enforces the judgment against the local Catholic entity and not necessarily from an insurance policy.

40.     Therefore, if a local Catholic entity has a money judgment entered against it by a child victim, it will be the local Catholic entity, not the child victim, who will be looking to the insurance policy to satisfy the judgment and protect the assets of the local Catholic entity.

41.     The Diocese should move to stay any action by the 405 local, non-bankrupt Catholic entities to obtain the insurance asset and keep that asset for itself to satisfy the claims against the bankrupt Diocese.

17

42.     The Diocese previously filed a motion on February 28, 2020 (Doc. No. 13) under Docket No.: 20-10322  (hereinafter identified as the "Diocese SIP Motion"), seeking orders authorizing it to continue to maintain its Self-Insurance Program and authorizing the payment of pre-petition obligations, including pre-petition claims… defense costs, etc.

43.     The Court granted the Diocese's SIP Motion on March 4, 2020 (Doc. No. 56) and, therefore, the Diocese is actively administrating the self-described "Self-Insurance Programs."

44.     In the Diocese's SIP Motion requesting authorization to continue operation of its "Self-Insurance Programs", the Diocese admitted that "…a majority of the funds used to fund the self-insurance programs are derived from sources other than the Diocese for the purpose of providing risk management services to other Catholic entities. *The Diocese… holds these funds in trust* for the benefit of such other Catholic entities and that they are therefore not property of the Diocese's bankruptcy estate."  (Doc. No. 13, Diocese SIP Motion, ¶26) (Emphasis added).

45.     The Debtor also admitted, "The Diocese funds the SIP primarily by billing each SIP participate a ratable portion of the overall cost of administrating the program and paying claims…"  "This premium revenue is used to pay administrative costs of the program, to pay claims for losses, and to pay premiums for excess coverage." Doc No. 13, Diocese SIP Motion, ¶ 13.  In the Diocese's SIP Motion, the Diocese candidly admitted that it was discriminating against child victims in the administration of claims as opposed to any other tort claims when it stated "[t]o the extent coverage may be available under the Self-Insurance Programs' policies for claims made pursuant to the New York Child Victims Act (the "CVA"), the Diocese is not seeking authority to pay such claims at this time."  Doc. No. 13, Diocese SIP Motion, ¶ 8.

46.     This admission establishes that the Diocese is prioritizing other pre-petition claims, including tort claims, all to the detriment of child victims of sexual assault.

47. The Diocese's SIP Motion requesting permission to continue to administer the Self-Insurance Program and the subsequent Order, granting the Diocese its requested authorization to continue its Self-Insurance Program undermines this adversarial proceeding, and the Diocese's Injunction Motion requesting a stay for the "Additional Stay Parties".

48. If the Diocese was not intent on denying justice to the child victims, it would have abandoned the administration of the Self-Insurance Program, it would have informed the "Additional Stay Parties" that there is a bankruptcy stay against those entities drawing on the Self-Insurance Program, and it would have requested that the Court simply protect the Self-insurance Program and the excess policies against depletion by the "Additional Stay Parties".

49. The overall effect of a stay issued by the Bankruptcy Court on behalf of the non-bankrupt "Additional Stay Parties" will essentially guarantee those 405 non-bankrupt Catholic entities do not need to contribute any money to the child victims, despite the culpable conduct on the part of the local Catholic entities in harboring the child molester employed by the Catholic entities.

## A. **THE AUTOMATIC STAY PROVISIONS OF § 362(a)(1), (3), and (6) OF THE BANKRUPTCY CODE DO NOT APPLY TO NON-DEBTOR CO-DEFENDANTS IN PENDING CHILD VICTIMS ACT CASES**

50. The Diocese contends that by operation of law, child sexual abuse victims are enjoined from any attempt to pursue their Child Victims Act cases, even where the Debtor is not a defendant to the proceeding. *See* Diocese Injunction Motion, ¶¶ 2, 5.

51. The Diocese cites § 362(a)(1), (3), and (6)of the Bankruptcy Code for the proposition that any continued prosecution of the Child Victims Act cases, even if only against the "Additional Stay Parties" is a "direct violation of the Diocese's automatic stay." Diocese Injunction Motion, ¶ 5.

19

52.     However, the Diocese's claim is contrary to the well-established case law that stays pursuant to § 362(a) of the Bankruptcy Code are limited only to debtors and does not extend to "co-tortfeasors," "joint obligors," "guarantors," "sureties," or other non-debtor "co-defendants." *Accord Maritime Electric Company v. United Jersey Bank,* 959 F.2d 1194, 1204 (3d Cir.1991) ("[t]he clear language of Section 362(a) indicates that it stays only proceedings against a 'debtor'—the term used by the statute itself").

53.     "Appellate courts in this State have repeatedly held that a bankruptcy stay does not prevent a plaintiff from proceeding on causes of action against nonbankrupt defendants, which do not involve the bankrupt's property." *Golden v. Moscowitz*, 194 A.D.2d 385, 385 (1st Dept. 1993) *quoting CenTrust Servs. v. Guterman,* 160 A.D.2d 416, 418 (1st Dept. 1990); *see also, Ryder v. Knopick*, 251 A.D.2d 732 (3rd Dept. 1998); *King v. Northway Agencies,* 127 A.D.2d 955 (3rd Dept. 1987); *Lottes v. Slater,* 114 A.D.2d 580 (3rd Dept. 1985); *Friend v. Dibble*, 124 Misc. 2d 151, 152 (Sup. Ct., Sullivan Cnty April 27, 1984) (Court found that 11 U.S.C. § 362(a) does not preclude personal injury action from going forward against solvent codefendants, and to conclude otherwise would permit a solvent codefendant to use the statute as a shield which was created to protect, not them but, primarily, the debtor and secondarily, the creditors of the debtor. Court went on to note that "[n]either the statute itself, nor its legislative history lend support to the proposition that this court is precluded from adjudicating the liabilities of the solvent codefendants.").

54.     The 405 independently incorporated local Catholic entities and individual child molesters, have not sought bankruptcy relief and are not part of the Diocese's bankruptcy estate.  *See* Affidavit of Peter Karalus (Doc. No. 8), in which Mr. Karalus avers:

> The secular legal embodiments of the parishes extant within the Diocese are non-member corporations formed under New York's Religious Corporation Law.

20

Pursuant to Article 5 of the Religious Corporations Law, each of the parish corporations is governed by a Board of Trustees comprised of the Bishop, the Vicor General of the Diocese, the Pastor of the Parish and two lay members of the Parish… ¶ 22.

Each parish corporation owns the real and personal property that is used in its ministry. Each Parish holds its own meetings, appoints its own councils and committees, establishes its annual budget, and maintains its own books, records, bank accounts and employee payroll. ¶ 23.

The Parish Corporations located within the Diocese are not under the fiscal or operating control of the Diocese. The Parish Corporations have not sought bankruptcy relief and are not debtors in this bankruptcy proceeding. ¶ 26.

55. The Diocese has further addressed the separation of local parishes from the Diocese in its pamphlet entitled, "Reorganizing for the Future … Together", a copy of which is annexed hereto, made part hereof and designated as **Exhibit 6**. The Diocese affirmatively states that "all 161 parishes in Western New York will not be part of the Chapter 11 filing. Parishes are incorporated as separate entities and will not be in Chapter 11." *Id.*, p. 9.   Diocese admits that it cannot use parish assets or property to settle claims.  *Id.*

56. Thus, by the Diocese's own admissions, the "Additional Stay Parties" are separate and distinct from the Diocese and not a part of its bankruptcy estate.

57. The automatic stay provisions provided for under § 362 of the Bankruptcy Code "protects only the debtor, property of the debtor or property of the estate. It does not protect non-debtor parties or their property." *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 490 B.R. 59, 65 (S.D.N.Y. 2013) *aff'd sub nom. Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199 (2d Cir. 2014) (internal quotations omitted).

58. Where, as here, "the non-debtor's liability rests upon his own breach of duty, a stay clearly cannot be extended to the non-debtor." *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff*

*Inv. Sec. LLC*, 490 B.R. 59, 68 (S.D.N.Y. 2013), *aff'd sub nom. Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199 (2d Cir. 2014) (internal quotations omitted).

59. Section 362(a)(1) does not bar claims where, as here, "the non-debtor's liability rests upon his own breach of duty." *Variable–Parameter Fixture Dev. Corp. v. Morpheus Lights, Inc.,* 945 F.Supp. 603, 608 (S.D.N.Y.1996). That is the case, even where the debtor and non-debtors are joint tortfeasors. *Id.*

60. With respect to Section 362(a)(3), it stays "any act to obtain possession of property of the estate of property from the estate or to exercise control over property of the estate".

61. Here, the Diocese has admitted in support of its Self-Insurance Program Motion, that the Self-Insurance Program is *not* an asset of the Diocese's estate. Diocese SIP Motion, ¶ 26).

62. Furthermore, as set forth in greater detail above, the child sexual abuse victims do not have a claim to the SIP Program; rather it is the non-debtor "Additional Stay Parties", that may at some point seek contribution/indemnification from the SIP Program.

63. Therefore, there is no good faith basis for the Diocese's contention that Section 362(a)(3) prevents continuation of the LG Victims pending New York State actions to proceed against the separately incorporated co-defendants.

64. Section 362(a)(6) of the Bankruptcy Code, precludes acts "to collect, assess, or recover a claim *against the debtor only.*" *In re Stuart*, 594 B.R. 834, 841 (Bankr. N.D. Ga. 2018) (emphasis added in original, original citations omitted).

65. "[T]here is nothing in the language of Section 362(a)(6) to indicate that the legislature intended the scope of 11 U.S.C. § 362(a)(6) to preclude creditors from acting against

claims or enforcing rights to payment against non-debtors." *In re Stuart*, 594 B.R. 834, 841

(Bankr. N.D. Ga. 2018) (internal quotations omitted)

66.     "Section 362(a)(6), is designed to protect the Debtor, not the property of the

Debtor or property of the estate." *In re Stuart*, 594 B.R. 834, 841 (Bankr. N.D. Ga. 2018); *See*

*Divane v. A and C Elec. Co., Inc.*, 193 B.R. 856, 860 (N.D. Ill. 1996); *see also In re Harchar*,

393 B.R. 160, 183 (Bankr. N.D. Ohio 2008) (noting that § 362(a)(6) "protects the debtor,

individually").  The purpose of § 362(a)(6) is to prevent creditors "from employing pressure

tactics or coercion in attempting to collect prepetition debts." *Divane v. A and C Elec. Co., Inc.*,

193 B.R. 856, 860 (N.D. Ill. 1996).

67.     Furthermore, the legislative history to § 362(a)(6) states:

> Paragraph (6) prevents creditors from attempting in any way to collect a
> prepetition debt. Creditors in consumer cases occasionally telephone debtors to
> encourage repayment in spite of bankruptcy. Inexperienced, frightened, or ill-
> counseled debtors may succumb to suggestions to repay notwithstanding their
> bankruptcy. This provision prevents evasion of the purpose of the bankruptcy
> laws by sophisticated creditors. *In re Brown*, 12 B.R. 885, 886–87 (Bankr. N.D.
> Ga. 1981) *quoting* H.R. No. 95-595, 95th Cong., 1st Sess., (1977) 340-2; S. Rep.
> No. 95-989, 95th Cong., 1 Sess. (1978) 49-51; U. S. Code Congressional and
> Administrative News 1978, pp. 5787, 5836.

68.     Accordingly, there is no basis in case law or the statutory scheme of § 362 of the

Bankruptcy Code, for this Court to enjoin the child victims act claimants from pursuing their

litigation against the non-bankrupt co-defendants.

## V.     THE DIOCESE HAS FAILED TO MEET ITS BURDEN OF ESTABLISHING "UNUSUAL CIRCUMSTANCES" SUCH THAT A STAY SHOULD BE EXTENDED TO THE NON-BANKRUPT CO-DEFENDANTS IN PENDING CHILD VICTIMS ACT ACTIONS

69.     Courts have held that in "unusual circumstances" the automatic stay may be

extended to non-debtors. *A.H. Robins Co., Inc. v. Piccinin,* 788 F.2d 994, 999 (4th Cir. 1986); *In*

*re Uni-Marts, LLC*, 399 B.R. 400, 416 (Bankr. D. Del. 2009); *NHI REIT of TX-IL, LLC v.*

23

*LaSalle Grp., Inc.*, 387 F. Supp. 3d 850, 852 (M.D. Tenn. 2019); *Luppino v. York*, 562 B.R. 894, 898 (W.D. Tex. 2016); *In re Union Tr. Philadelphia, LLC*, 460 B.R. 644, 657–58 (E.D. Pa. 2011); *see also Queenie Ltd., v. Nygard Intern.,* 321 F.3d 282 (2nd Cir. 2003).

70.     The burden of showing "unusual circumstances" to extend the automatic stay to non-bankrupt debtors falls on the party seeking the extension. *NHI REIT of TX-IL, LLC v. LaSalle Grp., Inc.*, 387 F. Supp. 3d 850, 852 (M.D. Tenn. 2019); *Luppino v. York*, 562 B.R. 894, 898 (W.D. Tex. 2016); *In re Union Tr. Philadelphia, LLC*, 460 B.R. 644, 657–58 (E.D. Pa.* 2011).

71.     The Second Circuit in *Queenie Ltd., v. Nygard Intern.,* 321 F.3d 282 (2003), noted that only in cases where there is an *immediate* adverse economic consequence to the debtor's estate, should the stay be extended to non-debtor co-defendants, and went on to identify three circumstances under which the automatic stay provisions may be extended: (1) a claim in which the debtor is a guarantor; (2) a claim against the debtor's insurer; and (3) actions where "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant.." *citing  A.H. Robins Co., Inc. v. Piccinin,* 788 F.2d 994, 999 (4th Cir. 1986).

72.     "[U]nusual circumstances do not exist where the debtor's insider is independently liable, the right to indemnity is not absolute, and the continuation of the suit will not interfere with the bankruptcy." *In re Bidermann Indus. U.S.A., Inc.*, 200 B.R. 779, 784 (Bankr. S.D.N.Y. 1996) *citing CAE Indus. Ltd.,* 116 B.R. at 33–34; *Aetna Casualty & Sur. Co. v. Namrod Dev. Corp.,* 140 B.R. 56, 60 (S.D.N.Y.1992).

73.     In *Millard v. Developmental Disabilities Inst., Inc.*, 266 B.R. 42, 44 (E.D.N.Y. 2001), the Court set forth four factors the Court should consider when deciding whether to

exercise its discretion under 11 U.S.C. § 105, in extending the automatic stay: (1) whether

continuation of outside litigation would so distract individuals important to the reorganization

process as to impede the reorganization effort; (2) whether extension of the stay would work a

hardship on plaintiffs by giving "unwarranted immunity" to solvent defendants; (3) whether a

recovery would so reduce the debtor's limited insurance fund as to affect the property of the

estate and (4) whether or not the non-bankrupt party seeking the stay is independently liable to

the plaintiff.

74.    Ultimately, the decisive issue is consideration of the same policy underlying the

Automatic Stay—whether extension of the stay is necessary to foster the reorganization process.

This question must be considered in conjunction with the directive that extensions of the

Automatic Stay are the exception rather than the rule and are not favored absent some usual

circumstance. *Millard v. Developmental Disabilities Inst., Inc.*, 266 B.R. 42, 44 (E.D.N.Y. 2001)

(internal citations omitted).

VI.    **THE DIOCESE AND THE NON-DEBTOR CATHOLIC ENTITIES, DO NOT
       SHARE AN IDENTITY OF INTEREST, SUCH THAT A CLAIM AGAINST
       THE FINANCIALLY INDEPENDENT AND SEPARATELY
       INCORPORATED CATHOLIC CO-DEFENDANTS IS A CLAIM AGAINST
       THE DIOCESE**

75.    The Diocese advances three arguments in support of its claim that unusual

circumstances exist to issue a stay against the non-bankrupt co-defendants in the civil

proceedings because "the Diocese is the real party defendant."  First, the Diocese admits that the

local churches and schools are separate civil corporations and have not filed bankruptcy, but

claim that they are "an integral part of the larger Catholic mission in Western New York which

the Diocese is charged with supporting." Diocese Injunction Motion, ¶ 30.

76.     That argument is irrelevant and does not make the Diocese the real party

defendant.  It is nothing more than a generic statement lacking in true meaning from a legal

perspective.

77.     Second, the Diocese claims that the "actions or inactions of the Diocese lie at the

core of the dispute in the CVA cases." Diocese Injunction Motion, ¶ 30.  This conclusory

statement lacks support.  The actions and inactions of the Diocese and its negligence in

evaluating, monitoring, supervising and communicating about the child molester priests, is

completely separate and apart from the actions and inactions of the local churches and schools in

failing to monitor, supervise and communicate about the child molester priests.  For example,

when the local parish and church officials became aware that the priests were sexually assaulting

children, but failed to communicate that information to the Diocese, that constitutes separate

liability, not implicating the Diocese.  Conversely, if the Diocese received information that the

priest assigned to the church had been sexually assaulting children and then reassigned that priest

to a different parish, its liability would be established, but the local church or parish would be

exonerated.  Therefore, the unsupported broad statement of the Diocese that in every case its

actions or inactions are inseparable from the local church or school is simply unsupported when

analyzed on a case by case basis.

78.     The Diocese makes the argument that "claims asserted against the Additional Stay

Parties are so closely intertwined with the claims against the Diocese that the Diocese may be

exposed to collateral estoppel, vicarious liability, or imputed admissions" if litigation continues.

Diocese Injunction Motion, ¶ 30.   That claim is simply unsupported by law. *See Queenie, Ltd.,*

*v. Nygard Intern.,* 321 F.3d 282, 282 (2003) (Court noted that it could not locate *any* decision

applying the stay to a non-debtor solely because of an apprehended later use against the debtor of

collateral estoppel or the precedential effect of an adverse decision. If such apprehension could support application of the stay, there would be vast and unwarranted interference with creditors' enforcement of their rights against non-debtor co-defendants") (emphasis added); *see also Stanford v. Foamex L.P.*, No. CIV. A. 07-4225, 2009 WL 1033607, at *3 (E.D. Pa. Apr. 15, 2009) (internal citations omitted) (The automatic stay does not extend to non-bankrupt parties merely because the non-bankrupt parties "are in a similar legal or factual nexus with the debtor." "To extend the stay to non-debtors merely because of factual and legal relatedness would be contrary to both the plain text of § 362 and the Third Circuit's reasoning").

79.     The Diocese admits that the local churches and other institutions identified as "Additional Stay Parties" are "separately incorporated" entities (Diocese Injunction Motion, ¶ 34), and further admits that the Diocese "does not exercise fiscal or operational control over the separately incorporated parishes, schools and other Catholic ministries entities and institutions…". Diocese Injunction Motion, ¶ 35.

80.     Finally, the Diocese admits "a substantial portion of the Diocese's operating budget is comprised of offerings and other contributions collected and remitted by the [parishes, schools and other Catholic institutions]." Diocese Injunction Motion, ¶ 36.

81.     Despite those admissions, the Diocese makes the claim that a stay should be issued on behalf of those separate entities because there exists an identity of interest between the Diocese and those separate corporations.

82.     The crux of the Diocese's argument is essentially that the separate institutions and corporations share common religious and charitable missions. *See* Diocese Injunction Motion, ¶¶ 34, 35, 36 and 37.

83.     To issue a stay against separate independent corporations based on that argument constitutes a perversion of the bankruptcy law and sets a dangerous precedent. *See e.g., Kreisler v. Goldberg*, 478 F.3d 209, 213-214 (4th Cir. 2009) (Court noted that "[i]t is a fundamental precept of corporate law that each corporation is a separate legal entity with its own debts and assets, even when such corporation is wholly owned by another corporate entity." Court denied debtor's argument that debtor was the real party defendant in a suit against non-bankrupt subsidiary corporation, finding that if that entity wanted the protections afforded under § 362(a)(1) it must file for bankruptcy).

84.     The Diocese's argument is analogous to McDonald's Corporation filing a bankruptcy proceeding and seeking to obtain a stay on behalf of its franchisees because there is a common interest in selling hamburgers.

85.     The Diocese also advances the following argument: "[t]he claims in the CVA cases reflect the shared identity of interest between the Diocese and the additional stayed parties." *See* Diocese Injunction Motion, ¶ 37. The Diocese then advances certain arguments without any supporting documentation or distinction among the 250 cases filed against it to date.

86.     With respect to LG Victims specifically, most, if not all of the cases, did not advance beyond a summons and complaint and answer stage. In its motion, the Diocese makes the claim that the "core allegations make no distinction between the conduct of the Diocese and the conduct of the Additional Stay Parties." *See* Diocese Injunction Motion ¶ 37.

87.     This argument fails to acknowledge the scope and purpose of a complaint in a civil action under New York law.

28

88.     The broad and general allegations of negligence or reckless conduct set forth in a complaint (even against multiple parties) serves as a notice pleading.  The actual detailed claims against each of the defendants are set forth in a bill of particulars.  (See New York Civil Practice Law and Rules § 3043).  Thus, it is both through a bill of particulars and through the course of discovery that a child victim will be able to gather evidence to distinguish between the negligent and reckless conduct of the Diocese separate and apart from the negligent and reckless conduct of the local churches and schools.  The mere broad general allegations on the complaint are not controlling in a civil action and should not be controlling in this motion.

89.     Thus, the LG Victims submit that there is a significant and irreparable hardship placed on the child sexual abuse victims by giving "unwarranted immunity" to the solvent "Additional Stay Parties".  It appears explicitly clear based on the Diocese's submissions that this really is their ultimate goal in filing this motion, as they could have filed a stay against these local churches/parishes/schools, etc., to prevent them from accessing the Self-Insurance Program, but instead, chose to file this Injunction Motion requesting to stay all pending child victims act cases until the Diocese's bankruptcy is resolved.  Therefore, in the Court's consideration of this factor, the Diocese's requested relief should be denied.

B.     **CONTINUATION OF THE CHILD VICTIMS ACT CASES AGAINST NON-BANKRUPT CO-DEFENDANTS DOES NOT DISSIPATE THE DEBTOR'S BANKRUPTCY ESTATE**

90.     Contrary to the Diocese's claim, there will be no *immediate* adverse economic consequence to the debtor's estate if the Child Victims Act cases continue against the financially independent, separately incorporated "Additional Stay Parties". *See* Diocese SIP Motion, ¶ 13, Diocese admits that it funds the SIP program primarily by billing each SIP Participant; *see also*

29

Diocese SIP Motion, ¶ 26, Diocese states that the SIP funds are held in trust for the benefit of such other catholic entities and are not property of the bankruptcy estate.

91.     The Diocese's claim that there will be an *immediate* economic impact is undermined by the prior motion of the Diocese to continue to operate its self-insured program and pay claims.  The Diocese advances the argument that, in the event the ["Additional Stay Parties"] are found liable in the CVA cases, they will likely seek to recover their losses from insurance, thereby reducing amounts available to the Diocese estate on a dollar for dollar basis – to cover Diocesan liabilities.  Diocese Injunction Motion, ¶ 34.

92.     That argument does not establish an immediate economic consequence to the Diocese.  In fact, it's predicting a contingent future event.

93.     The Diocese claims that if a stay is not issued against separate financially independent and legal entities, it will be required to participate in the defense of the claims in its capacity as the "risk manager and insurance coordinator" to protect its own legal interests. Diocese Injunction Motion, ¶ 39.

94.     First, all claims in existence before July 1, 1973, have separate insurance policies that are not part of the Diocese's Self-Insurance Program. *See* Scholl Declaration, ¶ 11 (Diocese admits that prior to the implementation of the SIP in July 1973, each of the "SIP Participants" were responsible for securing its own liability insurance coverage).

95.     Although the Diocese states "upon information and belief … the Diocese is an additional named insured on pre-1973 insurance policies", there is no factual basis or evidence provided for this blanket statement, as the Diocese admits that it does not have copies of such pre-1973 policies. *See* Scholl Declaration, ¶ 11.

96.     Therefore, by the Diocese's own admission, to the extent there is insurance coverage for claims in existence before July 1, 1973, it would be through the "Additional Stay Parties" separate insurance policies, and undisputedly, not covered under the Diocese's Self-Insurance Program.

97.     This is precisely why a factual inquiry should be made as to each respective Child Victims Act claimants case prior to a blanket stay being granted, as there are numerous cases regarding sexual abuse which transpired prior to July 1, 1973, and therefore, the Diocese's entire argument regarding the applicability of its SIP program is moot and inapplicable.

98.     The significance of the lack of the Diocese having proof that it is identified as an additional insured for pre-1973 claims is exemplified just by reviewing the claims of LG 4 DOE, LG 10 DOE, LG 21 DOE, LG 22 DOE, LG 26 DOE, LG 27 DOE, LG 28 DOE, LG 29 DOE, LG 30 DOE, LG 31 DOE, LG 36 DOE, LG 45 DOE, and LG 49 DOE, each of which were victimized by a priest or employee of a non-debtor Catholic Entity, prior to July 1, 1973.

99.     Second, the Diocese is not required to act as the risk manager or insurance coordinator, and simply could obtain a stay from participating in that role.  But if the Diocese is acting in that role, it voluntarily agreed to do so and spent time and money to obtain an order permitting it to continue the program and administer the program. *See* Diocese SIP Motion. The inconsistent position taken by the Diocese with its prior SIP Motion, seeking to continue to administer the self-insured program and pay claims, reveals that this Injunction Motion is nothing more than a thinly veiled effort to protect the assets of the non-bankrupt co-defendants in the pending civil actions by child victims of sexual assault.  This essential granting of "unwarranted immunity" of solvent defendants is a factor the Court should consider under

*Millard v. Developmental Disabilities Inst., Inc.*, 266 B.R. 42, 44 (E.D.N.Y. 2001), and would weigh heavily in favor of denying Debtor's Injunction Motion.

100.    Thus, with respect to the factor "whether a recovery would so reduce the debtor's limited insurance fund as to affect the property of the estate", the Debtor, fails to provide any, much less sufficient, proof, that continuation of the Child Victims Act cases would result in reducing the Debtor's insurance such that it would impact the property of its estate.  This is especially true as to pre-July 1, 1973 claims, which the Debtor does not provide any substantive proof that it is an additional insured on the separate insurance policies owned by any of the "Additional Stay Parties".  The Debtor cannot on one hand argue that its Self-Insurance Program is not part of its estate for purposes of its SIP Motion, and now assert, something entirely contrary in its Injunction Motion.

101.    The claim that key personnel will be diverted from their roles in the reorganization process, is not supported by any evidence but simply by conclusory statements.  What key personnel are being diverted from the bankruptcy proceeding to defend the child victim claims against the non-bankrupt defendants?  Specifically, who are they and how much time have they expended or will expend?  *See DeSouza v. PlusFunds Grp., Inc., No. 05 CIV. 5990 RCCJCF, 2006 WL 2168478, at *2 (S.D.N.Y. Aug. 1, 2006)* (Court denied a director of the Debtor's request for an extension of the stay, noting that *"vague indications of potential distraction, and limited participation in and discussions concerning reorganization, do not represent danger of imminent, irreparable harm to the estate or the debtor's ability to reorganize"*) (internal citations omitted).

102.    Furthermore, it has already been held that "[t]he need for discovery" is not an "unusual circumstance."  Stanford v. Foamex L.P., No. CIV. A. 07-4225, 2009 WL 1033607, at

*4 (E.D. Pa. Apr. 15, 2009). The Court in <u>Stanford v. Foamex L.P.</u>, No. CIV. A. 07-4225, 2009 WL 1033607, at *4 (E.D. Pa. Apr. 15, 2009) specifically found that:

> if the alleged need for discovery was sufficient to justify extending the stay to non-bankrupt parties, courts would need to extend the stay in most multiparty actions, which is contrary to the limited nature of the "unusual circumstances" exception. Moreover, the "unusual circumstances" exception is geared toward protecting *the debtor* during the pendency of the debtor's bankruptcy proceeding, either by preventing lawsuits against third parties where the debtor is the real party in interest or by allowing certain individuals to focus their attention and time on the debtor's reorganization. Staying an action because of routine discovery needs aids the non-bankrupt co-defendants, not the debtor, and therefore falls outside the scope of the unusual circumstances exception.

103. Certainly, the Diocese's lack of evidence of how "key personnel" will be diverted from the Diocese's reorganization effort, would not satisfy the standard set forth in *Millard*, namely that it "so distract individuals important to the reorganization process as to impede the reorganization effort". Thus, this factor would tilt decidedly in favor of denying the Diocese's request relief.

104. The bankrupt debtor advances several factual claims. Many of those claims - have no evidentiary support, are vague and opaque, contain general statements which are not applicable to all child victims with a pending state action.

105. As explained herein, questions of fact exist which require a hearing as to each and every victim represented by Lipsitz Green Scime Cambria, LLP as to whether unusual circumstances would permit the Court to issue a stay of the pending State lawsuits against the separate independent and non-bankrupt defendants.

106. For example, the bankrupt debtor makes the assertion that continuation of the lawsuits will deplete assets of the estate due to the cost of defending the lawsuit. The child victims represented by Lipsitz Green Scime Cambria LLP dispute that claim. *See e.g., LG 25 DOE v. Douglas Faraci, et al.*, New York State Supreme Court Index No. 812755/2019. In a

letter dated December 30, 2019, the attorneys for insurance companies that issue policies of insurance to the Diocese of Buffalo responded to a letter where the Diocese tendered the lawsuit, *LG 25 DOE* for defense and indemnification. The letter from counsel for the insurance carriers, responded on December 30, 2019, and stated, among other things, that "Wausau (the insurance company) hereby acknowledges its defense obligation to the Diocese of Buffalo in connection with the lawsuit…". (Attached hereto and made part of as **Exhibit 7**, is the front page and page 13 of the letter setting forth Wausau's acknowledgement of providing a defense for the Diocese of Buffalo).

107.    In *LG 25 DOE's* pending New York State claim, the Diocese of Buffalo is represented by Gibson, McAskill & Crosby LLP. Upon information and belief this law firm has been hired and is being paid by Wausau Insurance Company. (This information and belief derives from the letter referred to above and the fact that when the Diocese retains and pays a law firm to defend it in any action involving the sexual assault by a priest upon a child victim, that law firm is Connors LLP).

108.    Thus, under the "unusual circumstances" exception set forth in Queenie and consideration of the four factors set forth by the Court in *Millard v. Developmental Disabilities Inst., Inc.*, 266 B.R. 42, 44 (E.D.N.Y. 2001), it is respectfully submitted that the Diocese has failed to meet its burden of establishing "unusual circumstances", and its Motion for Injunctive Relief should be denied in all respects.

VII.    **THE DIOCESE FAILS TO MEET ITS BURDEN OF ESTABLISHING ITS ENTITLEMENT TO A PRELIMINARY INJUNCTION UNDER THE TRADITIONAL TEST**

109.    With respect to the traditional four prong test used to determine whether the Court should grant a preliminary injunction, the Diocese again fails to meet its burden.

110. In determining whether to grant a stay the Court must consider four factors: (1) whether the stay applicant has shown a substantial possibility of success on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of a stay will substantially injure the other parties interested in the proceeding; and (4) whether the granting of a stay would serve the public interest. *Marblegate Asset Management v. Education Management Corp.*, 75 F.Supp.3d 592, 604 (S.D.N.Y 2014); *see also In re City of Bridgeport*, 132 B.R. 81, 83 (Bankr. D. Conn. 1991).

A. **THE DIOCESE HAS FAILED TO ESTABLISH IT WILL SUCCESSFULLY REORGANIZE**

111. Here, there has been no showing by the Diocese that it will ultimately be successful in reorganization.

112. The Diocese purports that its "goals in seeking chapter 11 relief are two-fold: first, to protect and preserve its assets that are properly available for distribution to unsecured creditors; second, the Diocese must continue the work of the Church to the fullest extent possible, using the resources dedicated to that purpose." *See* Karalus Declaration (Doc. 8) ¶ 66.

113. It is apparent, however, that the Diocese's ultimate goal, through its Injunction Motion is to subvert the child sexual abuse victims' ability to pursue their claims in the forum of their choosing and eliminate their ability to pursue their claims against "Additional Stay Parties". *See* Diocese Injunction Motion, ¶ 2 (Diocese is seeking the instant relief to achieve a "global resolution" of child victims cases against both the Diocese and the "Additional Stay Parties"); *see* Diocese SIP Motion, ¶ 8 (Diocese discriminates only against child victims in the administration of claims as opposed to any other tort claims when it stated "[t]o the extent coverage may be available under the Self-Insurance Programs' policies for claims made pursuant to the New York Child Victims Act (the "CVA").

35

114.     Per the Opposition to the Diocese's Injunction Motion filed by Official

Committee of Unsecured Creditors, the Diocese completely ignored the reasonably and

necessary request(s) by the Committee of certain documents including insurance policies and

documents concerning the SIP to enable it to evaluate and respond to the Injunction Motion.

(Opposition by Committee, ¶ 24-25).

115.     The Diocese's flagrant disregard for the child victims of sexual abuse at the hands

of priests and other employees of the Diocese and/or Additional Stay Parties, by refusing to

provide any substantive proof for the sweeping relief it requests, does not in any way, indicate it

is willing to, or is, engaging in good faith in working to resolve the child victims claims.

116.     As such, there is a valid concern, as to whether the Diocese filed for Chapter 11

bankruptcy relief in good faith.

117.     Thus, it is certainly not known at this juncture whether the Diocese will be

successful in completely undermining the rationale and purpose of the child sexual abuse victim

legislation across the country that has allowed these claims to now be filed.  *See Matter of Johns-*

*Manville Corp.,* 26 B.R. 405, 409 (Bankr. S.D.N.Y. 1983), *aff'd sub nom. In re Johns-Manville*

*Corp.*, 40 B.R. 219 (S.D.N.Y. 1984) (Court denied request for preliminary injunction to non-

bankrupt co-defendants, finding that it was not within the Court's power to grant a pervasive

extension of the stay so as to suspend the litigation nationwide and create the co-defendants

purported goal of an expedient, efficient and fair compensatory delivery system to asbestos

victims).

118.     Therefore, it is respectfully submitted that the Diocese has failed to meet its

burden of establishing a substantial likelihood it will be successful in reorganizing.

B. **THE DIOCESE HAS MADE NO SHOWING IT WILL BE IRREPARABLY HARMED IF THE PRELIMINARY INJUNCTION IS NOT GRANTED**

119.　　The Diocese's conclusory and self-serving claims that it will be irreparably harmed if the requested preliminary injunction is not granted are wholly insufficient for this Court to find irreparable harm.

120.　　The Diocese claims it will be irreparably harmed based upon *a threat* that continuation of the actions will deplete certain assets due to the existence of some shared insurance policy. *See* Diocese Injunction Motion, ¶ 53.

121.　　However, as set forth in greater detail above, the Diocese has presented no substantive proof regarding its Shared-Insurance Program, and the alleged threat that continuation of the cases may have on the Debtor's estate.　In fact, the Diocese has admitted within the Diocese's SIP Motion, that its Self-Insurance Program is <u>not</u> part of the Debtor's bankruptcy estate. *See* Diocese SIP Motion, ¶ 26 (emphasis added).　Furthermore, with respect to pre-July 1, 1973 claims, the Diocese admits that "Additional Stay Parties" would have had their own liability insurance policies, and there is <u>no</u> proof provided by the Diocese that they are an additional insured on <u>any</u> of these policies. *See* Scholl Declaration, ¶ 11 (emphasis added).

122.　　The "Additional Stay Parties" have their own assets, are financially independent from the Diocese and the child victims should be able to pursue these entities independent of their claims against the Diocese.

123.　　Thus, there is no evidence that continuation of the pending abuse actions against the child sexual molesters and "Additional Stay Parties" will impact the Debtor's estate.

124.　　The Diocese is thwarting its main purported goal of a "global resolution" by stonewalling the Official Committee of Unsecured Creditors, refusing to provide copies of

insurance policies and other documents necessary for this Court to consider the sweeping relief the Diocese requests herein.

125.     The Diocese next contends that it will be irreparably harmed due to substantial risks of collateral estoppel, record taint and evidentiary prejudice if the Child Victims Act cases continue. *See* Diocese Injunction Motion, ¶ 54.   The Diocese provides no proof or factual basis for the Court to make these findings.

126.     Finally, the Diocese contends that continuation of the pending abuse actions will take away from its reorganization efforts as it will *be forced* to monitor and participate in such litigation. Diocese Injunction Motion, ¶ 55.

127.     It is respectfully submitted, that the Diocese's self-imposed decision to provide counsel and support for separate, independent entities, should not be rewarded by the granting of their requested relief, and certainly does not rise to the level of showing irreparable harm.

## C.  **LG VICTIMS WILL BE IRREPARABLY HARMED IF THE PRELIMINARY INJUNCTION IS GRANTED**

128.     LG Victims, and other victims of child sexual abuse stemming from their involvement with the Diocese and the "Additional Stay Parties", will be effectively estopped from pursuing their claims in a forum of their choosing, even as to non-bankrupt defendants.

129.     It is clear that The Diocese's intent in filing this motion is not to grant the Diocese a "breathing spell", but rather, to stop the prosecution of all pending abuse actions, even as to the non-bankrupt, financially independent "Additional Stay Parties", and force a global resolution of the cases.  *See* Diocese's Injunction Motion, ¶ 2.

130.     If the Diocese's requested relief is granted, New York State Supreme Court may no longer consider timely motions to sever the bankrupt debtor, the Diocese, and proceed against the non-debtor co-defendants as it could be considered prosecution of the action.

131.     The underlying plaintiffs of the pending abuse actions will most certainly be irreparably harmed if the ability for them to sue the individuals and institutions liable for the horrendous sexual abuse they sustained is ripped away forever.

132.     LG 27 DOE waited 47 years to finally be able to commence a lawsuit against St. John XIII Parish, f/k/a St. Bonaventure Parish, Notre Dame Academy, f/k/a St. Bonaventure School, and his abuser Donald W. Becker. Finally, he will be able to seek justice in a Court of law in September 2021. *See* Scheduling Order annexed hereto, made part hereof and designated **Exhibit 8**.

133.     Similarly, LG 28 DOE waited 47 years to finally be able to commence a lawsuit against St. Gualbert Church and Diocesan Shrine and his abuser, Norbert Orsolits. Finally, he will be able to seek justice in a Court of law in October 2021. *See* Scheduling Order annexed hereto, made part hereof and designated **Exhibit 9**.

134.     There is no date established for the Diocese of Buffalo to emerge from bankruptcy and then permit the continuation of the State Court action against the non-bankrupt defendants.  Therefore, the motion by the Diocese to protect the non-bankrupt defendants by staying the State Court action is an unjustifiable and unreasonable delay of justice for the child victim.

135.     The sexual abuse of the Child Victims Act claimants occurred decades ago.  The Diocese is seeking to prevent any discovery from taking place on the pending child victims act cases, including depositions of plaintiffs, child molesters, and employees of the "Additional Stay Parties".  LG Victims are continuing to age, and inevitably their health will decline. Furthermore, The Child Molesters, Mark M. Friel, Daniel J. Palys, Gerald Jasinski, Louis S. Dolinic, Fred D. Ingalls, Douglas Faraci, Donald W. Becker, Norbert F. Orsolits, and John J. Sardina, were each

over the age of twenty-one years old when they abused their child victims, decades ago, and their health and mental stability is unknown. It is imperative to LG Victims, that discovery and depositions of key party witnesses take place with respect to The Child Molesters and the non-debtor Catholic Entities.

136. In addition, to the extent the Court were to consider staying the action against the non-debtor Catholic entities, it will result in duplicative efforts for LG Victims who are pursuing The Child Molesters in New York State Court.

137. Thus, the harm to the victims of child sexual abuse is real, irreparable and far outweighs the purported harm to the Diocese.

138. Moreover, the findings that the Diocese is requesting in this motion for preliminary injunctive relief, will most certainly be used against the victims of child sexual abuse in response to motions to sever the pending abuse actions as to the debtor and non-bankrupt co-defendants, as it requires the court to find that the Diocese and non-debtor Catholic Entities are related and will have an impact on the Diocese's bankruptcy estate, without the victims being given a fair opportunity to litigate that issue in their respective Court forum.

139. Therefore, the real party that will be collaterally estopped by the granting of this relief without an opportunity to be heard, is the victims of child sexual abuse. The very persons that states across the nation have passed legislation to redress and provide an avenue for closure.

140. The Diocese is effectively slamming shut the door, which was finally opened to many victims, to hold the child molesters and responsible institutions liable in a court of law.

D. **THE PUBLIC INTEREST WOULD NOT BE SERVED BY GRANTING A STAY OF THE CIVIL PROCEEDING AGAINST THE NON-BANKRUPT CO-DEFENDANTS WHO WERE NEGLIGENT IN FACILITATING THE SEXUAL ASSAULTS UPON CHILDREN BY PRIESTS**

141.    Contrary to the claim by the Diocese, the issuance of an injunction/stay prohibiting child victims of sexual assault to continue the civil lawsuits in New York State Court against separate and independent corporations which have separate and independent physical and monetary operations does not serve the public interest and does not impair the ability of the Diocese to reorganize.

142.    On the contrary, staying the actions by child victims of sexual assault by separate and independent corporations frustrates the public purpose of obtaining full and fair compensation for those victims and would instead force those victims to accept meager sums of money through the Bankruptcy Court all the while protecting the assets of the non-bankrupt co-defendants in the pending civil proceedings.  Such a result would be a travesty of justice and would be a public display that rich and powerful entities, such as the Catholic Church, may use the U.S. Bankruptcy law as a tool to further harm child victims, all in contravention to the New York State's Legislatures justification for passing the Child Victims Act.

143.    It is respectfully submitted that the public interest in holding institutions liable for sexual abuse of children, is far more important, than the Diocese's self-serving attempt to minimize its negative exposure in the media, force a global resolution on victims of child sexual abuse, even as to non-bankrupt parties, and to slam shut the door that the Child Victims Act opened for child sexual abuse victims to pursue legal action against The Child Molesters, non-debtor Catholic Entities and the Diocese.

**WHEREFORE**, it is respectfully requested that the Court deny in its entirety the relief requested by The Diocese, along with all further relief that this Court deems just and proper.

I declare, under penalty of perjury, under the laws of the United States of America and the State of Florida, that the foregoing is true and correct.

Executed this 19th day of May, 2020, at Buffalo, New York.

*/s/ Jeffrey F. Reina*

_____
JEFFREY F. REINA, Declarant