```
UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
------------------------------------------------------
In re
        THE DIOCESE OF BUFFALO, N.Y.,            BK 20-10322 CLB


                    Debtor.                      DECISION & ORDER
------------------------------------------------------

        THE DIOCESE OF BUFFALO, N.Y.,

                    Plaintiff,                   AP 20-01016 CLB

    v.

    JMH 100 DOE, ET AL,


                    Defendant.
------------------------------------------------------
```

Bond, Schoeneck & King, PLLC
Stephen A. Donato, Esq., Charles J. Sullivan, Esq.,
Grayson T. Walter, Esq., of counsel
One Lincoln Center
Syracuse, New York 13202-1355
Attorneys for The Diocese of Buffalo, N.Y.

Pachulski Stang Ziehl & Jones LLP
Ilan D. Scharf, Esq., James I. Stang, Esq., of counsel
780 Third Avenue, 34th Floor
New York, New York 10017
Attorneys for Official Committee of Unsecured Creditors

Gleichenhaus, Marchese & Weishaar, PC
Scott Bogucki, Esq., of counsel
43 Court Street, Suite 930
Buffalo, New York 14202
Co-Counsel for Official Committee of Unsecured Creditors

Lipsitz Green Scime Cambria
Richard P. Weisbeck, Esq., Amy C. Keller, Esq.,
Jeffrey F. Reina, Esq., of counsel
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Attorneys for Various Defendants

Law Office of Kevin T. Stocker, PC
Kevin T. Stocker, Esq., of counsel
2645 Sheridan Drive
Tonawanda, New York 14150
Attorneys for Various Defendants

Marsh Law Firm PLLC
James R. Marsh, Esq., of counsel
151 East Post Road, Suite 102
White Plains, New York 10601
Attorneys for Various Defendants

Jeff Anderson & Associates, PA
Jeffrey R. Anderson, Esq., Stacey Benson, Esq., of counsel
366 Jackson Street, Suite 100
Saint Paul, Minnesota 55101
Attorneys for Various Defendants

Steve Boyd, PC
Stephen Boyd, Esq., of counsel
40 North Forest Rd
Williamsville, New York 14221
Attorneys for Various Defendants

Law Offices of Mitchell Garabedian
Mitchell Garabedian, Esq., William H. Gordon, Esq., of counsel
100 State Street, 6th Floor
Boston, Massachusetts 02109
Attorneys for Various Defendants

Chiacchia & Fleming, LLP
Daniel J. Chiacchia, Esq., of counsel
5113 South Park Avenue
Hamburg, New York 14075
Attorneys for Various Defendants

Bucki, Chief U.S.B.J., W.D.N.Y.

The filing of a bankruptcy petition operates to stay the commencement or continuation of various proceedings in state court. See 11 U.S.C. § 362. For the Diocese of Buffalo, this "automatic stay" has affected actions to recover damages arising from alleged occurrences of sexual abuse. In the motion now under consideration, the Diocese asks that this stay be extended for the benefit of parishes and other affiliated entities.

On February 14, 2019, New York State enacted the Child Victims Act, which reopened the state's statute of limitations to allow abuse victims additional time to assert claims that were otherwise barred by the passage of time. 2019 N.Y. Sess. Laws c. 11, § 3. As a consequence, by the end of February 2020, more than 250 actions alleging sexual abuse were commenced against The Diocese of Buffalo. In papers filed with this Court, the Diocese has estimated that more than 400 individuals will eventually seek compensation for sexual abuse. Facing a need to address these claims, The Diocese of Buffalo filed a petition for relief under Chapter 11 of the Bankruptcy Code on February 28, 2020.

The Diocese of Buffalo is an incorporated legal entity formed pursuant to a Special Act of the New York legislature for the purpose of serving the community of Latin Rite Catholics in the eight counties of Western New York. Currently, 161 parishes, seven Diocesan high schools and twelve Diocesan regional schools operate

within the debtor's geographic territory.  All are separately incorporated.  In addition, the debtor has identified 211 closed or merged parishes and what it describes as "Catholic Ministry Entities" created under New York's Not-for-Profit Corporation Law.  Hereafter, this opinion will refer to these parishes, schools and Catholic Ministry Entities as "Affiliated Entities."  Like the Diocese, some of the Affiliated Entities are or may become defendants in actions under the Child Victims Act.  Many plaintiffs have chosen to name both the Diocese and one or more of its affiliates as defendants in the same proceeding.  Other plaintiffs have initiated separate actions against the Diocese and an Affiliated Entity.[1]

On May 2, 2020, The Diocese of Buffalo commenced the above referenced adversary proceeding to obtain a judgment declaring that section 362 of the Bankruptcy Code operates to stay abuse victims from pursuing claims against the Affiliated Entities.  Alternatively, it seeks either a permanent or preliminary injunction barring the commencement or continued prosecution of abuse claims against these affiliates.  In the context of this adversary proceeding, The Diocese of Buffalo has filed a motion asking this Court to immediately enjoin the prosecution of lawsuits that victims of alleged abuse have brought or might wish to bring against any of the Affiliated Entities.

The Diocese contends that the automatic bankruptcy stay is sufficiently broad

---

[1] At least with regard to the issues decided herein, the decision to initiate one lawsuit or two is a distinction without a difference.

to apply to litigation brought against parishes and other Affiliated Entities. In the event that the reach of 11 U.S.C. § 362 is not so extensive, the Diocese believes that an expanded stay is needed to avoid excessive costs and the dissipation of assets, as well as to facilitate an expeditious settlement of all claims. Various creditors and the Official Committee of Unsecured Creditors oppose the motion of the Diocese. They argue that section 362 has no application to actions against non-debtors, that the Diocese has failed to establish any adverse consequences of continued litigation against the Affiliated Entities, and that the Diocese overreaches in the relief that its motion requests.

## Discussion

Bankruptcy Rule 7001(7) provides that an adversary proceeding is generally required "to obtain an injunction or other equitable relief." No simple motion will suffice. In contrast to a motion, an adversary proceeding contemplates an opportunity for defendants to present carefully formulated answers, to conduct discovery, and to try disputed issues of fact and law. Here, the Diocese asks the Court to shortcut this entire process. It filed the current motion on the same day that it commenced the adversary proceeding. In this motion, the Diocese seeks an order that would essentially impose a long-term injunction applicable to current and prospective state court litigants for a period extending from the entry of an order until 90 days after the later of either a dismissal of the bankruptcy case or the effective date of a confirmed plan. To grant such pre-trial relief at this time would deprive litigants of the benefit of procedures carefully designed to assure due process. At this stage of the adversary proceeding, the motion requests relief that is excessive and not now supported by the

record.

The present adversary proceeding seeks not a determination of liability, but to address the more narrow question of the extent to which alleged victims are subject to the automatic bankruptcy stay. Until affected parties are allowed a full opportunity to address this issue at a trial on the merits, this Court cannot grant the long-term stay that the Diocese seeks. However, this leaves open the possibility that the Court might allow a lesser form of interim relief known as a preliminary injunction. A preliminary injunction is a temporary remedy "issued before or during trial to prevent an irreparable injury from occurring before the court has a chance to decide the case." BLACK'S LAW DICTIONARY 904 (9th ed. 2014).

The Court of Appeals recited the controlling standard for issuance of a preliminary injunction in *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 122 (2d Cir. 1994), as follows:

> "To obtain a preliminary injunction, a plaintiff must demonstrate: (1) *either* a likelihood that he will succeed on the merits of his claim, *or* that the merits present serious questions for litigation and the balance of hardships tips decidedly toward the plaintiff; and (2) that without the injunction, he will likely suffer irreparable harm before the court can rule upon his claim."

The debtor makes a reasonable argument that it would likely incur significant costs if called upon to assist the Affiliated Entities in responding to the complaints of the alleged victims of abuse. However, this concern speaks only to the second

requirement for a preliminary injunction, and leaves open the more problematic first condition of likely success on the merits of the Diocese's position regarding the reach of 11 U.S.C. § 362(a).

Section 362(a) of the Bankruptcy Code provides that the filing of a bankruptcy petition will operate as a stay of eight types of activity.  In its moving papers, the Diocese asserts the applicability of subdivisions (1), (3) and (6).  On two of these subdivisions, the Court foresees little likelihood of success on the merits.

Subdivision (a)(1) of section 362 provides in relevant part that the filing of a bankruptcy petition operates as a stay of "the commencement or continuation. . . of a judicial, administrative, or other action or proceeding *against the debtor* that was or could have been commenced before the commencement of the case under [title 11], or to recover a claim *against the debtor* that arose before the commencement of the case." 11 U.S.C. § 362(a)(1)(emphasis added). By its language, subdivision (a) applies only to the debtor and not to any non-filing affiliates.  Throughout the course of this bankruptcy, the Diocese has insisted that its parishes are separate entities whose assets are not subject to bankruptcy administration.  To the same extent that they share none of the burdens of bankruptcy, the parishes and other Affiliated Entities similarly do not enjoy the benefit of the stay that section 362(a)(1) gives to a debtor with regard to state court litigation.

Subdivision (a)(6) of section 362 provides that the filing of a bankruptcy petition

operates to stay "any act to collect, assess, or recover a claim *against the debtor* that arose before the commencement of the case under [Title 11]." 11 U.S.C. § 362(a)(6)(emphasis added). By its language, this subdivision speaks to claims against the debtor, and not to the collection, assessment or recovery of damages from a different party, such as any of the Affiliated Entities.

For the Diocese, subdivision (a)(3) presents the only likely basis for an application of the automatic stay to Affiliated Entities. It provides that the filing of a bankruptcy petition imposes a stay upon "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." The Diocese contends that property of the estate includes rights under policies and programs of insurance, and that Affiliated Entities may look for liability coverage from many of the same insurance arrangements to which the Diocese is a party. To whatever extent that Affiliated Entities secure coverage from self-insurance pools or policies of insurance, coverage limitations may diminish the funds to which the Diocese would have access. The problem is that although the Diocese suggests a plausible basis to apply the automatic stay in some instances, it has yet to show the impact, if any, that a particular state court action will have on estate assets.

"Numerous courts have determined that a debtor's insurance policies are property of the estate, subject to the bankruptcy court's jurisdiction." *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 92 (2d Cir. 1988). For the Diocese and its affiliates, however, the character and status of these policies

are murky, jumbled, questionable and uncertain. Because the estimated 400 cases of alleged abuse have arisen over a span of decades, victims encounter a myriad of insurances coverages. Coverages differ not only over time, but also from parish to parish.

By affidavit, the Diocese attempted to describe the state of insurance coverage. Prior to 1973, to the extent that it exists, insurance coverage involved policies separately maintained by the Diocese and each of its Affiliated Entities. On July 1 of that year, the Diocese created what it calls a joint self-insurance program for the benefit of itself and its affiliates. Under this program, the Diocese would underwrite, coordinate and administer coverage, but with the supplemental protection of excess liability insurance through independent carriers. Initially, the excess liability policies provided coverage for occurrences within a stated period. Starting in 1990, the Diocese secured excess liability insurance supplying coverage on a claims-made basis. Depending on the year, one of several insurers provided at least some coverage after 1973, but with a variety of limitations. One of these insurers is now insolvent. Some of the policies limit coverage for sexual misconduct. Other policies apply caps on coverage. The Diocese represents that for at least one policy year, the coverage cap has already been exceeded. Meanwhile, individual parishes may have purchased their own insurance, which may or may not have listed the Diocese as a co-insured.

Thus far, the Diocese has supplied only an outline of insurance coverage. While this presentation is helpful, it falls far short of proof sufficient to establish that litigation

against Affiliated Entities would necessarily affect property of the bankruptcy estate. The Diocese asserts that since 1973, its self-insurance program provides an initial coverage for claims. At the hearing on the debtor's motion, counsel conceded that it could produce no written contract between the Diocese and parishes or other Affiliated Entities. Nor could the attorney give any assurance that the self-insurance program is a risk sharing arrangement that complies with the New York Insurance Law. With regard to coverage for claims arising prior to July 1, 1973, or for damages in excess of the coverage limits of the self-insurance program, the Diocese merely represents the possibility of coverage. It has presented no copies of insurance policies and concedes that excess coverage may be unavailable with regard to claims arising during particular periods of time. The Diocese further advises that some insurers have refused to acknowledge coverage and a duty to defend. For this reason, in a separate adversary proceeding, the Diocese has sought a declaratory judgment to determine obligations under the disputed policies of insurance.

Assuming that the Diocese has accurately represented the state of its insurance coverage, we can identify at least three possible situations. As to some claims, neither the Diocese nor the Affiliated Entity has the benefit of any insurance coverage. For plaintiffs in this first group, litigation against the Affiliated Entity only will not infringe on any asset of the bankruptcy estate. For such instances, this Court can identify no likely basis for a long-term stay of litigation against the Affiliated Entity. A second category of claims involves Affiliated Entities who have maintained adequate insurance policies that do not list the Diocese as a co-insured. Here too, litigation against the

Affiliated Entity does not infringe upon estate assets in a way that would justify a stay applicable to non-debtors. However, The Diocese is correct in suggesting a possibility that the stay of 11 U.S.C. § 362(a)(3) may apply to a third category of claims, where any recovery will dissipate estate assets. Subject to proof of their existence, these assets may include the debtor's self-insurance fund or capped coverage on a policy under which the Diocese is a named insured.

This Court lacks sufficient information to determine which of the 400 prospective plaintiffs are subject to a stay that applies to parishes and other Affiliated Entities. Nonetheless, the fact that a restraint applies to some victims does not justify its long-term extension to everyone. In addressing this dilemma, we heed the advice of the Supreme Court from a decision in 2017:

> "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents. The purpose of such interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward. In awarding a preliminary injunction a court must also 'conside[r] . . . the overall public interest.' In the course of doing so, a court 'need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case.'"

*Trump v. International Refugee Assistance Project*, __ U.S. __, 137 S.Ct. 2080, 2087 (2017) (citations deleted).

The Diocese asserts that because claims of abuse begin with events that

occurred in the 1940's, the identification of insurance coverage is a monumental task that requires the assistance of insurance archivists. Even though the Diocese has had sixteen months since enactment of the Child Victims Act to conduct an investigation, the Court is not altogether dismissive of this argument. Still we must balance investigatory challenges against the rights of victims to achieve a reasonably prompt resolution of claims involving non-debtors.

Having carefully considered the circumstances of this complex case and the competing rights of all parties, the Court will grant a preliminary injunction that will operate to stay the named defendants in this adversary proceeding from the prosecution of abuse claims against parishes and other Affiliated Entities until September 15, 2020. Before considering any request for an extension of this preliminary injunction, the Court will look for substantial progress in the collection of evidence sufficient to prove the nature and scope of insurance coverage. The parties should be mindful that a preliminary injunction serves only to preserve the status quo until such time as this Court can conduct a trial on the merits of the request for a declaratory judgment. For this reason, the Court intends to schedule this adversary proceeding for trial at the earliest reasonable date. At any such trial, because individual situations may differ, the Court shall give due consideration to the particular rights of each alleged victim to assert claims against entities other than The Diocese of Buffalo.

The motion of the Diocese asks also that this Court stay the initiation of new actions against parishes, schools and Catholic Ministry Entities. Subject to exceptions

not here relevant, Bankruptcy Rule 7065 provides that Rule 65 of the Federal Rules of Civil Procedure shall apply to all adversary proceedings in bankruptcy. Rule 65(a)(1) directs that "[t]he court may issue a preliminary injunction only on notice to the adverse party." Because the Diocese served its motion only upon existing plaintiffs, the preliminary injunction shall have no application to undesignated parties who may wish to file a new complaint against parishes or parties other than the Diocese itself.

For the reasons stated above, the Court will grant a preliminary injunction, but only to the extent expressly stated herein. In all other respects, the motion of the Diocese is denied.

So ordered.

Dated: July 2, 2020  
       Buffalo, New York

/s/ Carl L. Bucki  
------------------------------------------------  
Hon. Carl L. Bucki, Chief U.S.B.J., W.D.N.Y