UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

In re:

The Diocese of Buffalo, N.Y.,

    Debtor.

Case No. 20-10322 (CLB)

Chapter 11

---

The Diocese of Buffalo, N.Y.,

    Plaintiff,

v.

JMH 100 Doe, *et al.*[1]

    Defendants.

Adversary No. 20-01016

**DECLARATION OF MELISSA POTZLER, ESQ., IN SUPPORT OF THE DIOCESE'S MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 362(a) ENJOINING THE PROSECUTION OF CERTAIN STATE COURT LAWSUITS**

Melissa Potzler, Esq., declares and states as follows:

1.    I am the Chancellor for The Diocese of Buffalo, N.Y. (the "Diocese") and the Child Protection Policy Coordinator, Chief Compliance Officer and In-house Counsel. I have served in this role since September 2022. Prior to working for the Diocese, I was an assistant district attorney for Erie County, NY, a former criminal defense attorney, and the Parish Life Coordinator at a diocesan parish. In my capacity as the Chief Compliance Officer and In-house counsel, I handle the Diocese's legal affairs and am generally familiar with the assets, liabilities, and operations of the Diocese.

---

[1] A full list of the Defendants in this in this adversary proceeding is attached as Exhibit A to the Diocese's complaint, which has been redacted protect the privacy interests of survivors.

16675016.6

3. I am authorized by the Diocese to submit this Declaration in support of the *Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 362(a) Enjoining the Prosecution of Certain State Court Lawsuits* (the "Motion")[1], filed concurrently herewith.

4. On February 28, 2020 (the "Petition Date"), the Diocese filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Western District of New York, commencing the case (the "Chapter 11 Case"). The Diocese continues to operate its business and manage its properties as a debtor in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

5. There are approximately 800 lawsuits (the "Abuse Actions") brought by individuals seeking damages for alleged sexual abuse (the "Abuse Claimants") against the Diocese and/or certain parishes, schools and other Catholic entities affiliated with the Diocese (collectively, the "Related Entities").

6. Approximately 272 Abuse Actions were filed prior to the Petition Date naming the Diocese as a defendant. Many of the complaints in those actions do not meaningfully distinguish between allegations of liability asserted against the Diocese and those asserted against the Related Entities. In addition nearly all of the Abuse Claimants who filed Abuse Actions against Related Entities only after the Petition Date, and who were therefore prevented by the Bankruptcy Code's automatic stay provisions from including the Diocese as a named defendant, have nevertheless filed a companion proof of claim in this Chapter 11 Case based upon the same allegations of abuse asserted in their respective Abuse Actions, essentially substituting a proof of claim in lieu of a complaint against the Diocese.

---

[1] Capitalized terms that are used herein but not defined shall have the meanings assigned to such terms in the Motion.

7. Both prior to and during the course of the Chapter 11 Case, the Diocese has made significant reductions to its personnel, leaving the Diocese with very limited staffing resources. Currently, the Diocese has approximately 192 employees, which is a 28% reduction from 2019 levels. Litigating the Abuse Actions during the pendency of the Chapter 11 Case, while the Diocese also attempts to engage in mediation with the Committee and its Insurers, will put a significant strain on the Diocese's staff and will be burdensome and highly disruptive to the administration of the Chapter 11 Case, impairing the Diocese's ability to successfully reorganize. State court litigation against Related Entities would require the Diocese to divert its limited personnel away from the Diocese's restructuring efforts, thereby draining estate resources, and shifting the Diocese's attention away from the mediation, which is the best option for developing a plan of reorganization that will allow the Diocese to emerge from the Chapter 11 Case successfully.

8. In addition, litigation of the Abuse Actions will cause the Diocese and its limited personnel to shift their focus from continuing to provide religious and humanitarian services while pursuing reorganization efforts through mediation and to instead take an active role monitoring and possibly even participating in the litigation of the Abuse Actions. The Diocese would have to monitor the Abuse Actions in an effort to, among other things, protect against adverse findings and rulings that would impact insurance coverage liability, all of which would negatively affect the Diocese's efforts to confirm a plan of reorganization.

9. Specifically, if the Abuse Actions go forward, they will require significant attention from Bishop Fisher, Vicar General Fr. Peter Karalus, myself as Chancellor, Chief Operating Officer Richard Suchan, Chief Financial Officer Ellen Musalowski, Director of Insurance Services John Scholl, and likely many others.

3

10. In addition to attending to and overseeing the pastoral and operational needs of the Diocese, Bishop Fisher, Mr. Suchan, Ms. Musalowski, and I have been expending significant time focusing on the Diocese's reorganization efforts in this Chapter 11 Case. If litigation in the Abuse Actions goes forward, Bishop Fisher will be required to expend considerable additional time making important decisions regarding strategic and policy considerations relating to the impact of the Abuse Actions on the Diocese and the Related Entities. Because the Bishop also makes all decisions concerning the assignment of priests in the Diocese, it is likely that he will be required to appear and give testimony at depositions and trials. I anticipate that Mr. Suchan, Ms. Musalowski and I would also need to spend a significant amount of time to assist the Bishop in addressing such matters on behalf of the Diocese, as well as overseeing the Diocese's response to the inevitable flood of discovery requests from Abuse Claimants, Insurers and Related Entity defendants. I further expect that if litigation goes forward, Fr. Karalus will likely be distracted from his religious and operational duties as he will be called upon to sit for depositions and provide testimony at trial, and Mr. Scholl and I will need to coordinate the efforts of the multiple law firms that the Diocese and Related Entities would rely upon as defense counsel. Each of the above individuals is critical to the Diocese's day-to-day functioning, and the Diocese does not have anyone who can replace their services or, alternatively, who could take over for them in connection with this Chapter 11 Case or the Abuse Actions.

11. In addition, due to staffing reductions that have already been implemented, there are limited personnel available to assist the foregoing individuals, including myself, in carrying out our respective Diocesan duties. At this point in time the Diocese has only 42 employees engaged in non-ministerial functions to support the Diocese's business operations. Those employees currently handle functions including human resources and priest personnel services,

finance, audit, information technology, communications, safe environment, purchasing, tribunal, insurance services, buildings & properties, research, archives, and formation. Accordingly, if the Abuse Actions move forward, important Diocesan personnel will be stretched to their limits and beyond, which will unavoidably impair the Diocese's ability to operate its programs and ministries, to pursue a successful reorganization and exit from this Chapter 11 Case, and to adequately protect its interests and otherwise respond to litigation in the Abuse Actions. In fact, because of the staffing reductions, the Diocese has already had to reduce and/or eliminate several centralized ministry functions, including the following departments: (i) Youth & Young Adult; (ii) Camp Turner; (iii) Evangelization & Cathechesis; (iv) Deaf Ministry; (v) Disability Ministry; (vi) Hispanic Ministry; (vii) STREAM (Science, Technology, Religion, Engineering, Arts and Math); (viii) Family Life; and (ix) The Catholic Union Store.

12. Absent a stay of the Abuse Actions, the Diocese will be required to participate in substantial discovery concerning these fact-specific cases, including preparing for and participating in potentially hundreds of depositions, and providing testify at numerous trials. In such event, the administrative costs to the estate will be significant and will only serve to reduce the amount of funds available to the Diocese for contribution to a plan of reorganization.

13. Moreover, even if litigation proceeds only in those Abuse Actions where the Diocese is not a named defendant, because the causes of action asserted against the Related Entities in those Abuse Actions are the same or substantially similar causes of action asserted against the Diocese, the Diocese will be required to take an active part in defending against those causes of action in an effort to avoid issues relating to collateral estoppel, adverse precedent, vicarious liability, or imputed admissions. For example, even though an Abuse Action may not name the Diocese as a defendant, the Bishop and other Diocesan officers may be required to provide

5

16675016.6

Case 1-20-01016-CLB, Doc 291, Filed 10/23/23, Entered 10/23/23 19:57:10, Description: Main Document, Page 5 of 9

testimony that could have a direct impact on the viability and value of identical claims asserted against the Diocese in this Chapter 11 Case. Adverse findings and determinations made in the course of litigating Abuse Actions could aid Insurers in asserting defenses to coverage for Abuse Claims against the Diocese. For example, if findings of fact in a specific Abuse Action establish knowledge or notice of abuse sufficient to support an Insurer's declination of coverage for a Related Entity under the "expected or intended" defense, such findings could have negative precedential value for the Diocese with respect to its attempts to secure coverage for the same instance of abuse, as well as potentially any Abuse Claims of other individuals involving subsequent abuse committed by the same perpetrator.

14. Currently, the Diocese and its limited personnel are focused on, and need to remain focused on, the Diocese's restructuring efforts, including: (i) maintaining the daily operations of the Diocese and Related Entities to continue to support the religious, charitable and humanitarian mission and good works of the Catholic Church in Western New York; (ii) participating in the ongoing mediation and negotiations with the Committee and the Insurance Carriers to develop a plan of reorganization for the benefit of all creditors; (iii) assisting the professionals engaged by the Diocese in connection with the Chapter 11 Case; and (vi) reviewing, preparing, and producing documents necessary for expeditiously moving the Chapter 11 Case towards plan confirmation.

15. Should litigation of the Abuse Actions move forward, the Diocese will be faced with the cost and administrative burden of confronting multiple time-consuming lawsuits of indefinite duration when it should instead be utilizing estate resources to focus on negotiating a settlement of all Abuse Claims with the Committee and the Insurers. Further, the Diocese's reorganization efforts and the estate will suffer real and substantial harm to the detriment of all

6

creditors because almost so many Diocesan resources will be diverted to address litigation of the Abuse Actions instead of reorganization efforts in this Chapter 11 Case.

16. Beginning on or about July 1, 1973, and at all times thereafter, the Diocese's insurance office has sponsored a program to provide comprehensive risk management services and insurance coverage for the Diocese and its Related Entities. Under this program, each of the Related Entities makes contributions to a pooled fund held by the Diocese under the understanding that such funds will be earmarked for (i) the purchase of policies of insurance covering the Diocese and the Related Entities as co-insureds and (ii) the payment of any defense costs and claims for losses that are subject to a deductible or self-insured retention before coverage under the shared insurance policies becomes available. The Diocese currently holds approximately $10.9 million in pooled reserves to satisfy this obligation. With respect to general liability claims, including claims for bodily injury and sexual misconduct, some of the insurance policies provide for deductibles and self-insured retentions ranging from $10,000 to as much as $250,000 *per occurrence*. Consistent with its longstanding practices and the reliance interests and expectations of the Related Entities, the Diocese is obligated to use this earmarked pool of funds to satisfy any defense and/or indemnity costs in each Abuse Action until any applicable deductibles and/or self-insured retentions are satisfied.

17. Based on data retrieved from the Diocese's insurance claim management system the Diocese has paid approximately $297,307 in defense costs to address 24 personal injury claims and lawsuits (not including Abuse Actions), the majority of which are slip and fall claims.[2] Fifteen of those 24 claims remain unresolved and continue to incur additional defense costs. Accordingly, the Diocese's experience suggests an average of more than $12,388 per-claim in defense costs

---

[2] This does not include approximately 14 additional open claims where the Diocese has not yet been invoiced for defense costs.

7

16675016.6
Case 1-20-01016-CLB, Doc 291, Filed 10/23/23, Entered 10/23/23 19:57:10, Description: Main Document, Page 7 of 9

with respect to relatively straightforward matters. I anticipate that the cost to defend an Abuse Action, which will require the resolution of many more issues of disputed fact and law, as well as complex evidentiary issues, will likely be significantly higher, to say nothing of any ultimate settlements or verdicts which must be paid.

18. As the Court is aware, prior to the passage of the Child Victims Act ("CVA"), the Diocese conducted an Independent Reconciliation and Compensation Program ("IRCP"), which provided survivors of sexual abuse an opportunity to settle their Abuse Claims against the Diocese and Related Entities. The Diocese expended approximately $17.6 million to settle 107 survivor claims as part of the IRCP program, with an average settlement payment of approximately $164,486. Because the IRCP program predated passage of the CVA, the survivors who participated in that program were settling claims that were, at the time, subject to an absolute statute of limitations defense. Even setting aside the potential for massive jury verdicts, I anticipate that the per-claim cost to settle Abuse Actions that are now legally viable because they were commenced during the CVA revival window will require at least as much, if not substantially more than, what the Diocese expended to settle time-barred claims through the IRCP.

19. Thus, even if only a small subset of the Abuse Actions moves forward in litigation, the reserves established by the Diocese to pay deductibles and self-insured retentions will quickly be exhausted by defense costs and settlement/indemnity payments. Rather than dissipating those resources through litigation, the Diocese believes that they would be put to far better use as a contribution to a survivor trust under a plan of reorganization in this Chapter 11 Case.

20. Reviewing all of the foregoing factors leads me to conclude that if the stay of the Abuse Actions does not remain in place, the Diocese will be required to engage fully in the

litigation of the Abuse Actions and would not be able to commit the necessary funds, attention, and resources needed for the Chapter 11 Case to successfully exit the reorganization process.

21. It is imperative that the Diocese remains focused solely on the reorganization process and mediation, instead of diverting what limited and precious resources it has on defending its interests in the Abuse Actions, so as to maximize the value of the Diocese's estate for the benefit of all creditors.

I swear, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: October 23, 2023 /s/ Melissa Potzler

Melissa Potzler, Esq.
Chancellor, Chief Compliance Officer, and Child Protection Policy Coordinator
The Diocese of Buffalo, N.Y.