UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>THE DIOCESE OF BUFFALO, N.Y.,<br><br>Debtor. | Case No. 20-10322 (CLB)<br><br>Chapter 11 |
| THE DIOCESE OF BUFFALO, N.Y.,<br><br>Plaintiff,<br><br>v.<br><br>JMH 100 DOE, et al,<br><br>Defendants. | Adversary No. 20-01016 |

**RESPONSE BY THE PARISH STEERING
COMMITTEE IN SUPPORT OF THE DIOCESE'S MOTION FOR ENTRY OF AN
ORDER PURSUANT TO 11 U.S.C. §§ 105(a) and 362(a) ENJOINING THE
PROSECUTION OF CERTAIN STATE COURT LAWSUITS**

The Parish Steering Committee (the "Parish Committee"),[1] by its undersigned attorneys, Woods Oviatt Gilman LLP ("Woods Oviatt"), Timothy P. Lyster, Esq., and Elsaesser Anderson Chtd., Ford Elsaesser, Esq. submit this response in support of The Diocese of Buffalo, N.Y.'s (the "Diocese") Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 362(a) Enjoining the Prosecution of Certain State Court Actions (AP Dkt No. 296) (the "Motion for Injunction").

1. The parishes are committed to participating in the mediation process, with the objective of making a substantial contribution in exchange for a channeling injunction as to abuse claims. Permitting Abuse Actions[2] to proceed against the parishes in State Court would be a

---

[1] The Parish Committee includes all of the parishes located in the Diocese and certain other Catholic-affiliate entities within the Diocese.
[2] Capitalized terms used herein and not otherwise defined have the meaning ascribed to them in the Motion for Injunction.

{9404370: }1

significant burden on the resources of the parishes, and would deplete, dollar-for-dollar, the amount available for the parishes to pay to survivors through the bankruptcy case. Accordingly, as described below, the parishes support the Diocese's Motion for Injunction, and respectfully request that the Court enjoin the Abuse Actions from proceeding.

2. The parishes, through their undersigned attorneys, Ford Elsaesser and Tim Lyster, along with the Parish Steering Committee Chairperson, Msgr. Robert E. Zapfel, have participated in the mediation sessions with the survivors, as represented through their State Court attorneys and the Creditors' Committee, and the insurers.

3. The parishes acknowledge the need to make a significant monetary payment, along with the contribution of its insurance rights, in exchange for a third-party release of the survivors' claims. To this end, the parishes have voluntarily produced their financial information in the context of the mediation.

4. In its Decision & Order just four (4) months ago, extending the stay of litigation as to the LG Claimants, this Court recognized that:

> **[b]efore the Diocese can present a plan with any hope for confirmation, it must resolve many intricate issues, among which are arrangements for funding.** At this time, **litigation against parishes and affiliates will distract those entities and insurers from the process of negotiating contributions to the plan.** This distraction is further exasperated by insurance arrangements that provide shared coverage for both the Diocese and many affiliates.

*In re Diocese of Buffalo*, 652 B.R. 574, 576 (Bankr. W.D.N.Y. 2023)(emphasis added).

5. The parishes respectfully submit that this process is underway, and that the potential for a Catholic Family payment up to $100 million, as referenced by the Diocese, along with continued

mediation with the insurers, is significant progress toward a plan. Litigation would, in fact be a distraction, and could easily derail resolution with the parishes and other affiliate entities.

6. The Court also noted in its above decision that there was no mediation impasse, rather additional mediation was scheduled. *Id.* In its immediately prior decision extending the stay, the Court noted that "[n]o one has suggested bad faith or procrastination by the debtor or other parties in this attempt to achieve settlement. *In re Diocese of Buffalo*, 642 B.R. 350, 352 (Bankr. W.D.N.Y. 2022).

7. This reasoning still applies, and at a minimum, warrants an injunction of litigation for some time, to facilitate further mediation. Such time, should be free from the enormous distraction of costly, grinding, State Court litigation.

8. It may be asserted that parishes *need* the burden of pending litigation in State Court in order to make payment for a release. They do not. The parishes have known that litigation of abuse actions was already permitted down the Thruway with respect to the Diocese of Rochester bankruptcy case. They also know of the challenges from the beginning of this case in preventing the abuse actions from moving forward, whether as to all of the survivors or just the LG Claimants. Consequently, the parishes have participated in mediation in good faith, to reach a resolution without further delay.

9. The parishes also already understand that, despite the parishes' defenses to liability in the Abuse Actions, and despite the significant obstacles to the survivors in establishing liability, large jury verdicts might be entered. Such verdicts, obtained by Lipsitz Green Scime Cambria LLP (albeit not against parishes) have been well-publicized locally (along with other settlements, such as with Ken-Ton schools).

10. However, any such verdict against a parish will not better facilitate resolution of the survivors' claims (or cause the parishes to pay more) because the parishes, along with the Diocese, do

not have sufficient resources to pay these verdicts. Thus, the need to resolve the survivors' claims through the bankruptcy case. The parishes' finite resources will only be depleted through prosecution of the Abuse Actions, leaving less money for survivors.

11. The many challenges to parishes have played out in public, including a decline in parishioners, attendance, school enrollment, a priest shortage, and related restructuring. Under the "Road to Renewal," parishes are being grouped into "families," with a drastically reduced 36 pastors serving the 161 parishes.[3] Parish elementary school enrollment has been in steep decline over the past decade, with the retired superintendent of Catholic Schools warning of a further rapid descent based upon recent closures.[4] Overall, there are about 40,000 fewer practicing Catholics in the Diocese, from 2012 to 2021.[5] These issues, and the finite resources of the parishes, have caused the parishes to focus even more on the resolution of compensation for survivors.

12. The parishes understand the need to participate in the chapter 11 plan of the Diocese, including the potential $100 million collective contribution from the Catholic Family, in order to receive a third-party release. State Court litigation will not prove this point – it will severely hinder the parishes, particularly those already stretched to make any payment for a release.

---

[3] Ben Tsujimoto, *Buffalo Diocese will reduce number of pastors as part of reorganization*, BUFFALO NEWS, May 10, 2022; https://buffalonews.com/news/local/buffalo-diocese-will-reduce-number-of-pastors-as-part-of-reorganization/article_32e8c700-d0a9-11ec-afac-db1c022f3cce.html?utm_medium=social&utm_source=email&utm_campaign=user-share; *see also*, https://roadtorenewal.org/

[4] Ben Tsujimoto, *What's the future for Buffalo Catholic elementary schools?*, BUFFALO NEWS, October 19, 2023; https://buffalonews.com/news/local/education/buffalo-diocese-catholic-elementary-education-western-new-york/article_2cf12922-6866-11ee-8c86-7719677e1a9b.html?utm_medium=social&utm_source=email&utm_campaign=user-share

[5] Jay Tokasz, *Jesuits to cut back at St. Michael Church as Buffalo Diocese implements family of parishes plan*, BUFFALO NEWS, May 4, 2023; https://buffalonews.com/news/local/jesuits-to-cut-back-at-st-michael-church-as-buffalo-diocese-implements-family-of-parishes/article_52baea94-e9cc-11ed-8a1f-3ff01a4abaaa.html?utm_medium=social&utm_source=email&utm_campaign=user-share

13. As to the specific relief requested, the Diocese is correct that the approximately 272 Abuse Actions naming the Diocese as a defendant are stayed under Section 362(a)(1) as provided in *In re Fogarty*, 39 F. 4th 62, 76 (2d Cir. 2022). Each action is stayed in its entirety, including as to the co-defendant parishes and Catholic-affiliate entities. *See id.* at 76. The survivors are required to obtain relief from automatic stay in order to proceed against the non-Diocese defendants in State Court. *Id.* at 76-77.

14. Each Abuse Action which implicates an insurance policy covering the Diocese, regardless of whether the Diocese is a named defendant, should also be stayed under Section 362(a)(3). *See* Motion for Injunction (Dkt. No. 289, ¶49). As stated by the Diocese, this would result in a stay of at least 276 Abuse Actions which directly implicate one or more Diocesan insurance policy, and an additional 286 Abuse Actions which implicate pre-1973 parish insurance policies that likely provide coverage to the Diocese. *See* Motion for Injunction (Dkt No. 289, ¶55).

15. Specifically, the parishes and Diocese have shared occurrence-based liability insurance policies from July 1, 1973 until July 1, 1990, and shared claims-made insurance policies beginning June 1, 1999. *See* Declaration of James R. Murray in Support of the Diocese's Motion for Injunction ("Murray Dec."), (Dkt. No. 290, ¶¶4-16 and ¶¶17-18).

16. For the period prior to July 1973, the parishes purchased their own insurance policies, which likely also provide coverage for the Diocese as additional insured. *See* Murray Dec. (Dkt. No. 290, ¶¶19-20).

17. Additionally, the Abuse Claimants have filed claims in the Diocese's bankruptcy case based upon substantially the same alleged facts and damages asserted in the Abuse Actions. *See* Motion for Injunction, (Dkt. No. 289, ¶65, ftn. 17).

18. The primary allegations of abuse are directed to the Diocese's conduct. Importantly, the Bishop assigns priests to a parish. *See* Motion for Injunction, (Dkt. No. 289, p. 21, ftn. 13). The parishes are not liable for priest staffing decisions, and any such liability would be premised first upon proving the liability of the Diocese.

19. Discovery to the parishes in the Abuse Actions will actually be directed at facts necessary to establish liability of the Diocese. The Diocese will also be entangled in third-party discovery requests. The Diocese will need to protect against collateral estoppel, adverse precedent or imputed liability, including to protect against potential defenses to insurance coverage. As a practical matter, prosecution of the Abuse Actions will require significant coordination between the representatives and attorneys of the parishes and Diocese. This will be a severe distraction from resolution of the bankruptcy case and drive up attorney's fees, for which the monies could otherwise be paid to the survivor's trust.

20. To the extent the Abuse Actions are not subject to the automatic stay, they should be enjoined under Section 105(a).

21. The parishes have asserted indemnification and contribution claims against the Diocese with respect to the abuse claims. This Court correctly recognized this "circular whirlpool of claims" in deciding to enjoin under Section 105, Abuse Actions brought by the LG Claimants. *See In re Diocese of Buffalo, N.Y.*, 633 B.R. 185, 188 (Bankr. W.D.N.Y. 2021); *see also* Motion for Injunction, (Dkt. No. 289, ¶26). Indeed,

> [b]y reason of their claims for indemnification or contribution, parishes and affiliates have prospectively converted any judgment against them into a claim against the Diocese. Consequently, the prosecution of actions against parishes will ultimately require the parties to revisit the same dispute when in this proceeding, the Diocese proposes a plan to deal with contribution or indemnity rights. Under these circumstances, a stay under 11 U.S.C. § 105 is appropriate and necessary to fulfill the purpose of section 362.

*Id.*

22. This reasoning continues to support an injunction of the Abuse Actions under Section 105(a).

23. Also, most of the Diocese's insurance policies (on which the parishes are insured), have per occurrence limits, which would have to be shared by the Diocese and parishes; if the per occurrence limit is used to fully pay the liability of one insured, such as with respect to a judgment against the parishes in the State Court Actions, it could deprive the co-insured Diocese of coverage. *See* Murray Dec. (Dkt. No. 290, ¶¶23-24); *see also* Motion for Injunction, ¶77-78).

24. The notion of organizing a subset of cases to proceed is also unrealistic. Given the vigor of the LG Claimants' in pursuing their actions, they are unlikely to stand down. Thus, the parishes would be faced with defending against the 49 LG Claimants, along with numerous other claimants supported by the Creditors' Committee, and ultimately other claimants who do not adhere to a directive of the Creditors' Committee not to proceed.

25. The parishes will be required to spend a significant amount of monies to defend the Abuse Actions. It is beyond question that any such expenditure reduces, dollar-for-dollar, the amount available for the parishes to pay to the survivors' trust in the bankruptcy case. This certainly supports enjoining the Abuse Actions from proceeding.

26. The parishes are committed to returning to mediation - without the distraction and drain attendant with defending (any, or up to) about 800 Abuse Actions.

**WHEREFORE**, the Parish Steering Committee respectfully submits that the Diocese's Motion for an Injunction should be granted.

Dated: November 21, 2023

                                       Respectfully submitted,

                                       WOODS OVIATT GILMAN LLP

                 By:    /s/ Timothy P. Lyster
                         Timothy P. Lyster, Esq.
                         1900 Bausch & Lomb Place
                         Rochester, New York 14604
                         585.987.2894
                         tlyster@woodsoviatt.com

                         ELSAESSER ANDERSON, CHTD.
                         J. Ford Elsaesser, Esq.
                         320 East Neider Avenue, Suite 102
                         Coeur d'Alene, Idaho 83815
                         (208) 667-2900
                         firm@eaidaho.com