# EXHIBIT C

A UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No.: 20-10322-CLB |
| The Diocese of Buffalo, N.Y., | Chapter 11 |
| Debtor. | |

| | |
|---|---|
| The Diocese of Buffalo, N.Y., | |
| Plaintiff, | |
| v. | Adversary Proceeding No.: 20-01016-CLB |
| JMH 100 Doe, *et al.*[1], | |
| Defendants. | |

**DECLARATION OF ATTORNEY JAMES R. MURRAY IN SUPPORT OF THE MOTION TO ENJOIN THE CONTINUED PROSECUTION OF CERTAIN LAWSUITS**

Pursuant to 28 U.S.C. § 1746, JAMES R. MURRAY, ESQ., hereby declares and says as follows:

1. I am a partner of the law firm of Blank Rome, LLP ("Blank Rome"), which is Special Insurance Counsel to The Debtor Diocese of Buffalo, N.Y. ("Diocese") in this case. This Declaration is filed in support of the Diocese's Motion for an order enjoining the continued prosecution of certain lawsuits.

---

[1] The defendants in this adversary proceeding are identified in Exhibit A to the complaint filed by The Diocese of Buffalo, N.Y.

**Experience**

2. I am Chair of Blank Rome's policyholder-only Insurance Recovery Practice Group, which has received numerous group-wide and attorney-specific national recognitions.[2]

3. I have 35 years of insurance coverage experience, representing exclusively policyholders against insurance companies. A significant portion of that experience involves pursuing coverage under general liability policies from the 1940's through the 1980's for environmental, asbestos, and other matters involving events that go back many years.

4. I was retained in 2003 by the Catholic Archdiocese of Seattle to advise regarding coverage for underlying claims of sexual abuse of minors.

5. Since 2003, about half of my practice has involved insurance coverage for historical sexual abuse claims. I have represented more than twenty-five such clients, including religious organizations, schools, and hospitals.

6. Of those sexual abuse matters, I was Special Insurance Counsel for the debtors in the following Chapter 11 proceedings, each having been resolved by way of a consensual plan consisting of both debtor contributions and also substantial insurance company contributions to a survivor trust: (1) Diocese of Spokane (Spokane, Washington); (2) Society of Jesus, Northwest Province of Jesuits (Portland, Oregon); (3) Diocese of Helena (Helena, Montana); (4) Diocese of Duluth (Minneapolis, Minnesota); and (5) the Diocese of New Ulm (Minneapolis, Minnesota).

---

[2] Those announced since January 2020 include Law360's Insurance Practice of the Year (2019) (second year in a row), Benchmark Litigation's Insurance Firm of the Year (2020) and the National Law Journal's D.C. Litigation Department of the Year (Insurance) (2020) (second time in three years). Individually, I am ranked nationally in insurance by Chambers USA, as well as in Band 1 in Washington, D.C. Best Lawyers named me its 2020 "Lawyer of the Year" for Insurance Litigation in Washington, D.C. BTI Consulting Group designated me a 2019 "Client Service All-Star" for my work in insurance recovery for clients across the country.

2

Case 1-20-01016-CLB, Doc 303-3, Filed 11/21/23, Entered 11/21/23 16:07:11, Description: Exhibit C - Coverage Chart, Page 3 of 14

7. I am presently Special Insurance Counsel for the debtors in the following ongoing Chapter 11 proceedings: (1) Archdiocese of Agaña (Guam); (2) Archdiocese of Santa Fe (Albuquerque, New Mexico); (3) Diocese of Rochester (Rochester, New York); and (4) the Archdiocese of New Orleans (New Orleans, Louisiana). I am also coverage counsel to the Diocese of St. Cloud (Minnesota), which recently announced an agreement with survivors to fund a trust to compensate survivors, along with a commitment to file for Chapter 11 bankruptcy protection in the near future. I also served as insurance counsel for the Archdiocese of Seattle in an adversary proceeding in the Christian Brothers bankruptcy (New York). I also represent several other Catholic entities, which have not filed for bankruptcy, including, for example, the Archdiocese of New York and Saint John's Abbey in Minnesota.

8. In each concluded bankruptcy case in which I have been involved, insurance contributions to the survivor trust (the "pot") were critical components of agreement on a consensual plan. Working with (and sometimes against) the insurance companies and with the survivor Creditors' Committees is, in my experience, the best way to provide the greatest amount of compensation for the greatest number of survivors.

**Diocese's Insurance**

9. This case is no different. Attached as Exhibit A to this affidavit is a coverage "chart" that my firm prepared depicting relevant insurance policies identified thus far from the Diocese's post-1973 insurance program (the "Post 1973 Policies"). The chart is based on the Diocese's existing analysis of information currently available. The Diocese previously provided a version of the coverage chart to counsel for the Committee of Unsecured Creditors ("Committee Counsel") on April 7, 2020. The Diocese produced copies of the Post 1973 Policies and related documents on which the coverage chart is based to Committee Counsel on May 29, 2020.

3

10. The Diocese continues to investigate its historical insurance program. The Diocese has been working with an insurance archeology firm to search for missing policies that may provide coverage for sexual abuse claims. This effort has involved collecting and reviewing historical files from the Diocese, its parishes, and affiliates, requesting copies of policies from insurers, and identifying and searching other potential sources of information about the Diocese's historical insurance policies. As discussed below, the Diocese's insurance archeology firm is currently reviewing financial records from the parishes for information about insurance.

11. The Diocese's insurance provides the Diocese, parishes, and other affiliated entities with general liability insurance. From July 1, 1973 until July 1, 1990, the Diocese purchased occurrence-based general liability coverage. Occurrence-based policies cover any claims alleging loss arising out of an occurrence during the policy period, no matter when that claim is made.

12. From July 1, 1973 to July 1, 1978, the Diocese purchased primary insurance policies from Commercial Insurance of Newark, NJ ("CNA"). These policies provide $500,000 per occurrence and $250,000 per person limits of liability. From July 1, 1976 to July 1, 1978, CNA also issued the Diocese excess coverage, which provides $1 million per occurrence limits of liability in addition to the primary coverage. From July 1, 1976 to July 1, 1977, National Union Fire Insurance Company ("National Union") issued a $4 million excess policy, which provides coverage to the Diocese excess to CNA's excess policy and the primary policy in that year. On July 1, 1977, Fireman's Fund Insurance Company issued a $4 million blanket excess liability policy that replaced National Union's coverage. However, this policy was cancelled effective July 11, 1977, and the Diocese again purchased a $4 million excess policy from National Union for the period July 11, 1977 to July 1, 1978.

4

Case 1-20-01016-CLB, Doc 303-3, Filed 11/21/23, Entered 11/21/23 16:07:11, Description: Exhibit C - Coverage Chart, Page 5 of 14

13. From July 1, 1978 to July 1, 1980, the Diocese purchased primary coverage from the Wausau Insurance Companies ("Wausau"), which provides $500,000 per occurrence limits of liability. From July 1, 1979 to July 1, 1980, Wausau also issued the Diocese excess coverage, which provides $5 million per occurrence limits of liability.

14. From July 1, 1980 to July 1, 1981, the Diocese purchased primary coverage from Proprietors Insurance Company ("Proprietors"). Proprietors was ordered into liquidation on September 10, 1981, and is therefore no longer paying claims.

15. From July 1, 1981 to July 1, 1983, the Diocese purchased primary coverage from Exchange Mutual Insurance Company ("Exchange"), which provides $1 million per occurrence limits of liability. These primary policies include a $15,000 self-insured retention ("SIR"), not to exceed $200,000 in the aggregate, for which the Diocese is responsible before Exchange begins paying on a claim. For the 1982 to 1983 policy period, the SIR's aggregate cap was reduced to $100,000. Also for the 1982 to 1983 policy period, Exchange issued the Diocese an excess policy, which provides $50 million per occurrence limits of liability.

16. An SIR functions similarly to a deductible and is a sum that the policyholder must pay out of pocket before the risk-transferred insurance coverage issued by the insurers can be accessed.

17. Under the Diocese joint self-insurance program (the "SIP"), which provides risk management services and insurance coverage for the Diocese as well as the parishes and affiliated entities, the Diocese is responsible for all SIRs owed by the parishes and affiliated entities insured under the SIP. (Declaration of John M. Scholl Regarding the Diocese's Self-Insurance Program and Available Insurance Coverage ¶ 9, ECF No. 5).

5

Case 1-20-01016-CLB, Doc 303-3, Filed 11/21/23, Entered 11/21/23 16:07:11, Description: Exhibit C - Coverage Chart, Page 6 of 14

18. From July 1, 1983 to July 1, 1984, the Diocese returned to purchasing coverage from Wausau. Wausau issued a primary policy providing $1 million per occurrence limits of liability with a $10,000 per claim deductible. Wausau also issued the Diocese an excess policy for the 1983 to 1984 period, which provides $50 million per occurrence limits of liability.

19. From July 1, 1984 to July 1, 1985, the Diocese purchased primary coverage from Exchange, which provides $1 million per occurrence limits of liability. The policy included a $15,000 SIR, with a $125,000 aggregate cap on the SIR. In addition, the Diocese also purchased a $50 million excess liability policy during the 1984 to 1985 period, but the Diocese has not yet identified the issuing insurer and continues to search for and identify additional information regarding its historical insurance program.

20. Through the mid-1980s, sexual misconduct claims had not become sufficiently widespread to elicit a specific exclusion. However, in the mid-1980s, carriers began introducing abuse exclusions and other limitations and the insurance market for sexual misconduct coverage tightened substantially.

21. In July 1985, the Diocese moved its insurance program to the Catholic Mutual Relief Society of America ("Catholic Mutual"). From July 1, 1985 to July 1, 1986, Catholic Mutual issued a certificate providing $1 million per occurrence limits of liability and $35 million umbrella excess liability. Catholic Mutual also included a $15,000 SIR with a $125,000 aggregate cap.

22. Beginning in the 1986 to 1987 policy period, Catholic Mutual excluded sexual misconduct claims, but offered so-called morality coverage at a separate, reduced sub-limit of liability. The Diocese purchased morality coverage on an occurrence basis with a $100,000 sublimit. For the 1987 to 1990 policy periods, the Diocese was able to increase the sublimit to

6

$250,000 through the newly-formed Catholic Underwriting Pool. As of July 1988, the SIR aggregate cap increased to $350,000.

23. Starting in 1990, the Diocese's liability coverage for sexual abuse became claims-made. Claims-made coverage limits coverage to only those claims made during the policy period that allege wrongdoing after a "retroactive date." Generally speaking, claims-made policies respond to claims made for the first time during the policy period, and not those first made against the policyholder after the end of the policy period. Except for claims made during the policy period, the coverage under a claims-made policy expires when the policy period concludes.

24. Beginning June 1, 1999, the Diocese has purchased claims-made sexual misconduct coverage from The National Catholic Risk Retention Group, Inc. ("National Catholic").

25. For the current policy period from July 1, 2019 to July 1, 2020, the Diocese purchased two policies from National Catholic. The first policy provides a $750,000 each loss and aggregate limit of liability for sexual misconduct coverage after a $250,000 per loss SIR with a July 1, 1990 retroactive date. The second provides $4 million each loss and aggregate limit excess coverage for claims related to sexual misconduct with a June 1, 2002 retroactive date.

26. The Diocese has been able to verify that the parishes and affiliated entities are named insureds on many Post 1973 Policies, although some policies are missing or incomplete. For example, the 1976 to 1977 National Union excess policy broadly defines the named insured as "The Diocese of Buffalo, all subordinate civil corporations, all unincorporated Agencies, Departments, or Commissions comprising the Diocese of Buffalo under its management and control as may now or may hereinafter be constituted." The 1983 to 1986 Wausau primary policy includes almost identical language.

27. The present National Catholic policy defines the Named Insured to include:

7

Case 1-20-01016-CLB, Doc 303-3, Filed 11/21/23, Entered 11/21/23 16:07:11, Description: Exhibit C - Coverage Chart, Page 8 of 14

> Catholic Diocese of Buffalo, New York . . . and all of the subordinate civil corporations and all unincorporated agencies, departments or commissions comprising the Diocese of Buffalo under its management and control, as may now or hereafter be constituted; ***including Parishes, Schools, Cemeteries and other directly connected agencies***.

(emphasis added).

28. Prior to 1973, each parish was responsible for purchasing its own insurance coverage. In March 2020, the Diocese located large volumes of annual reports from each of its parishes. Some reports contain insurance information while others do not have any at all. The Diocese is working with an insurance archeology firm to review the reports as quickly as possible, and the Diocese expects to have the first analysis by early July. The results of that analysis will dictate how much more work needs to be done in meeting policy proof requirements.

29. The Diocese continues to search for coverage that it had prior to 1973 but, to date, has not located documents evidencing its coverage beyond the discussion in paragraph 28. Based on my experience, it is possible that the Diocese is an additional insured for coverage provided by at least some the pre-1973 policies.

**Examples of Depletion of Debtor's Assets**

30. Litigation against the parishes and affiliated entities can deplete the insurance and other assets of the Diocese's estate that otherwise would be available to the survivor trust. For example:

- From 1986 to 1990, Catholic Mutual issued certificates containing aggregate limits of liability that would likely apply to the instant claims. That is, the certificates set forth a maximum amount the insurer will pay for claims in a given policy period, regardless of how many claims are asserted. Once the aggregate limit has been reached, the coverage is exhausted and no longer available. While the Diocese

8

believes that the 1988 to 1990 policies may be exhausted currently, the 1986 to 1988 policies are still available.

- The aggregate limits for the 1986 to 1990 Catholic Mutual certificates are eroded by the defense costs expended in connection with covered claims. Thus, the cost of defending state court tort litigation against the parishes and affiliated entities would reduce the amount of insurance coverage available to fund the survivor trust.

- The claims-made policy issued for the current policy period similarly contains an aggregate limit of liability, which is reduced by defense costs. Thus, each claim alleging wrongdoing after 1990 that is filed between July 2019 and July 2020, and allowed to proceed against the parishes and affiliated entities, will further reduce and risk exhausting the current insurance policy's available limits.

- The primary policies and certificates issued by Exchange and Catholic Mutual, as well as the current National Catholic policy, incorporate a SIR. Under the SIP, the Diocese is responsible for all SIRs owed by the parishes and affiliated entities insured by the comprehensive program. (Declaration of John M. Scholl Regarding the Diocese's Self-Insurance Program and Available Insurance Coverage ¶ 9, ECF No. 5). Thus, permitting litigation against the parishes and affiliated entities to proceed will force the Diocese to pay hundreds of thousands of dollars for the SIR under each policy, further depleting the funds that the Diocese can otherwise make available to the survivor trust.

- New York courts have held that the number of occurrences is based on the instances of alleged abuse, not how many entities were allegedly negligent in oversight. Therefore, when multiple insureds seek coverage for those occurrences from the

9

same policy, the limits of liability are divided between the insureds. That is, the Diocese and co-defendant parish may be jointly entitled to a single limit and the parish could quickly use up the available coverage for that claim, leaving the Diocese unable to recover any insurance proceeds for the claim.

31. In addition to the depletion of insurance assets, other practical considerations further support imposing a stay in this instance. For example:

- Litigation against the parishes could result in rulings or factual findings that could jeopardize coverage for the Diocese. For example, a court may find that both the parish and the Diocese knew of a priest's abuse, which could serve as the basis for a ruling that the Diocese knew of the abuse of a priest. The litigation against the parishes, especially in the event of a verdict, could also lead to insurance coverage litigation that could also result in adverse rulings and findings that could jeopardize coverage for the Diocese. Insurance coverage litigation against a parish would involve many of the same issues that insurance litigation against the Diocese would involve.

- Litigation against the parishes and affiliated entities may trigger requests seeking discovery from the Diocese, causing the Diocese to expend portions of its limited resources to respond to those requests.

- Separate from the threat of eroding limits, insurers are often able to offer increased contributions to a survivor trust or other settlements if they are not simultaneously facing indeterminate, mounting defense costs which would be incurred as a result of litigation against the parishes and affiliated entities.

10

Case 1-20-01016-CLB, Doc 303-3, Filed 11/21/23, Entered 11/21/23 16:07:11, Description: Exhibit C - Coverage Chart, Page 11 of 14

- Parishes and affiliated entities will want to participate in the bankruptcy process with the aim of reaching a global resolution of all claims against the Diocese, the parishes, and affiliated entities. Part of the consideration for the parishes' and the affiliated entities' participation in a global resolution will be the insurance coverage under the Pre-1973 Policies.

32. Based on all of the foregoing policy and practical considerations, continuing litigation against the parishes and affiliated entities could negatively inhibit the Diocese's ability to recover from historical insurance policies, deplete its already limited assets, and reduce the pot available to compensate survivors' claims.

33. I declare under penalty of perjury that the foregoing is true and correct. Executed on June 4, 2020 in the District of Columbia.



James R. Murray, Esq.

11

Case 1-20-01016-CLB, Doc 303-3, Filed 11/21/23, Entered 11/21/23 16:07:11, Description: Exhibit C - Coverage Chart, Page 12 of 14

# EXHIBIT A

