**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| THE DIOCESE OF BUFFALO, N.Y., | Case No. 20-10322 (CLB) |
| Debtor. | |
| THE DIOCESE OF BUFFALO, N.Y., | |
| Plaintiff, | |
| v. | Adv. No. 20-01016 (CLB) |
| JMH 100 DOE, ET Al., | |
| Defendants. | |

## OPPOSITION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105(A) AND 362(A) ENJOINING THE PROSECUTION OF CERTAIN STATE COURT LAWSUITS

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................. 1

FACTUAL BACKGROUND ................................................................................. 5

    A.    The Bankruptcy.................................................................................. 5

    B.    The State Court Actions...................................................................... 6

    C.    Mediation Has Been Unsuccessful to Date......................................... 7

    D.    The Diocese's Offer........................................................................... 8

    E.    The Pre-1973 Insurance. .................................................................. 11

    F.    The Post-1973 Insurance.................................................................. 11

RECENT NEW YORK DIOCESE CASES  (ROCKVILLE CENTRE, ROCHESTER AND SYRACUSE) ....................................................................................................... 14

LEGAL ARGUMENT........................................................................................... 19

    I.    Section 362(a)(1) Is Inapplicable to State Court Actions  in Which the Diocese Is Not a Defendant. ........................................................................ 19

    II.    The Diocese Does Not Demonstrate Cause for a Section 105(a) Injunction........ 27

        A.    The Diocese Cannot Prove that Continued Prosecution of Each State Court Action Will Dissipate the Proceeds of Shared Insurance Policies............ 28

        B.    The Diocese Has No Indemnity Obligations to the Related Entities........ 28

        C.    Potential Contribution Claims Are Not Grounds for an Injunction.......... 30

        D.    Speculation About Piecemeal Litigation and Inconsistent Judgments Does Not Support an Injunction........................................................................ 31

        E.    Prosecution of the State Court Actions Will Not Expose the Diocese to Risks of Collateral Estoppel and Res Judicata.......................................... 34

    III.    The Diocese Cannot Meet Its Burden of Proof on Any of the Four Traditional Factors the Court Must Consider to Enjoin the State Court Actions Under Section 105(a) and Rule 7065........................................................................... 34

        A.    The Diocese Cannot Demonstrate a Likelihood of Success Because Confirmation of the Diocese Plan Is Unlikely........................................... 36

        B.    The Diocese Cannot Meet Its Burden of Proving a Risk of Imminent, Irreparable Harm to the Estate. .............................................................. 37

        C.    The Harm to Survivors Outweighs Harm to the Estate. .......................... 40

        D.    The Public Interest Is Not Advanced by an Injunction............................. 42

CONCLUSION...................................................................................................... 43

i

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*3M Occupational Safety LLC v. Those Parties Listed on Appendix A*
  *(In re Aearo Techs. LLC),*
  642 B.R. 891 (Bankr. S.D. Ind. 2022) ............................................................ 24, 38

*Abouelmakarem v. Mdnma Inc.,*
  2022 U.S. Dist. LEXIS 147579 at \*3 (S.D.N.Y. Aug. 17, 2022) ........................... 19

*Bayview Loan Serv. LLC v. Fogarty*
  *(In re Fogarty),*
  39 F.4th 62 (2d Cir. 2022) ................................................................................... 19

*Calpine Corp. v. Nev. Power Co.*
  *(In re Calpine Corp.),* 354 B.R. 45 (Bankr. S.D.N.Y. 2006) ................................... 36

*Diocese of Rochester v. AB 100 Doe (In re Diocese of Rochester),*
  2022 Bankr. LEXIS 1469, \*19 (Bankr. W.D.N.Y. May 23, 2022) ................... passim

*Drennen v. Certain Underwriters at Lloyds of London*
  *(In re Residential Capital, LLC),*
  563 B.R. 756 (Bankr. S.D.N.Y. 2016) ............................................................ 31, 32

*Dunaway v. Purdue Pharm L.P.*
  *(In re Purdue Pharm. L.P.),*
  619 B.R. 38 (S.D.N.Y. 2020) ................................................................................ 36

*Fengler v. Numismatic Americana, Inc.,*
  832 F. 2d 745 (2d Cir. 1987) ................................................................................ 35

*Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.,*
  25 F.3d 119 (2d Cir. 1994) ................................................................................... 35

*GAF Corp. v. Johns-Manville Corp*
  *(In re Johns-Manville Corp.),*
  26 B.R. 405 (Bankr. S.D.N.Y. 1983), *aff'd,* 40 B.R. 219 (S.D.N.Y 1984) ............. 37

*Gold v. Johns-Manville Sales Corp.,*
  723 F.2d 1068 (3d Cir. 1983) ............................................................................... 40

*Goldin v. Primavera Familienstiftung Tag Assocs.*
  *(In re Granite Partners, L.P.),*
  194 B.R. 318 (Bankr. S.D.N.Y. 1996) ............................................... 22, 23, 36, 38

*Gramatan Home Investors Corp. v. Lopez,*
  414 N.Y.S. 2d 308 (1979) ..................................................................................... 25

*Haw. Structural Ironworkers Pension Tr. Fund v. Calpine Corp.,*
  2006 U.S. Dist. LEXIS 42499 at \*13 (S.D.N.Y. Dec. 20, 2006) ...................... 36, 38

*In re Anje Jewelry Co., Inc.*,
47 B.R. 485 (Bankr. E.D.N.Y. 1983) ........................................................... 35

*In re Diocese of Buffalo, NY*,
618 B.R. 400 (Bankr. W.D.N.Y. 2020) ................................................. 6, 19, 24, 36

*In re Diocese of Buffalo, NY*,
626 B.R. 866 (Bankr. W.D.N.Y. 2021) ......................................................... 6

*In re Johns-Manville Corp.*,
517 F. 3d 52 (2d Cir. 2008) ....................................................................... 33

In re Mariner Health Cent., Inc., 2023 Bankr.
LEXIS 95, *35 (Bankr. N.D. Cal. Jan. 12, 2023) ................................... passim

*In re Metal Center, Inc.*,
31 B.R. 458 (Bankr. D. Conn. 1983) .......................................................... 21

*In re Roman Catholic Bishop of Great Falls*,
584 B.R. 335 (Bankr. D. Mont. 2018) ........................................................ 43

*Littanzi v. State*,
388 N.Y.S.2d 686 (3d Dep't 1976) ............................................................. 21

*Lomas Fin. Corp. v. Northern Trust Co.*
*(In re Lomas Fin. Corp.)*,
117 B.R. 64 (S.D.N.Y. 1990) ...................................................................... 26

*Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc.*
*(In re Lyondell Chem. Co)*,
402 B.R. 571 (Bankr. S.D.N.Y. 2009) ........................................................ 36

*Mardice v. Ebony Media Operations*,
2021 U.S. Dist. LEXIS 8520, at *8 (S.D.N.Y. Jan. 15, 2021) ....................... 21

*McHale v. Alvarez*
*(In re The 1031 Tax Grp., LLC)*,
397 B.R. 670 (Bankr. S.D.N.Y. 2008) ........................................... 25, 32, 33, 36

*Nev. Power Co. v. Calpine Corp.*
*(In re Calpine Corp.)*,
365 B.R. 401 (S.D.N.Y. 2007) ......................................................... 35, 37, 38

*Pacor, Inc. v. Higgins*,
743 F.2d 984 (3d Cir. 1984) ...................................................................... 25

*Peak v. Bartlett, Pontiff, Stewart & Rhodes, P.C.*,
814 N.Y.S.2d 763 (3d Dep't 2006) ............................................................. 21

*Queenie, Ltd. v. Nygard Int'l*,
321 F.3d 282 (2d Cir. 2003) ...................................................................... 26

*Shapiro v. Cadman Towers, Inc.*,
51 F. 3d 328 (2d Cir. 1995) ....................................................................... 37

*Singleton Mgmt. v. Compere,*
  673 N.Y.S. 2d 381 (App. Div. 1st Dept. 1998) ....................................................... 25

*Sobchack v. Am Nat'l Bank & Trust Co. of Chicago*
  *(In re Ionosphere Clubs, Inc.),*
  17 F. 3d 600 (2d Cir. 1994) ........................................................................................ 33

*Solidus Networks, Inc. v. Excel Innovations, Inc.*
  *(In re Excel Innovations, Inc.),*
  502 F.3d 1086 (9th Cir. 2007) ................................................................................... 36

*Stanford v. Foamex L.P.,*
  2009 U.S. Dist. LEXIS 32405 at *10 (E.D. Pa. April 15, 2009) ............................ 21

*Teachers Ins. & Annuity Assn v. Butler,*
  803 F. 2d 61 (2d Cir. 1986) ........................................................................................ 19

*The Roman Catholic Diocese of Syracuse, New York,*
  628 B.R. 571 (Bankr. N.D.N.Y. 2021) ............................................................. 14, 36

*W.R. Grace & Co. v. Chakarian*
  *(In re W.R. Grace & Co.),*
  591 F.3d 164 (3d Cir. 2009) ...................................................................................... 25

*Winter v. Natural Resources Defense Council, Inc.,*
  555 U.S. 7 (2008) ........................................................................................................ 35

## Federal Cases

NY CLS CPLR § 1001 ................................................................................................... 21

## State Cases

2 Collier on Bankruptcy ¶105.03 (16th ed. 2022) ................................................... 35

The Official Committee of Unsecured Creditors (the "**Committee**") of The Diocese of Buffalo, N.Y., the above-captioned debtor and debtor in possession (the "**Diocese**"), hereby submits its Opposition (the "**Opposition**") to the Diocese's *Motion For Entry of an Order Pursuant to 11 U.S.C. § § 105(a) and 362(a) Enjoining the Prosecution of Certain State Court Lawsuits* [Docket No. 289] (the "**Motion**").[1]  In support of its Opposition, the Committee respectfully states as follows:

## INTRODUCTION

1.        For over three and a half years, victims of child sexual abuse (the "**Survivors**")[2] agreed not to pursue their civil lawsuits against parishes, schools, and other Catholic entities (collectively, "**Related Entities**")[3] in the unfulfilled hope of achieving a consensual plan that would enable Survivors to obtain closure and fair compensation for their suffering and exploitation.  The Survivors repeatedly agreed to forbear from telling their tragic stories of abuse to state court juries of their peers in an effort to resolve the claims through mediation.  The Committee has participated in almost two years of mediation, including at least seven sessions since Judge NeMoyer was appointed, with no settlement.  Unless litigation is allowed to move forward against the Related Entities, neither the Related Entities, nor their insurers, will be motivated to contribute to a global settlement that reflects their exposure for the harm caused to

---

[1] Capitalized terms not otherwise defined have the meanings given to them in the Motion. All statutory references are to the Bankruptcy Code unless otherwise noted.

[2] As used herein, the term "Survivors" includes and is limited to all individuals who asserted claims against the Diocese on account of sexual abuse.

[3] As defined in the Motion, the term "Related Entities" includes the parishes and certain entities affiliated or associated with the Diocese.

1

Survivors.

2.      In October 2020, the Committee agreed to a standstill of State Court Actions pending against the Related Entities to facilitate a global resolution of this case and a consensual plan of reorganization.  Docket No. 79 (the "**Stay Stipulation**").  The Stay Stipulation has been extended **twelve** times.[4]

3.      For the purposes of this Motion, the Committee makes two highly significant concessions: (a) the Committee does not oppose the Motion as to claims that allege abuse in any time after July 1, 1986 to avoid the potential impact on shared insurance or the Diocese's funds and (b) the Committee agrees that no Survivor may enforce any judgment or settlement without Bankruptcy Court approval.  Further, while the Committee opposes an injunction of the lawsuits that name the Diocese as a defendant, the Committee agrees that those cases are stayed as long as the Diocese is named as a defendant.  The Committee does not take a position here, and reserves all rights, as to whether such a stay prohibits a plaintiff from moving to sever the Diocese from the action.

4.      The Motion must be denied because (1) the automatic stay does not apply to the State Court Actions in which the Diocese is not a defendant and there is no material impact on shared insurance; (2) the Diocese fails to establish entitlement to an injunction under Section 105(a); and (3) the Diocese cannot meet its burden of proof regarding each of the State Court Actions that it seeks to enjoin under the applicable four-factor test for a preliminary injunction.[5]

---

[4] *See* Doc. Nos. 103, 143, 156, 158, 160, 179, 199, 215, 246, 267, 269, 284.

[5] The four factor test for a preliminary injunction is: (a) the likelihood of success on the merits; (b) the likelihood of irreparable harm to the Diocese absent the injunction issuing; (c) the balance of hardships; and (d) the public

5.      When the Court previously considered the stay of the non-debtor litigation, the landscape of the Diocese's insurance and the potential impact of the non-debtor litigation was unknown.  The insurance relevant to this Motion is now crystal clear.  From 1973 to 1986, proceeding with the State Court Actions has no impact on insurance because the policies have no aggregate limits and defense costs do not reduce available coverage.[6]  Even though this insurance is shared, the available insurance has no limits so "sharing" does not harm the Diocese.  And, even if there was a potential threat of diminishing insurance, the Committee has agreed that no Survivor may enforce any judgments or settlements reached without further order of the Court.

6.      The Diocese has not identified any pre-1973 Diocesan insurance nor is there any evidence that  individual parishes' insurance policies were shared with the Diocese.  Without shared insurance, proceeding with litigation poses no threat to estate assets.

7.      The Diocese fails to demonstrate that there is any threat of collateral estoppel or *res judicata* such that the State Court Actions must be stayed under Section 362.

8.      The Diocese also cannot meet its burden to show its entitlement to a preliminary injunction of the State Court Actions under section 105(a). First, continuing the State Court Actions will not dissipate shared insurance proceeds.  Second, the Diocese has no contractual indemnity obligations to the Related Entities.  Third, there is no risk of piecemeal litigation or

---

interest. *See Diocese of Rochester v. AB 100 Doe (In re Diocese of Rochester),* 2022 Bankr. LEXIS 1469,  (Bankr. W.D.N.Y. May 23, 2022) ("***Rochester***").

[6] There is one exception of the primary policy for 1983-84, but there the excess has no aggregate and per occurrence limits of $50,000,000, essentially no cap on insurance.

inconsistent judgments.  Fourth, the Diocese has no risk of collateral estoppel or *res judicata*

from the prosecution of State Court Actions to which it is not a party.  Finally, the Diocese's

personnel will not be burdened by litigation of State Court Actions to an extent that would

interfere with its reorganization efforts.

9.      Last, the Diocese fails to satisfy the requirements for a preliminary injunction

under Rule 7065. The Second Circuit's recent decision in *Purdue Pharma* holds that a debtor

cannot confirm a non-consensual plan without tort-claimant support, which precludes a

determination that a successful reorganization is likely without the Committee's support.[7]

Accordingly, the Diocese cannot satisfy the first prong of the four-factor test for issuance of a

preliminary injunction.  In addition, the Diocese cannot demonstrate a risk of imminent,

irreparable harm to the estate if the State Court Actions proceed. The Diocese's argument that an

injunction must issue because its key personnel will be distracted from the reorganization is not

credible for actions to which it is not a party and its insurance is not diminished by prosecution

of the actions. After three and a half years, most of the reorganization work is minimal or

handled by counsel.  The Diocese has retained an army of highly specialized professionals to

assist with its reorganization efforts and cannot offer particularized evidence that prosecution of

the State Court Actions will have an immediate and material impact on its reorganization efforts.

10.     It is evident that the Diocese intends to pursue negotiation by attrition against

Survivors who have held-off litigating the State Court actions against non-debtors for three and

one-half years while negotiating with the Diocese and Related Entities in good faith.  The

---

[7] *Purdue Pharma, L.P. v. City of Grande Prairie (In re Pharma L.P.),* 69 F.4th 45, 78 (2d Cir.), cert. granted, No. 23-124, 2023 U.S. LEXIS 2872 (Aug. 10, 2023).

Committee will continue to negotiate in good faith on behalf of Survivors. However, the Diocese's efforts to wear down Survivors and stifle their voices must come to an end. Litigation against the Related Entities must be allowed to proceed subject only to the restrictions outlined by the Committee.

11.     Pending litigation, discovery deadlines, and trial dates motivate parties and their insurers to realistically evaluate their litigation costs and risks and, ultimately, to compromise. If all of the State Court Actions are stayed, settlement discussions will fail because the defendants and their insurers will not perceive any litigation risk. If the Diocese believes that a mediated resolution is still feasible, the prosecution of the State Court Actions will not foreclose settlement discussions. Rather, allowing these State Court Actions to proceed will allow Survivors to negotiate while exercising the rights afforded to them by New York's legislature under the CVA in order to obtain a fair settlement through a plan of reorganization.

## FACTUAL BACKGROUND

### A.     The Bankruptcy.

12.     On February 28, 2020 (the "**Petition Date**"), the Diocese filed a voluntary petition for relief under chapter 11 in the wake of hundreds of lawsuits filed by Survivors of sexual abuse under the New York Child Victims Act ("**CVA**") and in anticipation of the assertion of more sexual abuse claims. The CVA changed the statute of limitations and created a "window" beginning August 14, 2019, during which victims of child sexual abuse whose claims may have been time-barred could bring a timely civil action. The window closed on August 14, 2021.

13.     The Court established a deadline to assert claims against the Diocese that was co-terminous with the expiration of the window.  The Committee is comprised of four men and two women who are Survivors of child sexual abuse.  The perpetrators (and primary tortfeasors) were priests, teachers, youth leaders and others *employed by various parishes, schools, and other Related Entities*.

### B.     The State Court Actions.

14.     The Diocese seeks a stay of almost 800 State Court Actions, including the State Court Actions in which the Diocese is not a defendant and there is no foreseeable impact on shared insurance.

15.     In the vast majority of the State Court Actions, the Survivors assert direct claims (in contrast to derivative claims) against the Related Entities and other non-debtors, including, without limitation, claims for: negligence; gross negligence; negligent hiring, retention, supervision, and failure to warn; breach of duty; and premises liability.[8]

16.     The Committee supported a stay of litigation at the beginning of this case.  *See In re Diocese of Buffalo, NY,* 618 B.R. 400, 405 (Bankr. W.D.N.Y. 2020) ("*Buffalo I*") (granting two-month stay at the outset of the case to allow the diocese to gather evidence regarding shared insurance); *In re Diocese of Buffalo, NY,* 626 B.R. 866 (Bankr. W.D.N.Y. 2021) ("*Buffalo II")* (granting preliminary injunction extension for 36 CVA actions by non-consenting litigants when the Committee stipulated to stay litigation in exchange for discovery, the debtor was making

---

[8] Exhibit B (sample complaints filed in the State Court Actions). The Survivors assert claims against the Related Entities in their capacities as parishes, schools, and administrators, independent of any alleged liability of the Diocese.

progress gathering insurance information, and the debtor was expected to report back on filed claims and the status of a reorganization plan).[9]  The Diocese attempts to use the Committee's support for a consensual stay at an early stage of the case to justify a wholly non-consensual stay three years later.  That argument is patently absurd.  First, the Committee negotiated a stipulated stay three years ago.  The Diocese seeks to unilaterally impose a stay at this stage after mediation has not succeeded.  Second, the Committee was crystal clear that its support of a stay was due, in large part, to the fact that the chapter 11 case was at its early stages and there was a logic to a litigation standstill while parties attempted a mediated settlement.[10]  The Committee also negotiated limited duration stipulations because the Committee never supported an indefinite stay.[11]  The Committee has attempted to resolve the case through mediation and, at this stage of the case, does not believe that a continued stay of State Court Actions is in Survivors' best interests.  The Diocese's efforts to twist the Committee's support for a stay at an early stage of the case to blanket support for an endless stay is fatuous.

### C.    Mediation Has Been Unsuccessful to Date.

17.    On February 3, 2022, the Court entered an order appointing the Honorable

---

[9] *See also In re Diocese of Buffalo,* Bankr. W.D.N.Y. Adv. No. 20-1016, Docket No. 261, *Decision and Order* entered Aug. 11, 2022 ("***Buffalo III***") (preliminary injunction extended to 49 actions by non-consenting claimants where committee stipulated to extension on behalf of other survivors and parties were scheduled to resume mediation).

[10] *See Statement of Official Committee of Unsecured Creditors in Support of an Order Pursuant to 11 U.S.C. § 105(a) Enjoining the Continued Prosecution of State Court Actions by Certain Litigants Whose Actions are Not Subject to Prior Stipulation Staying the Further Litigation* [Doc. No. 130 at ¶ 13] (stating that an injunction was appropriate "[a]t [that] stage of the case….").

[11] The Stay Stipulation clearly provides that nothing therein "shall be construed as an admission by the Committee or any Plaintiff regarding any efforts by the Diocese or any Stay Defendant to obtain an order enforcing the automatic stay or prosecution of any CVA Action after the Termination Date."  Stay Stipulation ¶12 [Doc. No. 79-1].

Michael J. Kaplan as mediator and ordering the parties to mediate.[12]  On January 19, 2023, the Court appointed Patrick H. NeMoyer as an additional mediator for the bankruptcy case.[13]

18.      Since Judge NeMoyer was appointed, the Committee has participated in multiple in-person mediation sessions with a combination of the Diocese, the parishes, and the Diocese's insurers, and understands the mediator has held multiple additional sessions focused only on other parties.  Mediation has not achieved a global settlement.  Nor is a settlement likely under the current posture of this case if the State Court Actions are stayed.  The Committee remains committed to mediation, but the Survivors should not be precluded from pursing non-debtor litigation at this time.[14]

**D.      The Diocese's Offer.**

19.      The Diocese chose to negotiate through litigation by announcing for the first time, in the Motion. an offer of $100 million from the Diocese and Related Entities.  With great fanfare, the Diocese notes that this was the same amount at which the Diocese of Syracuse settled its bankruptcy case (although no plan documenting such contribution has been filed).  However, the Diocese fails to mention that there were only approximately 387

---

[12] *Order*, Case No. 20-10322-CLB, Doc. No. 1568.

[13] *Order Appointing Patrick H. NeMoyer as Additional Mediator*, Case No. 20-10322-CLB, Doc. No. 2215.

[14] The Committee, the Diocese and Diocesan insurers are scheduled to mediate on November 29-30, 2023, the days immediately after the hearing on the Motion.

claimants in Syracuse,[15] in contrast to the approximately 850 claims in this case.[16]  In other

words, according to the Diocese, being raped or otherwise sexually abused as a child in

Buffalo entitles you to less than half the compensation than if it had happened to you in

Syracuse.  Survivors in Buffalo are entitled to fair compensation.

20.     While the Diocese claims that it and the Related Entities are contributing close

to all of their "unrestricted liquid assets," it provides no evidence to support that statement.

The Diocese and the Related Entities have consistently refused to provide *any* documentation

for the alleged restrictions on their assets, they are not limited in addressing their liabilities

to just paying from "liquid" assets, and there are many additional sources of funding that

remain unexplored. The Diocese's protestations of a lack of funds ignore the myriad of potential

resources available to the Diocesan enterprise.[17]  For example, the eight New York bishops,

including Bishop Fisher, are the sole members of the Mother Cabrini Health Foundation

("**Cabrini Foundation**")[18] that, according to its audited financial statements for 2021, had over

---

[15] *Upstate New York Catholic diocese announces $100 million settlement for sexual abuse victims*, AP News, *available at* https://apnews.com/article/catholic-sex-abuse-new-york-bankruptcy e7f6c72bc9c41f8b461cbe343a93386c

[16] The Diocese also fails to present any evidence of the Diocese of Syracuse's insurance coverage and how it compares to the Diocese of Buffalo's and Related Entities' insurance coverage.  Available coverage is clearly a critical factor in analyzing any settlement proposal.  The Diocese's cherry-picked "evidence" from another case must be ignored as nothing more than sensational efforts to negotiate through pleadings and press releases.

[17] Conveniently for the Diocese, the Committee is not at liberty to provide information on the Diocese enterprise's assets that would paint a more complete picture of the ability of the Diocese and Related Entities to properly compensate survivors while maintaining their mission.

[18] The Cabrini Foundation was created in 2018 with proceeds from the sale of Catholic Health Plan, Inc. ("NYSCHP"), a New York not for profit corporation (of which the Debtor's Bishop was and remains a member) of substantially all of its assets to Centene Corporation ("Centene").  *See* Verified Petition ("Petition") filed by NYSCHP with the Attorney General. NYSCHP is a member organization and its membership, by its by-laws, is limited to the eight Diocesan Bishops of the State and Ecclesiastical Province of New York; those being New York, Albany, Brooklyn, Buffalo, Ogdensburg, Rochester, Rockville Centre and Syracuse.  The assets of NYSCHP

$4 billion dollars in assets.[19]  A central purpose of the Cabrini Foundation is to make grants "to improve the health and wellbeing of vulnerable New Yorkers."[20]   The Survivors indisputably constitute "vulnerable New Yorkers."

21.      Nor does the Diocese provide any evidence to the Court or Survivors about the value of Related Entities' assets, including cash, investments or real property.

22.      Additionally, the Diocese's "offer" provides no strategy for encouraging its intransigent insurers to pay fair settlements.  Absent litigation, the Diocese's and Related Entities' insurers have no motivation to offer reasonable payments.  What the Diocese is requesting is not that litigation *not* move forward against the Diocese and Related Entities, but that it only move forward once the Diocese and its affiliates' liability is capped and the funding for litigation against *its* insurers comes from the already inadequate payment the Diocese makes to Survivors. The Diocese and the Related Entities are responsible for the harm they caused Survivors, they should not be allowed to further burden Survivors with the responsibility for collecting from *their* insurers.

23.      The offer is clearly a publicity stunt presented in a vacuum.  It should be given no weight by the Court.

---

consisted primarily of a health insurance plan known as Fidelis Care New York ("Fidelis"). The sale was for a gross purchase price of $3.75 billion. *Id.* at ¶4. From the purchase price approximately $3.2 billion was used to create and fund the Cabrini Foundation. *Id.* at ¶ 139.

[19] https://cabrinihealth.org/wp-content/uploads/2023/01/2021-Audied-Financials-KPMG.pdf.

[20] *See* https://cabrinihealth.org/about/

### E. The Pre-1973 Insurance.

24.     In 1973, the Diocese created the Self Insurance Program ("**SIP**").  Prior to SIP, each parish and diocesan entity would purchase individual insurance.  There is no evidence of any policy issued before 1973 naming the Diocese as an insured.  Indeed, the Diocese's insurance coverage chart,[21] begins in 1973.  Prior to 1973, the Dicoese and Related Entities have no "shared" insurance. The theory that the Diocese shared insurance prior to 1973 with the Related Entities is based upon hope and speculation, not evidence.  Insurance counsel for the Diocese stated at the beginning of the case that "it is possible that the Diocese is an additional insured for coverage provided by **at least some** [of] the pre-1973 policies."[22]  No evidence was supplied to support this theory.  Now, Mr. Murray has modified his testimony: "the Diocese alleges that some or all of the parish policies also provide for coverage for the Diocese as an additional insured."[23]  Still no evidence is supplied.  The Diocese's Director of Insurance Services also testified that he had never seen a policy from before 1973 even though he was responsible for searching for them and that there was no evidence the Diocese was insured under the pre-1973 policies.[24]

### F. The Post-1973 Insurance.

25.     Once the Diocese had its own insurance, with the exception of one year, there are no aggregate limits on any of primary policies, and only a few aggregate limits on some excess

---

[21] Exhibit C (Diocese's insurance coverage chart).

[22] *Declaration of Attorney James R. Murray in Support of the Motion to Enjoin the Continued Prosecution of Certain Lawsuits* [Doc. No. 45] ("**Murray I Decl.**"), ¶ 29 (emphasis added).

[23] *Declaration of Attorney James R. Murray in Support of the Motion to Enjoin the Continued Prosecution of Certain Lawsuits* [Doc. No. 290] ("**Murray II Decl.**"), ¶ 20.

[24] Exhibit A (Transcript of Scholl Deposition), 44:10, 92:2-5.

Case 1-20-01016-CLB,   Doc 305,   Filed 11/21/23   Entered 11/21/23 20:20:43,   Description: Main Document , Page 16 of 49

policies that offer enormous amounts of coverage. The following is a summary of the Diocese's

available insurance from after 1973.[25]

- *Commercial Insurance of Newark, NJ ("CNA")* – **July 1, 1973 to July 1, 1978**: primary insurance providing $500,000 per occurrence and $250,000 per person limits of liability; July 1, 1976 to July 1, 1978: excess coverage providing $1 million per occurrence limits of liability in addition to the primary coverage.

- *National Union Fire Insurance Company of Pittsburgh, PA ("National Union") and Fireman's Fund Insurance Company ("Fireman's Fund")* – **July 1, 1976 to July 1, 1978**: excess insurance policies from National Union policies with $4,000,000 per occurrence limits, and Fireman's Fund policies with $4,000,000 per occurrence limit and a $4,000,000 aggregate limit.

- *Employers Insurance of Wausau ("Wausau")* – **July 1, 1978 to July 1, 1980**: primary policies provide a $500,000 per occurrence limit with a $10,000 per occurrence deductible and the excess policies provides a $5,000,000 per occurrence limit. Diocese also purchased two Wausau policies from July 1, 1983 through July 1, 1984, that provide primary coverage with a $1,000,000 per occurrence limit and a $10,000 per occurrence deductible, and excess coverage with a $50,000,000 per occurrence limit, respectively.

- *Proprietors (now insolvent)* – **July 1, 1980 to July 1, 1981**: primary policy with a $10,000,000 per occurrence limit with a $200,000 per occurrence deductible, in excess of a self-insured retention ("SIR(s)") of $15,000 per occurrence.

- *Exchange Mutual Insurance Company n/k/a Selective Insurance Company of America ("Exchange")* – **July 1, 1981 to July 1, 1985**: primary policies provide a $1,000,000 per occurrence limit with a $200,000 per occurrence deductible, in excess of an SIR of $15,000 per occurrence. The Diocese also purchased an Exchange excess policy from July 1, 1982 through July 1, 1983 that provides a $50,000,000 per occurrence limit, and an Exchange primary policy from July 1, 1984 through July 1, 1985 with a $1,000,000 per occurrence limit and an SIR of $15,000 per occurrence.

- *Unidenified Insurer* – **1984 to 1985:** The Diocese purchased a $50 million excess liability policy during the 1984 to 1985 period, but the Diocese has not yet identified the insurer of this policy and continues to search for and identify additional information regarding its historical insurance program.

- *Catholic Mutual Relief Society of America ("Catholic Mutual")* – **July 1, 1985 to July 1, 1990**: From July 1, 1985 through July 1, 1986, Catholic Mutual issued a certificate providing $1 million per occurrence limits of liability and $35 million umbrella excess

---

[25] This summary of the Diocese's insurance is based on the information provided in the Murray I and Murray II Decls. The Committee does not endorse this information or attest to its accuracy.

liability. Catholic Mutual also included a $15,000 SIR with a $125,000 aggregate cap.

26.     After 1973, the Diocese and the other Diocesan entities were insured as part of SIP. The Diocese billed and collected funds from the diocesan entities (including the Diocese), and used those funds to pay premiums, claims not covered by insurance, or applicable self insured retentions.[26]  Policies issued from 7/1/73-7/1/78 had no self insured retention, and the primary policies have duty to defend that does not reduce the available limits. The next two policy years featured a deductible of $10,000 on a $500,000 per occurrence limit. As a practical matter, the deductible reduces the available per occurrence limit to $490,000. The policies issued thereafter, from 7/1/78-7/1/86, did contain self insured retention obligations. Taking all those years together, the insured's obligation in totality, is $650,000. The SIP fund currently has $10.9 million. One policy, the Wausau 1983 policy does have $1 million aggregate limit for claims. But Wausau issued an excess policy above that policy for $50 million per occurrence without any aggregate limit. Essentially, there is no aggregate cap on insurance in that year.

27.     The last insurance period is characterized by the change from "occurrence" based policies to "claims made" policies. This change and other features placed greater financial responsibility on the Diocese and the SIP program, and limited coverage with differing versions of limiting coverage for sexual abuse claims. The Committee does not oppose the Preliminary Injunction insofar as it implicates policies issued after July 1, 1986. Thus, there will be no impact on the Diocese or its insurance for that time period.

28.     If the State Court Actions proceed (with the limitations the Committee has agreed to), the Diocese is under no legal or contractual obligation to administer or coordinate State

---

[26] *Declaration of John M. Scholl Regarding the Diocese's Self-Insurance Program and Available Insurance Coverage* [Doc. No. 5].

Court Actions against solely against the Related Entities. The Diocese's Director of Insurance Services admitted that there was no such obligation.[27]

## RECENT NEW YORK DIOCESE CASES
## (ROCKVILLE CENTRE, ROCHESTER AND SYRACUSE)

29.     Recent decisions in the other New York diocese cases explain why (i) the automatic stay is inapplicable to the State Court Actions and (ii) a section 105 injunction is improper. *Roman Cath. Diocese of Rockville Ctr. V. Ark320 Doe (In re Roman Cath. Diocese of Rockville Ctr.)*, 651 B.R. 622 (Bankr. S.D.N.Y. 2023) ("**Rockville**"); *Rochester* (denying extension of standstill agreement after two years of unsuccessful negotiations to achieve a consensual plan); *The Roman Catholic Diocese of Syracuse, New York,* 628 B.R. 571 (Bankr. N.D.N.Y. 2021) ("**Syracuse**") (granting preliminary injunction applicable to six CVA actions when the committee unanimously stipulated to stay litigation in exchange for discovery and "rogue" defendants objected through their counsel). Each case is discussed in more detail below based on its facts and the relevant considerations that supported the decisions.

30.     The facts here mirror those in *Rockville* and *Rochester*. The Diocese's argument that *Rockville* and *Rochester* are "distinguishable" or a "different factual backdrop"[28] is incorrect and misleading. The below chart highlights the similarities in the three cases:

---

[27] Exhibit A (Transcript of Scholl Deposition), 41:25-42:2, 57:20-58:10.

[28] Motion at 51–54

|  | Buffalo | Rockville Centre | Rochester |
|---|---|---|---|
| Years in Bankruptcy When Preliminary Injunction was Filed | 3.5 years | 2.5 years | 2.5 years |
| Time In Mediation at P.I. Filing | 2 years | 1 year[29] | 6 months in-person; 1 year via Zoom |
| Consensual Plans Filed at Time of P.I. Filing | 0 | 0 | 0 |

### A. *Diocese of Rockville Centre* Decision.

31.     In *Rockville*, Judge Glenn considered and rejected most of the exact arguments raised by the Diocese here.  Judge Glenn held that, although the actions "*could* eventually lead to draining shared insurance proceeds," the actions themselves do **not** "constitute actions to obtain insurance proceeds under section 362(a)(3)."[30]  Further, Judge Glenn ruled that "joint tortfeasors are not necessary parties because their liability is several and joint."[31] Judge Glenn went on to consider the debtor's eligibility for a preliminary injunction under Section 105(a) and Rule 7065.[32]  Under the Rule 7065 factors, Judge Glenn held that (i) the likelihood of a reorganization "is, at best, a toss-up at this point;"[33] (ii) no harm will occur to shared insurance when actual efforts to obtain such proceeds are protected by the automatic stay;[34] (iii) the debtor presented no

---

[29] *Rockville* at 635.

[30] *Id.*  at 642.

[31] *Id.* at 647.

[32] *Id.* at 650.

[33] *Id.* at 653.

[34] *Id.* at 655.

conceivable situation in which indemnity claims *might* arise;[35] (iv) increased risk of contribution claims do not justify a 105(a) injunction; (v) a "general overlap in factual circumstances" was insufficient to warrant an injunction;[36] (vi) the debtor failed to demonstrate how collateral estoppel or *res judicata* could occur;[37] (vii) the debtor failed to make a clear showing that "the harms complained of will have an imminent and irreparable effect on those chances of success;"[38] (viii) the harm to survivors outweighed the harm to the debtor;[39] and (ix) the public interest is "best served by allowing the State Court Actions to proceed."[40]

### B. *Diocese of Rochester* Decision.

32.    Similarly, in *Rochester*, after concluding the automatic stay does not apply to parishes and other non-debtor affiliates, Judge Warren held that the debtor did not satisfy its burden under the four-factor test for a preliminary injunction under section 105.  His reasons included: (i) the diocese's suggestion it might pursue a non-consensual plan precluded the court from finding a likelihood of successful reorganization; (ii) the diocese's arguments that absent an injunction, litigation against the non-debtor affiliates would deplete insurance proceeds, create risks of collateral estoppel, evidentiary prejudice, and divert its key personnel from the reorganization, were not supported by evidence and insufficient to show immediate and

---

[35] *Id.* at 658.

[36] *Id.* at 659.

[37] *Id.* at 662.

[38] *Id.* at 666.

[39] *Id.*

[40] *Id.* at 667.

Case 1-20-01016-CLB,    Doc 305,    Filed 11/21/23    Entered 11/21/23 20:20:43,
Description: Main Document  , Page 21 of 49

irreparable harm to the estate (as here, the CVA cases were in the early stages); (iii) the balance

of harms tipped in favor of the abuse survivors as the "sands of time are working against

them;"[41] and (iv) the public interest is advanced by allowing the abuse survivors to seek justice

from a jury of their peers.[42]  The court noted that if non-debtor affiliates need to stay litigation

without the survivors' consent, the proper remedy is for them to seek bankruptcy protection, not

for the court to issue a sweeping injunction.[43]

33.     In *Rochester,* after two and a half years in fruitless mediation and just five months

after Judge Warren permitted litigation against the parishes to proceed, the diocese and the

committee entered into a restructuring agreement.[44]  Prosecution of the State Court Actions

against the Related Entities will establish claim values and mobilize the defendants and their

insurers to assess their exposure and the risks of litigation separate from claims against the

Diocese.  None of the State Court Actions is presently scheduled for trial.  Absent any judgments

against defendants with shared insurance, there is no threat of immediate harm to the estate.

**C.  This Court's Prior Decisions and the *Syracuse* Decision.**

34.     The facts here are distinguishable from *Buffalo I, II, and III,* and *Syracuse.*  In

those cases the requests for injunctive relief were made early in the cases and directed at a small

subset of survivors who refused to consent to a stay ***even though the committee and the majority***

---

[41] *Rochester,* at *21.

[42] In the Motion, the Diocese confuses misapplying a standard with applying a standard but finding in favor of the opposition. Motion at 52.

[43] *Rochester* at 18-23.

[44] *Motion for Entry of an Order (I) Approving the RSA, (II) Authorizing the Diocese to Enter into and Perform Under the RSA; (III) Approving the Committee Settlement, and (IV) Granting Related Relief.  Rochester,* Bankr. W.D.N.Y. 19-20905, Docket No. 1790 (Nov. 3, 2022).

*of survivors consented*.  Here, the Diocese seeks to enjoin hundreds of State Court Actions

rather than the 6, 36, or 49 lawsuits by rogue plaintiffs at issue in the *Syracuse* and previous

*Buffalo* decisions.  In those cases, mediation was ongoing, or had not yet begun, and the

committees and the majority of survivors were still hopeful that mediation would prove fruitful.

Here, the Committee and the entire Survivor constituency (essentially the Diocese's entire

creditor constituency) have determined that a stay of all of the State Court Actions is no longer

conducive to mediation efforts or settlement.

### D. The Committee's Agreed Limitations.

35.     The Committee agrees that the following limitations will apply to any State Court

Cases that proceed:

   a. The automatic stay applies to any case that names the Diocese as a defendant,
      subject to plaintiffs rights to (i) seek relief from the stay or (ii) seek to sever the
      Diocese; and

   b. No plaintiff may seek to enforce any judgment or settlement, including through
      payment of any insurance proceeds, without further order of this Court; and

   c. All cases alleging abuse that occurred after July 1, 1986 remain subject to a
      consensual stay.

36.     These limitations eliminate two concerns raised by the Diocese.  First, there is no

need to issue an injunction regarding cases that name the Diocese.  Second, there is no risk of

dissipation of insurance proceeds that may be property of the Diocese'e estate if payment can

only be effectuated pursuant to further order of the Court.  Third, there is no risk of triggering

self-insured retentions or sexual abuse exclusions since the only policies that present such issues

were issued after July 1, 1986.

# LEGAL ARGUMENT

## I.   Section 362(a)(1) Is Inapplicable to State Court Actions in Which the Diocese Is Not a Defendant.

37.     Section 362(a)(1) automatically stays the commencement or continuation only of a proceeding "**against the debtor**" that arose before the commencement of the case.  Section 362(a)(1) does not apply to non-debtor defendants.[45]

38.     The Diocese contends that *Bayview Loan Serv. LLC v. Fogarty (In re Fogarty),* 39 F.4th 62, 76 (2d Cir. 2022), sets forth a bright-line rule that all State Court Actions that name the Diocese are automatically stayed against the non-debtor co-defendants.[46]  While the Committee disagrees and *Fogarty* is distinguishable on its facts,[47] the Committee agrees for the purposes of the Motion that, as long as the Diocese is still a defendant in an action, that case is stayed.  The Committee takes no position, and reserves all rights, regarding whether a motion to sever is prohibited by that stay.

39.     Given the Committee's concession that cases naming the Diocese as a defendant are stayed, the Diocese is merely seeking an impermissable advisory opinion regarding

---

[45] *Teachers Ins. & Annuity Assn v. Butler,* 803 F. 2d 61, 65 (2d Cir. 1986) ("It is well-established that stays pursuant to 362(a) are limited to debtors and do not encompass non-bankruptcy co-defendants"); *Buffalo I,* 618 B.R. at 405 (same); *Rochester,* 2022 Bankr. LEXIS 1469 at *13-14 (same).

[46] Motion at 19; b*ut see Abouelmakarem v. Mdnma Inc.,* 2022 U.S. Dist. LEXIS 147579 at *3 (S.D.N.Y. Aug. 17, 2022) ("The application of the stay to actions against non-debtors is limited… to actions with an 'adverse impact on a debtor that occurs by operation of law;'" quoting *In re Fogarty* and compelling discovery from non-debtor co-defendants).

[47] The Second Circuit ruled in *Fogarty* that if the debtor is named as a party in a proceeding then the automatic stay applies to "the continuation of such a proceeding or action" or to the "enforcement of an earlier judgment in that proceeding or action." *In re Fogarty,* 39 F.4th at 76.  However, *Fogarty* is a ruling in a specific case holding that the sale of property in connection with a proceeding that named the debtor constituted "the continuation of such a proceeding or action" and so violated that automatic stay.  The application of *Fogarty's* fact specific holdings and conclusions of law in any other case can only be determined in the context of the facts of that particular case or controversy.  The meaning and applicability of *Fogarty* to this case should not be determined in a vacuum, absent a factual record, with no controversy or action before it but only if an issue arises.  While the Debtor "anticipates" that certain plaintiffs "may" make "certain arguments," until an actual plaintiff makes an actual argument, this Court should not rule in advance on those "anticipated" arguments.

Case 1-20-01016-CLB,   Doc 305,   Filed 11/21/23,   Entered 11/21/23 20:20:43, Description: Main Document  , Page 24 of 49

*Fogarty*'s application.[48]  It is well settled that no justiciable controversy is presented when the

parties seek an advisory opinion.[49]  Thus, federal courts, including bankruptcy courts,[50] are

limited to "cases" and "controversies" that confine "the business of federal courts to questions

presented in an adversary context and in a form historically viewed as capable of resolution

through the judicial process."[51]  It is well settled that federal courts may not issue advisory

opinions.[52]  The Court should decline to issue an advisory opinion regarding Fogarty's

applicability to this matter.[53]

---

[48] *See Massachusetts v. Envtl. Prot. Agency*, 549 U.S. 497, 516 (2007) (ruling that a dispute may not be adjudicated if there is not a "controversy" sufficient to confer jurisdiction); *Doe v. Karadzic*, 866 F.Supp. 734, 737 (S.D.N.Y. 1994) ("[F]ederal judicial power is limited to those disputes ... which are traditionally thought to be capable of resolution through the judicial process.") (quoting *Flast v. Cohen*, 392 U.S. 83, 97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968)).

[49] *Flast v. Cohen*, 392 U.S. 83, 95 (1968).

[50] The power of bankruptcy courts, as units of the district courts, are similarly limited with respect to their jurisdictional authority. *See Frye v. Excelsior Coll. (In re Frye)*, 2009 Bankr. LEXIS 4556, at *27-29 (B.A.P. 9th Cir. Apr. 7, 2009).

[51] *Envtl. Prot. Agency*, 549 U.S. at 516.

[52] *See Frye,* 2009 Bankr. LEXIS 4556, at *27-29.

[53] *Fogarty*'s application is far from settled.  Notably, *Fogarty* specifically stated that "if [the debtor] had been dismissed from the case as a defendant before the Sale occurred, then the situation would perhaps be closer to the scenario" that might not have violated the automatic stay.  *Fogarty*, 39 F.4th at 76.  That statement demonstrates that the Second Circuit allows for the possibility that there may be "scenarios" in which plaintiffs can proceed against non-debtor defendants without violating the automatic stay.  *Fogarty*'s breadth can only by  fleshed out through Court decisions resolving actual cases on controversies.  Issues that may be resolved through future decisions may include the following:

    a. Can a plaintiff file a motion in the underlying action to dismiss a debtor-defendant without seeking relief from the automatic stay?

    b. Can a plaintiff file a motion in the underlying action to sever the cases of non-debtor defendants without seeking relief from the automatic stay?

    c. Can a plaintiff proceed against non-debtor defendants upon a representation that the plaintiff will not seek to enforce any rights against property of the debtor without seeking relief from the automatic stay.

These issues should be determined only by courts adjudicating actual cases and controversies presented by interested parties; not on a theoretical basis through an injunction against plaintiffs that are not pressing the issues before a court.

40.     As to the cases to which the Diocese is not a defendant, the Diocese argues that the Diocese is "a necessary party" in all such cases.[54]  This argument is without merit.[55]  The Motion fails to explain why the Diocese is a necessary party to any State Court Action, nor is there evidence that any court has determined the Diocese is a necessary party to any State Court Action.  The Survivors assert claims against the Related Entities based on their own negligence and breaches of fiduciary and statutory duties.  Under New York law, joint tortfeasors are not necessary parties because their liability is several and joint.[56]  This principle is not unique to New York law, and bankruptcy and district courts have determined in bankruptcy stay proceedings that joint tortfeasor debtors are not necessary parties.[57]  Therefore, the fact that the Diocese may be liable to Survivors as a joint tortfeasor, whether or not it is named as a co-defendant, should not impede Survivors' claims against non-debtor Related Entities.[58]  The

---

[54] Motion at 22.

[55] NY CLS CPLR § 1001, entitled "Necessary joinder of parties," provides:

(a) Parties who should be joined. Persons who ought to be parties if complete relief is to be accorded between the persons who are parties to the action or who might be inequitably affected by a judgment in the action shall be made plaintiffs or defendants. When a person who should join as a plaintiff refuses to do so he may be made a defendant.

[56] *Rockville* at 647; *see, e.g., Littanzi v. State*, 388 N.Y.S.2d 686, 688 (3d Dep't 1976); *Siskind v. Levy*, 213 N.Y.S.2d 379, 380-381 (N.Y. App. Div. 2d Dep't 1961); *see also Peak v. Bartlett, Pontiff, Stewart & Rhodes, P.C.*, 814 N.Y.S.2d 763, 765 (3d Dep't 2006) (joint tortfeasors are not necessary parties and need not be sued together in the same action).

[57] *Rockville* at 647 (unequivocally rejecting argument that debtor was a necessary party to actions in which it was not named a defendant); *see also Mardice v. Ebony Media Operations,* 2021 U.S. Dist. LEXIS 8520, at *8 (S.D.N.Y. Jan. 15, 2021) (automatic stay not applicable to non-debtor defendants who could be held independently liable as joint tortfeasors); *In re Metal Center, Inc.,* 31 B.R. 458, 462 (Bankr. D. Conn. 1983) (automatic stay does not apply where non-debtor defendant is "independently liable as, for example, where the debtor and another are joint tortfeasors or where the non-debtor's liability rests upon his own breach of a duty"); *Stanford v. Foamex L.P.,* 2009 U.S. Dist. LEXIS 32405 at *10-17 (E.D. Pa. April 15, 2009) (same; denying extension of automatic stay to non-debtor defendants based on direct claims against them).

[58] The Diocese, in a footnote, attempts to argue it is more than just a joint tortfeasor with the parishes.  Motion at 23, fn. 13.  The Diocese cites no authority to support its claim that being more than a "mere joint-tortfeasor" is legally significant or the criteria for determining such a special relationship.  Either the parishes are separately incorporated joint tortfeasors or they have such a "close-knit" relationship that they should be substantively consolidated into this Bankruptcy Case. The Diocese cannot have it both ways.

Diocese's argument that section 362(a)(1) automatically stays the State Court Actions in which the Diocese is not a defendant is both legally and factually baseless.[59]

41.     The Diocese also incorrectly argues that section 362(a)(3) (staying acts to obtain property of the estate or to exercise control over property of the estate) applies because the Related Entities are co-insureds under the Diocese's insurance policies.[60]

42.     In *Goldin v. Primavera Familienstiftung Tag Assocs. (In re Granite Partners, L.P.)*, 194 B.R. 318, 337-38 (Bankr. S.D.N.Y. 1996), cited by the Diocese, the court rejected the trustee's request to apply the automatic stay to suits by third parties against non-debtors based on shared insurance.  The two policies at issue both shared an aggregate $5 million cap.  The debtor's indemnification coverage was diminished by defense costs and payment of any liability on behalf of the defendants.  The court concluded that the automatic stay was inapplicable to the third party litigation, stating:

> We are not convinced that an action by a third party to recover a judgment against another third party, whose liability may be covered under an insurance policy that also grants the debtor separate rights, implicates the automatic stay.
>
> We conclude, therefore, that the automatic stay does not bar these lawsuits

---

[59] The two cases cited by the Diocese in support of its argument are inapposite. In *Joane*, psychiatric patients were suing NY state for a failure to find them appropriate out of hospital placements and the State was attempting to join certain city entities as necessary parties. The Court held the city parties were not necessary, explaining that to make a determination regarding the necessity of a party courts must decide "if the proposed party has such an interest in the litigation that the court cannot settle the controversy without . . . Considering" the proposed party's interests and if the court's decision "will have the element of finality for the protection of those before the court." *Joanne S. v. Carey*, 115 A.D.2d 4, 7 (App. Div. 1st Dept. 1986). Even less relevant to the current case, *Dawn Joy Fashions, Inc. v. Comm'r of Labor*, 181 A.D.2d 968, 969 (App. Div. 3rd Dept. 1992) held that the Commissioner of Labor was a necessary party to an action requesting judicial review of the administrative board's review of the Commissioner's decision.  The Diocese fails to provide any support for its conclusory statements that it is a necessary party because it would be "inequitable" or result in "unfair treatment" for the cases to proceed without it. Motion at 20 - 21

[60] Motion at 24 – 29.

on this separate ground involving the debtor's insurance coverage.

*Id*. at 337-338.

43.     The prohibition of enforcement of any judgment against, or payment of a settlement from, shared insurance, absent further order of this Court, eliminates the risk of any immediate impact from any future judgment. In *Rockville*, the court held that the non-debtor state court actions did not constitute "acts 'to obtain possession of' or 'to exercise control over' property of the estate within the scope and meaning of section 362(a)(3).[61]  Following *Granite Partners*, Judge Glenn ruled that *if* there was shared insurance, the Related Entities were the parties seeking to access it, not the Survivors.[62] Therefore when the state court litigation continues, the burden is on those entities claiming coverage under allegedly shared insurance to seek relief from the bankruptcy court to access that asset.

44.     Furthermore, even if the State Court Actions could be considered actions impacting shared insurance, which they are not, the Diocese has not met its burden of demonstrating that each Action it proposes enjoining would impact shared insurance.  In *Rochester* and this Court's previous decision in *Buffalo I,* the courts held section 362(a)(3) inapplicable to CVA litigation against non-debtor affiliates because movants had not shown the impact of any particular CVA action on insurance policies that were property of the estate.  In *Rochester*, the court declined to apply the automatic stay because that diocese did not satisfy its

---

[61] *Rockville* at 644.

[62] *Id.* at 645.

Case 1-20-01016-CLB,   Doc 305,   Filed 11/21/23   Entered 11/21/23 20:20:43,
Description: Main Document  , Page 28 of 49

burden of proof.[63]  In *Buffalo I*, this Court held that the diocese's proffer of "only an outline" of insurance coverage was insufficient to establish application of section 362(a)(3).[64]

45.     Here, too, the Diocese does not meet its burden. The Diocese must prove that the prosecution of **each** State Court Action that it seeks to enjoin will have a material adverse impact on the per-occurrence or aggregate limits, if any, of a specific insurance policy.  The differing periods of abuse alleged in the State Court Actions and the materially different terms of the insurance policies implicated by those actions, make it impossible to accept the Diocese's argument that defense costs and/or damages incurred by the Related Entities will necessarily erode all shared insurance policies.

46.     When State Court Actions allege abuse occurring solely before the inception of any of the Diocese's insurance policies, those State Court Actions can have no impact on the shared insurance under any scenario, because there is no evidence of the existence of shared

---

[63] Unpersuaded by conclusory allegations that litigation against non-debtors would impose defense costs on the diocese and erode insurance coverage shared by the diocese and the non-debtors, the *Rochester* court stated:

But, it is one thing to make that sweeping statement. It is another thing to prove it. Here, the Diocese made no effort to provide evidence showing that a specific CVA case would have a materially adverse impact on the per-occurrence limits of a specific policy of insurance. Instead, the Diocese invites the court to make a leap of faith and find that any state court litigation by any Abuse Survivor against any Catholic Corporation will necessarily adversely affect property of the Diocese's Estate. The Court declines that invitation.

The Court holds that **the Diocese has failed to carry its burden of proving that a specific CVA case would materially erode coverage under a specific policy of insurance. As a consequence, the Court is not convinced that section 362(a)(3) stays litigation by Abuse Survivors against non-debtor Catholic Corporations.**

2022 Bankr. LEXIS 1469 at *15-16 (emphasis added).  *See also 3M Occupational Safety LLC v. Those Parties Listed on Appendix A (In re Aearo Techs. LLC)*, 642 B.R. 891, 906 (Bankr. S.D. Ind. 2022) (beyond notification of insurers, moving parties presented no evidence that state court plaintiffs were proceeding against shared insurance or that there was a threat of inequitable distribution of insurance proceeds requiring automatic stay under 362(a)(3)).

[64] *Buffalo I*, 618 B.R. at 406-07.  The *Buffalo I* court granted a two month preliminary injunction to allow the diocese to gather evidence of its shared insurance. The narrow preliminary injunction, issued within the first five months of the case, was an accommodation to allow the debtor to marshal insurance evidence to show whether litigation against non-debtors would have a material adverse impact on insurance policies that were property of the estate.  *Id.* at 407.

insurance.

47.     The Diocese also cannot meet its burden regarding the State Court Actions that allege abuse between July 1973 and July 1986. Those policies provide for unlimited payment of defense costs, as long as the policies' per-occurrence limits have not been exhausted through indemnity payments.[65]

48.     And the Committee agrees to stay all State Court Actions alleging abuse after June 1986. Additionally, the State Court Actions are at early stages. None is presently scheduled for trial, much less trial-ready, so judgments are not an imminent threat. An order prohibiting enforcement of a judgment against, or payment of a settlement from, insurance policies that name the Diocese as an insured, without a further order by this Court would protect the estate and is a far less drastic remedy than a sweeping injunction of all State Court Actions.

49.     Finally, the Diocese also speculates that if the State Court Actions proceed without the Diocese, its rights "could likely be inequitably affected."[66] There is no actual risk of either collateral estoppel or *res judicata* because the Diocese is not a party to the majority of the State Court Actions, including the State Court Actions it seeks to stay.[67]

---

[65] *See supra,* ¶¶ 25 – 28.

[66] Motion at 31.

[67] Collateral estoppel only applies to matters "actually litigated and determined" against the party to be precluded. *Singleton Mgmt. v. Compere,* 673 N.Y.S. 2d 381, 383 (App. Div. 1st Dept. 1998). Likewise, *res judicata* or claim preclusion requires an identity of claims between a prior and current action and privity of parties. *Id.; Gramatan Home Investors Corp. v. Lopez,* 414 N.Y.S. 2d 308, 311 (1979) ("[A] person may not be precluded from litigating issues resolved in an action in which that person was not a party."); *W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.),* 591 F.3d 164, 172 (3d Cir. 2009) (debtor "will not be bound by any judgment against the third party in question"); *Pacor, Inc. v. Higgins,* 743 F.2d 984, 995 (3d Cir. 1984) ("Since Manville is not a party . . ., it could not be bound by res judicata or collateral estoppel."). This Court has previously recognized that neither *res judicata* nor collateral estoppel apply to a non-party. *The 1031 Tax Grp.,* LLC, 397 B.R. at 685.

50.     In *Queenie*, 321 F. 3d 282, the Second Circuit rejected "apprehension" of collateral estoppel as a basis for enjoining litigation against non-debtors:

> We have not located any decision applying the stay to a non-debtor solely because of an apprehended later use against the debtor of offensive collateral estoppel or the precedential effect of an adverse decision. **If such apprehension could support application of the stay, there would be a vast and unwarranted interference with creditors' enforcement of their rights against non-debtor co-defendants.**

*Id.* at 288 (emphasis added).

51.     The cases in which issue preclusion has been viewed as a risk to the debtor sufficient to justify an injunction are distinguishable because they typically involve actions against the debtor's principals, or directors and officers, sued in their capacity as agents of the debtor.[68]  The Diocese cannot establish an actual risk of collateral estoppel and *res judicata* if the State Court Actions to which it is not a party proceed.  Moreover, even if preclusion were a risk (it is not), it is not immediate given the early stage of the State Court Actions.[69]

52.     The Diocese attempts to avoid the lack of *actual* collateral estoppel or *res*

---

[68] *See, e.g., Lomas Fin. Corp. v. Northern Trust Co. (In re Lomas Fin. Corp.)*, 117 B.R. 64, 66-67 (S.D.N.Y. 1990) (action for fraud against **principals of debtor** by debtor's lender); *In re American Film Techs. v. Tarifero (In re American Film Techs.)*, 175 B.R. 847, 850 (Bankr. D. Del. 1994) (affirming a stay of litigation against the debtor's **directors**, while repeatedly holding that stays do not "last forever"); *Sudbury, Inc. v. Escott (In re Sudbury)*, 140 B.R. 461, 463 (Bankr. N.D. Ohio 1992) (enjoining actions against **present or former officers and directors**); *SN Liquid , Inc. v. Icon Int'l, Inc. (In re SN Liquid , Inc.)*, 388 B.R. 579, 585 (Bankr. D. Del. 2008) (enjoining actions against **present or former officers and directors**); *Majestic Star Casino, LLC v. City of Gary (In re Majestic Star Casino, LLC)*, Adv.No.10-50841(KG), 2010 Bankr. LEXIS1874, at 5 (Bankr. D. Del. Apr. 28, 2010) (Mem. Order.) (enjoining case against **debtor's most senior management**); *W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*, 386 B.R. 17 (Bankr. D. Del. 2008) (enjoining cases against non-debtor to whom the debtor had a ***contractual* indemnity obligation**); *In re Johns-Manville Corp.*, 40 B.R. 219 (S.D.N.Y. 1984) (enjoining direct actions against the **debtors' insurers** because the insurance sought was **property of the estate**); *In re Johns-Manville Corp.*, 26 B.R. at 429 (same).

[69] *In re Mariner Health Cent., Inc*., 2023 Bankr. LEXIS 95 at *45 (declining to enjoin litigation against non-debtors even where preclusion was a risk because litigation was in early stages; "there appears to be little if any imminent peril with respect to the Covered Actions").  The court also observed, "[I]t should be obvious that litigation proceeds frequently slowly, and certainly incrementally, to its final outcome, and that **at this early stage there is simply no identifiable likelihood of irreparable harm**.").  *Id.* at *48  (emphasis added).

*judicata* risk by claiming it is "in privity" with the Related Entities.[70]  However, the Diocese

makes no attempt to provide any justification or evidential support for that statement.  Further,

the cases it cites describe drastically different circumstances than those applicable here. *Buechel*

*v. Bain*, 97N.Y.2d 295 (N.Y. 2001) held that *law partners* wer bound by a decision against their

other *partner* and an *agent of their law firm*.  In *D'Arata v. New York Cent. Mut. Fire Ins. Co.*,

76 N.Y.2d 659 (N.Y. 1990), a plaintiff standing "in the shoes" of the insured was found to be in

legal privity with the insured. Finally, in *Watts v. Swuss Bank Corp.*, 27 N.Y.2d 270 (N.Y. 1970),

the court held that when the same individual prosecuted and managed litigation in two forums (in

one instance as the executor of his sister-in-law's estate and in one as the husband of an alleged

heir), both with the aid of the same law firm, he was bound by the first decision.

53.     The Diocese has failed to justify (1) that prosecution of the State Court Actions

implicates property of the estate or (2) that an apprehension of collateral estoppel or *res judicata*

justifies extension of the automatic stay. Therefore, the Diocese's request for a ruling that

Section 362(a) applies to the State Court Actions should be denied.

## II.     The Diocese Does Not Demonstrate Cause for a Section 105(a) Injunction

54.     In the Motion, the Diocese cites to the following factors to support a Section

105(a) injunction: (a) there will be dissipation of shared insurance, (b) the Related Entities could

be entitled to indemnification, (c) the Diocese could be subject to piecemeal litigation and

inconsistent judgments, (d) the Diocese risks liability from *res judicata* and collateral estoppel,

and (e) the prosecution of the State Court Actions would burden the Diocese's personnel. Each

---

[70] Motion at 32.

of these arguments fail.

**A. The Diocese Cannot Prove that Continued Prosecution of Each State Court Action Will Dissipate the Proceeds of Shared Insurance Policies.**

55.     The Diocese cannot prove that the prosecution of each State Court Action creates an imminent threat to its reorganization based on the purported dissipation of shared insurance. As discussed in above Section I, the Diocese cannot prove that each of the insurance policies it shares with the Related Entities will be diminished by the State Court Actions.

**B. The Diocese Has No Indemnity Obligations to the Related Entities.**

56.     The Diocese's argument that it has a substantial risk of indemnification liability if the State Court Actions are allowed to proceed is specious.[71] The Diocese cannot establish either contractual or common law indemnity obligations arising from the State Court Actions.[72] The Diocese has not identified any contractually obligated to indemnify any Related Entity for liability arising from any State Court Action, or for liability arising from child sexual abuse.[73]

57.     Any alleged common law indemnity claims of the Related Entities must fail as a matter of law on multiple grounds. Indemnification is the right of one party to shift a loss to another due to the nature of the relationship between the parties and may be based upon an express contract or an implied obligation. The Related Entities allege that they have the right to be indemnified by the Diocese for, among other things, any liability and costs incurred in

---

[71] Motion at 38.

[72] While this Court has speculated regarding the potential impact of contribution and indemnity claims in this Case, the Diocese had not yet been asked to prove the existence of such liability.

[73] Exhibit D (Transcript of Potzler Deposition), 82:21 – 84:1. Additionally, if a written contract existed, the Related Entities were required to attach such supporting documentation to their proofs of claim, which they did not. *See* Fed. R. Bankr. P. 3001(c).

connection with sexual abuse claims. The complaints filed by the Survivors in the State Court Actions assert direct claims relating to sexual abuse against the applicable Related Entities. Each Related Entity, as an independent legal entity, has its own liability to Survivors under New York law based on its own actions or inactions, including infliction of personal injury and emotional distress, negligence and gross negligence in hiring abusers, failing to take proper actions when notified of abuse, failing to supervise, and failing to comply with any alleged youth protection policies of the Diocese.

58. Common law indemnification is based on the concept that in certain instances, it is inequitable for the person determined to be liable to bear the burden of that liability.[74] In New York, common law indemnification enables an *innocent* person held liable for something to shift that liability to another person because of the relationship between the parties.[75]

59. Thus, under New York law, for common law indemnification claims to be asserted by the Related Entities against the Diocese, the Related Entity would have to establish that: (i) the Diocese had *exclusive responsibility* for the acts or omissions that resulted in the Survivor's damages and (ii) the Related Entities *committed no wrongdoings themselves* that contributed to the Survivors' losses.

---

[74] *Mas v. Two Bridges Assocs.*, 75 N.Y.2d 680, 690 (1990) ("Implied indemnity is restitution concept which permits shifting the loss because to fail to do so would result in the unjust enrichment of one party at the expense of the other").

[75] *See Konsky v. Escada Hair Salon*, 113 A.D.3d 656, 658 (App. Div. 2d Dep't 2014) ("the predicate of common-law indemnity is vicarious liability without actual fault on the part of the proposed indemnitee."); *Trustee of Columbia Univ. v Mitchell/Giurgolas Assoc*, 492 N.Y.S.2d 371 (App. Div. 1st Dep't 1985) ("In the classic indemnification case, the one entitled to indemnity from another had committed no wrong. . . ."); *XPO Logistics, Inc. v Malcomb*, 2021 N.Y. Misc. LEXIS 479, *13 (Sup. Ct. Feb. 5, 2021) ("With respect to the proposed common law indemnity claims, it is well established that 'since the predicate of [such claims] is vicarious liability without actual fault on the part of the proposed indemnitee, it follows that the party who has itself participated to some degree in the wrongdoing cannot receive the benefit of the doctrine'") (quoting *Trustee of Columbia Univ.*).

60.      As a matter of law, the Related Entities are not entitled to indemnification from

the Diocese because the Related Entities' prospective liability to the Survivors is the result of

their own breaches of duty and not vicarious liability for which the Diocese would be

responsible.  Given the independent duties the Related Entities had to the Survivors, as plead in

the State Court Actions, no indemnification claims could ever come into existence under

applicable law.

61.      As Judge Glenn observed when considering identical circumstances:

> [T]here is a large gap between general allegations regarding the Debtor's
> responsibility and the specific type of scenario giving rise to indemnification, and
> the Debtor has not articulated how the former could evolve into the latter.
> Specifically, the Debtor has failed to explain—even with a hypothetical—how any
> one of the State Court Actions could conclude in a way where the DRVC Related
> Party is found liable on a tort claim, but obtains an indemnification claim by which
> it would be able to show that it had no responsibility or wrongdoing under the
> precedents cited by the Committee."[76]

Here too, the Diocese fails to provide any explanation how an indemnity claim may actually

arise if the State Court Actions proceed.

**C.      Potential Contribution Claims Are Not Grounds for an Injunction.**

62.      In addition to failing to demonstrate that an indemnity claim may arise, the

Diocese also fails to explain how a possible contribution claim justifies an injunction of litigation

under Section 105(a).  The Diocese does not cite to a single case supporting that proposition. As

Judge Glenn also observed, "the absence of any such authority likely reflects that

indemnification and contribution are not synonymous for the purposes of the section 105(a)

---

[76] *Rockville* at 657.

analysis."[77]  Here, because the Committee is agreeing to prohibit collection on any judgment against the Related Entities without further order from this Court, there is no actual risk of a contribution claim becoming ripe.  However, even were such an event to happen, the Diocese has failed to show that the threat of such an unlikely event justifies an injunction.  Again in Judge Glenn's words, "[t]o the extent Survivors recover against solvent and insured [Related Entities], the Survivors could recover 100% of their claims while the [Related Entities] may have indemnification or contribution claims against the insolvent Debtor. This would likely mean that, at best, the [Related Entities] would receive *pro rata* distributions form the insolvent Debtor's estate. *One can certainly ask who should bear the loss – the Survivor or the [Related Entity]?*"[78]

**D. Speculation About Piecemeal Litigation and Inconsistent Judgments Does Not Support an Injunction.**

63.     The Diocese argues that courts have stayed non-debtor third party litigation under section 105(a) when the litigation involved common questions of fact and law and was more effectively resolved in one bankruptcy proceeding.[79]  The cases relied upon are inapposite.  In *Drennen v. Certain Underwriters at Lloyds of London (In re Residential Capital, LLC),* 563 B.R. 756 (Bankr. S.D.N.Y. 2016), the bankruptcy court addressed a post-confirmation insurance dispute for which the policies required arbitration in different foreign jurisdictions.  The insurers argued that they would be prejudiced by disparate arbitration rulings on coverage between the

---

[77] *Rockville* at 657, fn. 24.  Judge Glenn further observed that indemnification may implicate other factors that contribution claims do not and, that "enjoining litigation against non-debtors simply based on the risk of contribution claims arising from such actions would seem to be at odds with the principle . . . that status as co-defendants or joint tortfeasors alone does not warrant a stay." *Id.*

[78] *Id.* at 666, fn. 30 (emphasis added).

[79] Motion at 39-41.

excess and the primary carriers and a ruling by the bankruptcy court on the same issue.[80] The

court stayed the arbitration proceedings "until issues as to coverage under the primary, excess,

and second excess layers of [insurance] coverage are decided."[81] Because the issue in

*Residential Capital* was the same in all the proceedings—the extent of coverage under certain

policies—it made sense to have one court proceeding go forward instead of different arbitration

proceedings.[82]

64.     In *In re AP Indus., Inc.*, 117 B.R. 789 (Bankr. S.D.N.Y. 1990), the court issued a

Section 105 injunction to prevent inconsistent judgments on *the same cause of action*, a potential

fraudulent transfer of *estate property*. In addition to the Section 105 injunction, the *AP* court also

ruled that Section 362 applied because the non-bankruptcy actions were "a transparent attempt

by the Defendants to 'end run' the automatic stay. The actions constitute acts to exercise control

over property of the estate."[83]

65.     Finally, in *McHale v. Alvarez (In re The 1031 Tax Grp., LLC),* 397 B.R. 670, 683

(Bankr. S.D.N.Y. 2008), the court held that Section 362(a)(3) applied to parts of three lawsuits

brought against the debtor's former employees because some causes of action were derivative

claims that belonged to the estate. The court specifically reviewed the legal allegations and

determined that charges of conspiracy and aiding and abetting the principal's conversion of

---

[80] *Residential Capital,* 563 B.R. at 761-66.

[81] *Id.* at 775-77.

[82] *Allstate Ins. Co. v. Elzanaty*, 929 F. Supp. 2d 199 (E.D.N.Y. 2013) also dealt with staying arbitration on the *same issue* as was before the court, although bankruptcy was not involved.

[83] *AP Indus.,* 117 B.R. at 799.

Case 1-20-01016-CLB,   Doc 305,   Filed 11/21/23   Entered 11/21/23 20:20:43,
Description: Main Document  , Page 37 of 49

assets were derivative, as were generalized breach of fiduciary duty claims that arose from the defendants' employment by the debtor.[84]  In contrast, the court held that the claims against the former employees for fraudulent and negligent misrepresentation and violation of consumer statutes were direct claims that "allege[d] injuries particularized to the Plaintiffs" and, therefore, were not subject to the automatic stay.[85]  Here, the State Court Actions assert direct claims against the Related Entities.  The State Court Actions against the Related Entities do not seek recovery based exclusively on the Diocese's conduct or from the Diocese's assets, and the Diocese could not conceivably assert such personal injury claims derivatively against the Related Entities on behalf of the estate and the general creditor body.[86]

66.    The Diocese contends that "most, if not all of the State Court Actions assert common question of law and fact against the Diocese and the Related Entities."[87]  The Diocese provides no examples of such "common question of law and fact."  Even when directly asked, the Diocese's general counsel could provide no examples.[88] And the Diocese has not produced or offered into evidence a single State Court Action demonstrating a common question of law or

---

[84] *1031 Tax Grp.,* 397 B.R. at 681-83.

[85] *Id.* at 682.

[86] *See In re Johns-Manville Corp.,* 517 F. 3d 52, 63 (2d Cir. 2008) (vacating injunction of lawsuit against insurer alleging independent misconduct by insurer unrelated to misconduct of debtor); *Sobchack v. Am Nat'l Bank & Trust Co. of Chicago (In re Ionosphere Clubs, Inc.),* 17 F. 3d 600, 605 (2d Cir. 1994) (distinction between derivative and direct claims turns on whether breach of duty is to the debtor or the individual claimant, and whether the debtor or claimant should receive the relief).

[87] Motion at 40.

[88] Exhibit D (Transcript of Potzler Deposition), 105:13 – 108:17.  In fact, Ms. Potzler, the Diocese's witness to support its contention of the existence of common questions of law and fact, has only reviewed about ten State Court Actions in her role as the Diocese's general counsel. *Id.* at 18:15-20.

Case 1-20-01016-CLB,   Doc 305,   Filed 11/21/23,   Entered 11/21/23 20:20:43,
Description: Main Document  , Page 38 of 49

fact.

67.     As Judge Glenn observed, when ruling on an identical argument citing the same legal authority, in order to demonstrate the necessity of an injunction, the movant must demonstrate how factual or legal issues are common, a "general overlap in factual circumstances" is insufficient.[89]

### E.     Prosecution of the State Court Actions Will Not Expose the Diocese to Risks of Collateral Estoppel and Res Judicata.

68.     The Diocese again fails to provide any evidentiary support for its allegations regarding the risk of collateral estoppel and *res judicata*.[90]  Again, the Diocese makes factual statements regarding the State Court Actions and proofs of claim without providing the Court any supporting evidence.  The Court and the Committee cannot evaluate the veracity of the allegation that the Actions "primary allegations focus on the Diocese's conduct"[91] and, in fact, the State Court Actions support the contrary. The State Court Actions allege failures of the Related Entities independent of the Diocese and assert direct claims against the Related Entities. For example, the State Court Actions allege the abusers were employees of the Related Entities and the Related Entities were negligent in their training and supervision of such individuals.[92]

### III.     The Diocese Cannot Meet Its Burden of Proof on Any of the Four Traditional Factors the Court Must Consider to Enjoin the State Court Actions Under Section 105(a) and Rule 7065.

---

[89] *Rockville* at 660-61.

[90] *See supra* Section I.

[91] Motion at 30.

[92] Exhibit B (sample complaints filed in the State Court Actions).

Case 1-20-01016-CLB,    Doc 305,    Filed 11/21/23    Entered 11/21/23 20:20:43,
Description: Main Document  , Page 39 of 49

69.     Injunctive relief is an extraordinary remedy.[93]  The Diocese bears the burden of proof.[94]  Explicit findings of fact and conclusions of law by this Court are required and failure to make them is reversible error.[95]

70.     To obtain a stay of litigation against non-debtors under Section 105(a), the Diocese must satisfy all the prerequisites for an injunction in the Second Circuit.[96]  When, as here, the injunction is sought over three and a half years after the Petition Date and settlement discussions have not succeeded, this Court must examine the record before it without giving the Diocese the benefit of the doubt as it may have done in the immediate months after the case was filed or when the majority of the creditor constituency supported a continued injunction.[97]

71.     A preliminary injunction requires consideration of four factors: (1) likelihood of success on the merits, (2) imminent, irreparable harm to the estate absent an injunction, (3) the balance of harms tips in favor of the moving party, and (4) the public interest weighs in favor of an injunction.[98]  The recent diocesan cases in New York confirm the four "traditional" factors

---

[93] *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 24 (2008).

[94] *Id.* at 22*; see, e.g., In re Anje Jewelry Co., Inc.,* 47 B.R. 485, 487 (Bankr. E.D.N.Y. 1983).

[95] *Fengler v. Numismatic Americana, Inc.,* 832 F. 2d 745, 748 (2d Cir. 1987) (preliminary injunction vacated based on absence of factual findings to support relief).

[96] 2 COLLIER ON BANKRUPTCY ¶105.03 (16th ed. 2022) ("Unlike the automatic stay, a request for relief under section 105 must meet traditional requirements for an injunction, and must be presented and prosecuted in traditional formats."). *In re Anje Jewelry Co., Inc.,* 47 B.R. at 487 ("The court may issue a stay under section 105(a) only if the moving party satisfies the [] test established by the Second Circuit for the issuance of a preliminary injunction.").

[97] *See In re Mariner Health Cent., Inc.,* 2023 Bankr. LEXIS 95 at *29.

[98] *Winter,* 555 U.S. at 20.  *See also Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.,* 25 F.3d 119, 122 (2d Cir. 1994); *Nev. Power Co. v. Calpine Corp. (In re Calpine Corp.),* 365 B.R. 401, 409 (S.D.N.Y. 2007); *In re Anje Jewelry Co., Inc.,* 47 B.R. at 487.

must be applied.[99]  The Diocese cannot satisfy the requisite elements for a preliminary

injunction.

## A. The Diocese Cannot Demonstrate a Likelihood of Success Because Confirmation of the Diocese Plan Is Unlikely.

72.     In the bankruptcy context, "likelihood of success" means likelihood of a

successful reorganization.[100]  Bankruptcy courts are required to find particularized evidence of

the likelihood of plan confirmation or successful reorganization (and irreparable harm) before

ordering injunctive relief.[101]

73.     There is no evidence that the Diocese will likely confirm a plan.  Any confirmable

plan would require fair compensation to the Survivors to garner the necessary support.  A plan

containing third-party releases that is contested by the Survivors is unlikely to be confirmed and,

therefore, a successful reorganization is unlikely and an injunction of the State Court Actions

---

[99] *Rochester,* 2022 Bankr. LEXIS 1469 at *17; *Buffalo I,* 618 B.R. at 404-05; *Syracuse,* 628 B.R. at 580.  The Diocese argues that it is entitled to an injunction based on five considerations described in *The 1031 Tax Grp., LLC* and *Granite Partners* (Motion at 17).  While these considerations are relevant to whether the State Court Actions will cause immediate and irreparable harm to the Diocese, they are not a substitute for the traditional four elements required by the Second Circuit.  The Diocese's own citations are in accord.  *See, e.g., In re Purdue Pharma L.P.,* 619 B.R. at 45-46 and 58-62 (applying traditional injunction criteria); *Haw. Structural Ironworkers Pension Tr. Fund v. Calpine Corp.,* 2006 U.S. Dist. LEXIS 42499 at *13-18 (S.D.N.Y. Dec. 20, 2006) (same); *Calpine Corp. v. Nev. Power Co. (In re Calpine Corp.),* 354 B.R. 45, 48 (Bankr. S.D.N.Y. 2006) (same); *In re TK Holdings Inc.,* Bankr. D. Del. Adv. No. 17-50880, Docket No. 64-3, Transcript at 21:18-22:2 and 25:19-29:18 (same).  The Diocese cannot meet its burden under either set of factors.

[100] *In re Calpine Corp.,* 354 B.R. at 50; *In re Lyondell Chemical Co.,* 402 B.R. at 590 (successful reorganization is unknowable in the early days and may be a matter of whether the debtor is "on track," but any reasons to conclude that the debtor cannot reorganize weigh against this factor).

[101] *Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.),* 502 F.3d 1086, 1097 (9th Cir. 2007) (injunction vacated).  *Excel* instructs that a bankruptcy court must examine the record before granting an injunction and cannot rely on generalities alleged by the debtor, especially when an injunction is sought years after the case was filed rather than in the early days of the case.  *Accord, In re Mariner Health Cent., Inc.,* 2023 Bankr. LEXIS 95, at *29 (Bankr. N.D. Cal. Jan. 12, 2023).

Case 1-20-01016-CLB,   Doc 305,   Filed 11/21/23,   Entered 11/21/23 20:20:43,
Description: Main Document  , Page 41 of 49

must be denied on this basis alone.[102]  In particular, Survivors steadfastly object to a proposed

plan that broadly releases non-debtors, including the Related Entities that are the subject of

pending State Court Actions, without fair compensation.

74.     The Diocese does not cite to any "progress" it has made in the past year plus of

the Case.  The Diocese cites no progress in resolving disputes with its insurers or incentivizing

them to more seriously engage in negotiations.  The Diocese offers no solution to prevent

another three years of stagnated mediations.  The Diocese only cites to the fact that it is now

offering to contribute an amount that its neighboring Diocese of Syracuse is paying to settle

almost one-third the number of claims present here.[103]

### B.     The Diocese Cannot Meet Its Burden of Proving a Risk of Imminent, Irreparable Harm to the Estate.

75.     In the bankruptcy context, risk of "imminent, irreparable harm" means there must

be an imminent and substantial threat to the reorganization process posed by *each* action sought

to be enjoined.[104]

---

[102] *Rochester* at 18 ("[T]he Diocese also points to the serious possibility that it may seek to confirm a nonconsensual Chapter 11 plan—a plan that does not have the consent of the Abuse Survivors.  While obtaining confirmation of a non-consensual plan is not impossible, it makes the likelihood of a successful reorganization much more difficult. Given the Diocese's suggestion that it may seek to confirm a Chapter 11 plan without the consent of the Abuse Survivors, ***the Court cannot conclude that a successful reorganization is likely***.") (emphasis added); *see also In re Mariner Health Cent., Inc.,* Bankr. LEXIS 95 at *32 (debtor's likelihood of confirming a plan was "highly uncertain" and debtor failed to meet its burden on this prong where tort claimants could block confirmation of any plan that does not pay them in full while retaining ownership of assets).

[103] Motion at 45–46.

[104] *Shapiro v. Cadman Towers, Inc.,* 51 F. 3d 328, 332 (2d Cir. 1995) (injury must be neither remote nor speculative, and actual and imminent); *In re Calpine Corp.,* 365 B.R. at 410("[T]he threat to the reorganization process must be imminent, substantial and irreparable.") (citing *Haw. Structural*); *GAF Corp. v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 26 B.R. 405, 416-18 (Bankr. S.D.N.Y. 1983) (finding no showing of irreparable harm to the bankruptcy estate or that the balance of hardships favored an injunction notwithstanding movants' argument that there were unities of interest, they needed to jointly coordinate defenses, and there were pending disputes regarding insurance coverage).

76.     Enjoining litigation against non-debtors is only appropriate if the Diocese proves

the litigation threatens its reorganization. *In re Granite Partners, L.P.,* 194 B.R. at 38. ("The

trustee's proof falls well short of what he must show; he has not shown that the continuation of

these lawsuits will frustrate or thwart the reorganization because of their effect on [debtor's]

insurance coverage, or for any other reason."). The fact that the *Granite Partners* bankruptcy

case had been filed two years before the decision and no plan had been filed weighed against an

injunction.[105]

77.     The Diocese cannot prove that continued prosecution of the State Court Actions,

to which it is not a party, will divert critical resources and distract key personnel from the

Diocese's critical operations or its reorganization and mediation efforts. Courts require detailed

evidence of the alleged burden on reorganization for this factor to be considered in granting

injunctive relief.[106]

78.     The Diocese relies on the testimony of Ms. Potzler, who speculates regarding

---

[105] *In re Granite Partners, L.P.,* 194 B.R. at 338.

[106] *In re Calpine Corp.,* 365 B.R. 401, 411-12 (cited by the Diocese; irreparable harm finding based on evidence that a single individual was responsible for the work of 5 individuals that comprised his group before bankruptcy, that this individual was "integral and indispensable member of the restructuring team at [debtor] and devoted "30 to forty percent of his twelve hour work day directly to restructuring issues," and same individual was critical to the litigation against the debtor's guarantor that the debtor was seeking to stay); *Haw. Structural Ironworkers Pension Tr. Fund v. Calpine Corp.,* 2006 U.S. Dist. LEXIS 92499 at *5-7 (cited by the Diocese; irreparable harm finding based on testimony of Chief Accounting Officer regarding time and attention he and his staff spent on reorganization, their involvement in responding to discovery requests, their availability to respond to lawyer inquiries, and that two executives handling contract review relating to assumption and rejection of leases would be needed in connection with the state court litigation).

*Compare In re Mariner Health Cent., Inc.,* 2023 Bankr. LEXIS 95 at *38-39 (Court finds debtors' claim of distraction from reorganization efforts unconvincing where there was no precise evidence of senior management distraction due to pending litigation against non-debtors or of particularized harm from such distraction); *In re Aearo Techs. LLC,* 642 B.R. at 911 (same; "Undoubtedly those 3M employees tasked with providing services [] are busy and likely taxed on a regular basis… But the Court has otherwise heard no evidence to conclude that Aearo's operations or its administration of these bankruptcy cases will be impacted in the manner that Aearo argues.").

Case 1-20-01016-CLB, Doc 305, Filed 11/21/23, Entered 11/21/23 20:20:43,
Description: Main Document , Page 43 of 49

Diocesan involvement in the State Court Actions if they move forward.[107] Ms. Potzler's only

rationale for the Diocese's involvement is a misguided belief that the Diocese risks

indemnification liability.[108] Ms. Potzler only joined the Diocese after the bankruptcy filing and

has no first-hand knowledge of the work done by Diocesan staff on the CVA cases to which the

Diocese *was* a party and her concern regarding the burden of cases to which the Diocese *is not* a

party is entirely speculative.[109] Further, the Diocese does not explain how the key personnel are

critical to the Diocese's reorganization efforts three and a half years into the case.

79.     The Diocese does not allege outstanding discovery demands, pending trial dates,

or factors that would disable its personnel from fulfilling their unexplained roles in the Diocese's

reorganization efforts.  To the extent the Diocese is required to participate in the State Court

Actions against the Related Entities, which the Committee disputes, the Diocese has vast

professional resources available, which mitigate, if not entirely eliminate, any immediate harm to

its reorganization effort.

80.     Yet again, Judge Glenn considered this exact argument and, given an identical

relationship between the Diocese and the State Court Actions, determined that the Diocese failed

to explain "why its 'relationship' with the [Related Entities] would necessitate an in-depth

involvement with cases brought solely against the [Related Entities]."[110] He further ruled that

---

[107] Potzler Dec., ¶5. Mr. Scholl may have a limited involvement as to insurance, but that involvement will be mitigated by the order prohibiting enforcement of judgments against Related Entities.

[108] *See supra* Section II.B

[109] Exhibit D (Transcript of Potzler Deposition), 18:1–3 ("Q: DO you have any experience working on the CVA cases prior to the bankruptcy? A: No.").

[110] *Rockville* at 663.

"some cognizable harm" differs from "irreparable harm" in three ways: (1) courts typically rely on more than distraction to find irreparable harm; (2) reliance on the harm of distraction must be counterbalanced with a likelihood of success; and (3) the alleged distraction harm would not have "an imminent and irreparable effect on those chances of success." *Id.* at 663–65.

### C.  The Harm to Survivors Outweighs Harm to the Estate.

81.     Survivors' harm from an injunction of the State Court Actions is plain.  "[T]he clear damage to the plaintiffs is the hardship of being forced to wait for an indefinite and, if recent experience is any guide, a lengthy time before their causes are heard . . . . [P]laintiffs and crucial witnesses are dying. . . . "[111]

82.     The Diocese ignores the egregious nature of the sexual abuse suffered by the Survivors, their advancing age and deteriorating health, and the fact that some Survivors have already died and more will pass during the pendency of an injunction.[112]

83.     First, the Survivors' right to have their cases heard by a jury has been significantly delayed by a stay that has been in place for three and a half years; the injunction will impose further delay.  Second, many of the Survivors experienced sexual abuse decades ago and are elderly or ill, or both.  An injunction means some Survivors will never receive compensation or see the perpetrators of their sexual abuse held accountable.  At least fifteen Survivors have passed since the statutory window was expanded and others may pass before their case is heard. Third, litigation delays create a risk of further memory loss and lack of

---

[111] *Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068, 1076 (3d Cir. 1983).

[112] The Diocese's alleged concern for Survivors is disingenuous and disregards the harm of **four** years (not a "temporary") stay of litigation.

witnesses, which increases the burden on Survivors to prove their claims and diminishes the

value of their claims. Fourth, the Survivors have asserted direct claims against non-debtors, and

a broad injunction will prejudice the Survivors by precluding critical discovery from solvent

non-debtors.[113]

84.     Prosecution of the State Court Actions will advance, rather than impede, the goals

of a global settlement by incentivizing the Related Entities and insurers to make payments

commensurate with the risk they seek releases for. Discovery in, and trials of, the State Court

Actions will establish the strength and value of the Survivors' claims. This will advance the

settlement process and enable the parties to price plan releases the Related Entities seek. Absent

valuation of these claims at trial, this Court, or the district court, could be tasked with a massive

estimation proceeding in connection with a contested plan. In addition, discovery will aid

---

[113] *See Rochester*, 2022 Bankr. LEXIS 1469 at *20-21 (finding that the balance of speculative harms to the Diocese weighed against the harms to survivor-plaintiffs in connection with a proposed injunction favored survivor-plaintiffs). In *Rochester,* Judge Warren forcefully explained:

[W]hat is not academic is the fact that those Abuse Survivors lost the chance to seek justice in a court of law. Given the age of many of the Abuse Survivors, if enjoined from going forward with actions against the independent Catholic Corporations, it is likely that more will be denied the chance to seek justice because the sands of time are working against them. Additionally, given the Diocese's unequivocal threat to pursue a non- consensual Chapter 11 plan, the valuation of CVA claims becomes vitally important to the confirmation process. The state courts are far better equipped to handle the trial of CVA cases (and provide the valuation of CVA claims) than is the bankruptcy court or the district court. And, the Abuse Survivors are entitled to have juries hear their cases—an option rarely available in bankruptcy courts.

*Id.* at *19-20. In *Rockville*, Judge Glenn equally forcefully concluded:

For every day the injunction lasts, they are not only prevented from pursuing recovery on their claims, but their ability to prove their underlying case is weakened. For many Survivors, allowing time to pass means that they simply may not be able to recover either because the evidence for their case is lost, or because they themselves do not live long enough to press their claims. Importantly, these are claims they would be entitled to bring, if not for the stay in this case. It is clear that these harms to the Survivors become more significant with each passing day in this case, and in the past thirty months have eclipsed what is now a much more incidental—and certainly less consequential—harm for the Debtor, in having a limited role in participating in litigation against non-debtors."

*Rockville* at 666.

settlement negotiations by providing the facts and transparency necessary in mediation.

85.     By contrast, while the State Court Actions are stayed, the Related Entities and their insurers have no incentive to settle in an amount that reflects their litigation risk and costs, and mediation negotiations will remain at a standstill.  The Diocese, the Related Entities, and the insurers can afford to do nothing while litigation is at standstill and justice continues to be denied to the Survivors.  At the risk of stating the obvious, the insurers and the Related Entities benefit from delay beyond diminishing the value of the Survivors' claims because the insurers continue to earn returns on their invested reserves and the Related Entities do not have to pay their self-insured retentions and continue to earn investment returns on those funds.

86.     At this stage of the case, the Motion is a cynical attempt by the Diocese to tilt the leverage in this case in favor of itself and the Related Entities, rather than a legitimate effort to facilitate a reorganization.  *In re Mariner Health Cent., Inc.,* 2023 Bankr. LEXIS 95 at *58 (characterizing debtor's motion to enjoin litigation against non-debtor affiliates as "leverage shifting," and noting that "certainly does not support a request for injunctive relief"). The Diocese should not be allowed to bully Survivors through attrition into taking its inadequate offer and then force survivors to spend those already insufficient funds to attempt to collect from the *Diocese's*  insurers.  It is the Diocese and its affiliates that caused the harm that led to this bankruptcy, it is their insurers that refuse to fairly compensate survivors, they must bare the burden of resolving this bankruptcy.

**D.     The Public Interest Is Not Advanced by an Injunction.**

87.     To the extent this element means promoting the likelihood of a successful

reorganization or allowing settlement discussions to proceed without the distraction and expense of litigation, no public interest will be served by an injunction. As discussed above, the Diocese Plan cannot be confirmed without Survivor support. The public interest is advanced by motivating the Related Entities and their insurers to realistically evaluate their litigation expense and risk. *See Rochester,* 2022 Bankr. LEXIS at *22 ("[W]hat good are future charitable works if the people (children at the time) who suffered horrific acts of sexual abuse in the past (allegedly at the hands of clergy) are silenced?").

88.     In the bankruptcy case of the *Roman Catholic Bishop of Great Falls*, the court recognized the "therapeutic" value of letting litigation proceed against parishes when settlement discussions had stalled.[114] The three and a half year stay of litigation against the Related Entities has led to a stall in global settlement discussions rather than creating a path to a consensual plan. Allowing the litigation to proceed is the only way to incentivize the insurers and the Related Entities to meaningfully assess their litigation risk for purposes of any future negotiations.

89.     The public's interest in accountability and a meaningful resolution weighs strongly in favor of allowing the Survivors to pursue the State Court Actions pending against the Related Entities in which the Diocese is not a party and there is no immediate impact on shared insurance.

## **CONCLUSION**

---

[114] In *In re Roman Catholic Bishop of Great Falls*, 584 B.R. 335, 340 n.7 (Bankr. D. Mont. 2018), the court stated:

The Court also believes that **prosecution of the Avoiding Actions may have a therapeutic effect on the parties' attitudes about the desirability of a negotiated resolution to the issues raised in this case, and perhaps motivate them to consider a consensual plan**. Thus far, the parties have been unsuccessful in achieving any consensus on the appropriate outcome in this case. In the absence of a settlement, the Court believes litigation is the only means to clarify the parties' respective interests in the case, albeit an expensive, less desirable approach when compared to a compromise. (Emphasis added).

For the reasons set forth above, the automatic stay of section 362(a) is inapplicable and a preliminary injunction under section 105(a) is not available because the Diocese cannot meet its burden of proof on the four factors necessary to obtain an injunction. The Committee respectfully requests that the Court enter an order denying the Motion.

Dated: November 21, 2023

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Brittany M. Michael*
James I. Stang
Ilan D. Scharf
Iain A.W. Nasatir
Brittany M. Michael
780 Third Avenue, 34th Floor
New York, New York 10017-2024
Telephone: 212-561-7700
Facsimile: 212-561-7777

*Counsel to Official Committee of Unsecured Creditors*

4880-1907-0353, v. 9