1                UNITED STATES BANKRUPTCY COURT

2                WESTERN DISTRICT OF NEW YORK

3    _____

4    IN RE:                    Case No: 20-10322 (CLB)

5    THE DIOCESE OF BUFFALO, N.Y.,

6            Debtor.              Chapter 11

7    _____

8    THE DIOCESE OF BUFFALO, N.Y.,

9            Plaintiff,         Adv. No: 20-01016

10       v.

11   JMH 100 DOE, ET AL.,            Chapter 11

12           Defendants.

13   _____

14                     DEPOSITION

15   _____

16

17   WITNESS:          JOHN M. SCHOLL

18   DATE:             Thursday, November 16, 2023

19   START TIME:       11:11 a.m.

20   END TIME:         3:50 p.m.

21   REMOTE LOCATION:  Remote Legal platform

22   REPORTER:         Jaime Godinez, CER-1260

23   JOB NO.:          20996

24

25

```
 1              A P P E A R A N C E S

 2

 3        BOND, SCHOENECK & KING

 4        One Lincoln Center

 5        Syracuse, New York 13202

 6        By:  BRENDAN SHEEHAN, ESQUIRE

 7        By:  CHARLES SULLIVAN, ESQUIRE

 8        By:  JUSTIN KRELL, ESQUIRE

 9        By:  STEPHEN DONATO, ESQUIRE

10             bsheehan@bsk.com

11        Appearing for The Diocese of Buffalo, N.Y.

12

13        PACHULSKI STANG ZIEHL & JONES LLP

14        10100 Santa Monica Boulevard, 13th Floor

15        Los Angeles, California 90067

16        By:  IAIN A.W. NASATIR, ESQUIRE

17        By:  BRITTANY M. MICHAEL, ESQUIRE

18        By:  ILAN SCHARF, ESQUIRE

19             inasatir@pszjlaw.com

20        Appearing for Official Committee of Unsecured

21        Creditors

22

23   ALSO PRESENT:

24        Sarah Schroeter, Notary Public

25
```

1            I N D E X   O F   T E S T I M O N Y

2

3    EXAMINATION OF JOHN M. SCHOLL:                    PAGE

4         By Mr. Nasatir                              7

5         By Mr. Sheehan                             142

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X   O F   E X H I B I T S

2                      (Available for download)

3

4     EXHIBIT         DESCRIPTION                        PAGE

5     SCHOLL 1        Declaration of John M. Scholl Re

6                     Self-Insurance Program              35

7     SCHOLL 2        DOB_General12616                    48

8     SCHOLL 4        Buffalo Initial Coverage Chart

9                     2023                               127

10    SCHOLL 5        DOB_Insur00015222Confidential(4)   128

11    SCHOLL 6        DOB_Insur00015226Confidential(63)  130

12    SCHOLL 7        DOB_Insur00015228Confidential(79)  134

13    SCHOLL 8        DOB_General00000023(87)            138

14    SCHOLL 10       Objections and Responses to

15                    Committee's 1st Set of Discovery    15

16    SCHOLL 11       STARS Loss Report Re Misconduct

17                    Claims 7/1/2013-Present             18

18    SCHOLL 12       DOB_General00003167                 22

19

20

21

22

23

24

25

1                P R O C E E D I N G S

2                THE REPORTER:  Good morning.  We are now

3    on the record.  Today's date is November 16th, 2023, and

4    the time is approximately 11:11 a.m. Eastern.  My name

5    is Jaime Godinez, and I'm the officer designated by

6    Remote Legal, 11 Broadway, Suite 456, New York, New

7    York, to take the record of this proceeding.

8                This is the deposition of John M. Scholl,

9    taken in the matter of In Re: The Diocese of Buffalo,

10   New York, Case Number 20-10322 CLB, filed in the United

11   States Bankruptcy Court, Western District of New York.

12               Would all counsel please identify

13   themselves for the record, starting with the noticing

14   attorney, and state who they represent.

15               MR. NASATIR:   Iaian Nasatir, Pachulski

16   Stang, on behalf of the Committee.

17               MR. SHEEHAN:  Good morning.  Brendan

18   Sheehan, the firm Bond, Schoeneck & King, on behalf of

19   The Diocese of Buffalo.  We also have from Bond,

20   Schoeneck & King attorneys Stephen Donato, Charles

21   Sullivan, and Justin Krell.

22               MR. NASATIR:  And I'll identify for the

23   record that Ilan Scharf, my partner, Ilan Scharf, and

24   Brittany Michael from Pachulski Stang are attending

25   also, well, by audio.

1                    THE REPORTER:  Thank you so much.

2                    And will the notary please identify

3    herself for the record.

4                    THE NOTARY PUBLIC:  Good morning.  My

5    name is Sarah Schroeter, I'm a notary public for Remote

6    Legal.

7                    THE REPORTER:  Thank you.

8                    This deposition is being taken remotely

9    and is being conducted pursuant to the procedural rules

10   and laws of the state which governs this matter.  As

11   such, all parties agree to this means of capturing the

12   official record, which may include recording by audio

13   and/or audiovisual means, and agree not to oppose

14   admission of this proceeding on the basis of the

15   personnel, or method by which the testimony in this

16   proceeding was captured.

17                   Do the parties so stipulate?

18                   MR. NASATIR:  Yes.

19                   MR. SHEEHAN:  Yes.

20                   THE REPORTER:  Thank you.

21                   Would the notary please swear in the

22   witness.

23                   THE NOTARY PUBLIC:  Good morning, Mr.

24   Scholl.

25                   MR. SCHOLL:  Good morning.

1          THE NOTARY PUBLIC:  Would you please

2   state and spell your name for the record?

3          MR. SCHOLL:  John Scholl, J-O-H-N, last

4   name, S-C-H-O-L-L.

5          THE NOTARY PUBLIC:  Thank you.  Mr.

6   Scholl, would you please raise your right hand.  Do you

7   swear or affirm that the testimony you are about to give

8   will be the truth, the whole truth, and nothing but the

9   truth?

10          MR. SCHOLL:  I do.

11   WHEREUPON,

12          J O H N  M.  S C H O L L

13   having been called as a witness, being duly sworn by the

14   notary public present, testified as follows:

15          THE NOTARY PUBLIC:  Thank you.

16          THE REPORTER:  Thank you.

17          Counsel, you may begin.

18                    EXAMINATION

19   BY MR. NASATIR:

20      Q    Good morning, Mr. Scholl.

21      A    Good morning.

22      Q    My name is Iain Nasatir.  I'm a partner in the

23   law firm of Pachulski Stang, representing the Committee,

24   and I'll be asking you some questions today about your

25   declaration that was submitted back in 2020.

1          Let me start with, could you provide your name

2   and address, current address, for the record.

3       A    Yes.

4       Q    Could you provide your current address for the

5   record, please.

6            MR. SHEEHAN:  He's asking for your

7   current address.

8            THE WITNESS:  For work?

9            You want my home address or my work

10  address?

11  BY MR. NASATIR:

12      Q    Yes.  So that your -- so the transcript can be

13  mailed to you.

14      A    Okay.  It's 231 Crescent Avenue, C-R-E-S-C-E-

15  N-T, Buffalo, New York 14214.

16      Q    Thank you.  Have you been deposed before?

17      A    Yes.

18      Q    How many times?

19      A    I don't recall exactly.  Just one or two.

20      Q    Okay.  Can you tell me the circumstances under

21  which you gave testimony by deposition?

22      A    For other diocese liability cases.

23      Q    Can you be more specific, please?

24      A    I don't recall the exact cases.  They were

25  personal injury, trip and fall type cases and lawsuits

1    where I was deposed.

2        Q    And what was the nature of the testimony you

3    gave?

4        A    Relative to insurance coverage for the -- the

5    matter at hand.

6        Q    Okay.  So your testimony related to the

7    insurance available, that was issued to the Diocese; is

8    that right?

9        A    That's correct.

10        Q    Okay.  Do you recall, was it the Diocese of

11    Buffalo?

12        A    Yes.

13        Q    Okay.  Have you ever testified in court?

14        A    Yes.

15        Q    How many times?

16        A    Once.

17        Q    Okay.  What was the circumstances under which

18    you gave testimony in court?

19        A    I was -- I had testified before a grand jury

20    for the I -- what we call the IRCP program for the

21    Diocese of Buffalo, which I'm sure you're familiar with.

22        Q    Was this a grand jury investigation that was

23    created by the New York Attorney General's Office?

24        A    I'm not aware who --

25        Q    Okay.

1     A    -- who did it.  All I know is, I was asked to

2   testify.

3     Q    Okay.  And the scope of your testimony was the

4   IRCP program?

5     A    Correct.

6     Q    Okay.  Do you have any recollection of

7   approximately when that testimony took place?

8     A    About three years ago.  Two to three years

9   ago.

10    Q    Okay.  I'm going to go through some of the

11  rules of the deposition road.  I'm sure you're familiar

12  with them, but just in case, since it's been a while,

13  let me go through them.

14         Because you're under oath you have an

15  obligation to tell the truth.  Do you understand that?

16    A    Yes.

17    Q    Okay.  Everything we say here is on the record

18  and will appear in a written transcript.  Do you

19  understand that?

20    A    Yes.

21    Q    You've seen a deposition transcript before,

22  have you?

23    A    Yes, I have.

24    Q    Okay.  With that, the transcription of this

25  deposition will be given to you, you'll have an

1 opportunity to review it, make changes to the transcript

2 before a certain deadline, and then sign it.  Do you

3 understand that?

4      A    Yes.

5      Q    To the extent you make any changes to the

6 deposition, I, or another attorney on my behalf, will be

7 able to comment on the changes made after to live

8 testimony.  Do you understand that?

9      A    Yes.

10      Q    Okay.  If you don't understand my question,

11 will you please let me know?

12      A    Yes, I will.

13      Q    Okay.  It's important that we don't speak at

14 the same time.  I will try and let you finish your

15 answers, I'd appreciate if you'd let me finish my

16 questions.  Understood?

17      A    Yes.

18      Q    Are you comfortable that you understand the

19 rules we've just discussed?

20      A    Yes.

21      Q    All right.  You're going to testify as a fact

22 witness as opposed to an expert witness; is that your

23 understanding?

24      A    Yes.

25      Q    Okay.  Where are you located right now?

     1      A      In the offices of Bond, Schoeneck & King, in

     2   Buffalo, New York.

     3      Q      Okay.  And you have a lawyer present to

     4   represent you?

     5      A      Yes.

     6      Q      And who is that?  Is that Mr. Sheehan?

     7      A      Yeah, Brendan Sheehan.

     8      Q      Okay.  Is there anyone else in the room with

     9   you?

    10      A      No.

    11      Q      Do you understand that you're not allowed to

    12   contact anyone else about the subject of this

    13   deposition, now you've been sworn in?

    14      A      Correct.  Yes.

    15      Q      Okay.  You understand it's my position if you

    16   do have discussions with anyone, including your counsel,

    17   I'm entitled to inquire as to the nature of those

    18   communications, and you are required to disclose them.

    19   Do you understand that?

    20      A      Yes.

    21      Q      Is there any reason you cannot testify

    22   competently and truthfully today?

    23      A      No reason.

    24      Q      Excellent.  Your declaration has provided me

    25   with sufficient background for your education.  So

1    perhaps you could just tell me the chronology of your

2    employment at the Diocese.

3         A    The Diocese, I was hired in March of 1999 to

4    become the insurance services director, to take over for

5    someone who had left that position.

6         Q    Okay.  And you continue in that position

7    today?

8         A    Yes, I do.

9         Q    Okay.  How old are you, sir?

10        A    69.

11        Q    Got it.  Have you ever been a party to a

12   lawsuit personally?

13        A    No.

14        Q    Okay.  Have you ever testified in a tribunal

15   other than a court?

16        A    No.

17        Q    All right.  Have you ever been subject to any

18   form of disciplinary proceeding?

19        A    No.

20        Q    Okay.  Did you prepare -- did you review any

21   materials to prepare for your deposition today?

22        A    Yes, I -- I reviewed my declaration from 2020.

23        Q    Okay.  Anything else?

24        A    I did review the motion itself.

25        Q    The motion for a preliminary injunction?

```
 1        A     Yes.  Just to --

 2        Q     Anything else?

 3        A     -- familiarize --

 4        Q     Excuse me.  I spoke over you.  Say that again.

 5        A     I said, just to familiarize myself with that

 6   motion.

 7        Q     Okay.  Did you review Ms. Potzler's

 8   declaration in support of the motion?

 9        A     Yes, I did review that, as well.

10        Q     Okay.  Was there anything you saw in Ms.

11   Potzler's declaration you thought was inaccurate?

12        A     No.

13        Q     Okay.  When you reviewed your -- well, having

14   reviewed your declaration of April 30th, 2020, was --

15   did you determine that it was truthful when you signed

16   it back in 2020?

17        A     Yes.

18        Q     Okay.  And do you believe it to be truthful as

19   it sits here today?

20        A     Yes.

21        Q     Okay.  Were you involved in the production of

22   documents responsive to the Committee's document request

23   relating to the preliminary injunction?

24        A     Not sure what you mean.  Can you repeat that?

25        Q     Sure.  Let me see if I can successfully pull
```

1  up an exhibit, and we'll discuss it that way.  All

2  right.

3      A    I did submit a number of documents to Bond,

4  Schoeneck & King, as it relates to this matter.

5      Q    Okay.  And I'm going to try and share an

6  exhibit.  Review.  Do you see a document on your screen?

7  Do you have a screen?

8      A    Yes.

9          MR. NASATIR:  Okay.  I'd like the

10  reporter to mark this as Scholl Deposition Exhibit 10.

11     (Scholl 10 marked for identification.)

12          MR. SHEEHAN:  Are you able to read that?

13          THE WITNESS:  Oh, yes.

14          MR. SHEEHAN:  Okay.

15          MR. NASATIR:  Well, if I understand it

16  correctly, you have the ability to zoom in on them.

17          MR. SHEEHAN:  Yes, correct.

18          MR. NASATIR:  And you can also hit the

19  full screen.  That would help you, too.

20          THE WITNESS:  I can read it fine.

21  BY MR. NASATIR:

22     Q    All right.  So Mr. Scholl, have you seen this

23  document before?

24     A    I don't recall.

25     Q    Okay.  In this, I'm just going to -- all

1   right, here we go, for one of these.  This request,

2   Number 10, that I've zoomed in on, do you -- can you

3   read it?

4        A    Yes.

5        Q    Do you see it says, "All documents concerning

6   the costs of the IRCP program."

7                  MR. SHEEHAN:  One moment, please.

8                  MR. NASATIR:  Sure.

9                  MR. SHEEHAN:  Let us know when you've had

10  a chance to read --

11                 THE WITNESS:  All right.

12                 MR. SHEEHAN:  -- Number 10.

13  BY MR. NASATIR:

14       Q    What I want to address here is the document

15  numbers that are down here.  Do you know if you

16  participated in a search for documents that are

17  responsive to this request?

18       A    Yes.

19       Q    Yes, you did participate?

20       A    I -- I'm not sure exactly what you're asking.

21  To this -- what is, "this request"?  Request Number 10?

22       Q    Yeah.

23       A    "All documents concerning" -- okay.

24       Q    Let me ask it a different way, Mr. Scholl.

25       A    Yeah.

```
 1        Q    You were asked for search -- to search for

 2   documents recently; is that right?

 3        A    Recently?  Yes.

 4        Q    Did your attorneys ask -- did an attorney from

 5   Bond, Schoeneck & King ask you to search for documents?

 6             MR. SHEEHAN:  Objection, to the extent

 7   that answering would call for attorney-client privileged

 8   information, I'd instruct you not to answer.  If you can

 9   answer without doing so, you may.

10             THE WITNESS:  No.

11             MR. NASATIR:  So Mr. Sheehan, I really

12   want to cut to the quick here.  You represented to me in

13   an email that the documents were produced from Mr.

14   Scholl's review of documents from the Diocese

15   administrative records, something to that effect.

16             MR. SHEEHAN:  Yes.  As we represented to

17   you, that the documents we produced, I believe it was

18   last Friday, were provided by Mr. Scholl.

19             The objection is to the extent that

20   you're asking him specifically what we asked him to

21   search for.  That information is privileged.

22             MR. NASATIR:  I just want to understand

23   what he did.  So just --

24             MR. SHEEHAN:  Okay.

25   BY MR. NASATIR:
```

         1        Q    Mr. Scholl, I'm directing this to you.  What

         2   did you do to search for documents?

         3        A    I had records on my computer.  I also had

         4   some, say, paper file records in my office at the

         5   Diocese.  And yes, I -- I did search for records to

         6   provide to Bond, Schoeneck & King.

         7        Q    And what were the grounds on which you

         8   determined that the documents you were searching for

         9   were ones that would be produced to the Committee?

        10        A    Their relevance to just information about the

        11   insurance program itself.

        12        Q    Okay.  And in particular, the IRCP program?

        13        A    No.

        14        Q    You said no or yes?  I couldnâ€™t hear you.

        15        A    No.

        16                MR. NASATIR:  Oh.  Okay.  Okay.  I need

        17   to stop sharing the other exhibit.  How do I go about

        18   doing that?

        19                THE REPORTER:  I'll go ahead and close

        20   that exhibit for you.  Just give me a moment.

        21                MR. NASATIR:  Thank you very much.

        22                And let's mark this as Scholl Deposition

        23   Exhibit 11.

        24        (Scholl 11 marked for identification.)

        25   BY MR. NASATIR:

1    Q    Mr. Scholl, can you identify this document?

2    A    Yeah.  That is a loss report through what we

3 call STARS claim management system.  And it represents

4 information on misconduct claims between July 1st, 2013,

5 and present.

6    Q    And when we say misconduct claims, are we

7 talking about sexual abuse alleged claims?

8    A    It -- sexual abuse, and sexual harassment.

9 Anything in the misconduct area of insurance.

10    Q    Okay.  Why is the inception date July 1, 2013?

11    A    Because I provided 10 years' worth of loss

12 information.  And that began in July 1st of 2013.

13    Q    Does the Diocese operate on a calendar year

14 basis of July 1?

15    A    No.

16    Q    What's the relevance of the July 1 date?

17    A    That is the -- what I'll call the insurance

18 year.

19    Q    Okay.

20    A    The majority of our insurance policies run

21 from July 1 to July 1, and that it what we consider our

22 insurance year.

23    Q    Got it.  So this -- is this the totality of

24 misconduct claims that your loss run cultivated for the

25 time after July 1, 2013?

```
 1      A    That we were aware of, yes.

 2      Q    Okay.  Does this include claims that are

 3  represented by proofs of claims filed in the bankruptcy?

 4      A    No.

 5      Q    Do these -- does this list represent

 6  litigation claims?

 7      A    Poten -- not all of them, but potentially some

 8  of them, yes.

 9      Q    But it also includes other claims that have

10  not been brought to litigation?

11      A    Correct.

12      Q    Okay.  And this loss run captures the costs

13  that have been incurred to date?

14      A    Yes.

15      Q    And that would be the last column on the

16  right?

17      A    That would be the -- the total cost of a

18  particular claim, correct.

19      Q    Okay.  And does this include both open and

20  closed claims?

21      A    Yes.

22      Q    So if I understand this correctly, and please

23  let me know if I don't, the total incurred claims here

24  is 1 -- cost -- so the total incurred cost of these

25  misconduct claims is $1,142,130.04?
```

```
1        A    That would be the total incurred.  Correct.

2        Q    Okay.  Thank you.

3             MR. NASATIR:  All right.  All right.  I'm

4   finished with this exhibit, so you can remove it.  Thank

5   you.  All right.

6   BY MR. NASATIR:

7        Q    In the course of -- or prior to your

8   deposition have you met with Ms. Potzler about the

9   preliminary injunction?

10       A    No.

11       Q    Okay.  Have you spoken to Ms. Potzler about

12  the self-insurance program, which I'm going to refer to

13  as SIP?  Do you understand SIP is self-insurance

14  program?

15       A    Yes.  Yes.

16       Q    And did you meet with Ms. Potzler about that

17  program?

18       A    In what --

19            MR. SHEEHAN:  Objection.

20            THE WITNESS:  In what -- in what time

21  period?

22  BY MR. NASATIR:

23       Q    In the context of preparing for your

24  deposition.

25       A    No.
```

1    Q    Okay.  Do you have access to the priest files?

2    A    No.

3    Q    Prior to working for the Diocese of Buffalo,

4  did you have any prior relationship with the Diocese of

5  Buffalo?

6    A    No.

7    Q    Did you have a prior relationship with any

8  diocese, other than the Diocese of Buffalo, before they

9  hired you?

10    A    No.

11    (Pause.)

12        MR. NASATIR:  I apologize.  I'm looking

13  through the document production and I'm having a little

14  difficulty finding what I want.  Here we go.  Can you

15  mark this document, please, as Scholl Exhibit 12.

16    (Scholl 12 marked for identification.)

17  BY MR. NASATIR:

18    Q    Have you seen this before, Mr. Scholl?

19    A    I -- I don't recall seeing this document

20  before.

21    Q    Okay.  I'm going to scroll down and say that

22  this is DOB_Gen0003167.  It was part of the production

23  made on Friday, November 10th.

24        MR. SHEEHAN:  And was this a document

25  that was produced on the 10th, or that was referenced in

1   our responses?

2            MR. NASATIR:  I believe it was produced

3   on the 10th.  But it may have -- it may have been --

4   come from -- there was only two sources it would've come

5   from, the documents produced on the 10th, or productions

6   that were put into Everlaw.  And as I say, it bears a

7   Bates stamp number.

8   BY MR. NASATIR:

9       Q    If you don't recall seeing this document

10  before, Mr. Scholl, I'm just going to ask you if you

11  would read it, and tell me if you see anything that you

12  either disagree with or that you're not familiar with.

13      A    Okay.  I'll do that.

14      Q    You said, compared with that?  Is that the

15  question to me?

16      A    No.

17      Q    Okay.

18      A    I didn't say anything.

19      Q    Okay.  I just wanted you to read this and let

20  me know if there's anything in here which you thought

21  was either inaccurate or was information that you did

22  not have before.

23      A    This is information I did not have before.

24      Q    Okay.  Then we're going to close this off.

25  Okay.

1          Are you involved in coordinate efforts of

2    defense counsel in Child Victim Act cases prior to the

3    Diocese filing for bankruptcy?

4          A    Yes.

5          Q    Can you give -- tell me the nature of your

6    involvement?

7          A    Prior to the Child Victim Act going in --

8    going into law, there were a number of, we'll say,

9    lawsuits that were filed -- now, you're saying before

10   the enactment of the CVA?

11         Q    No, I -- my question was directed to before

12   the filing for bankruptcy.

13         A    Okay.  Yes, and I responded --

14         Q    And I was --

15         A    I'm sorry.  Yes, there were a number of

16   lawsuits, due to the Child Victim Act, that were

17   reported to my office for potential insurance coverage,

18   and was involved -- not alone, but I was involved in the

19   process of referring all of these lawsuits to

20   appropriate counsel.

21         Q    Prior to the bankruptcy filing, how many

22   defense counsel did the Diocese employ to defend itself

23   in these CVA claims?

24         A    For CVA claims?

25         Q    Yes.

1     A     Prior to bankruptcy, three firms.

2     Q     Which firms were those?

3     A     Connors LLP, Chelus Herdzik Speyer.  And the

4  name escapes me on -- on the third.

5     Q     Did any of those three firms have the

6  predominant amount of work?

7     A     The predominant amount of work would've been

8  Connors LLP.

9     Q     Okay.  And can you give me a percentage of --

10     A     No, I can't.

11     Q     You can't.  Well, was it over 50 percent of

12  the cases?

13     A     I -- I don't know.

14     Q     Okay.  Okay.  Besides -- sorry.

15           In connection with coordinating with defense

16  counsel, did you select the defense counsel for the

17  individual CVA cases?

18     A     No.

19     Q     Okay.  Who did?

20     A     That was through discussions between the three

21  firms.

22     Q     Okay.  So you did -- so you were not involved

23  in determining who got the cases?

24     A     Correct.

25     Q     Okay.  What did you do -- what made up the

1  work that you did in, quote, "coordinating" defense

2  counsel?

3      A    Well, usually the -- when the lawsuits started

4  coming in, pre-bankruptcy filing, lawsuits were referred

5  to me.  In other words, they were served to the Diocese,

6  they -- they were ultimately given to me.  And then I

7  coordinated the -- I would review -- I would review the

8  lawsuit, and I would then discuss that -- well, in the

9  beginning, at that time, it was through Connors LLP, and

10  we would -- we really wouldn't discuss the cases.  What

11  we were more concerned with was just getting these

12  lawsuits logged in and accounted for.

13      Q    And was the primary goal, from your

14  perspective, to make sure that the insurance company

15  that was covering the claim was on notice, and was

16  participating?

17      A    Well, my main goal was to make sure that any

18  lawsuit was properly responded to within the timeframe

19  allowed through the court system.

20      Q    So once you'd selected counsel, that became

21  counsel's responsibility, correct?

22      A    I'm sorry, what became counsel's

23  responsibility?

24      Q    Responding to the lawsuit timely.

25      A    Yes.

1      Q    Okay.  So what other involvement did you have

2  after making sure that counsel had the lawsuit to

3  respond timely?

4      A    I was also in the process of working with our

5  coverage attorneys who were involved, Blank Rome, and

6  again, just to make them aware of these lawsuits coming

7  in.  Thank you.

8      Q    Did you actively participate in any of the

9  litigation defending the Diocese against abuse claims?

10     A    No, I did not.

11     Q    Did you actively participate in any of the

12  coverage actions that Blank Rome was defending or

13  bringing?

14              MR. SHEEHAN:  Objection to form.  You can

15  answer.

16              THE WITNESS:  Sorry?

17              MR. SHEEHAN:  You can answer.

18              THE WITNESS:  Oh.  Okay.  I had a -- I

19  had correspondence with -- with Blank Rome on these

20  cases, yes.

21  BY MR. NASATIR:

22     Q    Were you involved in strategizing over the

23  defense of the Diocese in the abuse claims?

24              MR. SHEEHAN:  Objection, to the extent

25  answering would call for attorney-client privileged

1    information, I instruct you not to answer.  If you can

2    answer that question without divulging that information,

3    you may do so.

4              THE WITNESS:  No, I won't answer that.

5              MR. NASATIR:  It's a yes/no question. It

6    doesn't divulge any privileged information.  I ask you

7    to reconsider, Mr. Sheehan.

8              MR. SHEEHAN:  Could you please restate

9    the question, or repeat it?

10   BY MR. NASATIR:

11       Q    Were you involved in the defense of the

12   Diocese over abuse claims?

13       A    No.

14       Q    Were you involved in strategizing coverage

15   positions the Diocese was taking with respect to

16   insurers on abuse claims?

17       A    Yes.

18       Q    Okay.  How much time, on any -- strike that.

19            How often did that occur?

20       A    Back in the beginning, when many of the

21   initial suits were filed, I spent a lot of time on that.

22       Q    Okay.  Have the position -- are you spending

23   any more time on that now?

24            MR. SHEEHAN:  Objection to form.  You can

25   answer, if you know.

1                    THE WITNESS:  Okay.  Repeat the question.

2    Because I --

3                    MR. NASATIR:  I will rephrase.  I will

4    rephrase the question.

5    BY MR. NASATIR:

6        Q    Are you spending time now on coverage

7    positions the Diocese is taking with respect to its

8    insurers on the abuse claims?

9        A    Yes.

10       Q    Okay.  Approximately how much time?

11       A    It -- it varies.  Could be correspondence with

12   Blank Rome or Bond, Schoeneck & King.

13       Q    Okay.  Can you give me a sense of whether it's

14   an hour in your day or something else?

15       A    I would say hour or less a day right now.

16       Q    Okay.  Have you received coverage positions

17   from most of the insurers in the abuse claims?

18       A    Me, personally, no.  That information has been

19   communicated to Blank Rome.

20       Q    So you were not involved in the day-to-day

21   coverage positions that the insurers are taking with

22   Blank Rome?

23       A    Day-to-day, no.

24       Q    Okay.  After you -- you said you reviewed the

25   pleadings of an abuse claim that comes in, and then

1    determine that a -- that there would be a law firm that

2    will respond to the pleading, right?

3        A    That's correct.

4        Q    After you've done that, do you have any

5    further -- do you do any further review of the pleadings

6    or any of the filings in the particular state court

7    action regarding abuse claims?

8        A    Prior to the enactment of the Child Victim

9    Act, yes.

10       Q    Okay.  After that?

11       A    After that, I did have some involvement with

12   those particular cases.

13       Q    Okay.  What was your level of involvement?

14       A    Are you speaking of the lawsuits that were

15   filed once the window opened in August of 2019?

16       Q    Yes, I am.  Thank you for asking --

17       A    All right.

18       Q    -- me to clarify.

19       A    Yeah.  I had significant involvement in all of

20   those lawsuits that were filed post-August 14, 2019.

21       Q    What did you do?

22       A    What did I do?  I -- again, as I said, I

23   reported the cases, there were emails back and forth,

24   and phone conversations with -- initially with Connors

25   LLP.  When it became evident that there were going to be

1   a significant amount of lawsuits filed, two other firms

2   were contacted to assist in that process.

3           I had a lot of involvement looking into the

4   particular years involved with the lawsuit, the

5   insurance coverage that was potentially involved in

6   those lawsuits.

7       Q    Do you feel currently that the Diocese has a

8   firm handle on the amount of insurance available on

9   these abuse claims?

10          MR. SHEEHAN:  Objection to form.  You can

11  answer, if you know.

12          THE WITNESS:  I -- I honestly don't know.

13  My -- a firm handle on the insurance coverage post 19 --

14  post July 1, 1973, yes.  Pre-1973, no.

15  BY MR. NASATIR:

16      Q    Okay.  Well that -- let's -- thank you again

17  for clarifying.  Let's stick with the post-'73 period.

18      A    Okay.

19      Q    Do you think there's any further work that you

20  need to do on establishing the level of insurance

21  coverage available to the Diocese on these CVA claims?

22          MR. SHEEHAN:  Objection to form, but you

23  can answer, if you know.

24          THE WITNESS:  Are you saying -- are you

25  asking if I will have involvement going forward?

1    BY MR. NASATIR:

2        Q    Well, I -- let's ask you to answer that

3    question first.

4        A    Can you repeat the question?

5        Q    Is there any further insurance coverage work

6    that you, Mr. Scholl, need to do on the post-1973

7    coverage for CVA claims?

8        A    Yes.  And -- yes, in a advisory role.

9        Q    What type advice are you contemplating giving?

10       A    Or advising the -- the bishop and folks up in

11   -- you know, the -- our COO.  And also collaboration

12   with coverage attorneys at Blank Rome.

13       Q    What would you be collaborating with Blank

14   Rome on?

15       A    Specific insurance coverage that may apply to

16   the CVA cases.

17       Q    So you're saying you do not have -- I used a

18   firm handle on, but let's use a different phrase.  Let

19   me restate the question.

20            You believe there's further coverage work to

21   do with respect to claims that fall in the post-1973

22   insurance coverage years?

23            MR. SHEEHAN:  Objection to form.  You can

24   answer, if you know.

25            THE WITNESS:  Yes, there's more work to

```
 1   do --
 2                MR. NASATIR:  What type of --
 3                THE WITNESS:  -- I believe.
 4                MR. NASATIR:  Excuse me.  Sorry.
 5   BY MR. NASATIR:
 6        Q    Had you finished your answer?
 7        A    Yes, I have finished my answer.
 8        Q    Okay.  What type of work is there for you to
 9   do?
10        A    I would say just a continuation of -- now, if
11   you're talking about claims within bankruptcy court --
12   are you talking about lawsuits outside of bankruptcy?
13        Q    Both.
14        A    Both.
15        Q    But if you want to break them down, let's do
16   that.  What further work do you have to do with respect
17   to proofs of claim filed in the bankruptcy court that
18   relate to the post-1973 coverage periods?
19        A    I have little involvement with that particular
20   aspect, within the bankruptcy.
21        Q    Okay.  Outside of the bankruptcy, what
22   involvement do you have?
23        A    Well, as of right now, very little.  Because
24   the lawsuits against the related entities are -- are
25   currently under protection of stay.
```

1      Q      And what work do you see yourself having to do

2    if the stay is no longer in place?

3      A      If the stay is no longer in place, I would --

4    I would pretty much have to completely change my job to,

5    I would say, 75 percent, maybe even 100 percent of my

6    time being involved in those cases.

7      Q      And what would your involvement constitute?

8      A      It would constitute researching claims,

9    collaborating with appropriate counsel, getting into

10   discussions of settlements, further research on

11   insurance coverage and potential limits, and limit

12   exhaustion, aggregate exhaustion.  All those types of

13   matters related to insurance.

14     Q      When you say collaborating with appropriate

15   counsel, could you be more specific?

16     A      There would be discussions with the Connors,

17   and likely the other two firms, to discuss the specifics

18   of the case, the -- the matter of the lawsuit itself,

19   the merits of the lawsuit, and potential insurance

20   coverage that might come out of it.

21     Q      Would your involvement in discussions of the

22   merits of the lawsuit be limited to its impact on an

23   insurance coverage?

24     A      Yes.

25     Q      Okay.  Prior to filing for bankruptcy, when

1   there was no stay in place, were you researching claims

2   and collaborating with appropriate counsel, as it was --

3   involves insurance?

4      A   Yes.

5      Q   And you were able to do your job adequately?

6      A   No.  My -- my regular --

7      Q   Can you explain?

8      A   -- job, as director of insurance, no.  A lot

9   of my time was taken away from that because of the just

10  large numbers of lawsuits and discussions.  I had to

11  rely on other people.  And -- and even some of my job

12  functions took a back seat to the handling of the

13  lawsuits.

14     Q   Okay.  Have you read all the CVA lawsuits,

15  complaints?

16     A   Every one, no.

17     Q   How many?

18     A   I don't -- I can't answer that.  I don't know.

19     Q   Okay.  Is it closer to 10 or closer to 800?

20     A   Oh, definitely in the hundreds.

21        MR. NASATIR:  Okay.  Let's mark as Scholl

22  Exhibit 1 the declaration of John Scholl, please.

23   (Scholl 1 marked for identification.)

24 BY MR. NASATIR:

25     Q   Is this the 2020 declaration that we've been

```
 1  referring to in your deposition?

 2      A    Yes.

 3      Q    Can you describe to me the process involved in

 4  your preparation of this declaration?

 5      A    I -- as far as the -- the process of putting

 6  this together?

 7      Q    Yes.

 8      A    Well, with my -- I went through my background,

 9  my expertise in the area, and I worked with the

10  attorneys at Bond, Schoeneck & King to put this

11  together.

12      Q    Did somebody prepare an initial draft for you?

13           MR. SHEEHAN:  Objection, to the extent

14  that answering the question would call for attorney-

15  client privilege information, I instruct you not to

16  answer.  If you can do so without divulging that

17  information, you may do so.

18           THE WITNESS:  I'm following my attorney's

19  advice not to answer.  It would divulge attorney-client

20  privilege information.

21  BY MR. NASATIR:

22      Q    Did you revise your declaration any time

23  before it was filed?

24           MR. SHEEHAN:  I will assert the same

25  objection.  But if you can answer without divulging
```

1    attorney-client privilege information, you may do so.

2              THE WITNESS:  I -- I don't recall

3    revising it.  Unless there was a couple of misspellings

4    or tweaks in there.

5    BY MR. NASATIR:

6         Q    Let's -- I want you to read paragraph 3.

7    Let's start at the end there.  What appropriate diocesan

8    personnel and advisors did you speak with in order to

9    create this declaration?

10        A    Diocesan personnel and advisors.

11        Q    Yes.  Who?

12        A    I'm reading it right now.

13        Q    Sure.

14        A    The appropriate diocesan personnel at that

15   time would've been the bishop, and the chief financial

16   officer, who was my director.  I reported directly to

17   the CFO at that time.

18        Q    And who was --

19        A    (Indiscernible - simultaneous speech) --

20        Q    -- the CFO?

21        A    Pardon?

22        Q    I said, who was the CFO?

23        A    At that time, Steven Timmel.

24        Q    Okay.

25        A    Now, are you talking -- I'm sorry, I want to

1     clarify -- in 2020?

2          Q     Yes.

3          A     In 2020, the CFO was Charles Mandolera.  Mr.

4     Timmel left the Diocese in, I believe, February of 2019.

5          Q     The point of my question was to establish who

6     you spoke with in order to make this declaration.  So

7     did you speak with Mr. Mandolera in order to create this

8     declaration?

9          A     To create the declaration?

10         Q     To draft the declaration?

11         A     To draft it?  No.  That was all me.

12         Q     Okay.  But the information contained in this

13    declaration, was any of it derived from conversations

14    you had with Mr. Mandolera?

15         A     No.

16         Q     Or Mr. Timmel?

17         A     No.  Mr. Timmel was not employed at the

18    Diocese at that time.

19         Q     Okay.  And was any in the -- information in

20    this declaration derived from conversations you had with

21    the bishop?

22         A     No.

23         Q     Okay.  So is -- so does paragraph 3 accurately

24    reflect all the bases upon which you provided

25    information that's contained in your declaration?

1       A     Yes, it is accurate.

2       Q     Okay.  Looking at paragraph 13, are you aware

3   of whether there have been any additional CVA cases

4   brought against the Diocese or against SIP, as what you

5   call SIP participants?

6                 MR. SHEEHAN:  Can you just take a moment

7   and let Mr. Scholl review paragraph 13 first?

8                 MR. NASATIR:  Absolutely.

9                 MR. SHEEHAN:  Thanks.

10      (Pause.)

11                THE WITNESS:  Okay.  I went through it.

12  What is -- what is your question?

13  BY MR. NASATIR:

14      Q     Are you aware of whether there have been

15  additional CVA cases filed against SIP participants,

16  where the Diocese has not been named as a defendant?

17      A     Yes, I am aware of that.

18      Q     Okay.  Do you know approximately how many?

19      A     Several hundred.  But I -- I do not know

20  exactly how many.

21      Q     Okay.  Have you read all those complaints?

22      A     Not all of them, no.

23      Q     Okay.  How many?

24      A     Of those particular ones, I would say at least

25  half.

```
 1       Q    Okay.  Have you compared the statement you

 2  make -- let me put it a different way.

 3            Do you know if those additional lawsuits also

 4  allege identical facts and claims against the Diocese,

 5  against SIP participants?

 6                 MR. SHEEHAN:  Objection to form.  You can

 7  answer, if you know.

 8                 THE WITNESS:  To my knowledge, several --

 9  many of those lawsuits were the same lawsuits filed that

10  had named the Diocese as a defendant, and that the

11  Diocese was removed as a defendant, and basically the

12  same lawsuit was filed.

13  BY MR. NASATIR:

14       Q    And how many of those types of lawsuits are

15  you aware of?

16       A    Over 200, that I'm aware of.

17       Q    That's where the defendant -- the Diocese, as

18  a defendant, has been removed?

19       A    Well, the Diocese is not named as a defendant

20  in those lawsuits against SIP participants where the

21  Diocese is not named.

22       Q    I understood you to say, but that -- in those

23  types of lawsuits it's identical to the lawsuit that was

24  filed against the Diocese, except the Diocese has been

25  removed as a defendant.  Is that right?
```

1    A    In some of the cases, that is my

2  understanding.  I did not read every lawsuit, so I can't

3  comment on the ones I did not read.  Ones I did read

4  through in their entirety were identical, in my opinion,

5  to the original lawsuits.

6    Q    Okay.  And how many fell into that category?

7    A    I couldn't say.  I don't know.

8    Q    Okay.  And do you know how many of them make

9  no distinction between the conduct of the Diocese and

10  the conduct of the SIP participants?

11            MR. SHEEHAN:  Objection to form.  You can

12  answer, if you know.

13            THE WITNESS:  No, I do not know that.

14            MR. NASATIR:  Okay.  All right.  Just

15  give me a minute here.

16    (Pause.)

17  BY MR. NASATIR:

18    Q    Let's take a look at the first sentence in

19  paragraph 14.  You say, "In its capacity as the

20  administrator of the SIP program, the Diocese has taken

21  a lead role in defending itself, and other SIP

22  participants, in the CVA cases."

23    A    Okay.  Yes.

24    Q    Okay.  What is it -- sorry -- are there any

25  documents that reflect that the Diocese is the

1    administrator of the SIP program?

2        A    There are no written documents to that effect.

3        Q    Okay.  On what basis has the Diocese taken the

4    lead role in defending itself, and the other SIP

5    participants, in the CVA cases?

6        A    Taking the lead role is really because the

7    insurance program, the joint insurance program that I am

8    director of, or administrator of, any -- any claim that

9    happens to a SIP participant is reported to my office,

10   as -- as respects insurance coverage, or potential

11   insurance coverage.

12       Q    So it makes no difference if the Diocese is

13   named or not, in terms of taking -- the Diocese taking a

14   lead role?

15       A    That's correct.

16       Q    And the context in which you're talking about

17   taking the lead role is with respect to insurance

18   coverage?

19       A    Insurance coverage, and getting attorney --

20   attorneys involved to handle the -- the legal aspect of

21   those lawsuits.

22       Q    Putting aside the insurance coverage aspect,

23   once the case has been assigned to defense counsel, what

24   other involvement do you personally have?

25               MR. SHEEHAN:  Objection to form.  You can

1   answer.

2              THE WITNESS:  What personal -- okay, what

3   personal involvement do I have once a lawsuit has been

4   assigned to counsel?  Is that what --

5              MR. NASATIR:  Yes.

6              THE WITNESS:  -- you're asking?  I have

7   conversations with counsel, I have conversations with

8   parishes, to keep them updated on those particular

9   cases.

10  BY MR. NASATIR:

11     Q    And that's not -- that's not for respective --

12  that's -- excuse me.  Let me start again.

13          That's not concerning insurance, that's

14  noninsurance aspects, right?

15     A    I'm not sure what you mean by noninsurance

16  aspects.  Assigning counsel is -- won't say

17  noninsurance, but it certainly does involve,

18  potentially, the insurance.  That -- that is my main

19  goal, is to find out if there's insurance coverage for

20  these actions.

21     Q    With respect to the -- let's start again.

22          The SIP program began in 1973?

23     A    That is correct.

24     Q    Okay.  Prior to the SIP program, the Diocese

25  did not, itself, procure insurance; is that right?

1          MR. SHEEHAN:  Objection to form.  You can

2   answer.

3          THE WITNESS:  The Diocese procured

4   insurance for the Diocese of Buffalo legal entity, SIP -

5   - now, SIP participant's parishes, who are independent

6   corporations, they procured their own insurance.

7   BY MR. NASATIR:

8      Q    Prior to 1973?

9      A    Correct.

10     Q    Have you found any policies that the Diocese

11  procured for itself before 1973?

12     A    No, we have not.

13     Q    Have you been involved in searching for

14  insurance policies that were issued to the parishes or

15  non-debtors prior to 1973?

16     A    Yes, I have been involved in that process.

17     Q    When were you involved?

18     A    When was I involved in that process?

19     Q    Yes.

20     A    To my recollection, it was around the time of

21  the filing of bankruptcy and the beginning of the covid

22  pandemic.

23     Q    Okay.

24     A    Early in -- early 2020.

25     Q    Have you done any further -- or have you been

1  involved in any further searching for parish insurance

2  after that time?

3      A    Yes.

4      Q    What have you been doing?

5      A    I searched diocese archives; I searched --

6  literally went into the basement and go through boxes

7  and files.  I've gone to the insurance agencies who

8  started this -- we'll say the SIP program in 1973, went

9  in through their archives and basements looking for

10 records.

11          I've also gone through many parishes, digging

12 through information, looking for records.

13     Q    Did you find any insurance policies?

14     A    No, I did not.

15     Q    Okay.  Have any of the CVA state court actions

16 moved forward since the petition date?

17     A    To my knowledge, no.

18     Q    I didn't hear your answer.

19     A    I said, to my knowledge, no.

20     Q    Okay.  When did the IRCP come into effect?

21     A    That came into effect in 2018.

22     Q    And I'm looking currently at the last portion

23 of paragraph 14 of your declaration.  Is that referring

24 to the IRCP?

25     A    One second; I'm pulling it up now.

1     Q    Sure.

2     A    (indiscernible) a chance to -- oh, I -- okay,

3  yes, I -- I see what you're referring to.

4     Q    What was the source of the $18,000,000?

5          MR. SHEEHAN:  Objection.

6          You can answer to the extent that it's

7  not divulging privileged information.

8          THE WITNESS:  Okay.  Actually, I don't

9  know the exact source of -- of -- of the funding, but I

10 was not involved in the decision on where that money

11 came from.

12 BY MR. NASATIR:

13    Q    Would you have known if it came from the SIP

14 program funds?

15    A    I would've known if it came from the SIP

16 program -- program funds.

17    Q    So we can eliminate the SIP program as being

18 the source of the 18,000,000?

19    A    Yes.

20    Q    Were you involved in the IRCP?

21    A    Yes, I was

22    Q    What role did you have?

23    A    At that time in 2018, I had a very active

24 role.  At that time, Steven Timmel was the CFO who was,

25 shall we say, the -- we'll say the administrator of the

```
1    IRCP, and I was directly involved with Steve in the

2    handling of the IRCP claims.  Connors LLP was also very

3    actively involved as our counsel in the program.

4         Q    Were you involved in determining what claims

5    were accepted into the IRCP?

6         A    No, I was not.

7         Q    Were you involved in settling claims using the

8    IRCP?

9         A    No, I was not.

10        Q    Do you have any knowledge of the range of

11   values of settlements that the IRCP produced?

12                  MR. SHEEHAN:  Objection to form.

13                  To the extent that answer would call for

14   privileged information.  And, Iain, this line of

15   questioning is beginning to go far afield to the subject

16   matter of the motion that's pending.

17                  MR. NASATIR:  Are you instructing him not

18   to answer?

19                  MR. SHEEHAN:  I'm instructing him if the

20   answer calls for privileged information not to answer.

21                  THE WITNESS:  Okay.  I'm following the

22   advice of Counsel.

23                  MR. NASATIR:  So it's your position that

24   the range of settlements in the IRCP is privileged

25   information?  Mr. Sheehan?
```

1              MR. SHEEHAN:  Correct.

2              MR. NASATIR:  Okay.  I'm going to want to

3    come back to this exhibit, but for the moment, I'm going

4    to ask the Reporter to, I don't know, shelve it?

5    Whatever you can do?  Take it away, to bring it back

6    shortly?  Thank you.

7              Let me mark as Exhibit 2, Scholl Exhibit

8    2, a document that states "Memo" on it.  It's

9    DOB_General2616, and the first page has the date May 10,

10   2019.  I'm going to scroll to this page here.  All

11   right.  And I'm currently looking at page 2618.

12       (Scholl 2 marked for identification.)

13             MR. SHEEHAN:  We canâ€™t see --

14             MR. NASATIR:  Okay.

15             MR. SHEEHAN:  Go ahead.

16             MR. NASATIR:  I'm on page 2618.  And tell

17   me when you're ready.

18             MR. SHEEHAN:  Let him know when you've

19   had a chance to read that.

20             THE WITNESS:  Okay.  I've had a chance to

21   read it through.

22   BY MR. NASATIR:

23       Q    Okay.  Have you seen this document before?

24       A    No, I have not.

25       Q    Do you recall being at a finance council

1   meeting on or about March 14, 2019 to present a report

2   regarding the IRCP?

3        A    Yes, I do recall being there.

4        Q    Okay.  And do you see here that you reported

5   that there were an unexpectedly large number of claims

6   that you were previously unaware of?

7        A    Yep.

8        Q    Why were the large number of claims

9   unexpected?

10                  MR. SHEEHAN:  Objection to form.

11                  You can answer if you know.

12                  THE WITNESS:  Why were they unexpected?

13   They had never been reported to the insurance department

14   in the past.  We just had no knowledge that these were

15   there.

16   BY MR. NASATIR:

17        Q    The insurance department, you mean your -- the

18   --

19        A    Yes.

20        Q    -- Diocese of Buffalo's insurance department?

21        A    Correct.

22        Q    Do you see here where it says "Compensation

23   awards issued ranging from 2,000 to 650,000"?

24        A    Yes, I do see that.

25                  MR. NASATIR:  Well, I guess if this was

1   privileged, Mr. Sheehan, it's been waived.

2   BY MR. NASATIR:

3       Q    Is this 17.6-million in the next bullet point

4   the approximate 18-million that you referred to in your

5   declaration in paragraph 14?

6       A    Yes, it is.

7       Q    I think you testified you had no involvement

8   in the awards?

9       A    Correct.

10      Q    Okay.  And you had no involvement in

11  determining what claims satisfied the IRCP eligibility

12  requirements?

13      A    I had no involvement in that.

14      Q    Okay.  Oh, shoot; I closed that, and I didn't

15  mean to.  Let me just back to it for one second.  My

16  apologies.

17            MR. NASATIR:  Could you bring that

18  exhibit back up, Mr. Reporter?

19            THE REPORTER:  Which exhibit number was

20  that?

21            MR. NASATIR:  It was 2.

22            THE REPORTER:  2.  Okay.

23            MR. NASATIR:  I think it was 2.

24            THE REPORTER:  Okay.

25            MR. NASATIR:  I didn't realize that once

1    I mark it, I lose it.  It is up?  I can't see it.

2                    THE REPORTER:  I did pull it up.  Let me

3    try pulling it up again --

4                    MR. NASATIR:  I'm not -- I think this is

5    it.  Yeah, thank you.

6                    THE REPORTER:  Sometimes there's a lag;

7    I'm sorry.

8                    MR. NASATIR:  That's okay.  I just need

9    to scroll down here.

10                   Can you rotate this to the right?

11                   THE REPORTER:  Did you want me to rotate

12   that to the right?

13                   MR. NASATIR:  Yes.  I'm sorry; yes, I did

14   want you to rotate it to the right.  I don't see that

15   tool in my toolbar.

16                   THE REPORTER:  Let's see here.  Just give

17   me a second.  So I'm rotating it to the right.  I don't

18   know if I'm able to bring everyone to see what I'm

19   seeing.  I know the attorneys are able to do that, but

20   I'm not sure if the reporter is.

21                   On the toolbar, you see on top, there's a

22   page with a little gear wheel in it?  When you hover

23   over it --

24                   MR. NASATIR:  Yes, I see.  It says "View

25   controls."  Thank you.  I can do that now.

```
 1                THE REPORTER:  Okay.

 2                MR. NASATIR:  I hope I did that right.

 3    Let's see -- yes, I did.  Wow.

 4                MR. SHEEHAN:  Do you know, which page

 5    would you like us to be on?

 6                MR. NASATIR:  It's the last page of this

 7    exhibit.

 8                MR. SHEEHAN:  Okay.

 9                MR. NASATIR:  Tell me when you're ready.

10                MR. SHEEHAN:  You familiarize yourself

11    with that, and let him know when you're ready.

12                THE WITNESS:  Okay.

13    BY MR. NASATIR:

14         Q    Have you seen this kind of document before?

15         A    I've seen this kind of document before, yes.

16         Q    Are you familiar with this kind of document?

17         A    No, I am not.

18         Q    Okay.  Well, I'm going to ask this question,

19    but maybe you may not know the answer here.  There's an

20    entry line that says, "Self Insurance Neg Gain from

21    Other Activities."  It's about five lines from the

22    bottom.  Do you see that?

23         A    Yeah, I see it.

24         Q    Do you know to what that refers?

25         A    No, I do not.
```

1       Q    Okay.

2                MR. SHEEHAN:  To be clear, are those --

3       those appear to be two separate lines, but your question

4       is sounding as though they one line item?

5                MR. NASATIR:  I did not intend to do

6       that.  I meant to -- it was probably the improper

7       question, so let me re-ask it.

8       BY MR. NASATIR:

9       Q    Do you, Mr. Scholl, know -- or can you explain

10      to me what the line that says "Self Insurance Net"

11      means?

12      A    No, I -- I do not know --

13      Q    Okay.

14      A    -- this is a financial report that has nothing

15      to do with me.

16      Q    Got it.

17               MR. NASATIR:  Okay.  We can get rid of

18      this.

19               Oh, just for the record, I want to say

20      that page we were discussing was DOB_Gen2638.

21               All right.  I'm going to suggest we take

22      a five- or ten-minute break, whatever the witness wants?

23      And then I'm going to go back to the declaration.

24               MR. SHEEHAN:  Okay.

25               THE WITNESS:  Okay.

```
 1                  MR. NASATIR:  So what do you want -- how

 2   many -- five minutes?  Ten minutes?  What do you want?

 3                  MR. SHEEHAN:  Ten minutes.

 4                  MR. NASATIR:  All right.

 5                  THE REPORTER:  Okay.  The time is now

 6   12:36 Eastern, and we're off the record.

 7       (Off the record.)

 8                  THE REPORTER:  The time is now 12:48 p.m.

 9   Eastern, and we're back on the record.  I'll go ahead

10   and pull up Exhibit 1.

11                  Okay, thank you.  You may proceed.

12                  MR. NASATIR:  Thank you.

13   BY MR. NASATIR:

14       Q    Mr. Scholl, did you discuss anything with Mr.

15   Sheehan during the break?

16       A    Yes.

17       Q    What did you discuss?

18       A    The Buffalo Bills, and my house and a new

19   roof.

20       Q    I hope that was -- I hope your house and your

21   new roof was a better discussion than the Bills, but --

22       A    Unfortunately, yes.

23       Q    All right, we're going to proceed.  I'm going

24   to go back to your declaration.  Go to paragraph 15; do

25   you see -- you say that "The diocese is still
```

1    responsible under the SIP to provide a defense for other

2    SIP participants."  Do you see that statement?

3        A    Okay.

4            MR. SHEEHAN:  Could you allow him to take

5    a moment --

6            THE WITNESS:  Yeah --

7            MR. SHEEHAN:  -- just to read the whole

8    thing --

9            MR. NASATIR:  Yeah, sure.

10           MR. SHEEHAN:  (indiscernible -

11    simultaneous speech)

12           THE WITNESS:  Okay.

13    BY MR. NASATIR:

14       Q    What is the basis for your statement that the

15    diocese is still responsible under the SIP to provide a

16    defense for other SIP participants?

17       A    Okay.  Where it's stating that CVA cases are

18     against the diocese are -- are protected, state

19    against the diocese, still responsible under the SIP

20    providing a defense for other SIP participants.  This

21    would be parishes, schools, other related entities; we

22    will -- we -- we provide insurance protection for all

23    the parishes and SIP participants, whether or not the

24    CVA cases are -- are state or not.

25       Q    It says, "Provide a defense for the other SIP

1   participants."  That's not limited to insurance advice

2     or assistance, is it?

3       A     Where are you reading from?  Which --

4       Q     First sentence of paragraph 15.

5       A     Okay.  Yeah.  We're -- we're still responsible

6   under the SIP to provide a defense for the other SIP

7   participants.  That's an accurate statement.

8       Q     What's the basis for that statement?

9       A     How we run the insurance program.  A claim

10  comes in, and we provide through attorneys a defense for

11  all the -- the SIP participants.

12      Q     Is there a written agreement between the SIP

13  participants and the diocese to provide a defense?

14      A     There --

15            MR. SHEEHAN:  Objection to form.

16            You can answer.

17            THE WITNESS:  Okay.  There's -- there's

18  no written agreement, no.

19  BY MR. NASATIR:

20      Q     Okay.  Is there a directive from the bishop

21  that the diocese is to provide a defense to the SIP

22  participants?

23      A     A directive from the bishop?  Not -- not to my

24  knowledge.  No -- I don't know.

25      Q     Anything in canon law that provides authority

1   for the diocese to be providing a defense for the SIP

2   participants?

3                  MR. SHEEHAN:  Objection to form.

4                  You can answer if you know.

5                  THE WITNESS:  I am not familiar with

6   canon law, so I can't comment on that.

7   BY MR. NASATIR:

8        Q    Is it your understanding that the diocese has

9   a legal obligation to provide a defense for other SIP

10  participants?

11                 MR. SHEEHAN:  Objection to form.

12                 You can answer.

13                 THE WITNESS:  I don't know, a -- a legal

14  obligation?

15                 MR. NASATIR:  Yes.

16                 THE WITNESS:  I can't comment on that, to

17  -- can tell you is an obligation to provide them a

18  defense.  I don't know about "legal" obligation.

19  BY MR. NASATIR:

20       Q    What's the basis for the obligation?

21       A    The -- the basis for the obligation, in my 25

22  years there, has been that's how the program has always

23  been run, that the diocese insurance services department

24  is the -- we'll say the -- that's who parishes --

25  participants go to when they have a claim against them,

1    a lawsuit.

2            That's just always in -- in the -- certainly

3    the 25 years that I've been there, and the 50-plus years

4    now since that program was initiated in 1973, the

5    diocese insurance services office all would -- responded

6    to -- so it's just been the way it's been done.

7        Q    The obligation's there because that's the way

8    it's been done?

9        A    Basically, in a nutshell, yes, that is the

10   history of how it has gone over the years, yes.

11       Q    When the SIP program was initiated in 1973,

12   the CVA had not been passed, had it?

13       A    Correct.

14       Q    And in 2018, August 2018 when the CVA passed,

15   isn't it true there was significantly more abuse

16   litigation brought against the SIP participants?

17       A    I have not --

18            MR. SHEEHAN:  Objection to form.

19            THE WITNESS:  Okay.  I -- critical, think

20   I need to correct you.  You said August of '18; it was

21   August of 2019, I believe, when we'll -- we'll say that

22   -- the law passed.  It became valid that the claims were

23   allowed to be filed beginning in August of 2019.  I mean

24

25            MR. NASATIR:  You are correct.  You're

1    correct --

2                    THE WITNESS:  Okay.

3                    MR. NASATIR:  -- it was passed in 2018,

4    and it became effective in 2019.

5                    THE WITNESS:  Correct, yes --

6    BY MR. NASATIR:

7        Q    Would you agree with me that in August 2019,

8    there was a significant increase in abuse cases brought

9    against the SIP participants?

10       A    Yes.

11       Q    Okay.  Would you agree with me that the SIP

12   program, when it was initiated in 1973, could not have

13   contemplated the passage of the CVA?

14       A    That is --

15                   MR. SHEEHAN:  Objection.

16                   You can answer if you know.

17                   THE WITNESS:  Yeah.  I -- that's correct.

18   BY MR. NASATIR:

19       Q    So notwithstanding that this is the way things

20   have been done for 25 years, you would agree with me

21   that the CVA window has created different circumstances

22   for the SIP participants and for the diocese, correct?

23                   MR. SHEEHAN:  Objection to form.

24                   You can answer if you know.

25                   THE WITNESS:  It has created different

1    circumstances, yes.

2    BY MR. NASATIR:

3        Q    Does the SIP program make any distinction

4    between abuse -- strike that.

5             Does the SIP program make any distinction

6    between claims involving abuse that occurred pre-1973,

7    as opposed to abuse claims that are based on abuse post-

8    1973?

9             MR. SHEEHAN:  Objection to form.

10            You can answer if you know.

11            THE WITNESS:  To my knowledge, no.

12   BY MR. NASATIR:

13       Q    Starting in 1973, the SIP -- by the very

14   nature, the SIP participants began contributing to the

15   SIP program's funds, right?

16       A    I -- I don't know the answer in 1973 whether

17   or not that was occurring.  I can only comment on my

18   knowledge since I came in 1998.

19       Q    Okay.  Let's take your time period.  Since

20   1999, SIP participants have been contributing to the SIP

21   insurance -- the SIP fund; is that right?

22       A    That is correct.

23       Q    Okay.  And would you agree with me, sir, that

24   prior to the creation of the SIP program, none of the

25   parishes contributed to a general insurance fund?

1      A    I don't know.

2      Q    Okay.

3      A    I -- I have --

4      Q    Have any --

5      A    -- no knowledge of that.

6      Q    You have no knowledge of that.  Would you

7  agree with me that the SIP participants who have claims

8  for abuse occurring pre-1973 are utilizing the SIP

9  insurance program funds for defense of those claims?

10                MR. SHEEHAN:  Objection to form.

11                You can answer if you know.

12                THE WITNESS:  I -- can you rephrase that?

13  I'm not --

14                MR. NASATIR:  Sure.

15                THE WITNESS: -- exactly sure what you're

16  asking.

17  BY MR. NASATIR:

18      Q    Isn't it true, Mr. Scholl --

19      A    Mm-hmm.

20      Q    -- that parishes facing abuse claims stemming

21  from abuse before 1973 are getting a defense for which

22  they didn't pay?

23                MR. SHEEHAN:  Objection to form.

24                You can answer if you know.

25                THE WITNESS:  Getting a defense for which

1    they didn't pay.

2                    MR. NASATIR:  Correct.

3                    THE WITNESS:  Oh.  The diocese is

4    assisting in all of the CVA cases pre-1973; I wouldn't

5    characterize it as getting a defense for free.

6    BY MR. NASATIR:

7        Q    In the same paragraph, paragraph 15, you say,

8    "The diocese will be required to spend significant time

9    and money responding to CVA cases, both in its capacity

10   as the risk manager and insurance coordinator for the

11   SIP participants, and simply to protect the diocese's

12   own legal interests, which could be jeopardized by the

13   continued pursuit of the legal prosecution of the CVA

14   claims."

15       A    Okay.

16       Q    With respect to its capacity as risk manager

17   and insurance coordinator, as you stated in that

18   paragraph --

19       A    Yes.

20       Q    -- are those two different capacities, or are

21   they one and the same?

22       A    One and the same.

23       Q    Okay.  And is it fair to say that in its

24   capacity as risk manager, you're talking about your role

25   in establishing the extent to which there's insurance

1   coverage for any given claim?

2       A    There -- there's a lot of roles in my job

3   description, and that's one of them.

4       Q    Okay, but I'm talking about CVA cases, as you

5   define them in this paragraph, and --

6                MR. SHEEHAN:  Objection.

7   BY MR. NASATIR:

8       Q    -- defending, and I'm trying to understand

9   what the diocese and you are going to be required to do.

10  So in that context, I'm asking you that it's the

11  capacity is risk manager and the insurance coordinator,

12  can be summarized as this -- your -- the duty to inquire

13  and find insurance coverage for the CVA cases in

14  question?

15                MR. SHEEHAN:  Objection to form.

16                You can answer.

17                THE WITNESS:  So I -- I don't understand

18  your question.

19  BY MR. NASATIR:

20      Q    What is the diocese required to do in its

21  capacity as risk manager and insurance coordinator?

22      A    For what, CVA cases?

23      Q    Yes.  We're talking about paragraph 15.

24      A    Okay.  CVA cases against just SIP participants

25  without naming the diocese?

1      Q    Yes.  That's what --

2      A    Okay.

3      Q    -- this paragraph is all about.

4      A    Right.  Well, in the absence of a -- a stay,

5   where wouldn't have much involvement, if -- if the stay

6   were removed or lifted, I would then have to expend a

7   significant amount of time in coordinating defense; I'd

8   have to get involved in -- in the lawsuits themselves; I

9   would have to coordinate efforts with the claim

10  personnel who work with me to -- or work under me to set

11  up claims.

12          There would be a significant amount of

13  communications back and forth with legal counsel and the

14  SIP participants themselves; there would just be a lot

15  to be done in those particular cases.

16     Q    All right.  Let's go through your response

17  here.  As risk manager and insurance coordinator, what

18  involvement would you have in coordinating defense?

19  What role would you have?

20     A    The role I would have would be to contact

21  legal counsel; that is under the -- the SIP program, the

22  participants look to us to advise and -- and -- and

23  obtain legal counsel.  And then legal counsel would then

24  contact the SIP participant directly to work through the

25  facts of the case.

```
 1        Q     And wouldn't that conclude your role as risk

 2   manager and insurance coordinator?

 3        A     No, it would not.

 4        Q     What else would you have to do as risk manager

 5   and insurance coordinator?

 6        A     I would still have to work with the SIP

 7   participants who are, we'll say, very unknowledgeable in

 8   any matters relating to insurance; they would depend on

 9   me.  If there were any discussions of potential

10   settlements, mediations, I would be the person who would

11   do all of that.

12        Q     Because of the insurance?

13        A     Yes.

14        Q     Got it.

15        A     You wouldn't be involved in the discovery --

16   in the litigation of the CVA claims, would you?

17                    MR. SHEEHAN:  Objection to form.

18                    You can answer.

19                    THE WITNESS:  No, I would not be involved

20   in the discovery.

21   BY MR. NASATIR:

22        Q     You wouldn't be writing any briefs, would you?

23        A     No.

24        Q     Examining witnesses?

25        A     No.
```

```
 1       Q     Interviewing witnesses?

 2       A     No.

 3       Q     Advising on legal strategies?

 4       A     No.

 5       Q     Let's go to paragraph 16.

 6             MR. SHEEHAN:  Let us know

 7  (indiscernible).

 8  BY MR. NASATIR:

 9       Q     What's the basis for your statement in that

10  paragraph that "The claims asserted against other SIP

11  participants are so closely intertwined with the claims

12  asserted against the diocese"?

13       A     Well, because of, we'll say, the relationship

14  between the diocese and the parishes.

15       Q     Can you be more specific about that

16  relationship that makes -- that supports the intertwined

17  nature of the claims?

18       A     The relationship between the diocese and the

19  SIP participants?

20       Q     Yes.

21             MR. SHEEHAN:  Objection to form.

22             You can answer if you know.

23             THE WITNESS:  Well, I'm just trying to

24  find a -- you know, a way to express and answer to that.

25  I mean, that the insurance coverage that become involved
```

1    there, they're intertwined with insurance coverage and

2    sharing limits, and -- and those types of things, so

3    they're very much intertwined with claims asserted

4    against the diocese.

5    BY MR. NASATIR:

6        Q    Okay, so it's the shared insurance aspect --

7        A    Right.

8        Q    -- that creates this relationship that makes

9    the claims intertwines; is that right?

10       A    That is -- yeah, I would say that's part of

11   it.

12       Q    What's the rest of it?

13       A    SIP participants are -- it -- it -- well, it's

14   -- it's all about potentially a sharing of -- of

15   liability.

16       Q    But in this instance, we're talking about the

17   stay being in place for the diocese liability, but

18   continuing -- but the litigation continuing for the

19   other SIP participants.

20       A    Right.

21       Q    So where is there a shared liability in that

22   instance?

23           MR. SHEEHAN:  Objection to the form.

24           You can answer if you know.

25           THE WITNESS:  A -- we'll say shared

1   liability, it -- if cases were allowed to move forward

2   outside of, you know, the diocese, then it -- it could

3   get involved with having to pay for, we'll say, defense

4   for those particular matters; it, again, could involve

5   insurance coverage and limits available to those

6   individual SIP participants that could have an adverse

7   effect on the diocese.

8           If -- if, we'll say, certain -- if matters get

9   settled against SIP participants, there could be -- how

10  should I say -- it potentially could set a precedent

11  that could come back and be very negative for the

12  diocese moving forward through -- through bankruptcy and

13  Chapter 11.

14  BY MR. NASATIR:

15      Q   Okay.  So with respect to paying for defense,

16  settlements, those aspects are potentially negative in

17  your view because they could reduce the amount of shared

18  insurance available to the diocese if it has subsequent

19  liability; is that the point?

20      A   Yes.

21      Q   Okay.  And then, you raise the concern about

22  negative precedents.  So --

23      A   Yup.

24      Q   -- is that what you are referring to when you

25  -- in paragraph 16 you say, "The diocese may be exposed

1    to collateral estoppel, adverse precedent, vicarious

2    liability, or imputed admissions if the litigation

3    continues"?

4        A    Well, again, I -- I'm no lawyer, so yes, those

5    are all basically legal terms; but yeah, in -- in -- in

6    common terms, yes.  That's -- it -- it could have result

7    -- it could've result in awards that would deplete

8    insurance coverage, and it could be denials by insurance

9    carriers that could then be used as a precedent in the

10   negotiations of the Chapter 11 case.  It could deplete

11   the amount that carriers would be able to pay through

12   Chapter 11, and potentially reduce the amount of

13   contribution to a settlement fund in Chapter 11.

14       Q    Okay.  Those are -- with the exception of the

15   denial of coverage, those are all relating to the amount

16   of insurance that's available because it's shared and

17   the diocese may not have enough insurance to satisfy its

18   obligations, right?

19              MR. SHEEHAN:  Objection to form.

20              You can answer.

21              THE WITNESS:  That's a possibility.

22   BY MR. NASATIR:

23       Q    Okay.  So with respect to the denial of

24   coverage precedent, right now, there is no active

25   coverage actions going forward, are there?

1      A     Active coverage actions?

2      Q     Yes.  They --

3            MR. SHEEHAN:  Objection to form.

4            You can answer if you know.

5            THE WITNESS:  I -- I'm -- I don't know

6   how to answer that.

7   BY MR. NASATIR:

8      Q     Okay.  You're the director for insurance

9   services for the Diocese of Buffalo.  Are you aware --

10     A     Right.

11     Q     -- of any coverage litigation that's ongoing

12  regarding the insurance policies that are issued to the

13  diocese and the other SIP participants?

14     A     Yeah, non-CVA stuff, yes.

15     Q     Is that litigation against the diocese?

16     A     Many times, it's -- it's the diocese and the

17  SIP participant.

18     Q     So what "non-CVA stuff" are you talking about?

19     A     I --

20           MR. SULLIVAN:  I'm going to object to --

21  I'm going to object to the form.  Are you talking about

22  litigation in the bankruptcy case?

23           MR. NASATIR:  No, I'm talking -- what I'm

24  trying to understand from Mr. Scholl is whether there is

25  any active coverage litigation over insurance available

1  to the SIP participants for abuse claims.

2                    MR. SHEEHAN:  Insurance litigation at --

3  no.

4                    MR. NASATIR:  Okay.

5  BY MR. NASATIR:

6      Q    So there's not going to be a denial of

7  coverage creating a negative precedent, because there's

8  no ongoing coverage litigation with respect to the CVA

9  claims; isn't that right?

10                    MR. SULLIVAN:  Object to the form again.

11                    MR. SHEEHAN:  You can answer.

12                    THE WITNESS:  I -- I -- now you're --

13  you're totally confusing me.  I have no idea -- you're

14  going from one thing to another.  Please clarify what

15  you're asking.

16  BY MR. NASATIR:

17     Q    Sure.  You said, a few minutes ago, that one

18  of the concerns you had was that there could be denials

19  by insurance companies that could then be used as

20  precedent in the negotiation of the Chapter 11 case.  Do

21  you recall that testimony?

22     A    Yes, I do.

23     Q    Okay.  And I'm asking you if there's any

24  ongoing coverage litigation that would lead to such

25  denials of coverage.

1          MR. SHEEHAN:  Objection to form.

2          You can answer.

3          THE WITNESS:  No, because these cases are

4     stayed right now; so no, there's no -- not -- no.

5     BY MR. NASATIR:

6     Q    Okay.  And if the CVA cases involving the

7     other SIP participants were to go forward, are you aware

8     of any active coverage litigation involving those cases?

9          MR. SHEEHAN:  Objection to the form.

10         You can answer if you know.

11         THE WITNESS:  That makes no sense to me.

12    If they -- If they move forward, then litigation will

13    continue, and then potential insurance involvement is

14    there.

15    BY MR. NASATIR:

16    Q    Is it your -- in your experience, when an

17    abuse claim is being brought against a SIP participant,

18    are coverage issues litigated in that abuse litigation?

19         MR. SHEEHAN:  Objection to form.

20         You can answer.

21         THE WITNESS:  Insurance coverage issues?

22         MR. NASATIR:  Yes.

23         THE WITNESS:  No.

24    BY MR. NASATIR:

25    Q    They're litigated in a separate forum, aren't

 1  they?

 2              MR. SHEEHAN:  Objection to form --

 3              THE WITNESS:  Please explain.  What

 4  different forum are you talking about?

 5              MR. NASATIR:  Yeah, I think there has to

 6  be a separate coverage action to determine any coverage

 7  issues, separate and apart from the abuse litigation.

 8              THE WITNESS:  Again, I -- I don't know

 9  what you're asking.  I -- I'd like a question.

10  BY MR. NASATIR:

11     Q    All right.  I'm going to just move on to the

12  next part of your declaration.

13          You said you're not a lawyer, right?

14     A    Yes.

15     Q    Okay.  How often do you use the phrase

16  "collateral estoppel"?

17              MR. SHEEHAN:  Objection.

18              You can answer.

19              THE WITNESS:  Pretty much never.

20  BY MR. NASATIR:

21     Q    Do you know what it is?

22     A    Not exactly; no, I do not.

23     Q    Okay.  Do you know the rules that govern the

24  concept of collateral estoppel?

25     A    No, I do not.

1      Q    Okay.  Can you tell me what "vicarious

2   liability" is?

3      A    Yeah, it's -- well, vicarious liability is --

4   I don't know how to -- how to define it, no.  Through --

5   through your -- through certain actions, you're held

6   vicariously liable.

7      Q    In the context of abuse litigation, do you

8   understand vicarious liability to mean that the diocese

9   would be vicariously liable for the parish's actions?

10     A    Yes, potentially.

11     Q    Okay.  Do you have any understanding whether

12  under New York law that theory of vicarious liability is

13  valid?

14              MR. SHEEHAN:  Objection --

15              THE WITNESS:  I --

16              MR. SHEEHAN:  -- legal conclusion --

17              THE WITNESS:  Yeah.

18              MR. SHEEHAN:  -- you can answer if you

19  know.

20              THE WITNESS:  No, I -- I -- I'm not going

21  to answer that; I don't know.

22  BY MR. NASATIR:

23     Q    Okay.  That's all I'm asking, is if you know.

24              When you say, "The diocese may be exposed to

25  imputed admissions," what do you mean?

1    A    "Imputed admissions" --

2    Q    Yeah.

3    A    -- again, I don't know how to answer that.

4    Q    Okay.  Can you give me an example of an

5    imputed admission?

6              MR. SHEEHAN:  Objection to form.

7              You can answer if you know.

8              THE WITNESS:  I don't know.

9    BY MR. NASATIR:

10   Q    Okay.  I skipped over "adverse precedent."

11   What did you mean when you said, "The diocese may be

12   exposed to adverse precedent"?

13   A    Through a continuation of a CVA action against

14   a SIP participant, as I stated before, would create an

15   adverse precedent, whether or not it is sharing of

16   limits, insurance company denials of coverage in a

17   particular case, that could definitely adversely affect

18   potential involvement by insurance carriers in the

19   Chapter 11 action.

20   Q    Okay.  So your reference to adverse precedent

21   is in the context of insurance coverage; is that fair?

22   A    That's fair.

23   Q    Okay.  To your knowledge, has the diocese ever

24   been found liable as a result of a state court judgment

25   against one of its parishes where the diocese was not a

1   party?

2        A     Are you talking about CVA?

3        Q     Yes.

4        A     Prior to -- okay, prior to the enactment of

5   the -- of the CVA regulation?  The law?

6        Q     I'm asking you, in your experience, and to

7   your knowledge, has the diocese ever been found liable

8   as a result of a state court judgment against one of its

9   parishes where it wasn't a defendant in that case?

10                  MR. SHEEHAN:  Objection to form.

11                  You can answer if you know.

12                  THE WITNESS:  Has the diocese been found

13   liable?  I -- I don't -- no, I don't know.  I -- in my

14   experience, I -- I cannot recollect anything like that.

15   BY MR. NASATIR:

16        Q     Okay.  Now it -- the end of your paragraph,

17   you said, "In these circumstances, the diocese will have

18   no choice but to participate in CVA cases, thus

19   diverting significant resources from the pursuit of a

20   plan of reorganization, invitiating the efficacy of the

21   automatic stay."  Do you see that?

22        A     No.

23        Q     Would you agree with me that if the concerns

24   that you raise in the paragraph -- in the sentence

25   before this sentence, are not valid, there would be no

```
 1   need to divert "significant resources"?

 2        A    No.

 3                  MR. SHEEHAN:  Objection.  Calls for

 4   speculation.

 5                  You can answer.

 6                  THE WITNESS:  Yeah.  I -- that -- that's

 7   speculation -- no, I -- I -- no.  I disagree.

 8   BY MR. NASATIR:

 9        Q    Okay.  Do you have any role, sir, in the

10   restructuring efforts of the diocese?

11        A    Not directly, no.

12        Q    Okay.  I guess I -- it's maybe a little bit of

13   an unfair question.

14             Are you involved in aspects of insurance

15   coverage insofar as it impacts your organization of the

16   diocese?

17        A    Yes.

18        Q    Okay.  Are you involved in any other role

19   regarding any structuring of the diocese?

20        A    No.

21        Q    Excuse me, I misspoke; reorganization.

22        A    The reorganization?  No, I am not directly

23   involved in that.

24        Q    Are you involved indirectly in anything other

25   than the insurance?
```

1        A       Indirectly, yes.  I --

2        Q       What do you mean?

3        A       I am team leader of a team that is involved in

4   the -- the major initiative to create a families of

5   parishes, and reorganizing the diocese into families

6   versus just individual parishes.

7               And I am on a committee and a team that has

8   input into a lot of, you know, not even just insurance

9   aspects, but just other aspects to help the parishes

10  create a -- a good working environment.

11       Q       And this is with a view to subsequent

12  reorganization by the diocese?

13       A       Yes.

14       Q       Okay.  How much time on a monthly basis are

15  you spending on tasks that are related to the

16  reorganization of the diocese?

17       A       Non-insurance related?

18       Q       Not insurance related.

19       A       In a month, probably maybe -- I'd say maybe

20  the equivalent of a -- a whole day; eight hours.

21       Q       Okay.  And how much time do you spend on

22  insurance-related matters as they are related to the

23  reorganization of the diocese in a month?

24       A       In a month.  I'd put a guess on that; I would

25  say -- say maybe -- maybe 25 hours a month?  Somewhere

1    in that area?

2         Q    Okay.  Do you think any of the tasks that you

3    are undertaking that are related to the reorganization

4    of the diocese can be handled by other professionals?

5         A    When it comes to insurance, no.

6         Q    What about restructuring the parishes into

7    families?

8         A    Well, is there a question there?

9         Q    Yes.  Could that be done by other

10   professionals?

11        A    Yes.

12        Q    Okay.

13        A    I -- I'm not sure, what do you mean "by other

14   professionals"?  Outside the diocese?

15        Q    Yes, or inside the diocese.

16        A    It is being handled by other experts in the

17   diocese.

18        Q    Okay.  Do you have any role in non-abuse

19   claims?

20                   MR. SHEEHAN:  Form.  Answer.

21                   THE WITNESS:  Yes, if you elaborate.

22   BY MR. NASATIR:

23        Q    Well, like slip-and-falls, for example?

24        A    Yes.

25        Q    What's your role there?

1    A    It is, again, having it -- a claim reported to

2    our department, logged in as a claim; it is reviewed by

3    the diocese claim unit nerve and myself.  And we set up

4    a claim, and if it -- each case, obviously, is

5    different.

6         We contact the parish.  I, along with the

7    claim manager, will do some claim investigation, we will

8    make contact with the people that get hurt.

9         We don't assign any counsel unless it becomes

10   a litigated issue.  In those instances, we work with

11   both the SIP participant and the injured party to come

12   to an agreeable settlement of the claim, depending on

13   the circumstances.

14   Q    Okay.  So your role for abuse and non-abuse

15   cases is not that different, as I understand it.

16   A    Correct.  It's not that different.

17   Q    Okay.  Would you agree with me that the time

18   you spend on abuse cases far outweighs the time you

19   spend on non-abuse cases?

20   A    Currently?

21        MR. SHEEHAN:  Objection to form.

22        You can answer.

23        THE WITNESS:  I didn't -- are you talking

24   about currently, without -- with the stay in place?

25        MR. NASATIR:  No, we'll say before the

1    bankruptcy.  Thank you for making me focus on the time

2    frame --

3                    THE WITNESS:  Okay.  Before -- before the

4    bankruptcy, yeah, I would say spent more time -- well,

5    exactly what are you asking, more time on those

6    particular cases?

7                    MR. NASATIR:  Okay.  I'm going to move to

8    paragraph 18.

9                    MR. SHEEHAN:  Let us know when you're

10   finished.

11                   THE WITNESS:  Okay.

12                   MR. NASATIR:  Yes.  Let me know when

13   you've read paragraph 18.

14                   THE WITNESS:  Okay, I'm done reading it.

15   BY MR. NASATIR:

16      Q    Okay.  Would you agree with me that the first

17   sentence needs to be updated in terms of who's likely to

18   be distracted if the CVA cases continue?

19      A    Yes.  Obviously, Bishop Scharfenberger would

20   be changed.  Charles Mendolara would be changed.

21      Q    Okay.  Have you spoken to Bishop Fisher

22   regarding his role in administering the state court

23   actions to which the diocese is not a party if the stay

24   is lifted?

25      A    No, I have not spoken with Bishop Fisher

1    directly.

2         Q    Have you spoken to someone who's spoken to

3    Bishop Fisher about his role in administering the state

4    court actions to which the diocese is not a party if the

5    stay is lifted?

6                   MR. SHEEHAN:  Objection to form.

7                   You can answer.

8                   THE WITNESS:  Yeah.  That -- that's

9    speculating.  I -- I don't know if someone I've talked

10   to has talked to Bishop Fisher about the -- I'm not

11   aware of it --

12                  MR. NASATIR:  Have --

13                  THE WITNESS:  -- has happened, I'm not

14   aware.

15   BY MR. NASATIR:

16        Q    Fair enough.  Have you spoken to Bishop Fisher

17   about insurance coverage for the CVS cases?

18        A    No, I have not.

19        Q    Okay.  Is it your understanding that if the

20   state court actions to which the diocese is not a party

21   are allowed to proceed, that diocese personnel would be

22   deposed?

23                  MR. SHEEHAN:  Objection to form.

24                  You can answer.

25                  THE WITNESS:  Would -- that they'll be

1    deposed?

2                    MR. NASATIR:  Yeah.

3                    THE WITNESS:  I don't know that.

4    BY MR. NASATIR:

5        Q    Okay.  Do you know if any diocese personnel

6    would likely to be witnesses?

7        A    Witnesses in what respect?  To the CVA cases?

8        Q    Yes.  To which the diocese is not a party.

9        A    I -- I'm unaware of any that would be.

10       Q    Okay.  Do you know if any of those cases have

11   been set for trial?

12       A    No.  Not that I --

13       Q    No --

14       A    -- know of.

15       Q    -- you -- no, you don't know; or no, they

16   haven't?

17       A    Set for trial?  CVA cases?

18       Q    Yeah.

19       A    Against -- against non-diocese entities?

20       Q    Yes.

21       A    I am not aware of any that have been set for

22   trial.  To my knowledge, no.

23       Q    Okay.  I'm going to go to your -- the next

24   sentence here.  "It is the hope -- the diocese's hope

25   and expectation that a consensual plan of reorganization

1    can be formulated."  Do you see that?

2         A    Yes.  Okay?

3         Q    Thank you.  When did you make that statement?

4         A    When did I make that statement?  It was

5    obviously part of my declaration.  So I made it back in

6    2020.

7         Q    Okay.  So sitting here in November of 2023,

8    you would agree with me that that hope and expectation

9    has not materialized, has it?

10                  MR. SHEEHAN:  Objection to form.

11                  THE WITNESS:  Hope and expectation has

12   not materialized?  That's --

13   BY MR. NASATIR:

14        Q    That's my question.

15        A    I would say that there's still hope that it

16   will move forward, and -- I mean, I -- I still have an

17   expectation and hope that a consensual plan will be

18   formulated.

19        Q    Okay.  Are there any particular CVA actions

20   against SIP -- other SIP participants only, in other

21   words, not the Diocese, that you believe will threaten

22   the Diocese reorganization if they proceed?

23                  MR. SHEEHAN:  Objection to form.  You can

24   answer.

25                  THE WITNESS:  I -- on a specific case

 1  basis, no, I am not aware of any specific case that

 2  would do that.

 3  BY MR. NASATIR:

 4      Q    Okay.  I am -- we are now going back to other

 5  portions of your declaration, so if you were hoping we

 6  were done, I'm apologizing, you are not.  But I'm just

 7  telling you that so you know where we're going.

 8      A    Okay.

 9           MR. SHEEHAN:    Do -- can I ask, do you

10  plan to take a lunch break?  Do you have -- do you know

11  how much question you have left?

12           MR. NASATIR:  If you want -- I would

13  prefer to take a short break.  If -- it can be longer,

14  it can be, you know, as much as half an hour.  But I

15  don't really need -- I don't really need or want a 45 or

16  an hour break for lunch.  And I would say that I don't

17  have -- I'm clearly a third of the way -- sorry, halfway

18  through.  I may be as close to a third of the way

19  through my outline.  Of course, that doesn't mean that

20  the witness's answers are, you know, commensurate with

21  my outline.  But that's where we stand if you're

22  thinking about how much longer we have.

23           So how would you like to proceed, Mr.

24  Scholl?

25           MR. SHEEHAN:  I think the witness would

1   like at least a half an hour.  Think -- would 30 minutes

2   be sufficient?

3                    THE WITNESS:  Thirty is fine.

4                    MR. SHEEHAN:  It's sufficient on our end.

5                    MR. NASATIR:  So would -- I'm sorry, I'm

6   not on your time zone.  So you're looking at -- it's --

7   you're looking at 1:30 -- it's 1:35 now; is that right?

8                    MR. SHEEHAN:  1:38 here, that's right.

9                    MR. NASATIR:  1:38.

10                   THE WITNESS:  Yeah.

11                   MR. NASATIR:  Okay.  Yeah, that's right,

12  the computer tells me these things.  Okay.  So you want

13  -- you want to get back in half an hour?

14                   THE WITNESS:  Yes.

15                   MR. NASATIR:  Is that your preference?

16                   THE WITNESS:  Yes, my preference.

17                   MR. SULLIVAN:  And Ian, this is Charlie.

18  So, I'm just curious, you said you are halfway through

19  your outline or a third of the way through your outline?

20                   MR. NASATIR:  No, I -- I'm sorry, I said

21  I'm at least halfway through.  And I may have as much as

22  only a third left.

23                   MR. SULLIVAN:  Understood.  Thank you.

24                   MR. NASATIR:  Okay.  That's fine.  Is

25  that all right with you, Mr. Reporter?

1                THE REPORTER:  Yes, that's fine.

2                MR. NASATIR:  Okay.  Why don't we get

3   back on at -- in half an hour, whatever that is.

4                MR. SHEEHAN:  Okay.  Thank you.  About

5   2:10.  Okay.

6                MR. NASATIR:  Okay.  Thank you.

7                THE REPORTER:  The time is now 1:38 p.m.

8   Eastern and we're off the record.

9        (Off the record.)

10               THE REPORTER:  The time is now 2:10 p.m.

11  Eastern and we're back on the record.  You may proceed.

12               MR. NASATIR:  Thank you.

13  BY MR. NASATIR:

14       Q    Mr. Scholl, did you discuss your deposition,

15  the -- deposition testimony with anyone during the

16  break?

17       A    No.

18       Q    Thank you.  Going to go to paragraph 11 of

19  your declaration.  Take a moment, please, to read

20  paragraph 11.  Let me know when you're done.

21       A    Okay.

22       Q    Okay.  Let's start with the first sentence.

23  "Prior to the implementation of the SIP in 1973, each of

24  the SIP participants were responsible for securing their

25  own liability insurance coverage."  See that?

        1       A     Yeah.

        2       Q     Technically, before 1973, there actually

        3    wasn't a SIP, right?

        4       A     Correct.

        5       Q     So there couldn't be SIP participants prior to

        6    1973?

        7       A     Correct.

        8       Q     So what you're really talking about are non-

        9    diocesan entities that were responsible for securing

       10    their own liability insurance coverage, right?

       11       A     Well, they were diocesan entities.  They

       12    weren't non-diocesan entities.  They were diocesan

       13    parishes and -- and schools.  And who were responsible

       14    for obtaining their own liability insurance coverage.

       15       Q     Thank you for that clarification.  I misspoke.

       16    So, skipping down to power -- to the sentence beginning,

       17    "On or about March 10, 2020, the Diocese located in its

       18    archives a number of records which identify in

       19    reasonable detail secondary proof of pre-1973 policies

       20    that provide liability coverage to various

       21    participants."  Do you see that?

       22       A     Yes.

       23       Q     Okay.  What is secondary evidence?

       24       A     Secondary evidence would be evidence of

       25    insurance without having the actual policy, with all the

1    coverage terms, conditions.  It would -- it could mean

2    many things, such as certificates of insurance.  It

3    could reference the insurance company that insured a

4    particular parish in a particular year.  There could be

5    a policy number that would be contained in that

6    information.  There could be names of insurance agents.

7    It could be written communications that referenced

8    insurance coverage.  Anything like that.

9        Q    Okay.  And that was -- that material was

10   located in 2020 of March approximately, right?

11       A    Yes.

12       Q    And was there any subsequent search done for

13   the pre-1973 policies?

14       A    Yeah, there were many searches done at

15   different times.

16       Q    Okay.  Has there -- has there been a search

17   done in 2023?

18       A    Yes.

19       Q    When was it done?

20       A    I -- I myself went back down to our basement

21   area and -- still in search of some potential boxes or

22   documents that might contain some information.  I did

23   not locate anything.  There was also communication sent

24   out to all parishes again in 2023, asking them again to

25   please look through all of their archives and places

1    where they might store old records and search again.

2         Q    Who's -- is that -- first of all, is that

3    search ongoing?

4         A    Yes.

5         Q    Who's coordinating it?

6         A    The search is coordinated, we'll say jointly,

7    between myself and the chief operating officer of the

8    Diocese, Richard Suchan.

9         Q    Is it your understanding that the parishes

10   have an obligation to come back to you or the CFO with

11   some indication of their compliance with the search?

12        A    Yes.

13        Q    Okay.

14        A    And they do.

15        Q    With -- in terms of progress, where -- how far

16   along are you in getting responses from all the parishes

17   to whom you reached out?

18        A    We -- over, we'll say, the three years, we

19   have received responses probably from every single

20   parish, at least in one form or another.

21        Q    With respect to the 2023 search, in which the

22   parishes have an obligation to provide some proof of

23   their compliance with the search, how far along are you

24   with having all the parishes return such compliance

25   proof?

1      A      I don't know the answer to that because I am

2    not the one that has personally received the record of

3    compliance or not compliance.  So I -- I can't answer

4    that because I don't know.

5      Q    Okay.  Do you know if any of the searches, the

6    2023 and the prior searches, reached out to schools or

7    camps or other diocesan entities?

8                MR. SHEEHAN:  Objection.  This line of

9    questioning is going beyond the subject matter that's

10   relevant to the pending motion.

11               MR. NASATIR:  No, it's not.  It's

12   relevant to whether there's shared insurance, which is a

13   foundation upon which Mr. Scholl is resting his

14   declaration.

15               MR. SHEEHAN:  You can answer the

16   question.

17               THE WITNESS:  Okay.  Would you repeat

18   that, please?

19   BY MR. NASATIR:

20     Q    Sure.  Do you know if any of the searches, the

21   2023 and the prior searches, included schools or camps

22   or other diocesan entities besides parishes?

23     A    Yes.

24     Q    Okay.  Do you know if that's still an ongoing

25   process?

1       A    Yes, it is.

2       Q    Okay.  Now, I believe you testified earlier

3  that you were unable to locate any actual policies of --

4  that were issued pre-1973; is that right?

5       A    That's right.

6       Q    Did you locate any declaration pages standing

7  alone?

8       A    Dec pages?

9       Q    Dec pages, yes.

10      A    Yeah, dec pages.  No.

11      Q    Okay.  Does a declaration page describe who

12  the named insured is?

13      A    Yes.

14      Q    Does it also describe other insureds under the

15  policy?

16      A    Not necessarily, no.

17      Q    It can be found in endorsements?

18      A    Yes.

19      Q    Okay.

20      A    Additional insured endorsements.

21      Q    Did you find any additional insured

22  endorsements?

23           MR. SHEEHAN:  Objection to form.  You can

24  answer.

25           THE WITNESS:  Not to my knowledge.

1   BY MR. NASATIR:

2        Q    Okay.  You say in your declaration in

3   paragraph 11 that, "Upon information and belief, copies

4   of the relevant policies are in the possession of the

5   respective carriers."  Have you -- what's the basis for

6   that statement on information and belief?

7        A    Say that -- which -- which line is that?

8        Q    It is the sentence -- it's starting at the

9   bottom of page 4 and carrying over to page 5.

10       A    Okay.  "Upon information and belief."  Okay.

11   "Copies in a" -- okay.  "Are in the possession of their

12   respective carriers."  Okay.

13       Q    What's the basis for that statement?

14       A    The basis for that statement is that insurance

15   companies retain old policies.  I work for three

16   insurance companies and, you know, the -- the companies

17   do retain, at least at some level, copies of insurance

18   policies, or should be.

19       Q    Okay.  Have any of the carriers who provide

20   pre-1973 insurance to diocesan entities confirmed that

21   they have the copies of these policies in their

22   possession?

23       A    Okay.  I cannot answer that.  That is out of

24   my direct area of responsibility.  That is all directed

25   to Blank Rome.

1      Q    Okay.  So when you say, "Upon information and

2  belief, copies of the relevant policies are in the

3  possession of the respective carriers," your basis for

4  saying that is your prior experience with other

5  insurance companies?

6      A    Correct.  Insureds --

7      Q    Okay.

8      A    -- often don't keep their policies, but

9  insurance companies do keep records of insurance

10  policies that they issue.

11      Q    But in this case, you have no specific

12  evidence of that being the case here?

13           MR. SHEEHAN:  Objection.  You can answer.

14           THE WITNESS:  No, that's correct.

15  BY MR. NASATIR:

16      Q    Okay.  Do you know if the carriers have been

17  asked to produce copies of the policies?

18      A    Yes, they have been asked.

19      Q    But they have not done so?

20      A    That would be a question for Blank Rome.  I

21  don't know the answer to that.

22      Q    Okay.  Now, let's see.  Give me a second here.

23  All right.  Let's focus on the last sentence in your

24  declaration, paragraph 11.

25      A    Okay.  Yes.  Okay.

1    Q    Okay.  Now, because you've not seen a pre-'73

2    policy, you'll agree with me, you've never seen the

3    Diocese as named as an insured under any of these

4    policies, right?

5    A    Yeah, I have not physically seen it, correct.

6    Q    Okay.  Okay.  But your conclusion is that each

7    of the SIP participants maintained liability insurance

8    policies and that each of these policies would have

9    included the Diocese as an additional named insured,

10   right?

11   A    Yes.

12   Q    Okay.  And you based that on your review of

13   available records.  What records supported the view that

14   the policies would have included the Diocese as an

15   additional named insured?

16             MR. SHEEHAN:  Objection to form.  You can

17   answer.

18             THE WITNESS:  What records are you

19   referring to?

20   BY MR. NASATIR:

21   Q    Well, that's what I'm asking you.  In your --

22   in your declaration under oath, you said, "Based on my

23   review" --

24   A    Right.

25   Q    -- "of the available records."  What records

1    are you referring to?

2        A    Well, specific written records -- no, it would

3    have been -- for pre-'73 -- that was really a -- a

4    statement of my experience in the insurance business,

5    and says, "Based on" -- yeah, "my knowledge of the

6    relationship between the Diocese and other SIP

7    participants and my experience in the industry."  It --

8    to me, it was a -- a conclusion that the Diocese would

9    have been named as additional insureds, very similar to

10   corporation insurance that have subsidiaries.  The

11   insurance of the subsidiary would name the parent

12   corporation as additional insured.  The Diocese is

13   basically like the home office or, you know, the entity

14   in Western New York, and the parishes are basically like

15   subsidiaries of the Diocese and would have named -- in

16   my opinion, would have named the Diocese as an

17   additional name insured on those liability policies.

18                MR. NASATIR:  Move to strike as non-

19   responsive.

20   BY MR. NASATIR:

21       Q    What additional document -- what additional

22   records -- strike that.

23                What available records are you relying on for

24   the conclusion that each of the policies would have

25   included the Diocese as a named additional -- as an

1    additional named insured?

2                    MR. SHEEHAN:  Objection to form.  You can

3    answer.

4                    THE WITNESS:  No specific records.

5    BY MR. NASATIR:

6        Q    Okay.  Let's move to the next sentence, your

7    "knowledge of the relationship between the Diocese and

8    the other SIP participants."

9        A    Yes.

10       Q    How old were you in 1973?

11       A    In '73?

12       Q    Yeah.

13       A    I was 19.

14       Q    Okay.  Did you have any understanding of the

15   relationship between the Diocese and its parishes before

16   1973?

17                   MR. SHEEHAN:  Objection to the form.  Are

18   you asking at the time he signed this declaration, or

19   actually 1973?

20                   THE WITNESS:  Yeah, if you're ask --

21   BY MR. NASATIR:

22       Q    I'm asking you --

23       A    In --

24       Q    -- in 1973, were you a percipient witness to

25   the relationship between the Diocese and the other --

1  and the parishes?

2      A    No, I was not directly involved in that.

3      Q    So what is your knowledge based upon, in terms

4  of the relationship between the Diocese and the other

5  SIP participants?

6      A    Okay.  My knowledge of the relationship is

7  based on -- between the Diocese and other SIP

8  participants?  Other than that I've been working at the

9  Diocese for 25 years, so I've come to understand and

10  know a lot of how the relationship worked in 19 -- in

11  the 1970s and even '60s and '80s, '90s, before I came on

12  board there.  So it'd be based on knowledge I've gained

13  in the 25 years that I've worked there.

14      Q    Give me specifics.

15      A    There are no specifics.

16      Q    Okay.  Let me ask you about your experience in

17  the insurance and risk management industry.

18      A    Okay.

19      Q    That means facts and experience is not coming

20  out of this -- the relationship between the Diocese of

21  Buffalo and its parishes, right?

22      A    That is correct.

23      Q    Okay.  You're making your assumption about who

24  is insured here based upon other cases or other matters,

25  right?

1       A      That is correct.

2       Q      You've not been qualified as an expert in the

3    area of insurance interpretation or insurance

4    archaeology, have you?

5       A      No, I have not.

6       Q      What experiences are you relying upon to

7    conclude that these policies would have included the

8    Diocese as an additional named insured?

9       A      Basically, I had 20 years of commercial

10   underwriting experience, and as a commercial insurance

11   underwriter, you know all about relationships of

12   insureds' contractual liability, insureds' additional

13   insurance.  And I handled many, many, many commercial

14   insurance policies involving parent and subsidiary

15   corporations, where additional insureds status was

16   granted to parent corporations, affiliated entities.

17   That was -- that's just a very common practice to do,

18   especially when two entities are as related to each

19   other as a parish and the Diocese.  In -- in my opinion,

20   they absolutely would have been named as an additional

21   insured under the parish policies.

22      Q      In your -- the many, many commercial policies

23   that you were involved with, did any of them -- were any

24   of them issued to a religious institution?

25      A      Yeah, as a matter of fact, when I was first

1   hired at my first job in 1978, I actually trained on the

2   Diocese of Buffalo liability insurance policy for the

3   Diocese of Buffalo.

4        Q    Right.  But that was a pre-1973 policy,

5   correct?

6        A    No.  No, no, that was in 1978, when the

7   company I worked for was the insurance carrier for the

8   Diocese.

9        Q    I'm sorry, I misspoke.  I meant that was a

10  post-'73 policy, right?

11       A    Yes, it was.

12       Q    Okay.  And by then, the SIP program was in

13  place, correct?

14       A    Correct.

15       Q    Okay.  So there was a preexisting structure

16  where the Diocese was the named insured, right?

17            MR. SHEEHAN:  Objection to form.  You can

18  answer.

19            THE WITNESS:  Were you talking about

20  post-'73?

21  BY MR. NASATIR:

22       Q    Yes.

23       A    Yes, there -- there was a structure where the

24  -- the Diocese had in- -- a liability insurance policy.

25       Q    And would you agree with me that where the

1    individual parish pre-'73 was seeking insurance, it

2    would have been the named insured?.

3         A    Under the Diocese policy, the parishes pre-

4    '73?

5         Q    Yes.

6         A    Okay.  No, that -- they would not be -- the

7    parishes would not be named insureds on the Diocese --

8    well, I take that back.  I -- I would think that they

9    would have been part of the name insured.  As --

10        Q    And as the -- strike --

11        A    And --

12        Q    As the --

13        A    That they would be -- would have been named as

14   insured as under -- very similar to the way the policies

15   read now, which is the Diocese of Buffalo, its

16   affiliated entities and civil corporations, parishes,

17   that kind of thing.

18        Q    Yeah, but that's different, Mr. Scholl,

19   because in the pre-'73 policies, the individual parish

20   would have been the named insured.  And if your --

21        A    Correct.

22        Q    -- opinion is correct, the Diocese might have

23   been named as an additional named insured.  But --

24        A    Right.

25        Q    -- in this post-'73 policies, it is going to

1  be the Diocese that's the named insured.  And the

2  definition of named insured will include the parishes

3  and other Diocese entities; isn't that right?

4              MR. SHEEHAN:  Object --

5              THE WITNESS:  Right.

6              MR. SHEEHAN:  -- to the form of the

7  question.

8  BY MR. NASATIR:

9      Q    So it's different, right, pre-'73 and post-'73

10 in the structure?

11             MR. SHEEHAN:  Objection to form.  You can

12 answer.

13             THE WITNESS:  The structure of the

14 insurance coverage is -- well, I can't -- well, I would

15 say post-'73 it was different because of the joint

16 program.

17 BY MR. NASATIR:

18     Q    Okay.  Let me ask you this.  You would agree

19 with me that if the Diocese was not an additional named

20 insured on a post-1973 policy, all the concerns that you

21 have about shared insurance would not be relevant, fair?

22             MR. SHEEHAN:  Objection to form.

23             THE WITNESS:  Will you rephrase that?  I

24 say no.

25             MR. NASATIR:  Okay.

                    THE WITNESS:  I -- I'm not sure what

1    you're looking for.

2    BY MR. NASATIR:

3        Q    I'm looking for you to agree with me that if

4    there isn't shared insurance, then the concerns you have

5    relating to shared insurance are irrelevant.

6        A    There is shared insurance.

7                    MR. SHEEHAN:  Objection to form.  To the

8    extent you're characterizing his prior testimony.  I

9    don't believe that's an accurate characterization.  You

10   can answer.

11                   MR. NASATIR:  That's all right.  I'll

12   move on.

13   BY MR. NASATIR:

14       Q    This is a fun question for you, Mr. Scholl.

15   What do the following insurance companies all have in

16   common: Arrowood, American Centennial, Bedivere,

17   Midland, Lumbermens, Great Atlantic, Proprietors,

18   Mission?

19                   MR. SHEEHAN:  Objection to form.  You can

20   answer, if you know.

21                   THE WITNESS:  What do they all have in

22   common?

23                   MR. NASATIR:  Yep.

24                   THE WITNESS:  I would say those that

1    probably -- if I -- I don't know the answer to that, but

2    I believe they all --

3              MR. SHEEHAN:  Don't speculate.

4              THE WITNESS:  Okay.  I'm not going to

5    speculate.

6    BY MR. NASATIR:

7        Q    All right.  So you have no -- would you -- one

8    more time.  Do you know if any of them are insolvent?

9        A    Yes.

10       Q    Do you know if Midland is insolvent?

11       A    I don't know that.

12       Q    Which ones do you know are insolvent?

13       A    Proprietors and Mission.

14       Q    Okay.  Do you know when Mission was put into

15   liquidation?

16       A    No, I do not.

17       Q    I do.  I worked on it.  It was 1985.  Do you

18   know if the Mission estate liquidation phase has been

19   closed?

20       A    No, I do not know that.

21       Q    Okay.  Would you agree with me that to the

22   extent any parish was insured by an insolvent insurer,

23   there are no shared insurance concerns?

24             MR. SHEEHAN:  Objection.  Calls for

25   speculation.  You can answer.

          1                    THE WITNESS:  Yeah, that -- that would --

          2    that would be speculating.  I -- I can't answer that.

          3    BY MR. NASATIR:

          4        Q    Well, let's bring it into the specifics.

          5    Proprietors is an insurer of the Diocese, is it not,

          6    sir?

          7        A    Proprietors is or was?

          8        Q    Was.

          9        A    Yes.

         10        Q    And there's no insurance to be gotten from

         11    Proprietors because it's insolvent, right?

         12        A    Correct.

         13        Q    So there can be no concerns about negative

         14    precedent on coverage issues relating to Proprietors,

         15    right?

         16                    MR. SHEEHAN:  Objection.  Calls for legal

         17    conclusion.  You can answer, if you know.

         18                    THE WITNESS:  Say that again, please.

         19                    MR. NASATIR:  Would you read that back,

         20    please?

         21                    THE REPORTER:  Yes, just give me a

         22    second.

         23        (Readback as requested.)

         24                    THE WITNESS:  So --

         25                    MR. SHEEHAN:  Same objection.  If you

1    can, answer.

2                    THE WITNESS:  Yeah, that's right.

3    BY MR. NASATIR:

4        Q    Okay.  And that would be true of any other

5    insolvent carrier who issued insurance to the Diocese or

6    to a parish, right?

7                    MR. SHEEHAN:  Objection.  Form.  You can

8    answer.

9                    THE WITNESS:  I -- no, I can't answer

10   that.  I -- I don't know the answer to that one.

11   BY MR. NASATIR:

12       Q    Let's go to paragraph 16.  Did you read the

13   one sentence that paragraph 6 constitutes?

14       A    Yes.

15       Q    Okay.  Does SIP use third-party insurance

16   brokers for sexual abuse claims?

17                    MR. SHEEHAN:  Objection to form.  You can

18   answer.

19                    THE WITNESS:  Anytime on sexual abuse

20   coverage or claims?

21   BY MR. NASATIR:

22       Q    I'm talking about claims.

23       A    Okay.  Okay.  Because the paragraph talks

24   about purchasing appropriate excess insurance, not --

25       Q    Okay.

1      A     -- claims.

2      Q     Let me ask you then -- let me switch that

3  around then, fair enough, and ask you, does SIP use

4  third-party insurance brokers to procure coverage for

5  sexual abuse claims?

6      A     Yes -- wait, no.  Coverage for sexual abuse

7  claims?  Okay.  Sexual abuse coverage.  Yes.  Yes, and I

8  do use a third-party broker to procure insurance for

9  sexual abuse coverage.

10      Q     Are they paid a commission?

11      A     They are paid a fee.

12      Q     Does the fee come out of SIP funds?

13      A     Yes, it does.

14      Q     Okay.  Let's move to paragraph 7.  Before we

15  go there, let me go back to my question I meant to ask

16  first -- or second.  What -- does SIP utilize third-

17  party administrators with respect to sexual abuse

18  claims?

19      A     Third-party claims administrators?

20      Q     Yes.

21      A     No.

22      Q     Okay.  Is that done in-house?

23      A     Yes, it is.

24      Q     Got it.  All right.  Now we're going to

25  paragraph 7.  Okay.  Will you take a moment and read

1    through it, please?

2         A    Okay.  Okay.

3         Q    All right.  You say that, "The Diocese funds

4    sit primarily by billing each of the SIP participants a

5    ratable portion of the projected overall cost of

6    administering the program and paying claims using

7    allocation methodologies which take into account

8    numerous different ratable exposure bases."

9         A    Yes.

10        Q    That's a lot of ratable in there.

11        A    Ratable.

12        Q    Ratable.  What do you mean by "a ratable

13   portion of projected overall cost of administering the

14   program and paying claims?"

15        A    Where you can assign a specific insurance rate

16   to a specific coverage component.  For example, property

17   insurance, you would take a rate times the replacement

18   value of the property, workers comp a rate times the

19   payrolls for a particular worker, and so on.

20        Q    And for liability coverage for sexual abuse,

21   how does that work?

22        A    That is included under a -- a general rating

23   of general liability insurance, which is based on a

24   combination of the size of a parish, as -- as the number

25   of families involved in a parish, and also the --

1    potentially, the square footage of a particular

2    structure.  It's -- there's no specific sexual

3    misconduct rate.  It is all included, as the coverage is

4    included, under one heading of general liability.

5        Q    So it sounds to me like loss exposure -- or

6    loss experience, excuse me, by an individual SIP

7    participant is not a factor in your allocation

8    methodology?

9              MR. SHEEHAN:  Objection to form.  You can

10    answer.

11              THE WITNESS:  I think as far as

12    experience of a SIP participant, no, that is not

13    included in a specific rate assigned to that parish.

14    That's --

15              MR. NASATIR:  Okay.

16              THE WITNESS:  -- correct.

17    BY MR. NASATIR:

18        Q    Okay.  The next sentence you say, "The Diocese

19    strives to achieve a consistent and fair allocation of

20    premium costs amongst the SIP participants."  How does

21    it do that?

22        A    A consistent and fair allocation is based on

23    the exposures that each of the participants have, such

24    as numbers of buildings, square footages and values of

25    buildings, numbers of employees, total payroll, number

1    of automobile vehicles.  There's many different, as I

2    say, ratable exposures.  So we -- the consistent and

3    fair allocation is to assess a certain amount of what we

4    call premium to a particular entity based on their own

5    individual exposures.

6         Q    Okay.  I think I recall you testified that the

7    insurance calendar year runs from July 1 to July 1; is

8    that right?

9         A    That's right.

10        Q    Okay.  Does -- is that also a true statement

11   for the SIP fund?

12        A    Yes, it is.

13        Q    Okay.  And at the end of the insurance

14   calendar year for the SIPs fund, if there's a surplus,

15   what happens to it?

16        A    If there's a -- if there's a surplus, it goes

17   back into the reserve account for insurance services.

18        Q    Is it --

19        A    For the --

20        Q    Is it rechanneled back into the SIP fund for

21   the next year?

22        A    Yeah.  Yes, it is.

23        Q    Okay.  What if there's a deficit?

24        A    If there's a deficit, then we have to reduce,

25   we'll say, the assets that we have that are held against

1   the -- the program.

2       Q    Do -- is the billing of each of the SIP

3   participants for the year after the fund closes with a

4   deficit impacted?

5               MR. SHEEHAN:  Objection to form.  You can

6   answer.

7               THE WITNESS:  It is one of the -- it is

8   one of the components of after a -- after insurance year

9   closes and we're billing for the following year, that is

10  one of the components on whether or not there was, shall

11  we say, a -- a net loss.

12  BY MR. NASATIR:

13      Q    So the -- is it like an assessment for each

14  parish, if there's a deficit in the -- for each SIP

15  participant, if there's a deficit in the SIP fund at the

16  end of the year?

17      A    Not a specific assessment to each SIP

18  participant.  It goes into the overall -- the overall

19  revenues that are -- that are -- are needed to run the

20  --

21      Q    Okay.

22      A    -- program.

23      Q    Now, you say in this paragraph you budgeted --

24  or the Diocese budgeted 7.4 million in premium revenue

25  related to the -- to the SIP?

1     A    Right.

2     Q    Is that the total amount of money that was

3 raised from the SIP participants, or is that -- is that

4 all the money in addition to the money that was raised

5 by the SIP participants?

6     A    The vast majority of that money is from the

7 SIP participants for their annual insurance assessments.

8 It's not 100 percent of it, but it is probably 90

9 percent of it.

10    Q    Does the Diocese itself receive a ratable

11 portion in the form of a bill for the overall --

12    A    Yes.

13    Q    -- cost?

14    A    Yes.

15    Q    How is that calculated?

16    A    Same way that everything else is calculated,

17 based on ratable exposures.

18    Q    Can you give me a percentage of what annually

19 the Diocese's ratable portion is?

20             MR. SHEEHAN:  Objection to form.  You can

21 answer.

22             THE WITNESS:  I can tell you that it is

23 -- I would say it's probably in the area of about 5

24 percent.

25 BY MR. NASATIR:

1      Q    Okay.  So since 1973 -- let me ask you, do you

2   know if that percentage has changed over time?

3      A    I don't know the answer to that.

4      Q    Okay.  Prior to 1973, though, we can agree

5   that Diocese could not -- could not have been paying a

6   ratable portion of the SIP because it didn't exist,

7   right?

8      A    Correct.

9      Q    Okay.  But notwithstanding that, is it fair --

10  isn't it true that the Diocese is using the SIP fund to

11  defend claims against it that existed from abuse

12  occurring pre-1973?

13            MR. SHEEHAN:  Objection to form.  You can

14  answer.

15            THE WITNESS:  Okay.  Yes, that would be

16  the case that I won't say defend, but since policies

17  back then were written on an occurrence basis, the --

18  the coverage then becomes the problem of the current

19  insurance program.

20  BY MR. NASATIR:

21      Q    Right.  And the policies issued to the Diocese

22  and the SIP -- other SIP participants turned into

23  claims-made coverage as opposed to occurrence coverage

24  in the late '80s; is that fair?

25      A    Yes.

```
1        Q    Okay.  Okay.  I only have a few more

2   questions.  I'm going to -- I'm going to just finish

3   with the -- with your declaration, and I'm going to move

4   to a few billing letters.  Okay?

5        A    Okay.

6        Q    I'm going to go to paragraph 17.  Oh, I'm

7   sorry, before we get there, I apologize, I want to go

8   back to the -- we were talking about claims-made

9   coverage, and I want to just find that discussion.

10  Okay.  Look at paragraph 9.  Do you see the discussion

11  of the self-insured retention for $250,000 for general

12  liability claims?

13       A    Yes.

14       Q    Okay.

15            MR. SHEEHAN:  I'd appreciate it if you

16  read the whole paragraph, too.

17            THE WITNESS:  Oh, okay.

18            MR. SHEEHAN:  Just let us know when

19  you're done.

20            THE WITNESS:  Okay.

21  BY MR. NASATIR:

22       Q    Okay.  Now, the T -- where is it?  The

23  National Catholic Risk Retention Group, those policies

24  were issued in the 1990s and thereafter, right?

25       A    From 1990 -- from 1999 forward.
```

1      Q    Okay.  And they're claims-made policies,

2  right?

3      A    For sexual abuse coverage, they are claims-

4  made policies.

5      Q    So in order for this self-insured retention of

6  $250,000, it would have to be triggered in a policy in

7  the last several years where a claim had been made on

8  it, right?

9           MR. SHEEHAN:  Objection.  Form.  You can

10  answer.

11          THE WITNESS:  Not necessarily.  It

12  depends on what the retroactive date is.

13  BY MR. NASATIR:

14      Q    Fair enough.  Let me put it another way.  This

15  $250,000 per claim self-insured retention only comes

16  into play if the National Catholic Risk Retention

17  Group's policy is covering the claim?

18          MR. SHEEHAN:  Objection.  Form.  You can

19  answer.

20          THE WITNESS:  I -- I don't like the way

21  that is phrased.  Will you please explain what you're

22  looking for?

23  BY MR. NASATIR:

24      Q    I'm looking for your acknowledgment that the

25  self-insured retention of $250,000 is only triggered

1    when there's a claim against a National Catholic Risk

2    Retention Group policy that has that retention.

3        A    No.

4        Q    So it's applicable to every year from 1973

5    forward?

6                MR. SHEEHAN:  Objection to form.  You can

7    answer.

8                THE WITNESS:   It -- what is the same

9    from 1973 forward?

10   BY MR. NASATIR:

11       Q    No, I -- I'm simply trying to have you

12   acknowledge that your discussion here about $250,000

13   self-insured retention relates only to the National

14   Catholic Risk Retention Group.

15       A    Yes.

16       Q    Okay.  Thank you.  That's all I was trying to

17   establish.  Are there any other -- let me strike that.

18            Are you aware of any other self-insured

19   retentions that are -- that exist for any other policies

20   that cover sexual abuse claims?

21       A    No.

22       Q    Okay.  Let's go to paragraph -- paragraph

23   before -- paragraph 17.  Let me know when you're ready.

24       A    I'll let you know.  Okay.

25       Q    All right.  You say that the -- at the end of

1    paragra- -- it's at the end of the sentence -- hold on a

2    second.  Do any of the policies that were issued post-

3    1973 to the Diocese and the SIP participants have

4    aggregate limits?

5         A    Say that --

6         Q    Strike that.

7         A    -- again?

8         Q    Strike that.

9              Let me ask a different question.  Let me ask,

10   did any of the primary policies issued to the Diocese

11   and the SIP participants that cover sexual abuse claims

12   have aggregate limits?

13        A    Since what time frame?

14        Q    1973 forward.

15        A    Okay.  Certainly since 1990 and forward, there

16   were aggregate limits.  From 1985 to 1990, there were

17   coverage limitations as far as the amount of coverage

18   that was -- was given out, but still on -- that was on

19   an occurrence basis.

20        Q    Okay.  So let me narrow my question, because

21   you correctly pointed out in the '90s there were and

22   then post-'85.  So let me be more specific.  For

23   policies issued between 1973 and 19 -- and the end of

24   1984 --

25        A    Okay.

1      Q     -- did any primary policies have aggregate

2   limits?

3              MR. SHEEHAN:  Objection to form.  You can

4   answer.

5              THE WITNESS:  I got to think about that

6   one a second.

7   BY MR. NASATIR:

8      Q     Go ahead.

9      A     As far as sexual misconduct coverage goes, I

10  -- I would have to look at those policies and -- and

11  determine whether or not there was an aggregate limit

12  that would apply to that.  There are -- there were

13  aggregate limits within those policies.

14     Q     Okay.  Can -- but you can't tell me which ones

15  as you sit here?

16     A     No.

17     Q     Okay.  Were you involved in the preparation of

18  a coverage chart with colors identifying different

19  insurance carriers?

20             MR. SHEEHAN:  I'm going to object to the

21  form.

22             MR. NASATIR:  Charles -- Charlie, you're

23  on -- not on mute.  Please go on mute.

24             THE WITNESS:  I -- I'm --

25             MR. SHEEHAN:  Objection.

                    THE WITNESS:  -- not going on mute.

                    MR. NASATIR:  Charlie, you're not on
mute.

                    MR. SULLIVAN:  Sorry.

                    MR. SHEEHAN:  Objection.  The extent that
answering the question would divulge any attorney-client
privilege information, I instruct you not to do so.
Also, objection to form.  If you can answer without
divulging privileged information, you may do so.

                    THE WITNESS:  That would -- that would be
violation of attorney/client privilege and I won't
answer.

BY MR. NASATIR:

        Q    Can you answer whether you've seen a color --
a coverage chart?

                    MR. SHEEHAN:  Objection to form.  You can
answer.

                    THE WITNESS:  I have seen one, yes.

BY MR. NASATIR:

        Q    Have you reviewed it for accuracy?

                    MR. SHEEHAN:  Objection to form.  You can
answer.

                    THE WITNESS:  Yes, I have.

BY MR. NASATIR:

        Q    Okay.  I'm going to bring that up in a minute.

1    Going back to your declaration, you say in this

2    paragraph 17, "To the extent a claim remains unstayed,

3    the SIP will be required to expend its reserves to fund

4    defense costs."  That would not be true for any claim

5    that falls within a year in which the insurer provides

6    defense, right?

7                    MR. SHEEHAN:  Objection to form.  You can

8    answer.

9                    THE WITNESS:  In which the insurer

10   provides --

11   BY MR. NASATIR:

12        Q    A defense.

13        A    Say that again.  Okay.  "The SIP will be

14   required to expend its reserve to fund defense costs."

15   Again, what was your question?

16        Q    Where the insurer is providing a defense, the

17   SIP will not have to expend its reserves to fund the

18   defense cost, will it?

19        A    Where the insurer is providing a defense?

20        Q    Yes.

21        A    We'd still have to pay for the defense costs.

22        Q    Is it your understanding that policies -- that

23   occurrence policies that were issued as primary policies

24   to the Diocese have no obligation to provide defense?

25                    MR. SHEEHAN:  Objection to form.

1             THE WITNESS:  Which years are you talking

2     about?

3     BY MR. NASATIR:

4        Q    '73 through '84.

5        A    '73 through '84.  Okay.  The Diocese -- trying

6     to think of those years.  Without looking at -- there

7     were so many different policies -- primary policies in

8     those years.  I -- I really can't answer them unless I

9     had a chance to look at the actual insurance policies

10    themselves.

11       Q    Would you agree with me that if the policy --

12    if a policy provides an obligation to defend and defense

13    costs are included in the definition of loss under that

14    policy, there would be no need for SIP to expend its

15    reserves to fund defense costs?

16            MR. SHEEHAN:  Objection to form.  You can

17    answer, if you know.

18            THE WITNESS:  Well, it would up to the --

19    the appropriate self-insured retention or deductible

20    that was in place in those years.

21    BY MR. NASATIR:

22       Q    Didn't we establish -- I thought we

23    established that there was no self-insured retention or

24    deductible in the years from 1973 through 1984.

25       A    Again, I would -- I would have to look at the

1    policies themselves.

2         Q    When you looked at the policies, after

3    determining that defense costs were incorporated in the

4    definition of a covered loss under that policy, would

5    you agree with me that the -- a SIP would not be

6    required to expend its reserves to fund defense costs?

7                   MR. SHEEHAN:  Objection.  Form.  Are you

8    asking him a hypothetical since he testified he'd have

9    to look at the policies?

10   BY MR. NASATIR:

11        Q    Please answer the question.

12                  MR. NASATIR:  You can make your

13   objection.

14                  THE WITNESS:  Again, like he said, is

15   this a hypothetical question?

16   BY MR. NASATIR:

17        Q    Will you please answer the question, Mr.

18   Scholl, and stop fencing with me?

19        A    I'm not the one fencing here.  And what was

20   the question again?

21        Q    Having looked at the policies and determining

22   that defense costs were incorporated in the definition

23   of loss -- the covered loss under the policy, would --

24   do you agree with me that the SIP would not be required

25   to expand its reserves to fund defense costs?

```
 1      A     In --

 2                  MR. SHEEHAN:  Objection.

 3                  THE WITNESS:  In those particular --

 4                  MR. SHEEHAN:  Call for speculation.

 5                  THE WITNESS:  Okay.  Sorry.

 6                  MR. SHEEHAN:  Objection.  Calls for

 7   speculation.  You can answer, if you know.

 8                  THE WITNESS:  What I can tell you is that

 9   the SIP would not have to expend defense -- its reserves

10   for defense costs in those particular years.

11   BY MR. NASATIR:

12      Q     Okay.  Would you agree with me that where a

13   policy has no aggregate limits, there's no risk of

14   depleting the policy?

15      A     I do not agree with that.

16      Q     Okay.  Why?

17      A     I just don't agree.

18      Q     Well --

19      A     There could be a lot of reasons.

20      Q     Okay.

21      A     (Indiscernible) no aggregate?

22      Q     Yeah.

23      A     Again, I don't know how to answer that.  Are

24   you talking about sexual misconduct coverage?  General

25   liability coverage?
```

```
 1        Q    I'm talking about policy issued between 1973

 2   and 1984, that is a primary policy that has coverage for

 3   sexual abuse claims.  In that context, I am asking you

 4   if it does not -- if those policies do not have

 5   aggregate limits whether there's any danger of the

 6   policy's proceeds being depleted or exhausted.

 7             MR. SHEEHAN:  Objection to form of the

 8   question.  The witness has testified multiple times he'd

 9   have to look at those policies to answer specific

10   questions about them.  Therefore, the question is

11   hypothetical and calls some speculation.  You can

12   answer, if you know.

13             THE WITNESS:  No, I don't know, and I

14   won't answer.

15   BY MR. NASATIR:

16        Q    In your declaration in paragraph 17, you

17   state, "Moreover, with respect to any claim which is

18   successfully prosecuted against a SIP participant,

19   plaintiffs undoubtedly will look directly to any shared

20   insurance to satisfy any judgment, thereby depleting

21   dollar for dollar proceeds which would otherwise be

22   available to the Diocese bankrupt estate."  Please

23   explain the basis for that statement.

24        A    I will reread that.

25        Q    Well, you can read it.  It's in your -- it's
```

 1   in your -- in your -- in paragraph 17.

 2        A    Yeah, I see it.

 3        Q    Okay.  What's the basis for that statement?

 4        A    It's -- okay.  "Available under -- and/or any

 5   pre-'73" -- we're talking post-'73?  I'm not sure.

 6        Q    It's your statement.  You tell me what you

 7   meant.

 8        A    Okay.  "To the extent a claim remains

 9   unstayed, okay, the SIP will be required to expend its

10   reserve to fund defense costs."  Okay.

11        Q    That's --

12        A    That's true.

13        Q    We've done that -- we've done that statement.

14        A    "Moreover" --

15        Q    Next one.

16        A    "Moreover, with respect to any claim which is

17   successfully prosecuted against a SIP participant,

18   plaintiff undoubtedly will look directly to any shared

19   insurance to satisfy any judgment."  Yes, that would be

20   for the insurance policy that is written on behalf of

21   the Diocese Buffalo and its SIP participants.  They

22   share limits.  So if a judgment goes up against a

23   particular SIP participant and that money is gone, then

24   there would be -- there would be dollar for dollar that

25   would have an adverse effect on -- on remaining

1  coverage.

2      Q    Doesn't that assume that there are aggregate

3  limits on the policy?

4              MR. SHEEHAN:  Objection to form.

5              You can answer.

6              THE WITNESS:  Assume that there's

7  aggregate limits?

8  BY MR. NASATIR:

9      Q    If you are saying that the -- you said if they

10  -- they share limits, so if a judgment goes against a

11  particular SIP participant, then that money is gone.

12  And I am asking, when you say they share limits, aren't

13  you talking -- are you talking about aggregate limits?

14              MR. SHEEHAN:  Objection to form.

15              You can answer.

16              THE WITNESS:  I'm talking about self-

17  insured retentions.

18  BY MR. NASATIR:

19      Q    Okay.  So this statement -- this statement,

20  beginning with "moreover", only applies to self-insured

21  retentions and deductibles?

22              MR. SHEEHAN:  Objection to form.

23              You can answer.

24              THE WITNESS:  Now -- now if the dollar

25  proceeds otherwise available to the Diocese bankruptcy

```
 1   is taken, it -- it could also mean that there's

 2   potentially insurance policy limits that are aggregated,

 3   that would also -- that could also be exhausted, and

 4   then there's no coverage after that.

 5   BY MR. NASATIR:

 6       Q    Okay.  So this sentence relates to either

 7   self-insured retentions or aggregate limit policies; is

 8   that fair?

 9       A    That's fair.

10       Q    Thank you.  All right.  Now, I just have a few

11   exhibits to mark, and then I'll take a break to make

12   sure I don't have any other questions.  And then you

13   might -- you'll either be done or maybe your attorney

14   will ask some questions.

15            MR. NASATIR:  All right.  Let me see if I

16   can successfully bring up some more exhibits.  That's

17   not what I meant to do.  Okay.  All right.  Share with

18   all.  Here we go.

19            Would you please mark this as Scholl

20   Exhibit 4?

21       (Scholl 4 marked for identification.)

22   BY MR. NASATIR:

23       Q    Mr. Scholl, have you seen this document

24   before?

25       A    I've seen a form of this document before, but
```

1    not this specific one.

2        Q    Okay.  And for the record, we are talking

3    about this exhibit does not have a Bates stamp number

4    that I can see, but it does have in the upper left

5    corner -- I'm trying to highlight here.  Whoops, it

6    says, "draft mediation confidential."  I thought this

7    was the -- this was the one that was sent to me by Blank

8    Rome a day or two ago.  I will -- for use in this

9    context, so I'm hoping that's not going to be a problem

10   that it has that on it, but it is the purports to be the

11   Diocese of Buffalo overage chart, 1972 through 2020.

12            And you say you've seen this document before,

13   sir?

14       A    I have seen a form of this document.  This is

15   an updated one that I have not seen.

16       Q    Okay.  Do you have any reason to believe that

17   any part of it is incorrect?

18       A    I have no reason to believe that any of it is

19   incorrect.

20       Q    Okay.

21            MR. NASATIR:  Let's mark this as Scholl

22   Exhibit 5, please.

23       (Scholl 5 marked for identification.)

24            MR. NASATIR:  This is document 8 --

25   sorry, it's dated July 19th, 2019, and it's Bates

1    stamped number DOB insur15222.  And no surprise here,

2    Mr. Shawl has your name at the bottom.

3                    THE WITNESS:  Yeah.

4    BY MR. NASATIR:

5        Q    Do you recognize this letter?

6        A    Yes, I do.

7        Q    Okay.  And is it a reflection of the yearly

8    billing to SIP participants?

9        A    Yes.

10       Q    Okay.  If you look at paragraph 2, it says,

11   "Two major components of insurance department expenses

12   are self-insured claims and premiums paid for both

13   primary and catastrophe insurance protection."

14       A    Yes.

15       Q    And then the next sentence, it says, "Self-

16   insured claims are right on track with budget.  Just

17   over 2.1 million in paid losses.  The budget of 2.9

18   million through nine months."

19       A    Okay.

20       Q    Does the self-insured claims you're referring

21   to include claims regarding sexual abuse?

22       A    Yes.

23       Q    Okay.  Sorry, hold on a second.  Looking at

24   the last sentence there, it says, "The premium increases

25   for "-- where -- "part of the increase" -- "premium

1    increases were for misconduct liability insurance."

2            Is that talking about the cost of procuring

3    current -- well, at least current for 20 -- 2019

4    coverage for sexual abuse.

5        A    Where exactly is that in the letter?  Which

6    paragraph?

7        Q    The last -- it's the second paragraph, and the

8    last sentence.

9        A    Okay.  "Part of a distributable premium" --

10   yes.

11       Q    Okay.

12       A    Okay.  And the -- the cost of excess

13   insurance.

14       Q    Okay.  And then when you say excess, you mean

15   above a self-insured retention?

16       A    Correct.

17       Q    Okay.  And I also see, consistent with your

18   prior testimony, that some of the premium increases can

19   come from increased value in property, right?

20       A    Yes, it can definitely come from that.  Or

21   increased excess premiums.  Yeah.

22       Q    Got it.

23            MR. NASATIR:  All right.  Let me -- Let's

24   mark this as Scholl Deposition Exhibit 6.

25       (Scholl 6 marked for identification.)

1          MR. NASATIR:  It is Bates stamped, DOB

2    Insur15226, and it bears the date September 16, 2021,

3    and has Mr. Scholl's name at the bottom.

4    BY MR. NASATIR:

5        Q    All right.  Do you see -- do you recognize

6    this letter as a -- another annual billing letter?

7        A    Yes, I do.

8        Q    Okay.  I want to ask you about the last

9    sentence in paragraph 3.

10       A    Taking a moment to get there.

11       Q    Absolutely.

12       A    Paragraph 3?

13       (Witness and Counsel confer.)

14          THE WITNESS:  Okay.

15   BY MR. NASATIR:

16       Q    Can you explain why there were extremely high

17   legal expenses due to the Child Victim Act legal

18   expenses?

19       A    Well, okay, the -- the information is based on

20   -- on, I'll say, fiscal year.  When that billing letter

21   goes out in 2021, it's based -- based on information

22   down for 2020 -- actually, fiscal year 9/1/20 to

23   8/31/21, at -- at that point in time when the letter

24   goes out.  There were still significant, we'll say,

25   legal expenses that we were still paying out for, not

1   for specific cases, because the -- that was, of course,

2   post declaration of bankruptcy.  But there were -- there

3   were still a lot of legal expenses that got assessed to

4   the Insurance Services Department for Blank Rome

5   expenses, those types of things.  Those -- those kept

6   coming.  So we still had, you know, a lot of legal

7   expenses for -- for the 2020 to 2021 year.  That was

8   literally months after, a few months after the

9   declaration of bankruptcy.  (Indiscernible -

10  simultaneous speech) --

11      Q    So if these -- sorry, go ahead.

12      A    That's okay.

13      Q    So if these were mostly Blank Rome expenses,

14  would that mean that these were insurance related legal

15  expenses?

16      A    I can't --

17           MR. SHEEHAN:  Form.

18           THE WITNESS:  I can't say they're mostly

19  Blank Rome expenses.  I would have to go through

20  literally my -- my budget folder for that particular

21  year and break out the legal expenses between law firms

22  to really accurately answer that question.

23  BY MR. NASATIR:

24      Q    Okay.  Is it possible that any of these legal

25  expenses were expenses that were incurred pre bankruptcy

1    and are being billed post-bankruptcy?

2                    MR. SHEEHAN:  Objection to form.  Object

3    to the extent that answering would call for attorney-

4    client privilege.

5                    You can answer it up to the extent you

6    know.  You can answer.

7                    THE WITNESS:  Well, yeah, I believe that

8    is attorney-client privilege for that information.

9    BY MR. NASATIR:

10       Q    But in any event, the extremely high legal

11   expenses this year are being -- are part of this billing

12   to each of the SIP participants to put money into the

13   fund, right?

14                   MR. SHEEHAN:  Objection to form.

15                   You can answer.

16                   THE WITNESS:  There's no direct

17   relationship between those high legal bills and charges

18   made to the SIP participants.  It's a -- a group of

19   probably 50 different items that go into insurance

20   budget for paid claims, reserve claims, legal expenses.

21   In the aggregate, in the whole, that is what matters as

22   far as what gets filled out to the parishes.  So there's

23   no direct relationship with that expense line.

24   BY MR. NASATIR:

25       Q    Okay.  So it's all part of general assessment

1    for each -- from each SIP participant?

2        A    Right.  Correct.  Yeah.  As it states in the

3    letter, it went up 9 percent that year, and increased

4    legal expenses was one component of that.

5        Q    Understood.  We got one more on this line of

6    questions -- okay.

7            MR. NASATIR:  Let's mark this as Scholl

8    Exhibit 7.  It is a document Bates stamp number DOB I-S

9    -- I-N-S-U-R 15228, dated August 26th, 2022.

10           THE REPORTER:  The exhibit isn't showing

11   on my end to mark it yet.

12           MR. NASATIR:  Okay.  Oh, I haven't shared

13   it with you.  That's my problem.  Sorry.  You think I'd

14   be getting more --

15       (Scholl 7 marked for identification.)

16   BY MR. NASATIR:

17       Q    When you've had a chance to look at it, Mr.

18   Scholl, my question is going to be, is there any

19   substantive -- any significant difference between the

20   2022 billing letter and the 2021 or 2019 letter?

21       A    No.  In-- in general makeup of the letter,

22   they're similar every year.

23       Q    Okay.  And there's no change circumstances

24   that makes the 2022 billing letter different than the

25   others?

```
1                    MR. SHEEHAN:  Objection to form.

2                    You can answer.

3                    THE WITNESS:  As I look through it, in

4     form, it's similar to the prior years.  The --

5                    MR. NASATIR:  Okay --

6                    THE WITNESS:  Okay.  Go ahead.

7     BY MR. NASATIR:

8          Q    In the prior years and in this letter, there's

9     a two percent discount offered for prompt payment of the

10    entire premium.  Is --

11         A    That is correct.

12         Q    Yeah.  Is collecting the premium from each of

13    the SIP participants a problem?

14                   MR. SHEEHAN:  Objection to form.

15                   You can answer.

16                   THE WITNESS:  No.  In general, no.

17    BY MR. NASATIR:

18         Q    No.  And how -- what proportion of the SIP

19    participants take advantage of the two percent discount?

20         A    Usually between one third and 50 percent.

21         Q    Okay.  Interesting.

22         A    It's definitely going down this year.

23         Q    Okay.  Okay, Mr. Scholl, I need to take a

24    moment to review my notes.

25                   MR. NASATIR:  Can we take a ten-minute
```

1    break, and then I'll figure out what, if anything, I

2    have left?

3              THE WITNESS:  Okay.

4              MR. NASATIR:  Thank you.

5              THE REPORTER:  Okay.  The time is now

6    3:30 p.m., Eastern, and we're off the record.

7       (Off the record.)

8              THE REPORTER:  The time is now 3:39 p.m.,

9    Eastern, and we're back on the record.

10             You may proceed.

11             MR. NASATIR:  Thank you.

12   BY MR. NASATIR:

13      Q    Mr. Scholl, did you discuss your deposition

14   testimony with anyone during the break?

15      A    No, I did not.

16      Q    Thank you.  Mr. Scholl, did you have any

17   involvement in the parishes filing proofs of claim in

18   the bankruptcy?

19      A    No, I did not.

20      Q    Have you reviewed any proofs of claim that

21   parishes filed in the bankruptcy?

22      A    No, I Have not.

23      Q    IAG produced -- sorry, let me start --

24             In your declaration, you refer to IAG.  Do you

25   know who to whom I'm referring?

1       A     Yes.   Insurance Archaeology Group.

2       Q     Okay.   What involvement did you have with

3  them?

4       A     We contracted with them to assist in the

5  finding of old insurance information dating back in the

6  50s, 60s, and -- and beyond.

7       Q     And this was relating to the pre 73 insurance?

8       A     Yes.

9       Q     Okay.   And did they produce an Excel

10 spreadsheet of what -- of policies that they believed

11 were issued to individual diocesan entities during that

12 time period?

13      A     Did they produce an Excel spreadsheet?   I

14 don't know.   I'm not sure.

15      Q     Have you seen an Excel spreadsheet that

16 purports to list policies that would have been issued or

17 might have been issued to what you call non -- strike

18 that -- to parishes pre-1973?

19            MR. SHEEHAN:   Objection to form.

20            You can answer.

21            THE WITNESS:   Yeah.   I have seen an Excel

22 spreadsheet with a lot of data relating to old policies.

23 Yes.

24 BY MR. NASATIR:

25      Q     Okay.   Have you reviewed it for accuracy?

1      A     No, I have not.

2      Q     What was the purpose of your -- did you review

3    it?  You've seen it, but did you review it?

4      A     Not at -- I did not review it in any great

5    detail.

6      Q     Does it have any -- is your declaration in any

7    way based on its contents?

8      A     No.

9      Q     Okay.

10            MR. NASATIR:  Can you mark this as Scholl

11   Exhibit 9?  No, it's eight.  Sorry, eight.

12        (Scholl 8 marked for identification.)

13   BY MR. NASATIR:

14     Q     Have you seen financial statements like this

15   before, Mr. Scholl?

16     A     Yes, I have.

17     Q     Okay.  You can go through it, but my interest

18   is going to be on -- oh, sorry.  Let me just -- for the

19   record, this is a -- financial statements as of and for

20   the years ended August 31, 2015 and 2014.  It is Bates

21   stamped number DOB General 23.  And I am going to go,

22   for my questions, not surprisingly, to the heading

23   Insurance Activities, which can be found on page 13.

24            But you're welcome to look through it.  But

25   eventually, that's what we're going to discuss.

```
 1        (Witness and counsel confer.)

 2                   THE WITNESS:  He said page 13?

 3                   MR. NASATIR:  Yeah

 4                   THE WITNESS:  We at 13 right now.  Are

 5   you talking about page 13 of the report?

 6                   MR. NASATIR:  Yes, I'm talking -- yes,

 7   I'm afraid that's what I am talking about.  It's Bates

 8   stamp number --

 9                   THE WITNESS:  Yes, I see it.

10                   MR. NASATIR:  -- thirty-seven.

11                   THE WITNESS:  Okay.

12   BY MR. NASATIR:

13        Q    Typically for these types of financial

14   statements, are you the author of the discussion under

15   insurance activities?

16        A    No, I'm not.

17        Q    Okay.  Who is?

18        A    The CFO.

19        Q    Okay.  Do you have any input into the

20   discussion of insurance activities in a financial

21   statement?

22        A    No, I do not.

23        Q    Have you seen this kind or this type of

24   discussion of insurance activities before?

25        A    I have seen this every year in the financial
```

1    statements, yes.

2        Q    Okay.  So, first of all, CAO stands for

3    Catholic Administrative Offices?

4        A    Well, technically, it's for Central

5    Administrative Offices.

6        Q    Okay.  For the Diocese of Public?

7        A    Yes.

8        Q    Okay.  It says premium revenue.  Again, does

9    the SIP fund consist of part of the premium revenue?

10       A    Yes.

11       Q    Okay.  It says realized investment gain.  Can

12   you tell me what that line is about?

13       A    Yeah.  That is - there are certain assets that

14   are designated for insurance, and that money -- that --

15   the funds in there, would have investment gains or

16   losses every year.  And those two particular years,

17   those were, they realized, investment gains on the

18   portfolio.

19       Q    So there is some form of stock or other type

20   of financial instrument that is earmarked for funding

21   the SIP; is that right?

22       A    That is correct.

23       Q    Okay.  And it is not a product of the funds

24   raised through the SIP billing that we've been

25   discussing?

1          MR. SHEEHAN:  Objection to form.

2          You can answer.

3          THE WITNESS:  It is.  I'm just trying to

4    think whether the funds -- the amount in those

5    particular funds do vary one year to the next based on

6    insurance activity, whether it be surplus or loss.

7    BY MR. NASATIR:

8        Q    What I'm trying to understand is, it's an

9    investment which throws off interest, which is what I'm

10   seeing as the realized gain; is that right?

11       A    Yes.

12       Q    Okay.  So the principal remains invested every

13   year, all the time; is that right?

14       A    Yes, that is -- that is correct.

15       Q    Okay.  So the only variable here is the amount

16   of interest it's thrown off?

17       A    Yes.

18       Q    Got it.  So is this a fairly standard

19   representation of a year of the insurance activities?

20       A    Yes, it is.

21       Q    Okay.

22          MR. NASATIR:  All right.  I have no

23   further questions, Mr. Scholl.  I reserve the right to

24   ask any if there's any further questions.

25          MR. SHEEHAN:  I have just one question

1   for the witness.

2                   EXAMINATION

3   BY MR. SHEEHAN:

4        Q    Mr. Scholl, do any of the policies that were

5   issued to the Diocese or SIP participants since 1973

6   have per recurrence limits?

7        A    Since '73, yes.

8        Q    Okay.

9             MR. SHEEHAN:  I have no further

10  questions.  Thank you.

11            MR. NASATIR:  Thank you.

12            THE REPORTER:  Okay.  Before we go off

13  the record, I just want to confirm some orders.  Mr.

14  Nasatir, you still want to expedite it for as soon as

15  possible, by today --

16            MR. NASATIR:  Yes.

17            THE REPORTER:  -- or tomorrow?

18            MR. NASATIR:  Yeah.  That'd be great.

19  That's a -- yeah -- we have not -- I'm sorry, we still

20  on the record or not?

21            THE REPORTER:  We are still on the

22  record.

23            MR. NASATIR:  Okay.  We -- I do want to

24  establish a time by which, like we did yesterday with

25  Ms. Potzler, a time by which the witness will review the

1  transcript, make any corrections or changes, and get a

2  signature back.  And if it isn't done within that time,

3  we can use a copy as if it were an original.

4              So, working off what the court reporter

5  said, they got us Potzler last night.  If we get -- if

6  we get this transcript by the end of close of business

7  on Friday, could we get a commitment that we would get a

8  signed copy executed?  Doesn't have to get to us, but

9  executed and the page sent to us before Thanksgiving?

10              MR. SHEEHAN:  Yeah, we can do that.

11              THE WITNESS:  Yeah.

12              MR. NASATIR:  Okay.  Thank you.  Agreed

13  on that.

14              THE REPORTER:  Okay.  Thank you so much.

15  And, Mr. Sheehan, would you like to purchase a copy of

16  that as well?

17              MR. SHEEHAN:  Yes, I will.

18              THE REPORTER:  Okay.  Thank you.  And the

19  time is now 3:50 p.m., Eastern, and we're off the

20  record.

21          (Proceedings concluded at 3:50 p.m.)

22              (Read and Sign requested.)

23                  * * * * *

24

25

1              CERTIFICATE OF NOTARY PUBLIC

2

3   State of Ohio    )

4   County of Summit )

5

6       I hereby certify that on the 15th day of November

7   2023, before me, a RON notary public for the State of

8   Ohio, JOHN SCHOLL, remotely appeared via

9   videoconference, and prior to testifying, swore an oath,

10  to tell the truth.

11

12      DATED this 16th day of November 2023.

13

14

15                    /s/Sarah Schroeter

16                    Sarah Schroeter

17                    RON Notary Public, State of Ohio

18                    Commission No.:  2020-RE-823171

19                    Commission Expiration:  11/29/2025

20

21

22

23

24

25

```
1              CERTIFICATE OF REPORTER

2

3          I, Jamie Godinez, hereby certify:

4          That the foregoing proceedings were taken

5   before me at the time and place therein set forth;

6          That the proceedings were recorded by me and

7   thereafter formatted into a full, true, and correct

8   transcript of same;

9          I further certify that I am neither counsel

10  for nor related to any parties to said action, nor in

11  any way interested in the outcome thereof.

12

13          DATED, this 16th day of November 2023.

14

15

16          _____

17          Jamie Godinez, CER-1260

18          Certified Electronic Reporter

19

20

21

22

23

24

25
```

```
 1              A C K N O W L E D G E M E N T

 2

 3              I do hereby certify that having been first

 4    duly sworn to testify to the truth, I gave the above

 5    testimony on November 16, 2023.

 6

 7              I further certify that the foregoing

 8    transcript is a true and correct transcript of the

 9    testimony given by me at the time and placed specified.

10

11

12                          _____

13                                 JOHN SCHOLL

14

15    Sworn to before me this ____ day of _____, 20__

16

17

18    _____

19    Notary Public

20

21

22

23

24

25
```

```
1              E R R A T A    S H E E T
     Deponent:  JOHN SCHOLL
2    Deposition Date:  Thursday, November 16, 2023
3    PAGE  LINE  CHANGE FROM/TO   REASON FOR CHANGE
4
     _____ _____ _____ _____
5
     _____ _____ _____ _____
6
     _____ _____ _____ _____
7
     _____ _____ _____ _____
8
     _____ _____ _____ _____
9
     _____ _____ _____ _____
10
11   _____ _____ _____ _____
12   _____ _____ _____ _____
13   _____ _____ _____ _____
14   _____ _____ _____ _____
15   _____ _____ _____ _____
16   _____ _____ _____ _____
17   _____ _____ _____ _____
18
     Under penalties of perjury, I declare that I have
19   read the foregoing deposition and hereby affix my
     signature that same is true and correct, except as noted
20   above.
21   _____        _____
     JOHN SCHOLL                      Date
22
     Sworn to before me this ____ day of _____, 20__
23
24   _____
     Notary Public
25
```

**WORD INDEX**

**< $ >**
**$1,142,130.04**
 20:25
**$18,000,00**
**0**   46:4
**$250,000**
 114:11
 115:6,
15, 25
 116:12

**< 1 >**
**1**   4:5
 19:10,
14, 16,
21, 25
 20:24
 31:14
 35:22,
23
 54:10
 110:7
**1:30**
 86:7
**1:35**
 86:7
**1:38**
 86:8, 9
 87:7
**10**   4:14
 15:10,
11  16:2,
12, 21
 19:11
 35:19
 48:9
 88:17
**100**
 1:11

34:5
 112:8
**10100**
 2:14
**10th**
 22:23,
25   23:3,
5
**11**   1:6,
11   4:16
 5:6
 18:23,
24
 68:13
 69:10,
12, 13
 71:20
 75:19
 87:18,
20   93:3
 94:24

**11/29/2025**
 144:19
**11:11**
 1:19
 5:4
**12**   4:18
 22:15, 16
**12:36**
 54:6
**12:48**
 54:8
**127**   4:9
**128**   4:10
**13**   39:2,
7
 138:23
 139:2, 4,
5
**130**   4:11
**13202**

2:5
**134**   4:12
**138**   4:13
**13th**
 2:14
**14**
 30:20
 41:19
 45:23
 49:1
 50:5
**142**   3:5
**14214**
 8:15
**15**   4:15
 54:24
 56:4
 62:7
 63:23
**15228**
 134:9
**15th**
 144:6
**16**   1:18
 66:5
 68:25
 106:12
 131:2
 146:5
 147:2
**16th**
 5:3
 144:12
 145:13
**17**
 114:6
 116:23
 120:2
 124:16
 125:1
**17.6-million**
 50:3

**18**   4:17
 58:20
 81:8, 13
**18,000,000**
 46:18
**18-million**
 50:4
**19**
 31:13
 97:13
 98:10
 117:23
**1970s**
 98:11
**1972**
 128:11
**1973**
 31:14
 43:22
 44:8, 11,
15   45:8
 58:4, 11
 59:12
 60:8, 13,
16
 61:21
 87:23
 88:2, 6
 97:10,
16, 19,
24
 113:1, 4
 116:4, 9
 117:3,
14, 23
 121:24
 124:1
 142:5
**1978**
 100:1, 6

**1984**
 117:24
 121:24
 124:2
**1985**
 104:17
 117:16
**1990**
 114:25
 117:15,
16
**1990s**
 114:24
**1998**
 60:18
**1999**
 13:3
 60:20
 114:25
**19th**
 128:25
**1st**
 4:15
 19:4, 12

**< 2 >**
**2**   4:7
 48:7, 8,
12
 50:21,
22, 23
 129:10
**2,000**
 49:23
**2.1**
 129:17
**2.9**
 129:17
**2:10**
 87:5, 10
**20**   99:9
 130:3

146:15
147:21
**200**
40:16
**20-01016**
1:9
**20-10322**
1:4
5:10
**2013**
19:4, 10,
12, 25
**2014**
138:20
**2015**
138:20
**2018**
45:21
46:23
58:14
59:3
**2019**
30:15,
20   38:4
48:10
49:1
58:21,
23   59:4,
7
128:25
130:3
134:20
**2020**
7:25
13:22
14:14,
16
35:25
38:1, 3
44:24
84:6
88:17
89:10

128:11
131:22
132:7
**2020-RE-
823171**
144:18
**2021**
131:2,
21
132:7
134:20
**2022**
134:9,
20, 24
**2023**
1:18
4:9
5:3
84:7
89:17,
24
90:21
91:6, 21
144:7,
12
145:13
146:5
147:2
**20996**
1:23
**22**   4:18
**23**
138:21
**231**   8:14
**25**
57:21
58:3
59:20
78:25
98:9, 13
**2618**
48:11, 16

**26th**
134:9

**< 3 >**
**3**   37:6
38:23
131:9, 12
**3:30**
136:6
**3:39**
136:8
**3:50**
1:20
143:19,
21
**30**   86:1
**30th**
14:14
**31**
138:20
**35**   4:6

**< 4 >**
**4**   4:8
93:9
127:20,
21
**45**   85:15
**456**   5:6
**48**   4:7

**< 5 >**
**5**   4:10
93:9
112:23
128:22,
23
**50**
25:11
133:19
135:20
**50-plus**
58:3

**50s**
137:6

**< 6 >**
**6**   4:11
106:13
130:24,
25
**60s**
98:11
137:6
**650,000**
49:23
**69**   13:10

**< 7 >**
**7**   3:4
4:12
107:14,
25
134:8, 15
**7.4**
111:24
**7/1/2013-
Present**
4:17
**73**
97:11
101:4
121:4, 5
137:7
142:7
**75**   34:5

**< 8 >**
**8**   4:13
128:24
138:12
**8/31/21**
131:23
**800**
35:19

**80s**
98:11
113:24
**84**
121:4, 5

**< 9 >**
**9**
114:10
134:3
138:11
**9/1/20**
131:22
**90**   112:8
**90067**
2:15
**90s**
98:11
117:21

**< A >**
**a.m**
1:19
5:4
**A.W**   2:16
**ability**
15:16
**able**
11:7
15:12
35:5
51:18,
19   69:11
**absence**
64:4

**Absolutely**
39:8
99:20
131:11
**abuse**
19:7, 8
27:9, 23

28:*12,
16*   29:*8,
17, 25*
30:*7*
31:*9*
58:*15*
59:*8*
60:*4, 6,
7*   61:*8,
20, 21*
71:*1*
72:*17,
18*   73:*7*
74:*7*
80:*14,
18*
106:*16,
19*
107:*5, 6,
7, 9, 17*
108:*20*
113:*11*
115:*3*
116:*20*
117:*11*
124:*3*
129:*21*
130:*4*
**accepted**
47:*5*
**access**
22:*1*
**account**
108:*7*
110:*17*
**accounted**
26:*12*
**accuracy**
119:*20*
137:*25*
**accurate**
39:*1*

56:*7*
103:*10*

**accurately**
38:*23*
132:*22*
**achieve**
109:*19*
**acknowledge**   116:*12*
**acknowledgment**
115:*24*
**Act**
24:*2, 7,
16*   30:*9*
131:*17*
**action**
30:*7*
73:*6*
75:*13,
19*
145:*10*
**actions**
27:*12*
43:*20*
45:*15*
69:*25*
70:*1*
74:*5, 9*
81:*23*
82:*4, 20*
84:*19*
**active**
46:*23*
69:*24*
70:*1, 25*
72:*8*
**actively**
27:*8, 11*
47:*3*
**Activities**

52:*21*
138:*23*
139:*15,
20, 24*
141:*19*
**activity**
141:*6*
**actual**
88:*25*
92:*3*
121:*9*
**addition**
112:*4*

**additional**
39:*3, 15*
40:*3*
92:*20,
21*   95:*9,
15*   96:*9,
12, 17,
21, 25*
97:*1*
99:*8, 12,
15, 20*
101:*23*
102:*19*
**address**
8:*2, 4,
7, 9, 10*
16:*14*

**adequately**
35:*5*
**administering**
81:*22*
82:*3*
108:*6, 13*
**administrative**
17:*15*
140:*3, 5*

**administrator**
41:*20*
42:*1, 8*
46:*25*
**administrators**
107:*17,
19*
**admission**
6:*14*
75:*5*

**admissions**
69:*2*
74:*25*
75:*1*
**Adv**   1:*9*
**advantage**
135:*19*
**adverse**
68:*6*
69:*1*
75:*10,
12, 15,
20*
125:*25*
**adversely**
75:*17*
**advice**
32:*9*
36:*19*
47:*22*
56:*1*
**advise**
64:*22*
**advising**
32:*10*
66:*3*
**advisors**
37:*8, 10*
**advisory**
32:*8*

**affect**
75:*17*

**affiliated**
99:*16*
101:*16*
**affirm**
7:*7*
**affix**
147:*19*
**afield**
47:*15*
**afraid**
139:*7*
**agencies**
45:*7*
**agents**
89:*6*
**aggregate**
34:*12*
117:*4,
12, 16*
118:*1,
11, 13*
123:*13,
21*
124:*5*
126:*2, 7,
13*
127:*7*
133:*21*

**aggregated**
127:*2*
**ago**
10:*8, 9*
71:*17*
128:*8*
**agree**
6:*11, 13*
59:*7, 11,
20*
60:*23*

61:*7*
76:*23*
80:*17*
81:*16*
84:*8*
95:*2*
100:*25*
102:*18*
103:*4*
104:*21*
113:*4*
121:*11*
122:*5, 24*
123:*12, 15, 17*
**agreeable**
80:*12*
**Agreed**
143:*12*
**agreement**
56:*12, 18*
**ahead**
18:*19*
48:*15*
54:*9*
118:*8*
132:*11*
135:*6*
**AL**   1:*11*
**allege**
40:*4*
**alleged**
19:*7*
**allocation**
108:*7*
109:*7, 19, 22*
110:*3*
**allow**
55:*4*

**allowed**
12:*11*
26:*19*
58:*23*
68:*1*
82:*21*
**American**
103:*17*
**amount**
25:*6, 7*
31:*1, 8*
64:*7, 12*
68:*17*
69:*11, 12, 15*
110:*3*
112:*2*
117:*17*
141:*4, 15*
**and/or**
6:*13*
125:*4*
**Angeles**
2:*15*
**annual**
112:*7*
131:*6*
**annually**
112:*18*
**answer**
17:*8, 9*
27:*15, 17*   28:*1, 2, 4, 25*
31:*11, 23*   32:*2, 24*   33:*6, 7*   35:*18*
36:*16, 19, 25*
40:*7*
41:*12*
43:*1*

44:*2*
45:*18*
46:*6*
47:*13, 18, 20*
49:*11*
52:*19*
56:*16*
57:*4, 12*
59:*16, 24*
60:*10, 16*
61:*11, 24*
63:*16*
65:*18*
66:*22, 24*
67:*24*
69:*20*
70:*4, 6*
71:*11*
72:*2, 10, 20*
73:*18*
74:*18, 21*   75:*3, 7*   76:*11*
77:*5*
79:*20*
80:*22*
82:*7, 24*
84:*24*
91:*1, 3, 15*
92:*24*
93:*23*
94:*13, 21*
95:*17*
97:*3*
100:*18*

102:*12*
103:*11, 21*
104:*1, 25*
105:*2, 17*
106:*1, 8, 9, 10, 18*
109:*10*
111:*6*
112:*21*
113:*3, 14*
115:*10, 19*
116:*7*
118:*4*
119:*8, 12, 14, 17, 22*
120:*8*
121:*8, 17*
122:*11, 17*
123:*7, 23*
124:*9, 12, 14*
126:*5, 15, 23*
132:*22*
133:*5, 6, 15*
135:*2, 15*
137:*20*
141:*2*
**answering**
17:*7*
27:*25*
36:*14*

119:*6*
133:*3*
**answers**
11:*15*
85:*20*
**Anytime**
106:*19*
**apart**
73:*7*
**apologies**
50:*16*
**apologize**
22:*12*
114:*7*
**apologizing**   85:*6*
**appear**
10:*18*
53:*3*
**appeared**
144:*8*
**Appearing**
2:*11, 20*
**applicable**
116:*4*
**applies**
126:*20*
**apply**
32:*15*
118:*12*
**appreciate**
11:*15*
114:*15*
**appropriate**   24:*20*
34:*9, 14*
35:*2*
37:*7, 14*
106:*24*
121:*19*

approximate 50:4
approximately 5:4
10:7
29:10
39:18
89:10
April 14:14
archaeology 99:4
137:1
archives 45:5, 9
88:18
89:25
area 19:9
36:9
79:1
89:21
93:24
99:3
112:23
Arrowood 103:17
aside 42:22
asked 10:1
17:1, 20
94:17, 18
asking 7:24
8:6
16:20
17:20
30:16
31:25
43:6
61:16
63:10

71:15, 23  73:9
74:23
76:6
81:5
89:24
95:21
97:18, 22
122:8
124:3
126:12
aspect 33:20
42:20, 22  67:6
aspects 43:14, 16
68:16
77:14
78:9
assert 36:24
asserted 66:10, 12  67:3
assess 110:3
assessed 132:3
assessment 111:13, 17
133:25
assessments 112:7
assets 110:25
140:13

assign 80:9
108:15
assigned 42:23
43:4
109:13
Assigning 43:16
assist 31:2
137:4
assistance 56:2
assisting 62:4
assume 126:2, 6
assumption 98:23
Atlantic 103:18
attending 5:24
attorney 5:14
9:23
11:6
17:4
36:14
42:19
127:13
133:3
attorney/client 119:11
attorney-client 17:7
27:25
36:19

37:1
119:6
133:8
attorneys 5:20
17:4
27:5
32:12
36:10
42:20
51:19
56:10

attorney's 36:18
audio 5:25
6:12
audiovisual 6:13
August 30:15
58:14, 20, 21, 23  59:7
134:9
138:20
author 139:14
authority 56:25
automatic 76:21

automobile 110:1
Available 4:2
9:7
31:8, 21
68:5, 18
69:16
70:25

95:13, 25
96:23
124:22
125:4
126:25
Avenue 8:14
awards 49:23
50:8
69:7
aware 9:24
20:1
27:6
39:2, 14, 17
40:15, 16  70:9
72:7
82:11, 14
83:21
85:1
116:18

< B >
back 7:25
14:16
28:20
30:23
35:12
48:3, 5
50:15, 18
53:23
54:9, 24
64:13
68:11
84:5
85:4

86:*13*
87:*3, 11*
89:*20*
90:*10*
101:*8*
105:*19*
107:*15*
110:*17, 20*
113:*17*
114:*8*
120:*1*
136:*9*
137:*5*
143:*2*

**background**
12:*25*
36:*8*

**bankrupt**
124:*22*

**BANKRUPTCY**
1:*1*
5:*11*
20:*3*
24:*3, 12, 21*   25:*1*
33:*11, 12, 17, 20, 21*
34:*25*
44:*21*
68:*12*
70:*22*
81:*1, 4*
126:*25*
132:*2, 9, 25*
136:*18, 21*

**based**
60:*7*

95:*12, 22*   96:*5*
98:*3, 7, 12, 24*
108:*23*
109:*22*
110:*4*
112:*17*
131:*19, 21*
138:*7*
141:*5*

**basement**
45:*6*
89:*20*

**basements**
45:*9*

**bases**
38:*24*
108:*8*

**basically**
40:*11*
58:*9*
69:*5*
96:*13, 14*   99:*9*

**basis**
6:*14*
19:*14*
42:*3*
55:*14*
56:*8*
57:*20, 21*   66:*9*
78:*14*
85:*1*
93:*5, 13, 14*   94:*3*
113:*17*
117:*19*
124:*23*
125:*3*

**Bates**
23:*7*
128:*3, 25*
131:*1*
134:*8*
138:*20*
139:*7*

**bears**
23:*6*
131:*2*

**Bedivere**
103:*17*

**began**
19:*12*
43:*22*
60:*14*

**beginning**
26:*9*
28:*20*
44:*21*
47:*15*
58:*23*
88:*16*
126:*20*

**behalf**
5:*16, 18*
11:*6*
125:*20*

**belief**
93:*3, 6, 10*   94:*2*

**believe**
14:*18*
17:*17*
23:*2*
32:*20*
33:*3*
38:*4*
58:*21*
84:*21*
92:*2*
103:*10*

104:*2*
128:*16, 18*   133:*7*

**believed**
137:*10*

**better**
54:*21*

**beyond**
91:*9*
137:*6*

**bill**
112:*11*

**billed**
133:*1*

**billing**
108:*4*
111:*2, 9*
114:*4*
129:*8*
131:*6, 20*
133:*11*
134:*20, 24*
140:*24*

**Bills**
54:*18, 21*
133:*17*

**bishop**
32:*10*
37:*15*
38:*21*
56:*20, 23*
81:*19, 21, 25*
82:*3, 10, 16*

**bit**
77:*12*

**Blank**
27:*5, 12,*

*19*
29:*12, 19, 22*
32:*12, 13*
93:*25*
94:*20*
128:*7*
132:*4, 13, 19*

**board**
98:*12*

**BOND**
2:*3*
5:*18, 19*
12:*1*
15:*3*
17:*5*
18:*6*
29:*12*
36:*10*

**bottom**
52:*22*
93:*9*
129:*2*
131:*3*

**Boulevard**
2:*14*

**boxes**
45:*6*
89:*21*

**break**
33:*15*
53:*22*
54:*15*
85:*10, 13, 16*
87:*16*
127:*11*
132:*21*
136:*1, 14*

**BRENDAN**
2:*6*

5:17
12:7
**briefs**
65:22
**bring**
48:5
50:17
51:18
105:4
119:25
127:16
**bringing**
27:13
**BRITTANY**
2:17
5:24
**Broadway**
5:6
**broker**
107:8
**brokers**
106:16
107:4
**brought**
20:10
39:4
58:16
59:8
72:17
**bsheehan@b**
**sk.com**
2:10
**budget**
129:16,
17
132:20
133:20
**budgeted**
111:23,
24
**BUFFALO**
1:5, 8
2:11

4:8
5:9, 19
8:15
9:11, 21
12:2
22:3, 5,
8   44:4
54:18
70:9
98:21
100:2, 3
101:15
125:21
128:11
**Buffalo's**
49:20
**buildings**
109:24,
25
**bullet**
50:3
**business**
96:4
143:6

< C >

**calculated**
112:15,
16
**calendar**
19:13
110:7, 14

**California**
2:15
**call**
9:20
17:7
19:3, 17
27:25
36:14
39:5

47:13
110:4
123:4
133:3
137:17
**called**
7:13
**calls**
47:20
77:3
104:24
105:16
123:6
124:11
**camps**
91:7, 21
**canâ**
48:13
**canon**
56:25
57:6
**CAO**
140:2

**capacities**
62:20
**capacity**
41:19
62:9, 16,
24
63:11, 21
**captured**
6:16
**captures**
20:12
**capturing**
6:11
**carrier**
100:7
106:5
**carriers**
69:9, 11
75:18

93:5, 12,
19   94:3,
16
118:19
**carrying**
93:9
**Case**
1:4
5:10
10:12
34:18
42:23
64:25
69:10
70:22
71:20
75:17
76:9
80:4
84:25
85:1
94:11,
12
113:16
**cases**
8:22, 24,
25   24:2
25:12,
17, 23
26:10
27:20
30:12,
23
32:16
34:6
39:3, 15
41:1, 22
42:5
43:9
55:17,
24   59:8
62:4, 9
63:4, 13,

22, 24
64:15
68:1
72:3, 6,
8   76:18
80:15,
18, 19
81:6, 18
82:17
83:7, 10,
17
98:24
132:1
**catastroph**
**e**   129:13
**category**
41:6
**Catholic**
114:23
115:16
116:1,
14   140:3

**Centennial**
103:17
**Center**
2:4
**Central**
140:4
**CER-1260**
1:22
145:17
**certain**
11:2
68:8
74:5
110:3
140:13
**certainly**
43:17
58:2
117:15

**CERTIFICATE** 144:1 145:1

**certificates** 89:2

**Certified** 145:18

**certify** 144:6 145:3, 9 146:3, 7

**CFO** 37:17, 20, 22 38:3 46:24 90:10 139:18

**chance** 16:10 46:2 48:19, 20 121:9 134:17

**change** 34:4 134:23 147:3

**changed** 81:20 113:2

**changes** 11:1, 5, 7 143:1

**Chapter** 1:6, 11 68:13 69:10, 12, 13 71:20 75:19

**characterization** 103:10

**characterize** 62:5

**characterizing** 103:9

**charges** 133:17

**CHARLES** 2:7 5:20 38:3 81:20 118:22

**Charlie** 86:17 118:22 119:2

**Chart** 4:8 118:18 119:15 128:11

**Chelus** 25:3

**chief** 37:15 90:7

**Child** 24:2, 7, 16 30:8 131:17

**choice** 76:18

**chronology** 13:1

**circumstances** 8:20 9:17

59:21 60:1 76:17 80:13 134:23

**civil** 101:16

**claim** 19:3 20:18 26:15 29:25 33:17 42:8 56:9 57:25 63:1 64:9 72:17 80:1, 2, 3, 4, 7, 12 115:7, 15, 17 116:1 120:2, 4 124:17 125:8, 16 136:17, 20

**Claims** 4:17 19:4, 6, 7, 24 20:2, 3, 6, 9, 20, 23, 25 24:23, 24 27:9, 23 28:12, 16 29:8,

17 30:7 31:9, 21 32:7, 21 33:11 34:8 35:1 40:4 47:2, 4, 7 49:5, 8 50:11 58:22 60:6, 7 61:7, 9, 20 62:14 64:11 65:16 66:10, 11, 17 67:3, 9 71:1, 9 79:19 106:16, 20, 22 107:1, 5, 7, 18, 19 108:6, 14 113:11 114:12 115:3 116:20 117:11 124:3 129:12, 16, 20, 21 133:20

**claims-made** 113:23 114:8 115:1

**clarification** 88:15

**clarify** 30:18 38:1 71:14

**clarifying** 31:17

**CLB** 1:4 5:10

**clear** 53:2

**clearly** 85:17

**client** 36:15 133:4

**close** 18:19 23:24 85:18 143:6

**closed** 20:20 50:14 104:19

**closely** 66:11

**closer** 35:19

**closes** 111:3, 9

**collaborating** 32:13 34:9, 14 35:2

**collaboration** 32:11

collateral
 69:*1*
 73:*16*, *24*

collecting
 135:*12*
color
 119:*14*
colors
 118:*18*
column
 20:*15*
combinatio
n 108:*24*
come
 23:*4*
 34:*20*
 45:*20*
 48:*3*
 68:*11*
 80:*11*
 90:*10*
 98:*9*
 107:*12*
 130:*19*,
*20*
comes
 29:*25*
 56:*10*
 79:*5*
 115:*15*
comfortabl
e 11:*18*
coming
 26:*4*
 27:*6*
 98:*19*
 132:*6*
commensura
te 85:*20*
comment
 11:*7*

41:*3*
57:*6*, *16*
60:*17*

commercial
99:*9*, *10*,
*13*, *22*

commission
 107:*10*
 144:*18*,
*19*

commitment
 143:*7*
Committee
 2:*20*
 5:*16*
 7:*23*
 18:*9*
 78:*7*
Committee'
s 4:*15*
 14:*22*
common
 69:*6*
 99:*17*
 103:*17*,
*23*
communicat
ed 29:*19*
communicat
ion
 89:*23*
communicat
ions
 12:*18*
 64:*13*
 89:*7*
comp
 108:*18*
companies
 71:*19*

93:*15*,
*16* 94:*5*,
*9* 103:*16*
company
 26:*14*
 75:*16*
 89:*3*
 100:*7*
compared
 23:*14*
 40:*1*
Compensati
on 49:*22*
competentl
y 12:*22*

complaints
 35:*15*
 39:*21*

completely
 34:*4*

compliance
 90:*11*,
*23*, *24*
 91:*3*
component
 108:*16*
 134:*4*

components
 111:*8*,
*10*
 129:*11*
computer
 18:*3*
 86:*12*
concept
 73:*24*
concern
 68:*21*

concerned
 26:*11*

concerning
 16:*5*, *23*
 43:*13*
concerns
 71:*18*
 76:*23*
 102:*20*
 103:*5*
 104:*23*
 105:*13*
conclude
 65:*1*
 99:*7*
concluded
 143:*21*

conclusion
 74:*16*
 95:*6*
 96:*8*, *24*
 105:*17*

conditions
 89:*1*
conduct
 41:*9*, *10*
conducted
 6:*9*
confer
 131:*13*
 139:*1*
confidenti
al 128:*6*
confirm
 142:*13*
confirmed
 93:*20*
confusing
 71:*13*

connection
 25:*15*
Connors
 25:*3*, *8*
 26:*9*
 30:*24*
 34:*16*
 47:*2*

consensual
 83:*25*
 84:*17*
consider
 19:*21*
consist
 140:*9*

consistent
 109:*19*,
*22*
 110:*2*
 130:*17*

constitute
 34:*7*, *8*
constitute
s 106:*13*
contact
 12:*12*
 64:*20*,
*24* 80:*6*,
*8*
contacted
 31:*2*
contain
 89:*22*
contained
 38:*12*,
*25* 89:*5*
contemplat
ed 59:*13*

contemplating 32:9
contents 138:7
context 21:23 42:16 63:10 74:7 75:21 124:3 128:9
continuation 33:10 75:13
continue 13:6 72:13 81:18
continued 62:13
continues 69:3
continuing 67:18
contracted 137:4
contractual 99:12
contributed 60:25
contributing 60:14, 20
contribution 69:13
controls 51:25
conversations

30:24 38:13, 20 43:7
COO 32:11
coordinate 24:1 64:9
coordinated 26:7 90:6
coordinating 25:15 26:1 64:7, 18 90:5
coordinator 62:10, 17 63:11, 21 64:17 65:2, 5
copies 93:3, 11, 17, 21 94:2, 17
copy 143:3, 8, 15
corner 128:5
corporation 96:10, 12
corporations 44:6 99:15, 16 101:16

correct 9:9 10:5 12:14 15:17 20:11, 18 21:1 25:24 26:21 30:3 42:15 43:23 44:9 48:1 49:21 50:9 58:13, 20, 25 59:1, 5, 17, 22 60:22 62:2 80:16 88:4, 7 94:6, 14 95:5 98:22 99:1 100:5, 13, 14 101:21, 22 105:12 109:16 113:8 130:16 134:2 135:11 140:22 141:14 145:7 146:8 147:19

corrections 143:1
correctly 15:16 20:22 117:21
correspondence 27:19 29:11
cost 20:17, 24 108:5, 13 112:13 120:18 130:2, 12
costs 16:6 20:12 109:20 120:4, 14, 21 121:13, 15 122:3, 6, 22, 25 123:10 125:10
couldnâ 18:14
could've 69:7
council 48:25
counsel 5:12 7:17 12:16 24:2, 20, 22 25:16

26:2, 20 27:2 34:9, 15 35:2 42:23 43:4, 7, 16 47:3, 22 64:13, 21, 23 80:9 131:13 139:1 145:9
counsel's 26:21, 22
County 144:4
couple 37:3
course 21:7 85:19 132:1
COURT 1:1 5:11 9:13, 18 13:15 26:19 30:6 33:11, 17 45:15 75:24 76:8 81:22 82:4, 20 143:4
cover 116:20 117:11

Coverage
  4:8
  9:4
  24:17
  27:5, 12
  28:14
  29:6, 16,
  21  31:5,
  13, 21
  32:5, 7,
  12, 15,
  20, 22
  33:18
  34:11,
  20, 23
  42:10,
  11, 18,
  19, 22
  43:19
  63:1, 13
  66:25
  67:1
  68:5
  69:8, 15,
  24, 25
  70:1, 11,
  25  71:7,
  8, 24, 25
  72:8, 18,
  21  73:6
  75:16,
  21
  77:15
  82:17
  87:25
  88:10,
  14, 20
  89:1, 8
  102:14
  105:14
  106:20
  107:4, 6,
  7, 9

  108:16,
  20
  109:3
  113:18,
  23
  114:9
  115:3
  117:17
  118:9,
  18
  119:15
  123:24,
  25
  124:2
  126:1
  127:4
  130:4
covered
  122:4, 23
covering
  26:15
  115:17
covid
  44:21
create
  37:9
  38:7, 9
  75:14
  78:4, 10
created
  9:23
  59:21, 25
creates
  67:8
creating
  71:7
creation
  60:24
Creditors
  2:21
C-R-E-S-C-
E  8:14

Crescent
  8:14
critical
  58:19

cultivated
  19:24
curious
  86:18
current
  8:2, 4,
7
  113:18
  130:3
currently
  31:7
  33:25
  45:22
  48:11
  80:20, 24
cut
  17:12
CVA
  24:10,
23, 24
  25:17
  31:21
  32:7, 16
  35:14
  39:3, 15
  41:22
  42:5
  45:15
  55:17,
24
  58:12,
14
  59:13,
21  62:4,
9, 13
  63:4, 13,
22, 24
  65:16

  71:8
  72:6
  75:13
  76:2, 5,
18
  81:18
  83:7, 17
  84:19
CVS
  82:17

< D >
danger
  124:5
data
  137:22
DATE
  1:18
  5:3
  19:10,
16
  20:13
  45:16
  48:9
  115:12
  131:2
  147:2, 21
dated
  128:25
  134:9
  144:12
  145:13
dating
  137:5
day
  29:14,
15
  78:20
  128:8
  144:6,
12
  145:13

  146:15
  147:21
day-to-
day
  29:20, 23
deadline
  11:2
Debtor
  1:6
Dec
  92:8, 9,
10
decision
  46:10
Declaratio
n  4:5
  7:25
  12:24
  13:22
  14:8, 11,
14
  35:22,
25  36:4,
22  37:9
  38:6, 8,
9, 10, 13,
20, 25
  45:23
  50:5
  53:23
  54:24
  73:12
  84:5
  85:5
  87:19
  91:14
  92:6, 11
  93:2
  94:24
  95:22
  97:18
  114:3
  120:1

124:*16*
132:*2, 9*
136:*24*
138:*6*
**declare**
147:17

**deductible**
121:*19,
24*
**deductibles** 126:*21*
**defend**
24:22
113:*11,
16*
121:*12*
**defendant**
39:*16*
40:*10,
11, 17,
18, 19,
25* 76:9

**Defendants**
1:*12*
**defending**
27:*9, 12*
41:*21*
42:*4*
63:*8*
**defense**
24:*2, 22*
25:*15,
16* 26:*1*
27:*23*
28:*11*
42:*23*
55:*1, 16,
20, 25*
56:*6, 10,
13, 21*
57:*1, 9,*

*18* 61:*9,
21, 25*
62:*5*
64:7, *18*
68:*3, 15*
120:*4, 6,
12, 14,
16, 18,
19, 21,
24*
121:*12,
15*
122:*3, 6,
22, 25*
123:*9,
10*
125:*10*
**deficit**
110:*23,
24*
111:*4,
14, 15*
**define**
63:*5*
74:*4*

**definitely**
35:*20*
75:*17*
130:*20*
135:*22*

**definition**
102:*2*
121:*13*
122:*4, 22*
**denial**
69:*15,
23* 71:*6*
**denials**
69:*8*
71:*18,
25* 75:*16*

**department**
49:*13,
17, 20*
57:*23*
80:*2*
129:*11*
132:*4*
**depend**
65:*8*
**depending**
80:*12*
**depends**
115:*12*
**deplete**
69:*7, 10*
**depleted**
124:*6*
**depleting**
123:*14*
124:*20*
**Deponent**
147:*1*
**deposed**
8:*16*
9:*1*
82:*22*
83:*1*

**DEPOSITION**
1:*14*
5:*8*
6:*8*
8:*21*
10:*11,
21, 25*
11:*6*
12:*13*
13:*21*
15:*10*
18:*22*
21:*8, 24*
36:*1*

87:*14,
15*
130:*24*
136:*13*
147:*2, 19*
**derived**
38:*13, 20*
**describe**
36:*3*
92:*11, 14*
**DESCRIPTION** 4:*4*
63:*3*

**designated**
5:*5*
140:*14*
**detail**
88:*19*
138:*5*
**determine**
14:*15*
30:*1*
73:*6*
118:*11*

**determined**
18:*8*
**determining** 25:*23*
47:*4*
50:*11*
122:*3, 21*

**difference**
42:*12*
134:*19*
**different**
16:*24*
32:*18*
40:*2*
59:*21,
25*

62:*20*
73:*4*
80:*5, 15,
16*
89:*15*
101:*18*
102:*9,
15*
108:*8*
110:*1*
117:*9*
118:*18*
121:*7*
133:*19*
134:*24*

**difficulty**
22:*14*
**digging**
45:*11*
**diocesan**
37:*7, 10,
14* 88:*9,
11, 12*
91:*7, 22*
93:*20*
137:*11*
**DIOCESE**
1:*5, 8*
2:*11*
5:*9, 19*
8:*22*
9:*7, 10,
21* 13:*2,
3* 17:*14*
18:*5*
19:*13*
22:*3, 4,
8* 24:*3,
22* 26:*5*
27:*9, 23*
28:*12,
15* 29:*7*

31:7, *21*
38:4, *18*
39:4, *16*
40:4, *10,*
*11, 17,*
*19, 21,*
*24* 41:*9,*
*20, 25*
42:*3, 12,*
*13*
43:*24*
44:*3, 4,*
*10* 45:*5*
49:*20*
54:*25*
55:*15,*
*18, 19*
56:*13,*
*21* 57:*1,*
*8, 23*
58:*5*
59:*22*
62:*3, 8*
63:*9, 20,*
*25*
66:*12,*
*14, 18*
67:*4, 17*
68:*2, 7,*
*12, 18,*
*25*
69:*17*
70:*9, 13,*
*15, 16*
74:*8, 24*
75:*11,*
*23, 25*
76:*7, 12,*
*17*
77:*10,*
*16, 19*
78:*5, 12,*
*16, 23*

79:*4, 14,*
*15, 17*
80:*3*
81:*23*
82:*4, 20,*
*21* 83:*5,*
*8* 84:*21,*
*22*
88:*17*
90:*8*
95:*3, 9,*
*14* 96:*6,*
*8, 12, 15,*
*16, 25*
97:*7, 15,*
*25* 98:*4,*
*7, 9, 20*
99:*8, 19*
100:*2, 3,*
*8, 16, 24*
101:*3, 7,*
*15, 22*
102:*1, 3,*
*19*
105:*5*
106:*5*
108:*3*
109:*18*
111:*24*
112:*10*
113:*5,*
*10, 21*
117:*3,*
*10*
120:*24*
121:*5*
124:*22*
125:*21*
126:*25*
128:*11*
140:*6*
142:*5*

diocese's
62:*11*
83:*24*
112:*19*
**direct**
93:*24*
133:*16,*
*23*
**directed**
24:*11*
93:*24*
**directing**
18:*1*
**directive**
56:*20, 23*
**directly**
37:*16*
47:*1*
64:*24*
77:*11,*
*22* 82:*1*
98:*2*
124:*19*
125:*18*
**director**
13:*4*
35:*8*
37:*16*
42:*8*
70:*8*
**disagree**
23:*12*
77:*7*
**disciplina**
**ry** 13:*18*
**disclose**
12:*18*
**discount**
135:*9, 19*
**Discovery**
4:*15*
65:*15, 20*

**discuss**
15:*1*
26:*8, 10*
34:*17*
54:*14,*
*17*
87:*14*
136:*13*
138:*25*
**discussed**
11:*19*

**discussing**
53:*20*
140:*25*

**discussion**
54:*21*
114:*9,*
*10*
116:*12*
139:*14,*
*20, 24*
**discussion**
**s** 12:*16*
25:*20*
34:*10,*
*16, 21*
35:*10*
65:*9*
**distinctio**
**n** 41:*9*
60:*3, 5*

**distracted**
81:*18*
**distributa**
**ble**
130:*9*
**DISTRICT**
1:*2*
5:*11*

**divert**
77:*1*
**diverting**
76:*19*
**divulge**
28:*6*
36:*19*
119:*6*
**divulging**
28:*2*
36:*16,*
*25* 46:*7*
119:*9*
**DOB**
129:*1*
131:*1*
134:*8*
138:*21*
**DOB_Gen000**
**3167**
22:*22*
**DOB_Gen263**
**8** 53:*20*
**DOB_Genera**
**100000023(**
**87** 4:*13*
**DOB_Genera**
**100003167**
4:*18*
**DOB_Genera**
**112616**
4:*7*
**DOB_Genera**
**12616**
48:*9*
**DOB_Insur0**
**0015222Con**
**fidential(**
**4** 4:*10*
**DOB_Insur0**
**0015226Con**
**fidential(**
**63** 4:*11*

DOB_Insur00015228Confidential(**79** 4:*12*
document 14:*22* 15:*6, 23* 16:*14* 19:*1* 22:*13, 15, 19, 24* 23:*9* 48:*8, 23* 52:*14, 15, 16* 96:*21* 127:*23, 25* 128:*12, 14, 24* 134:*8*
documents 14:*22* 15:*3* 16:*5, 16, 23* 17:*2, 5, 13, 14, 17* 18:*2, 8* 23:*5* 41:*25* 42:*2* 89:*22*
DOE 1:*11*
doing 17:*9* 18:*18* 45:*4*
dollar 124:*21* 125:*24* 126:*24*
donâ 11:*10*

DONATO 2:*9* 5:*20*
download 4:*2*
draft 36:*12* 38:*10, 11* 128:*6*
due 24:*16* 131:*17*
duly 7:*13* 146:*4*
duty 63:*12*

< E >
earlier 92:*2*
Early 44:*24*
earmarked 140:*20*
Eastern 5:*4* 54:*6, 9* 87:*8, 11* 136:*6, 9* 143:*19*
education 12:*25*
effect 17:*15* 42:*2* 45:*20, 21* 68:*7* 125:*25*
effective 59:*4*
efficacy 76:*20*

efforts 24:*1* 64:*9* 77:*10*
eight 78:*20* 138:*11*
either 23:*12, 21* 127:*6, 13*
elaborate 79:*21*

Electronic 145:*18*
eligibility 50:*11*
eliminate 46:*17*
email 17:*13*
emails 30:*23*
employ 24:*22*
employed 38:*17*
employees 109:*25*

employment 13:*2*
enactment 24:*10* 30:*8* 76:*4*
ended 138:*20*
endorsements 92:*17, 20, 22*

entire 135:*10*
entirety 41:*4*
entities 33:*24* 55:*21* 83:*19* 88:*9, 11, 12* 91:*7, 22* 93:*20* 99:*16, 18* 101:*16* 102:*3* 137:*11*
entitled 12:*17*
entity 44:*4* 96:*13* 110:*4*
entry 52:*20*
environment 78:*10*

equivalent 78:*20*
escapes 25:*4*

especially 99:*18*
ESQUIRE 2:*6, 7, 8, 9, 16, 17, 18*
establish 38:*5* 116:*17*

121:*22* 142:*24*
established 121:*23*
establishing 31:*20* 62:*25*
estate 104:*18* 124:*22*
estoppel 69:*1* 73:*16, 24*
ET 1:*11*
event 133:*10*

eventually 138:*25*
Everlaw 23:*6*
evidence 88:*23, 24* 94:*12*
evident 30:*25*
exact 8:*24* 46:*9*
exactly 8:*19* 16:*20* 39:*20* 61:*15* 73:*22* 81:*5* 130:*5*
EXAMINATION 3:*3* 7:*18* 142:*2*

Examining
  65:24
example
  75:4
  79:23
  108:16
Excel
  137:9,
  13, 15, 21
Excellent
  12:24
exception
  69:14
excess
  106:24
  130:12,
  14, 21
Excuse
  14:4
  33:4
  43:12
  77:21
  109:6
executed
  143:8, 9
exhausted
  124:6
  127:3

exhaustion
  34:12
EXHIBIT
  4:4
  15:1, 6,
  10
  18:17,
  20, 23
  21:4
  22:15
  35:22
  48:3, 7
  50:18,
  19    52:7

54:10
127:20
128:3,
22
130:24
134:8,
10
138:11
exhibits
  127:11,
  16
exist
  113:6
  116:19
existed
  113:11
expand
  122:25
expectatio
n    83:25
  84:8, 11,
  17
expedite
  142:14
expend
  64:6
  120:3,
  14, 17
  121:14
  122:6
  123:9
  125:9
expense
  133:23
expenses
  129:11
  131:17,
  18, 25
  132:3, 5,
  7, 13, 15,
  19, 21,
  25

133:11,
20    134:4

experience
  72:16
  76:6, 14
  94:4
  96:4, 7
  98:16,
  19
  99:10
  109:6, 12
experience
s    99:6
expert
  11:22
  99:2
expertise
  36:9
experts
  79:16

Expiration
  144:19
explain
  35:7
  53:9
  73:3
  115:21
  124:23
  131:16
exposed
  68:25
  74:24
  75:12
exposure
  108:8
  109:5
exposures
  109:23
  110:2, 5
  112:17

express
  66:24
extent
  11:5
  17:6, 19
  27:24
  36:13
  46:6
  47:13
  62:25
  103:9
  104:22
  119:5
  120:2
  125:8
  133:3, 5
extremely
  131:16
  133:10

< F >
facing
  61:20
fact
  11:21
  99:25
factor
  109:7
facts
  40:4
  64:25
  98:19
fair
  62:23
  75:21,
  22
  82:16
  102:21
  107:3
  109:19,
  22
  110:3
  113:9,

24
  115:14
  127:8, 9
fairly
  141:18
fall
  8:25
  32:21
falls
  120:5
familiar
  9:21
  10:11
  23:12
  52:16
  57:5
familiariz
e    14:3,
  5    52:10
families
  78:4, 5
  79:7
  108:25
far
  36:5
  47:15
  80:18
  90:15,
  23
  109:11
  117:17
  118:9
  133:22
February
  38:4
fee
  107:11,
  12
feel
  31:7
fell
  41:6

fencing
  122:18,
19
figure
  136:1
file
  18:4
filed
  5:10
  20:3
  24:9
  28:21
  30:15,
20   31:1
  33:17
  36:23
  39:15
  40:9, 12,
24
  58:23
  136:21
files
  22:1
  45:7
filing
  24:3, 12,
21   26:4
  34:25
  44:21
  136:17
filings
  30:6
filled
  133:22
finance
  48:25
financial
  37:15
  53:14
  138:14,
19
  139:13,

20, 25
  140:20
find
  43:19
  45:13
  63:13
  66:24
  92:21
  114:9
finding
  22:14
  137:5
fine
  15:20
  86:3, 24
  87:1
finish
  11:14,
15   114:2
finished
  21:4
  33:6, 7
  81:10
firm
  5:18
  7:23
  30:1
  31:8, 13
  32:18
firms
  25:1, 2,
5, 21
  31:1
  34:17
  132:21
first
  32:3
  39:7
  41:18
  48:9
  56:4
  81:16
  87:22

90:2
  99:25
  100:1
  107:16
  140:2
  146:3
fiscal
  131:20,
22
Fisher
  81:21,
25   82:3,
10, 16
five
  52:21
  53:22
  54:2
Floor
  2:14
focus
  81:1
  94:23
folder
  132:20
folks
  32:10
following
  36:18
  47:21
  103:16
  111:9
follows
  7:14
footage
  109:1
footages
  109:24
foregoing
  145:4
  146:7
  147:19
form
  13:18

27:14
  28:24
  31:10,
22
  32:23
  40:6
  41:11
  42:25
  44:1
  47:12
  49:10
  56:15
  57:3, 11
  58:18
  59:23
  60:9
  61:10,
23
  63:15
  65:17
  66:21
  67:23
  69:19
  70:3, 21
  71:10
  72:1, 9,
19   73:2
  75:6
  76:10
  79:20
  80:21
  82:6, 23
  84:10,
23
  90:20
  92:23
  95:16
  97:2, 17
  100:17
  102:6,
11, 22
  103:8,
20

106:7,
17
  109:9
  111:5
  112:11,
20
  113:13
  115:9,
18
  116:6
  118:3,
21
  119:8,
16, 21
  120:7,
25
  121:16
  122:7
  124:7
  126:4,
14, 22
  127:25
  128:14
  132:17
  133:2,
14
  135:1, 4,
14
  137:19
  140:19
  141:1
formatted
  145:7

formulated
  84:1, 18
forth
  30:23
  64:13
  145:5
forum
  72:25
  73:4

forward
 31:*25*
 45:*16*
 68:*1, 12*
 69:*25*
 72:7, *12*
 84:*16*
 114:*25*
 116:*5, 9*
 117:*14,
 15*
found
 44:*10*
 75:*24*
 76:7, *12*
 92:*17*
 138:*23*

foundation
 91:*13*
frame
 81:*2*
 117:*13*
free
 62:*5*
Friday
 17:*18*
 22:*23*
 143:7
FROM/TO
 147:*3*
full
 15:*19*
 145:7
fun
 103:*15*
functions
 35:*12*
fund
 60:*21,
 25*
 69:*13*
 110:*11,*

*14, 20*
 111:*3,
 15*
 113:*10*
 120:*3,
 14, 17*
 121:*15*
 122:*6,
 25*
 125:*10*
 133:*13*
 140:*9*
funding
 46:*9*
 140:*20*
funds
 46:*14,
 16*
 60:*15*
 61:*9*
 107:*12*
 108:*3*
 140:*15,
 23*
 141:*4, 5*
further
 30:*5*
 31:*19*
 32:*5, 20*
 33:*16*
 34:*10*
 44:*25*
 45:*1*
 141:*23,
 24*
 142:*9*
 145:*9*
 146:7

< G >
Gain
 52:*20*

140:*11*
 141:*10*
gained
 98:*12*
gains
 140:*15,
 17*
gear
 51:*22*
general
 60:*25*
 108:*22,
 23*
 109:*4*
 114:*11*
 123:*24*
 133:*25*
 134:*21*
 135:*16*
 138:*21*
General's
 9:*23*
getting
 26:*11*
 34:*9*
 42:*19*
 61:*21,
 25*   62:*5*
 90:*16*
 134:*14*
give
 7:7
 18:*20*
 24:*5*
 25:*9*
 29:*13*
 41:*15*
 51:*16*
 75:*4*
 94:*22*
 98:*14*
 105:*21*
 112:*18*

given
 10:*25*
 26:*6*
 63:*1*
 117:*18*
 146:*9*
giving
 32:*9*
go
 10:*10,
 13*   16:*1*
 18:*17,
 19*
 22:*14*
 45:*6*
 47:*15*
 48:*15*
 53:*23*
 54:*9, 24*
 57:*25*
 64:*16*
 66:*5*
 72:7
 83:*23*
 87:*18*
 106:*12*
 107:*15*
 114:*6, 7*
 116:*22*
 118:*8,
 23*
 127:*18*
 132:*11,
 19*
 133:*19*
 135:*6*
 138:*17,
 21*
 142:*12*
goal
 26:*13,
 17*   43:*19*

Godinez
 1:*22*
 5:*5*
 145:*3, 17*
goes
 110:*16*
 111:*18*
 118:*9*
 125:*22*
 126:*10*
 131:*21,
 24*
going
 10:*10*
 11:*21*
 15:*5, 25*
 21:*12*
 22:*21*
 23:*10,
 24*   24:*7,
 8*   30:*25*
 31:*25*
 48:*2, 3,
 10*
 52:*18*
 53:*21,
 23*
 54:*23*
 63:*9*
 69:*25*
 70:*20,
 21*   71:*6,
 14*
 73:*11*
 74:*20*
 81:7
 83:*23*
 85:*4, 7*
 87:*18*
 91:*9*
 101:*25*
 104:*4*
 107:*24*

114:*2, 3, 6*
118:*20*
119:*1, 25*
120:*1*
128:*9*
134:*18*
135:*22*
138:*18, 21, 25*
**Good**
5:*2, 17*
6:*4, 23, 25*  7:*20, 21*  78:*10*
**gotten**
105:*10*
**govern**
73:*23*
**governs**
6:*10*
**grand**
9:*19, 22*
**granted**
99:*16*
**Great**
103:*18*
138:*4*
142:*18*
**grounds**
18:*7*
**Group**
114:*23*
116:*2, 14*
133:*18*
137:*1*
**Group's**
115:*17*
**guess**
49:*25*

77:*12*
78:*24*

**< H >**
**half**
39:*25*
85:*14*
86:*1, 13*
87:*3*
**halfway**
85:*17*
86:*18, 21*
**hand**
7:*6*  9:*5*
**handle**
31:*8, 13*
32:*18*
42:*20*
**handled**
79:*4, 16*
99:*13*
**handling**
35:*12*
47:*2*
**happened**
82:*13*
**happens**
42:*9*
110:*15*

**harassment**
19:*8*
**heading**
109:*4*
138:*22*
**hear**
18:*14*
45:*18*
**he'd**
122:*8*
124:*8*

**held**
74:*5*
110:*25*
**help**
15:*19*
78:*9*
**Herdzik**
25:*3*
**high**
131:*16*
133:*10, 17*
**highlight**
128:*5*
**hired**
13:*3*
22:*9*
100:*1*
**history**
58:*10*
**hit**
15:*18*
**hold**
117:*1*
129:*23*
**home**
8:*9*
96:*13*
**honestly**
31:*12*
**hope**
52:*2*
54:*20*
83:*24*
84:*8, 11, 15, 17*
**hoping**
85:*5*
128:*9*
**hour**
29:*14, 15*
85:*14,*

*16*  86:*1, 13*  87:*3*
**hours**
78:*20, 25*
**house**
54:*18, 20*
**hover**
51:*22*
**hundred**
39:*19*
**hundreds**
35:*20*
**hurt**
80:*8*
**hypothetical**
122:*8, 15*
124:*11*

**< I >**
**Iâ**  70:*21*
**IAG**
136:*23, 24*
**Iaian**
5:*15*
**IAIN**
2:*16*
7:*22*
47:*14*
**Ian**
86:*17*
**idea**
71:*13*
**identical**
40:*4, 23*
41:*4*
**identification**
15:*11*
18:*24*
22:*16*

35:*23*
48:*12*
127:*21*
128:*23*
130:*25*
134:*15*
138:*12*
**identify**
5:*12, 22*
6:*2*
19:*1*
88:*18*
**identifying**  118:*18*
**ILAN**
2:*18*
5:*23*
**impact**
34:*22*
**impacted**
111:*4*
**impacts**
77:*15*
**implementation**
87:*23*
**important**
11:*13*
**improper**
53:*6*
**imputed**
69:*2*
74:*25*
75:*1, 5*

**inaccurate**
14:*11*
23:*21*
**inasatir@pszjlaw.com**
2:*19*

inception
 19:*10*
include
 6:*12*
 20:*2, 19*
 102:*2*
 129:*21*
included
 91:*21*
 95:*9, 14*
 96:*25*
 99:7
 108:*22*
 109:*3, 4, 13*
 121:*13*
includes
 20:*9*
including
 12:*16*
incorporat
ed
 122:*3, 22*
incorrect
 128:*17, 19*
increase
 59:*8*
 129:*25*
increased
 130:*19, 21*  134:*3*
increases
 129:*24*
 130:*1, 18*
incurred
 20:*13, 23, 24*
 21:*1*
 132:*25*
independen
t  44:*5*

indication
 90:*11*

indirectly
 77:*24*
 78:*1*
Indiscerni
ble
 37:*19*
 46:*2*
 55:*10*
 66:7
 123:*21*
 132:*9*

individual
 25:*17*
 68:*6*
 78:*6*
 101:*1, 19*
 109:*6*
 110:*5*
 137:*11*
industry
 96:7
 98:*17*
informatio
n  17:*8, 21*
 18:*10*
 19:*4, 12*
 23:*21, 23*  28:*1, 2, 6*
 29:*18*
 36:*15, 17, 20*
 37:*1*
 38:*12, 19, 25*
 45:*12*

46:7
 47:*14, 20, 25*
 89:*6, 22*
 93:*3, 6, 10*  94:*1*
 119:*7, 9*
 131:*19, 21*
 133:*8*
 137:*5*
in-house
 107:*22*
Initial
 4:*8*
 28:*21*
 36:*12*
initially
 30:*24*
initiated
 58:*4, 11*
 59:*12*

initiative
 78:*4*

injunction
 13:*25*
 14:*23*
 21:*9*
injured
 80:*11*
injury
 8:*25*
input
 78:*8*
 139:*19*
inquire
 12:*17*
 63:*12*
inside
 79:*15*

insofar
 77:*15*
insolvent
 104:*8, 10, 12, 22*
 105:*11*
 106:5
instance
 67:*16, 22*
instances
 80:*10*
institutio
n  99:*24*
instruct
 17:*8*
 28:*1*
 36:*15*
 119:7
instructin
g  47:*17, 19*

instrument
 140:*20*
I-N-S-U-R
 134:*9*

insur15222
 129:*1*

Insur15226
 131:*2*
insurance
 9:*4, 7*
 13:*4*
 18:*11*
 19:*9, 17, 20, 22*
 24:*17*
 26:*14*
 31:*5, 8, 13, 20*

32:*5, 15, 22*
 34:*11, 13, 19, 23*  35:*3, 8*  42:*7, 10, 11, 17, 19, 22*
 43:*13, 18, 19, 25*  44:*4, 6, 14*
 45:*1, 7, 13*
 49:*13, 17, 20*
 52:*20*
 53:*10*
 55:*22*
 56:*1, 9*
 57:*23*
 58:5
 60:*21, 25*  61:*9*
 62:*10, 17, 25*
 63:*11, 13, 21*
 64:*17*
 65:*2, 5, 8, 12*
 66:*25*
 67:*1, 6*
 68:*5, 18*
 69:*8, 16, 17*  70:*8, 12, 25*
 71:*2, 19*
 72:*13, 21*
 75:*16, 18, 21*

77:14, 25   78:8, 18   79:5
82:17
87:25
88:10, 14, 25
89:2, 3, 6, 8
91:12
93:14, 16, 17, 20   94:5, 9   95:7
96:4, 10, 11
98:17
99:3, 10, 13, 14
100:2, 7, 24
101:1
102:14, 21
103:5, 6, 7, 16
104:23
105:10
106:5, 15, 24
107:4, 8
108:15, 17, 23
110:7, 13, 17
111:8
112:7
113:19
118:19
121:9
124:20
125:19, 20

127:2
129:11, 13
130:1, 13
132:4, 14
133:19
137:1, 5, 7
138:23
139:15, 20, 24
140:14
141:6, 19

**insurance-related**
78:22
**insured**
89:3
92:12, 20, 21
95:3, 9, 15
96:12, 17   97:1
98:24
99:8, 21
100:16
101:2, 9, 14, 20, 23
102:1, 2, 20
104:22
126:17
129:16
**insureds**
92:14
94:6
96:9
99:12, 15   101:7

**insurer**
104:22
105:5
120:5, 9, 16, 19
**insurers**
28:16
29:8, 17, 21
**intend**
53:5
**interest**
138:17
141:9, 16

**interested**
145:11
**Interesting**   135:21
**interests**
62:12
**interpretation**
99:3
**intertwined**   66:11, 16   67:1, 3
**intertwines**   67:9
**Interviewing**   66:1
**invested**
141:12
**investigation**
9:22
80:7

**investment**
140:11, 15, 17
141:9

**invitiating**   76:20
**involve**
43:17
68:4
**involved**
14:21
24:1, 18
25:22
27:5, 22
28:11, 14
29:20
31:4, 5
34:6
36:3
42:20
44:13, 16, 17, 18   45:1
46:10, 20   47:1, 3, 4, 7
64:8
65:15, 19
66:25
68:3
77:14, 18, 23, 24   78:3
98:2
99:23
108:25
118:17
**involvement**   24:6
27:1
30:11, 13, 19
31:3, 25
33:19, 22   34:7,

21
42:24
43:3
50:7, 10, 13   64:5, 18
72:13
75:18
136:17
137:2
**involves**
35:3
**involving**
60:6
72:6, 8
99:14
**IRCP**
9:20
10:4
16:6
18:12
45:20, 24
46:20
47:1, 2, 5, 8, 11, 24   49:2
50:11

**irrelevant**
103:6
**I-S**
134:8
**issue**
80:10
94:10
**issued**
9:7
44:14
49:23
70:12
92:4
99:24

106:5
113:21
114:24
117:2,
10, 23
120:23
124:1
137:11,
16, 17
142:5
**issues**
72:18,
21    73:7
105:14
**itâ**    46:6
**it'd**
98:12
**item**
53:4
**items**
133:19
**its**
29:7
34:22
41:19
62:9, 16,
23
63:20
69:17
75:25
76:8
88:17
97:15
98:21
101:15
120:3,
14, 17
121:14
122:6,
25
123:9
125:9,

21    138:7

**< J >**
**Jaime**
1:22
5:5
**Jamie**
145:3, 17
**jeopardize
d**    62:12
**JMH**    1:11
**JOB**
1:23
34:4
35:5, 8,
11    63:2
100:1
**JOHN**
1:17
3:3
4:5
5:8
7:3
35:22
144:8
146:13
147:1, 21
**J-O-H-N**
7:3
**joint**
42:7
102:15
**jointly**
90:6
**JONES**
2:13
**judgment**
75:24
76:8
124:20
125:19,
22
126:10

**July**
19:4, 10,
12, 14,
16, 21,
25
31:14
110:7
128:25
**jury**
9:19, 22
**JUSTIN**
2:8
5:21

**< K >**
**keep**
43:8
94:8, 9
**kept**
132:5
**kind**
52:14,
15, 16
101:17
139:23
**KING**
2:3
5:18, 20
12:1
15:4
17:5
18:6
29:12
36:10
**know**
10:1
11:11
16:9, 15
20:23
23:20
25:13
28:25
31:11,

12, 23
32:11,
24
35:18
39:18,
19    40:3,
7    41:7,
8, 12, 13
46:9
48:4, 18
49:11
51:18,
19    52:4,
11, 19,
24    53:9,
12
56:24
57:4, 13,
18
59:16,
24
60:10,
16    61:1,
11, 24
66:6, 22,
24
67:24
68:2
70:4, 5
72:10
73:8, 21,
23    74:4,
19, 21,
23    75:3,
7, 8
76:11,
13    78:8
81:9, 12
82:9
83:3, 5,
10, 14,
15    85:7,
10, 14,

20
87:20
91:1, 4,
5, 20, 24
93:16
94:16,
21
96:13
98:10
99:11
103:21
104:1, 8,
10, 11,
12, 14,
18, 20
105:17
106:10
113:2, 3
114:18
116:23,
24
121:17
123:7,
23
124:12,
13
132:6
133:6
136:25
137:14
**knowledge**
40:8
45:17,
19
47:10
49:14
56:24
60:11,
18    61:5,
6    75:23
76:7
83:22
92:25

96:5
97:7
98:3, 6, 12
known
  46:13, 15
KRELL
  2:8
  5:21

< L >
lag   51:6
large
  35:10
  49:5, 8
late
  113:24
law
  7:23
  24:8
  30:1
  56:25
  57:6
  58:22
  74:12
  76:5
  132:21
laws
  6:10
lawsuit
  13:12
  26:8, 18, 24   27:2
  31:4
  34:18, 19, 22
  40:12, 23   41:2
  43:3
  58:1
lawsuits
  8:25
  24:9, 16,

19   26:3, 4, 12
  27:6
  30:14, 20   31:1, 6   33:12, 24
  35:10, 13, 14
  40:3, 9, 14, 20, 23   41:5
  42:21
  64:8
lawyer
  12:3
  69:4
  73:13
lead
  41:21
  42:4, 6, 14, 17
  71:24
leader
  78:3
left
  13:5
  38:4
  85:11
  86:22
  128:4
  136:2
Legal
  1:21
  5:6
  6:6
  42:20
  44:4
  57:9, 13, 18
  62:12, 13
  64:13,

21, 23
  66:3
  69:5
  74:16
  105:16
  131:17, 25
  132:3, 6, 14, 21, 24
  133:10, 17, 20
  134:4
letter
  129:5
  130:5
  131:6, 20, 23
  134:3, 20, 21, 24   135:8
letters
  114:4
level
  30:13
  31:20
  93:17
liability
  8:22
  67:15, 17, 21
  68:1, 19
  69:2
  74:2, 3, 8, 12
  87:25
  88:10, 14, 20
  95:7
  96:17
  99:12
  100:2, 24

108:20, 23
  109:4
  114:12
  123:25
  130:1
liable
  74:6, 9
  75:24
  76:7, 13
lifted
  64:6
  81:24
  82:5
limit
  34:11
  118:11
  127:7
limitations   117:17
limited
  34:22
  56:1
limits
  34:11
  67:2
  68:5
  75:16
  117:4, 12, 16
  118:2, 13
  123:13
  124:5
  125:22
  126:3, 7, 10, 12, 13
  127:2
  142:6
Lincoln
  2:4

line
  47:14
  52:20
  53:4, 10
  91:8
  93:7
  133:23
  134:5
  140:12
  147:3
lines
  52:21
  53:3
liquidation
  104:15, 18
list
  20:5
  137:16
literally
  45:6
  132:8, 20
litigated
  72:18, 25   80:10
litigation
  20:6, 10
  27:9
  58:16
  65:16
  67:18
  69:2
  70:11, 15, 22, 25   71:2, 8, 24
  72:8, 12, 18   73:7
  74:7
little
  22:13

33:*19*, *23*
51:*22*
77:*12*
live
11:*7*
LLP
2:*13*
25:*3*, *8*
26:*9*
30:*25*
47:*2*
locate
89:*23*
92:*3*, *6*
located
11:*25*
88:*17*
89:*10*
LOCATION
1:*21*
logged
26:*12*
80:*2*
longer
34:*2*, *3*
85:*13*, *22*
look
41:*18*
64:*22*
89:*25*
114:*10*
118:*10*
121:*9*, *25*
122:*9*
124:*9*, *19*
125:*18*
129:*10*
134:*17*
135:*3*
138:*24*

looked
122:*2*, *21*
looking
22:*12*
31:*3*
39:*2*
45:*9*, *12*, *22*
48:*11*
86:*6*, *7*
103:*2*, *4*
115:*22*, *24*
121:*6*
129:*23*
Los   2:*15*
lose
51:*1*
Loss
4:*16*
19:*2*, *11*, *24*
20:*12*
109:*5*, *6*
111:*11*
121:*13*
122:*4*, *23*   141:*6*
losses
129:*17*
140:*16*
lot
28:*21*
31:*3*
35:*8*
63:*2*
64:*14*
78:*8*
98:*10*
108:*10*
123:*19*
132:*3*, *6*
137:*22*

Lumbermens
103:*18*
lunch
85:*10*, *16*

< M >
mailed
8:*13*
main
26:*17*
43:*18*

maintained
95:*7*
major
78:*4*
129:*11*
majority
19:*20*
112:*6*
makeup
134:*21*
making
27:*2*
81:*1*
98:*23*

management
19:*3*
98:*17*
manager
62:*10*, *16*, *24*
63:*11*, *21*
64:*17*
65:*2*, *4*
80:*7*
Mandolera
38:*3*, *7*, *14*

March
13:*3*
49:*1*
88:*17*
89:*10*
mark
15:*10*
18:*22*
22:*15*
35:*21*
48:*7*
51:*1*
127:*11*, *19*
128:*21*
130:*24*
134:*7*, *11*
138:*10*
marked
15:*11*
18:*24*
22:*16*
35:*23*
48:*12*
127:*21*
128:*23*
130:*25*
134:*15*
138:*12*
material
89:*9*
materializ
ed   84:*9*, *12*
materials
13:*21*
matter
5:*9*
6:*10*
9:*5*
15:*4*
34:*18*

47:*16*
91:*9*
99:*25*
matters
34:*13*
65:*8*
68:*4*, *8*
78:*22*
98:*24*
133:*21*
mean
14:*24*
43:*15*
49:*17*
50:*15*
58:*23*
66:*25*
74:*8*, *25*
75:*11*
78:*2*
79:*13*
84:*16*
85:*19*
89:*1*
108:*12*
127:*1*
130:*14*
132:*14*
means
6:*11*, *13*
53:*11*
98:*19*
meant
53:*6*
100:*9*
107:*15*
125:*7*
127:*17*
mediation
128:*6*

mediations
65:*10*

meet
  21:16
meeting
  49:1
Memo
  48:8
Mendolara
  81:20
merits
  34:19, 22
met    21:8
method
  6:15
methodolog
ies
  108:7
methodolog
y    109:8
MICHAEL
  2:17
  5:24
Midland
  103:18
  104:10
million
  111:24
  129:17,
18
minute
  41:15
  119:25
minutes
  54:2, 3
  71:17
  86:1

Misconduct
  4:16
  19:4, 6,
9, 24
  20:25
  109:3
  118:9

123:24
130:1
Mission
  103:19
  104:13,
14, 18
misspellin
gs    37:3
misspoke
  77:21
  88:15
  100:9
Mm-hmm
  61:19
moment
  16:7
  18:20
  39:6
  48:3
  55:5
  87:19
  107:25
  131:10
  135:24
money
  46:10
  62:9
  112:2, 4,
6
  125:23
  126:11
  133:12
  140:14
Monica
  2:14
month
  78:19,
23, 24, 25
monthly
  78:14
months
  129:18
  132:8

morning
  5:2, 17
  6:4, 23,
25    7:20,
21
motion
  13:24,
25    14:6,
8    47:16
  91:10
move
  68:1
  72:12
  73:11
  81:7
  84:16
  96:18
  97:6
  103:13
  107:14
  114:3
moved
  45:16
moving
  68:12
multiple
  124:8
mute
  118:23
  119:1, 3

< N >
N.Y    1:5,
8    2:11
name
  5:4
  6:5
  7:2, 4,
22    8:1
  25:4
  96:11,
17
  101:9

129:2
131:3
named
  39:16
  40:10,
19, 21
  42:13
  92:12
  95:3, 9,
15    96:9,
15, 16,
25    97:1
  99:8, 20
  100:16
  101:2, 7,
13, 20,
23
  102:1, 2,
19
names
  89:6
naming
  63:25
narrow
  117:20
NASATIR
  2:16
  3:4
  5:15, 22
  6:18
  7:19, 22
  8:11
  15:9, 15,
18, 21
  16:8, 13
  17:11,
22, 25
  18:16,
21, 25
  21:3, 6,
22
  22:12,
17    23:2,

8    27:21
  28:5, 10
  29:3, 5
  31:15
  32:1
  33:2, 4,
5    35:21,
24
  36:21
  37:5
  39:8, 13
  40:13
  41:14,
17    43:5,
10    44:7
  46:12
  47:17,
23    48:2,
14, 16,
22
  49:16,
25    50:2,
17, 21,
23, 25
  51:4, 8,
13, 24
  52:2, 6,
9, 13
  53:5, 8,
17    54:1,
4, 12, 13
  55:9, 13
  56:19
  57:7, 15,
19
  58:25
  59:3, 6,
18    60:2,
12
  61:14,
17    62:2,
6    63:7,
19

65:*21*
66:*8*
67:*5*
68:*14*
69:*22*
70:*7, 23*
71:*4, 5, 16*  72:*5, 15, 22, 24*  73:*5, 10, 20*
74:*22*
75:*9*
76:*15*
77:*8*
79:*22*
80:*25*
81:*7, 12, 15*
82:*12, 15*  83:*2, 4*  84:*13*
85:*3, 12*
86:*5, 9, 11, 15, 20, 24*
87:*2, 6, 12, 13*
91:*11, 19*  93:*1*
94:*15*
95:*20*
96:*18, 20*  97:*5, 21*
100:*21*
102:*8, 17, 25*
103:*3, 12, 14, 24*
104:*6*
105:*3,*

*19*
*106:3, 11, 21*
*109:15, 17*
111:*12*
112:*25*
113:*20*
114:*21*
115:*13, 23*
116:*10*
118:*7, 22*
119:*2, 13, 19, 24*
120:*11*
121:*3, 21*
122:*10, 12, 16*
123:*11*
124:*15*
126:*8, 18*
127:*5, 15, 22*
128:*21, 24*
129:*4*
130:*23*
131:*1, 4, 15*
132:*23*
133:*9, 24*
134:*7, 12, 16*
135:*5, 7, 17, 25*
136:*4, 11, 12*

137:*24*
138:*10, 13*
139:*3, 6, 10, 12*
141:*7, 22*
142:*11, 14, 16, 18, 23*
143:*12*
**National**
114:*23*
115:*16*
116:*1, 13*
**nature**
9:*2*
12:*17*
24:*5*
60:*14*
66:*17*
**necessarily**  92:*16*
115:*11*
**need**
18:*16*
31:*20*
32:*6*
51:*8*
58:*20*
77:*1*
85:*15*
121:*14*
135:*23*
**needed**
111:*19*
**needs**
81:*17*
**Neg**
52:*20*
**negative**
68:*11, 16, 22*

71:*7*
105:*13*
**negotiation**  71:*20*
**negotiations**  69:*10*
**neither**
145:*9*
**nerve**
80:*3*
**Net**
53:*10*
111:*11*
**never**
49:*13*
73:*19*
95:*2*
**NEW**  1:*2*
2:*5*
5:*6, 10, 11*  8:*15*
9:*23*
12:*2*
54:*18, 21*
74:*12*
96:*14*
**night**
143:*5*
**nine**
129:*18*
**non**
88:*8*
96:*18*
137:*17*
**non-abuse**
79:*18*
80:*14, 19*
**non-CVA**
70:*14, 18*
**non-debtors**
44:*15*

**non-diocesan**
88:*12*
**non-diocese**
83:*19*
**noninsurance**
43:*14, 15, 17*
**Non-insurance**
78:*17*
**Notary**
2:*24*
6:*2, 4, 5, 21, 23*
7:*1, 5, 14, 15*
144:*1, 7, 17*
146:*19*
147:*24*
**noted**
147:*19*
**notes**
135:*24*
**notice**
26:*15*
**noticing**
5:*13*
**notwithstanding**
59:*19*
113:*9*
**November**
1:*18*
5:*3*
22:*23*
84:*7*
144:*6, 12*
145:*13*

146:5
147:2
**N-T** 8:15
**Number**
5:10
15:3
16:2, 12,
21 23:7
24:8, 15
49:5, 8
50:19
88:18
89:5
108:24
109:25
128:3
129:1
134:8
138:21
139:8
**numbers**
16:15
35:10
109:24,
25
**numerous**
108:8
**nutshell**
58:9

**< O >**
**oath**
10:14
95:22
144:9
**object**
70:20,
21
71:10
102:4
118:20
133:2

**Objection**
17:6, 19
21:19
27:14,
24
28:24
31:10,
22
32:23
36:13,
25 40:6
41:11
42:25
44:1
46:5
47:12
49:10
56:15
57:3, 11
58:18
59:15,
23 60:9
61:10,
23 63:6,
15
65:17
66:21
67:23
69:19
70:3
72:1, 9,
19 73:2,
17
74:14
75:6
76:10
77:3
80:21
82:6, 23
84:10,
23 91:8
92:23
94:13

95:16
97:2, 17
100:17
102:11,
22
103:8,
20
104:24
105:16,
25
106:7,
17
109:9
111:5
112:20
113:13
115:9,
18
116:6
118:3,
25
119:5, 8,
16, 21
120:7,
25
121:16
122:7,
13
123:2, 6
124:7
126:4,
14, 22
133:2,
14
135:1,
14
137:19
141:1

**Objections**
4:14

**obligation**

10:15
57:9, 14,
17, 18,
20, 21
90:10,
22
120:24
121:12
**obligation
s** 69:18

**obligation'
s** 58:7
**obtain**
64:23
**obtaining**
88:14
**obviously**
80:4
81:19
84:5
**occur**
28:19
**occurred**
60:6
**occurrence**
113:17,
23
117:19
120:23
**occurring**
60:17
61:8
113:12
**offered**
135:9
**Office**
9:23
18:4
24:17
42:9

58:5
96:13
**officer**
5:5
37:16
90:7
**offices**
12:1
140:3, 5
**Official**
2:20
6:12
**Oh**
15:13
18:16
27:18
35:20
46:2
50:14
53:19
62:3
114:6,
17
134:12
138:18
**Ohio**
144:3, 8,
17
**Okay**
8:14, 20
9:6, 10,
13, 17,
25 10:3,
6, 10, 17,
24
11:10,
13, 25
12:3, 8,
15 13:6,
9, 14, 20,
23 14:7,
10, 13,
18, 21

15:5, *9*, *14*, *25*
16:*23*
17:*24*
18:*12*, *16*
19:*10*, *19* 20:*2*, *12*, *19*
21:*2*, *11*
22:*1*, *21*
23:*13*, *17*, *19*, *24*, *25*
24:*13*
25:*9*, *14*, *19*, *22*, *25* 27:*1*, *18*
28:*18*, *22* 29:*1*, *10*, *13*, *16*, *24*
30:*10*, *13*
31:*16*, *18* 33:*8*, *21*
34:*25*
35:*14*, *19*, *21*
37:*24*
38:*12*, *19*, *23*
39:*2*, *11*, *18*, *21*, *23* 40:*1*
41:*6*, *8*, *14*, *23*, *24* 42:*3*
43:*2*, *24*
44:*23*
45:*15*,

*20* 46:*2*, *8* 47:*21*
48:*2*, *14*, *20*, *23*
49:*4*
50:*10*, *14*, *22*, *24* 51:*8*
52:*1*, *8*, *12*, *18*
53:*1*, *13*, *17*, *24*, *25* 54:*5*, *11* 55:*3*, *12*, *17*
56:*5*, *17*, *20*
58:*19*
59:*2*, *11*
60:*19*, *23* 61:*2*
62:*15*, *23* 63:*4*, *24* 64:*2*
67:*6*
68:*15*, *21*
69:*14*, *23* 70:*8*
71:*4*, *23*
72:*6*
73:*15*, *23* 74:*1*, *11*, *23*
75:*4*, *10*, *20*, *23*
76:*4*, *16*
77:*9*, *12*, *18*
78:*14*, *21* 79:*2*, *12*, *18*
80:*14*,

*17* 81:*3*, *7*, *11*, *14*, *16*, *21*
82:*19*
83:*5*, *10*, *23* 84:*2*, *7*, *19*
85:*4*, *8*
86:*11*, *12*, *24*
87:*2*, *4*, *5*, *6*, *21*, *22*
88:*23*
89:*9*, *16*
90:*13*
91:*5*, *17*, *24* 92:*2*, *11*, *19*
93:*2*, *10*, *11*, *12*, *19*, *23*
94:*1*, *7*, *16*, *22*, *25* 95:*1*, *6*, *12*
97:*6*, *14*
98:*6*, *16*, *18*, *23*
100:*12*, *15*
101:*6*
102:*18*, *25*
104:*4*, *14*, *21*
106:*4*, *15*, *23*, *25*
107:*7*, *14*, *22*, *25*
108:*2*

109:*15*, *18*
110:*6*, *10*, *13*, *23*
111:*21*
113:*1*, *4*, *9*, *15*
114:*1*, *4*, *5*, *10*, *14*, *17*, *20*, *22*
115:*1*
116:*16*, *22*, *24*
117:*15*, *20*, *25*
118:*14*, *17*
119:*25*
120:*13*
121:*5*
123:*5*, *12*, *16*, *20*
125:*3*, *4*, *8*, *9*, *10*
126:*19*
127:*6*, *17*
128:*2*, *16*, *20*
129:*7*, *10*, *19*, *23*
130:*9*, *11*, *12*, *14*, *17*
131:*8*, *14*, *19*
132:*12*, *24*
133:*25*

134:*6*, *12*, *23*
135:*5*, *6*, *21*, *23*
136:*3*, *5*
137:*2*, *9*, *25*
138:*9*, *17*
139:*11*, *17*, *19*
140:*2*, *6*, *8*, *11*, *23*
141:*12*, *15*, *21*
142:*8*, *12*, *23*
143:*12*, *14*, *18*
**old**
13:*9*
90:*1*
93:*15*
97:*10*
137:*5*, *22*
**Once**
9:*16*
26:*20*
30:*15*
42:*23*
43:*3*
50:*25*
**ones**
18:*9*
39:*24*
41:*3*
104:*12*
118:*14*
**ongoing**
70:*11*
71:*8*, *24*
90:*3*
91:*24*

open
 20:19
opened
 30:15
operate
 19:13
operating
 90:7
opinion
 41:4
 96:16
 99:19
 101:22
opportunit
y   11:1
oppose
 6:13
opposed
 11:22
 60:7
 113:23
order
 37:8
 38:6, 7
 115:5
orders
 142:13
organizati
on   77:15
original
 41:5
 143:3
outcome
 145:11
outline
 85:19,
21   86:19
outside
 33:12,
21   68:2
 79:14
outweighs
 80:18

overage
 128:11
overall
 108:5,
13
 111:18
 112:11

< P >
p.m
 1:20
 54:8
 87:7, 10
 136:6, 8
 143:19,
21
PACHULSKI
 2:13
 5:15, 24
 7:23
PAGE
 3:3
 4:4
 48:9, 10,
11, 16
 51:22
 52:4, 6
 53:20
 92:11
 93:9
 138:23
 139:2, 5
 143:9
 147:3
pages
 92:6, 8,
9, 10
paid
 107:10,
11
 129:12,
17
 133:20

pandemic
 44:22
paper
 18:4
paragra
 117:1
paragraph
 37:6
 38:23
 39:2, 7
 41:19
 45:23
 50:5
 54:24
 56:4
 62:7, 18
 63:5, 23
 64:3
 66:5, 10
 68:25
 76:16,
24   81:8,
13
 87:18,
20   93:3
 94:24
 106:12,
13, 23
 107:14,
25
 111:23
 114:6,
10, 16
 116:22,
23
 120:2
 124:16
 125:1
 129:10
 130:6, 7
 131:9, 12
Pardon
 37:21

parent
 96:11
 99:14, 16
parish
 45:1
 80:6
 89:4
 90:20
 99:19,
21
 101:1,
19
 104:22
 106:6
 108:24,
25
 109:13
 111:14
parishes
 43:8
 44:5, 14
 45:11
 55:21,
23
 57:24
 60:25
 61:20
 66:14
 75:25
 76:9
 78:5, 6,
9   79:6
 88:13
 89:24
 90:9, 16,
22, 24
 91:22
 96:14
 97:15
 98:1, 21
 101:3, 7,
16
 102:2

133:22
 136:17,
21
 137:18
parish's
 74:9
part
 22:22
 67:10
 73:12
 84:5
 101:9
 128:17
 129:25
 130:9
 133:11,
25   140:9
participan
t   42:9
 64:24
 70:17
 72:17
 75:14
 80:11
 109:7,
12
 111:15,
18
 124:18
 125:17,
23
 126:11
 134:1
participan
ts   39:5,
15   40:5,
20
 41:10,
22   42:5
 55:2, 16,
20, 23
 56:1, 7,
11, 13,

22    57:2,
10, 25
58:16
59:9, 22
60:14,
20    61:7
62:11
63:24
64:14,
22    65:7
66:11,
19
67:13,
19    68:6,
9    70:13
71:1
72:7
84:20
87:24
88:5, 21
95:7
96:7
97:8
98:5, 8
108:4
109:20,
23
111:3
112:3, 5,
7
113:22
117:3,
11
125:21
129:8
133:12,
18
135:13,
19    142:5
**participan
t's**    44:5
**participat
e**    16:19

27:8, 11
76:18
**participat
ed**    16:16
**participat
ing**
26:16

**particular**
18:12
20:18
30:6, 12
31:4
33:19
39:24
43:8
64:15
68:4
75:17
81:6
84:19
89:4
108:19
109:1
110:4
123:3,
10
125:23
126:11
132:20
140:16
141:5
**parties**
6:11, 17
145:10
**partner**
5:23
7:22
**party**
13:11
76:1
80:11
81:23

82:4, 20
83:8
107:17
**passage**
59:13
**passed**
58:12,
14, 22
59:3
**Pause**
22:11
39:10
41:16
**pay**
61:22
62:1
68:3
69:11
120:21
**paying**
68:15
108:6,
14
113:5
131:25
**payment**
135:9
**payroll**
109:25
**payrolls**
108:19
**penalties**
147:17
**pending**
47:16
91:10
**people**
35:11
80:8
**percent**
25:11
34:5
112:8, 9,

24
134:3
135:9,
19, 20

**percentage**
25:9
112:18
113:2

**percipient**
97:24
**period**
21:21
31:17
60:19
137:12
**periods**
33:18
**perjury**
147:17
**person**
65:10
**personal**
8:25
43:2, 3
**personally**
13:12
29:18
42:24
91:2
**personnel**
6:15
37:8, 10,
14
64:10
82:21
83:5
**perspectiv
e**    26:14
**petition**
45:16

**phase**
104:18
**phone**
30:24
**phrase**
32:18
73:15
**phrased**
115:21
**physically**
95:5
**place**
10:7
34:2, 3
35:1
67:17
80:24
100:13
121:20
145:5
**placed**
146:9
**places**
89:25
**Plaintiff**
1:9
125:18

**plaintiffs**
124:19
**plan**
76:20
83:25
84:17
85:10
**platform**
1:21
**play**
115:16
**pleading**
30:2

pleadings
  29:*25*
  30:*5*
please
  5:*12*
  6:*2, 21*
  7:*1, 6*
  8:*5, 23*
  11:*11*
  16:*7*
  20:*22*
  22:*15*
  28:*8*
  35:*22*
  71:*14*
  73:*3*
  87:*19*
  89:*25*
  91:*18*
  105:*18,*
*20*
  108:*1*
  115:*21*
  118:*23*
  122:*11,*
*17*
  124:*22*
  127:*19*
  128:*22*
point
  38:*5*
  50:*3*
  68:*19*
  131:*23*
pointed
  117:*21*
policies
  19:*20*
  44:*10,*
*14*
  45:*13*
  70:*12*
  88:*19*

  89:*13*
  92:*3*
  93:*4, 15,*
*18, 21*
  94:*2, 8,*
*10, 17*
  95:*4, 8,*
*14*
  96:*17,*
*24*  99:*7,*
*14, 21,*
*22*
  101:*14,*
*19, 25*
  113:*16,*
*21*
  114:*23*
  115:*1, 4*
  116:*19*
  117:*2,*
*10, 23*
  118:*1,*
*10, 13*
  120:*22,*
*23*
  121:*7, 9*
  122:*1, 2,*
*9, 21*
  124:*4, 9*
  127:*7*
  137:*10,*
*16, 22*
  142:*4*
policy
  88:*25*
  89:*5*
  92:*15*
  95:*2*
  100:*2, 4,*
*10, 24*
  101:*3*
  102:*20*
  115:*6,*

*17*
  116:*2*
  121:*11,*
*12, 14*
  122:*4,*
*23*
  123:*13,*
*14*
  124:*1, 2*
  125:*20*
  126:*3*
  127:*2*
policy's
  124:*6*
portfolio
  140:*18*
portion
  45:*22*
  108:*5,*
*13*
  112:*11,*
*19*  113:*6*
portions
  85:*5*
position
  12:*15*
  13:*5, 6*
  28:*22*
  47:*23*
positions
  28:*15*
  29:*7, 16,*
*21*

possession
  93:*4, 11,*
*22*  94:*3*
possibilit
y  69:*21*
possible
  132:*24*
  142:*15*

post
  31:*13,*
*14*  60:*7*
  117:*2*
  132:*2*
post-1973
  32:*6, 21*
  33:*18*
  102:*20*
post-'73
  31:*17*
  100:*10,*
*20*
  101:*25*
  102:*9,*
*15*  125:*5*
post-'85
  117:*22*
post-
August
  30:*20*
post-
bankruptcy
  133:*1*
Poten
  20:*7*
potential
  24:*17*
  34:*11,*
*19*
  42:*10*
  65:*9*
  72:*13*
  75:*18*
  89:*21*
potentiall
y   20:*7*
  31:*5*
  43:*18*
  67:*14*
  68:*10,*
*16*
  69:*12*

  74:*10*
  109:*1*
  127:*2*
Potzler
  21:*8, 11,*
*16*
  142:*25*
  143:*5*
Potzler's
  14:*7, 11*
power
  88:*16*
practice
  99:*17*
pre
  101:*3*
  132:*25*
  137:*7*
Pre-1973
  31:*14*
  60:*6*
  61:*8*
  62:*4*
  88:*19*
  89:*13*
  92:*4*
  93:*20*
  100:*4*
  113:*12*
  137:*18*
pre-'73
  95:*1*
  96:*3*
  101:*1,*
*19*
  102:*9*
  125:*5*
pre-
bankruptcy
  26:*4*
precedent
  68:*10*
  69:*1, 9,*

24  71:7, 20
75:10, 12, 15, 20
105:14
**precedents**
68:22
**predominant**  25:6, 7
**preexisting**  100:15
**prefer**
85:13
**preference**
86:15, 16
**preliminary**  13:25
14:23
21:9
**premium**
109:20
110:4
111:24
129:24, 25
130:9, 18
135:10, 12
140:8, 9
**premiums**
129:12
130:21
**preparation**  36:4
118:17
**prepare**
13:20, 21  36:12

**preparing**
21:23
**PRESENT**
2:23
7:14
12:3
19:5
49:1
**pretty**
34:4
73:19

**previously**
49:6
**priest**
22:1
**primarily**
108:4
**primary**
26:13
117:10
118:1
120:23
121:7
124:2
129:13
**principal**
141:12
**prior**
21:7
22:3, 4, 7  24:2, 7, 21
25:1
30:8
34:25
43:24
44:8, 15
60:24
76:4
87:23
88:5
91:6, 21

94:4
103:9
113:4
130:18
135:4, 8
144:9
**privilege**
36:15, 20  37:1
119:7, 11
133:4, 8

**privileged**
17:7, 21
27:25
28:6
46:7
47:14, 20, 24
50:1
119:9
**probably**
53:6
78:19
90:19
104:1
112:8, 23
133:19
**problem**
113:18
128:9
134:13
135:13

**procedural**
6:9
**proceed**
54:11, 23
82:21
84:22

85:23
87:11
136:10

**proceeding**
5:7
6:14, 16
13:18
**Proceedings**
143:21
145:4, 6
**proceeds**
124:6, 21
126:25
**process**
24:19
27:4
31:2
36:3, 5
44:16, 18  91:25
**procure**
43:25
107:4, 8
**procured**
44:3, 6, 11
**procuring**
130:2
**produce**
94:17
137:9, 13
**produced**
17:13, 17  18:9
22:25
23:2, 5
47:11
136:23
**product**
140:23

**production**
14:21
22:13, 22
**productions**  23:5
**professionals**
79:4, 10, 14
**Program**
4:6
9:20
10:4
16:6
18:11, 12
21:12, 14, 17
41:20
42:1, 7
43:22, 24  45:8
46:14, 16, 17
47:3
56:9
57:22
58:4, 11
59:12
60:3, 5, 24  61:9
64:21
100:12
102:16
108:6, 14
111:1, 22
113:19
**program's**
60:15

progress
90:15
projected
108:5, 13
prompt
135:9
proof
88:19
90:22, 25
proofs
20:3
33:17
136:17, 20
properly
26:18
property
108:16, 18
130:19

proportion
135:18
Proprietors
103:18
104:13
105:5, 7, 11, 14

prosecuted
124:18
125:17
prosecution 62:13
protect
62:11
protected
55:18

protection
33:25

55:22
129:13
provide
8:1, 4
18:6
55:1, 15, 22, 25
56:6, 10, 13, 21
57:9, 17
88:20
90:22
93:19
120:24
provided
12:24
17:18
19:11
38:24
provides
56:25
120:5, 10
121:12
providing
55:20
57:1
120:16, 19
Public
2:24
6:4, 5, 23   7:1, 5, 14, 15
140:6
144:1, 7, 17
146:19
147:24
pull
14:25
51:2
54:10

pulling
45:25
51:3
purchase
143:15

purchasing
106:24
purports
128:10
137:16
purpose
138:2
pursuant
6:9
pursuit
62:13
76:19
put
23:6
36:10
40:2
78:24
104:14
115:14
133:12
putting
36:5
42:22

< Q >
qualified
99:2
question
11:10
23:15
24:11
28:2, 5, 9   29:1, 4   32:3, 4, 19
36:14
38:5

39:12
52:18
53:3, 7
63:14, 18   73:9
77:13
79:8
84:14
85:11
91:16
94:20
102:7
103:15
107:15
117:9, 20
119:6
120:15
122:11, 15, 17, 20
124:8, 10
132:22
134:18
141:25
questioning   47:15
91:9
questions
7:24
11:16
114:2
124:10
127:12, 14
134:6
138:22
141:23, 24
142:10
quick
17:12

quote
26:1

< R >
raise
7:6
68:21
76:24
raised
112:3, 4
140:24
range
47:10, 24
ranging
49:23
ratable
108:5, 8, 10, 11, 12
110:2
112:10, 17, 19
113:6
rate
108:15, 17, 18
109:3, 13
rating
108:22
reached
90:17
91:6
read
15:12, 20   16:3, 10
23:11, 19
35:14
37:6
39:21
41:2, 3
48:19,

*21* 55:*7*
81:*13*
87:*19*
101:*15*
105:*19*
106:*12*
107:*25*
114:*16*
124:*25*
143:*22*
147:*19*
**Readback**
105:*23*
**reading**
37:*12*
56:*3*
81:*14*
**ready**
48:*17*
52:*9, 11*
116:*23*
**realize**
50:*25*
**realized**
140:*11,
17*
141:*10*
**really**
17:*11*
26:*10*
42:*6*
85:*15*
88:*8*
96:*3*
121:*8*
132:*22*
**re-ask**
53:*7*
**reason**
12:*21,
23*
128:*16,
18* 147:*3*

**reasonable**
88:*19*
**reasons**
123:*19*
**recall**
8:*19, 24*
9:*10*
15:*24*
22:*19*
23:*9*
37:*2*
48:*25*
49:*3*
71:*21*
110:*6*
**receive**
112:*10*
**received**
29:*16*
90:*19*
91:*2*
**rechannele
d** 110:*20*
**recognize**
129:*5*
131:*5*
**recollect**
76:*14*
**recollecti
on** 10:*6*
44:*20*

**reconsider**
28:*7*
**record**
5:*3, 7,
13, 23*
6:*3, 12*
7:*2*
8:*2, 5*
10:*17*
53:*19*

54:*6, 7,
9* 87:*8,
9, 11*
91:*2*
128:*2*
136:*6, 7,
9*
138:*19*
142:*13,
20, 22*
143:*20*
**recorded**
145:*6*
**recording**
6:*12*
**records**
17:*15*
18:*3, 4,
5* 45:*10,
12*
88:*18*
90:*1*
94:*9*
95:*13,
18, 25*
96:*2, 22,
23* 97:*4*

**recurrence**
142:*6*
**reduce**
68:*17*
69:*12*
110:*24*
**refer**
21:*12*
136:*24*
**reference**
75:*20*
89:*3*

**referenced**

22:*25*
89:*7*
**referred**
26:*4*
50:*4*
**referring**
24:*19*
36:*1*
45:*23*
46:*3*
68:*24*
95:*19*
96:*1*
129:*20*
136:*25*
**refers**
52:*24*
**reflect**
38:*24*
41:*25*

**reflection**
129:*7*
**regarding**
30:*7*
49:*2*
70:*12*
77:*19*
81:*22*
129:*21*
**regular**
35:*6*

**regulation**
76:*5*
**relate**
33:*18*
**related**
9:*6*
33:*24*
34:*13*
55:*21*
78:*15,*

*17, 18,
22* 79:*3*
99:*18*
111:*25*
132:*14*
145:*10*
**relates**
15:*4*
116:*13*
127:*6*
**relating**
14:*23*
65:*8*
69:*15*
103:*6*
105:*14*
137:*7, 22*
**relationsh
ip** 22:*4,
7* 66:*13,
16, 18*
67:*8*
96:*6*
97:*7, 15,
25* 98:*4,
6, 10, 20*
133:*17,
23*
**relationsh
ips**
99:*11*
**Relative**
9:*4*
**relevance**
18:*10*
19:*16*
**relevant**
91:*10,
12* 93:*4*
94:*2*
102:*21*
**religious**
99:*24*

rely
  35:11
relying
  96:23
  99:6
remaining
  125:25
remains
  120:2
  125:8
  141:12
REMOTE
  1:21
  5:6   6:5
remotely
  6:8
  144:8
remove
  21:4
removed
  40:11,
  18, 25
  64:6
reorganiza
tion
  76:20
  77:21,
  22
  78:12,
  16, 23
  79:3
  83:25
  84:22
reorganizi
ng   78:5
repeat
  14:24
  28:9
  29:1
  32:4
  91:17
rephrase
  29:3, 4

61:12
102:23
replacemen
t   108:17
Report
  4:16
  19:2
  49:1
  53:14
  139:5
reported
  24:17
  30:23
  37:16
  42:9
  49:4, 13
  80:1
REPORTER
  1:22
  5:2
  6:1, 7,
  20   7:16
  15:10
  18:19
  48:4
  50:18,
  19, 22,
  24   51:2,
  6, 11, 16,
  20   52:1
  54:5, 8
  86:25
  87:1, 7,
  10
  105:21
  134:10
  136:5, 8
  142:12,
  17, 21
  143:4,
  14, 18
  145:1, 18

represent
  5:14
  12:4
  20:5
representa
tion
  141:19
represente
d   17:12,
  16   20:3
representi
ng   7:23

represents
  19:3
request
  14:22
  16:1, 17,
  21
requested
  105:23
  143:22
required
  12:18
  62:8
  63:9, 20
  120:3,
  14
  122:6,
  24   125:9
requiremen
ts   50:12
reread
  124:24
research
  34:10
researchin
g   34:8
  35:1
reserve
  110:17
  120:14
  125:10

133:20
141:23
reserves
  120:3,
  17
  121:15
  122:6,
  25   123:9
resources
  76:19
  77:1
respect
  28:15
  29:7
  32:21
  33:16
  42:17
  43:21
  62:16
  68:15
  69:23
  71:8
  83:7
  90:21
  107:17
  124:17
  125:16

respective
  43:11
  93:5, 12
  94:3
respects
  42:10
respond
  27:3
  30:2
responded
  24:13
  26:18
  58:5
Responding

26:24
62:9
response
  64:16
Responses
  4:14
  23:1
  90:16, 19
responsibi
lity
  26:21,
  23   93:24
responsibl
e   55:1,
  15, 19
  56:5
  87:24
  88:9, 13

responsive
  14:22
  16:17
  96:19
rest
  67:12
restate
  28:8
  32:19
resting
  91:13
restructur
ing
  77:10
  79:6
result
  69:6, 7
  75:24
  76:8
retain
  93:15, 17
retention
  114:11,
  23

115:5,
15, 16,
25
116:2,
13, 14
121:19,
23
130:15
**retentions**
116:19
126:17,
21    127:7
**retroactiv**
**e**    115:12
**return**
90:24
**revenue**
111:24
140:8, 9
**revenues**
111:19
**review**
11:1
13:20,
24    14:7,
9    15:6
17:14
26:7
30:5
39:7
95:12,
23
135:24
138:2, 3,
4    142:25
**reviewed**
13:22
14:13,
14
29:24
80:2
119:20

136:20
137:25
**revise**
36:22
**revising**
37:3
**Richard**
90:8
**rid**
53:17
**right**
7:6
9:8
11:21,
25
13:17
15:2, 22
16:1, 11
17:2
20:16
21:3, 5
29:15
30:2, 17
33:23
37:12
40:25
41:14
43:14,
25
48:11
51:10,
12, 14,
17    52:2
53:21
54:4, 23
60:15,
21    64:4,
16    67:7,
9, 20
69:18,
24
70:10
71:9

72:4
73:11,
13    86:7,
8, 11, 25
88:3, 10
89:10
92:4, 5
94:23
95:4, 10,
24
98:21,
25
100:4,
10, 16
101:24
102:3, 5,
9
103:12
104:7
105:11,
15
106:2, 6
107:24
108:3
110:8, 9
112:1
113:7,
21
114:24
115:2, 8
116:25
120:6
127:10,
15, 17
129:16
130:19,
23
131:5
133:13
134:2
139:4
140:21

141:10,
13, 22, 23
**risk**
62:10,
16, 24
63:11,
21
64:17
65:1, 4
98:17
114:23
115:16
116:1,
14
123:13
**road**
10:11
**role**
32:8
41:21
42:4, 6,
14, 17
46:22,
24
62:24
64:19,
20    65:1
77:9, 18
79:18,
25
80:14
81:22
82:3
**roles**
63:2
**Rome**
27:5, 12,
19
29:12,
19, 22
32:12,
14
93:25

94:20
128:8
132:4,
13, 19
**RON**
144:7, 17
**roof**
54:19, 21
**room**
12:8
**rotate**
51:10,
11, 14
**rotating**
51:17
**rules**
6:9
10:11
11:19
73:23
**run**
19:20,
24
20:12
56:9
57:23
111:19
**runs**
110:7

**< S >**
**s/Sarah**
144:15
**Santa**
2:14
**Sarah**
2:24
6:5
144:16
**satisfied**
50:11
**satisfy**
69:17

124:*20*
125:*19*
saw
  14:10
saying
  24:*9*
  31:*24*
  32:*17*
  94:*4*
  126:*9*
says
  16:*5*
  49:*22*
  51:*24*
  52:*20*
  53:*10*
  55:*25*
  96:*5*
  128:*6*
  129:*10*,
  *15, 24*
  140:*8, 11*
SCHARF
  2:*18*
  5:*23*
Scharfenbe
rger
  81:*19*
SCHOENECK
  2:*3*
  5:*18, 20*
  12:*1*
  15:*4*
  17:*5*
  18:*6*
  29:*12*
  36:*10*
SCHOLL
  1:*17*
  3:*3*
  4:*5, 7,*
  *8, 10, 11,*
  *12, 13,*

*14, 16,*
*18*    5:*8*
  6:*24, 25*
  7:*3, 6,*
  *10, 20*
  15:*10,*
  *11, 22*
  16:*24*
  17:*18*
  18:*1, 22,*
  *24*    19:*1*
  22:*15,*
  *16, 18*
  23:*10*
  32:*6*
  35:*21,*
  *22, 23*
  39:*7*
  48:*7, 12*
  53:*9*
  54:*14*
  61:*18*
  70:*24*
  85:*24*
  87:*14*
  91:*13*
  101:*18*
  103:*15*
  122:*18*
  127:*19,*
  *21, 23*
  128:*21,*
  *23*
  130:*24,*
  *25*
  134:*7,*
  *15, 18*
  135:*23*
  136:*13,*
  *16*
  138:*10,*
  *12, 15*
  141:*23*

142:*4*
  144:*8*
  146:*13*
  147:*1, 21*
S-C-H-O-L-
L    7:*4*
Scholl's
  17:*14*
  131:*3*
schools
  55:*21*
  88:*13*
  91:*6, 21*
Schroeter
  2:*24*
  6:*5*
  144:*15,*
  *16*
scope
  10:*3*
screen
  15:*6, 7,*
  *19*
scroll
  22:*21*
  48:*10*
  51:*9*
search
  16:*16*
  17:*1, 5,*
  *21*    18:*2,*
  *5*    89:*12,*
  *16, 21*
  90:*1, 3,*
  *6, 11, 21,*
  *23*
searched
  45:*5*
searches
  89:*14*
  91:*5, 6,*
  *20, 21*

searching
  18:*8*
  44:*13*
  45:*1*
seat
  35:*12*
second
  45:*25*
  50:*15*
  51:*17*
  94:*22*
  105:*22*
  107:*16*
  117:*2*
  118:*6*
  129:*23*
  130:*7*
secondary
  88:*19,*
  *23, 24*
securing
  87:*24*
  88:*9*
see
  14:*25*
  15:*6*
  16:*5*
  23:*11*
  34:*1*
  46:*3*
  48:*13*
  49:*4, 22,*
  *24*    51:*1,*
  *14, 16,*
  *18, 21,*
  *24*    52:*3,*
  *22, 23*
  54:*25*
  55:*2*
  76:*21*
  84:*1*
  87:*25*
  88:*21*

94:*22*
  114:*10*
  125:*2*
  127:*15*
  128:*4*
  130:*17*
  131:*5*
  139:*9*
seeing
  22:*19*
  23:*9*
  51:*19*
  141:*10*
seeking
  101:*1*
seen
  10:*21*
  15:*22*
  22:*18*
  48:*23*
  52:*14,*
  *15*    95:*1,*
  *2, 5*
  119:*14,*
  *18*
  127:*23,*
  *25*
  128:*12,*
  *14, 15*
  137:*15,*
  *21*
  138:*3,*
  *14*
  139:*23,*
  *25*
select
  25:*16*
selected
  26:*20*
Self
  52:*20*
  53:*10*

126:*16*
129:*15*
**Self-**
**Insurance**
  4:*6*
  21:*12, 13*
**self-**
**insured**
  114:*11*
  115:*5,*
*15, 25*
  116:*13,*
*18*
  121:*19,*
*23*
  126:*20*
  127:*7*
  129:*12,*
*20*
  130:*15*
**sense**
  29:*13*
  72:*11*
**sent**
  89:*23*
  128:*7*
  143:*9*
**sentence**
  41:*18*
  56:*4*
  76:*24,*
*25*
  81:*17*
  83:*24*
  87:*22*
  88:*16*
  93:*8*
  94:*23*
  97:*6*
  106:*13*
  109:*18*
  117:*1*
  127:*6*

129:*15,*
*24*
  130:*8*
  131:*9*
**separate**
  53:*3*
  72:*25*
  73:*6, 7*
**September**
  131:*2*
**served**
  26:*5*
**services**
  13:*4*
  57:*23*
  58:*5*
  70:*9*
  110:*17*
  132:*4*
**Set**
  4:*15*
  64:*10*
  68:*10*
  80:*3*
  83:*11,*
*17, 21*
  145:*5*
**settled**
  68:*9*

**settlement**
  69:*13*
  80:*12*
**settlement**
**s**   34:*10*
  47:*11,*
*24*
  65:*10*
  68:*16*
**settling**
  47:*7*
**sexual**
  19:*7, 8*

106:*16,*
*19*
  107:*5, 6,*
*7, 9, 17*
  108:*20*
  109:*2*
  115:*3*
  116:*20*
  117:*11*
  118:*9*
  123:*24*
  124:*3*
  129:*21*
  130:*4*
**share**
  15:*5*
  125:*22*
  126:*10,*
*12*
  127:*17*
**shared**
  67:*6, 21,*
*25*
  68:*17*
  69:*16*
  91:*12*
  102:*21*
  103:*5, 6,*
*7*
  104:*23*
  124:*19*
  125:*18*
  134:*12*
**sharing**
  18:*17*
  67:*2, 14*
  75:*15*
**Shawl**
  129:*2*
**SHEEHAN**
  2:*6*
  3:*5*
  5:*17, 18*

6:*19*
  8:*6*
  12:*6, 7*
  15:*12,*
*14, 17*
  16:*7, 9,*
*12*   17:*6,*
*11, 16,*
*24*
  21:*19*
  22:*24*
  27:*14,*
*17, 24*
  28:*7, 8,*
*24*
  31:*10,*
*22*
  32:*23*
  36:*13,*
*24*   39:*6,*
*9*   40:*6*
  41:*11*
  42:*25*
  44:*1*
  46:*5*
  47:*12,*
*19, 25*
  48:*1, 13,*
*15, 18*
  49:*10*
  50:*1*
  52:*4, 8,*
*10*   53:*2,*
*24*   54:*3,*
*15*   55:*4,*
*7, 10*
  56:*15*
  57:*3, 11*
  58:*18*
  59:*15,*
*23*   60:*9*
  61:*10,*
*23*   63:*6,*

15
  65:*17*
  66:*6, 21*
  67:*23*
  69:*19*
  70:*3*
  71:*2, 11*
  72:*1, 9,*
*19*   73:*2,*
*17*
  74:*14,*
*16, 18*
  75:*6*
  76:*10*
  77:*3*
  79:*20*
  80:*21*
  81:*9*
  82:*6, 23*
  84:*10,*
*23*   85:*9,*
*25*   86:*4,*
*8*   87:*4*
  91:*8, 15*
  92:*23*
  94:*13*
  95:*16*
  97:*2, 17*
  100:*17*
  102:*4, 6,*
*11, 22*
  103:*8,*
*20*
  104:*3,*
*24*
  105:*16,*
*25*
  106:*7,*
*17*
  109:*9*
  111:*5*
  112:*20*
  113:*13*

114:*15*,
*18*
115:*9*,
*18*
116:*6*
118:*3*,
*20*, *25*
119:*5*,
*16*, *21*
120:*7*,
*25*
121:*16*
122:*7*
123:*2*, *4*,
*6*   124:*7*
126:*4*,
*14*, *22*
132:*17*
133:*2*,
*14*
135:*1*,
*14*
137:*19*
141:*1*,
*25*
142:*3*, *9*
143:*10*,
*15*, *17*
**shelve**
48:*4*
**shoot**
50:*14*
**short**
85:*13*
**shortly**
48:*6*
**showing**
134:*10*
**sign**
11:*2*
143:*22*

**signature**
143:*2*
147:*19*
**signed**
14:*15*
97:*18*
143:*8*
**significan
t** 30:*19*
31:*1*
59:*8*
62:*8*
64:*7*, *12*
76:*19*
77:*1*
131:*24*
134:*19*
**significan
tly**
58:*15*
**similar**
96:*9*
101:*14*
134:*22*
135:*4*
**simply**
62:*11*
116:*11*
**simultaneo
us**
37:*19*
55:*11*
132:*10*
**single**
90:*19*
**SIP**
21:*13*
39:*4*, *5*,
*15*   40:*5*,
*20*
41:*10*,
*20*, *21*
42:*1*, *4*,

*9*   43:*22*,
*24*   44:*4*,
*5*   45:*8*
46:*13*,
*15*, *17*
55:*1*, *2*,
*15*, *16*,
*19*, *20*,
*23*, *25*
56:*6*, *11*,
*12*, *21*
57:*1*, *9*
58:*11*,
*16*   59:*9*,
*11*, *22*
60:*3*, *5*,
*13*, *14*,
*15*, *20*,
*21*, *24*
61:*7*, *8*
62:*11*
63:*24*
64:*14*,
*21*, *24*
65:*6*
66:*10*,
*19*
67:*13*,
*19*   68:*6*,
*9*   70:*13*,
*17*   71:*1*
72:*7*, *17*
75:*14*
80:*11*
84:*20*
87:*23*,
*24*   88:*3*,
*5*   95:*7*
96:*6*
97:*8*
98:*5*, *7*
100:*12*
106:*15*

107:*3*,
*12*, *16*
108:*4*
109:*6*,
*12*, *20*
110:*11*,
*20*
111:*2*,
*14*, *15*,
*17*, *25*
112:*3*, *5*,
*7*   113:*6*,
*10*, *22*
117:*3*,
*11*
120:*3*,
*13*, *17*
121:*14*
122:*5*,
*24*
123:*9*
124:*18*
125:*9*,
*17*, *21*,
*23*
126:*11*
129:*8*
133:*12*,
*18*
134:*1*
135:*13*,
*18*
140:*9*,
*21*, *24*
142:*5*
**SIPs**
110:*14*
**sir**
13:*9*
60:*23*
77:*9*
105:*6*
128:*13*

**sit**
108:*4*
118:*15*
**sits**
14:*19*
**sitting**
84:*7*
**size**
108:*24*
**skipped**
75:*10*
**skipping**
88:*16*
**slip-and-
falls**
79:*23*
**somebody**
36:*12*
**soon**
142:*14*
**sorry**
24:*15*
25:*14*
26:*22*
27:*16*
33:*4*
37:*25*
41:*24*
51:*7*, *13*
85:*17*
86:*5*, *20*
100:*9*
114:*7*
119:*4*
123:*5*
128:*25*
129:*23*
132:*11*
134:*13*
136:*23*
138:*11*,
*18*
142:*19*

| | | | | |
|---|---|---|---|---|
| sounding 53:4 | speculate 104:3, 5 | square 109:1, 24 | 6:10 7:2 | status 99:15 |
| sounds 109:5 | speculating 82:9 105:2 | stamp 23:7 128:3 | 30:6 45:15 55:18, 24 | stay 33:25 34:2, 3 35:1 |
| source 46:4, 9, 18 | speculation 77:4, 7 | 134:8 139:8 | 75:24 76:8 | 64:4, 5 67:17 |
| sources 23:4 | 104:25 123:4, 7 | stamped 129:1 | 81:22 82:3, 20 | 76:21 80:24 |
| speak 11:13 | 124:11 | 131:1 138:21 | 124:17 144:3, 7, | 81:23 82:5 |
| 37:8 38:7 | speech 37:19 55:11 | stand 85:21 | 17 stated | stayed 72:4 |
| speaking 30:14 | 132:10 | standard 141:18 | 62:17 75:14 | stemming 61:20 |
| specific 8:23 | spell 7:2 | standing 92:6 | statement 40:1 | STEPHEN 2:9 |
| 32:15 34:15 | spend 62:8 78:21 | stands 140:2 | 55:2, 14 56:7, 8 | 5:20 Steve |
| 66:15 84:25 | 80:18, 19 | STANG 2:13 | 66:9 84:3, 4 | 47:1 Steven |
| 85:1 94:11 | spending 28:22 | 5:16, 24 7:23 | 93:6, 13, 14   96:4 | 37:23 46:24 |
| 96:2 97:4 | 29:6 78:15 | STARS 4:16 | 110:10 124:23 | stick 31:17 |
| 108:15, 16 | spent 28:21 | 19:3 START | 125:3, 6, 13 | stipulate 6:17 |
| 109:2, 13 | 81:4 Speyer | 1:19 8:1 | 126:19 139:21 | stock 140:19 |
| 111:17 124:9 | 25:3 spoke | 37:7 43:12, | | stop 18:17 |
| 128:1 132:1 | 14:4 38:6 | 21 87:22 | statements 138:14, | 122:18 store |
| specifically 17:20 | spoken 21:11 | 136:23 started | 19 139:14 | 90:1 |
| specifics 34:17 | 81:21, 25   82:2, | 26:3 45:8 | 140:1 STATES | strategies 66:3 |
| 98:14, 15   105:4 | 16 spreadsheet | starting 5:13 | 1:1 5:11 | strategizing |
| specified 146:9 | 137:10, 13, 15, 22 | 60:13 93:8 | 48:8 134:2 | 27:22 28:14 |
| | | state 5:14 | stating 55:17 | |

strike
  28:*18*
  60:*4*
  96:*18,*
*22*
  101:*10*
  116:*17*
  117:*6, 8*
  137:*17*
strives
  109:*19*
structure
  100:*15,*
*23*
  102:*10,*
*13*  109:*2*
structuring
g  77:*19*
stuff
  70:*14, 18*
subject
  12:*12*
  13:*17*
  47:*15*
  91:*9*
submit
  15:*3*
submitted
  7:*25*

subsequent
  68:*18*
  78:*11*
  89:*12*
subsidiaries
es
  96:*10, 15*

subsidiary
  96:*11*
  99:*14*
substantiv
e  134:*19*

successful
ly
  14:*25*
  124:*18*
  125:*17*
  127:*16*
Suchan
  90:*8*

sufficient
  12:*25*
  86:*2, 4*
suggest
  53:*21*
Suite
  5:*6*
suits
  28:*21*
SULLIVAN
  2:*7*
  5:*21*
  70:*20*
  71:*10*
  86:*17,*
*23*  119:*4*

summarized
  63:*12*
Summit
  144:*4*
support
  14:*8*
supported
  95:*13*
supports
  66:*16*
sure
  9:*21*
  10:*11*
  14:*24,*
*25*  16:*8,*
*20*
  26:*14,*

*17  27:2*
  37:*13*
  43:*15*
  46:*1*
  51:*20*
  55:*9*
  61:*14,*
*15*
  71:*17*
  79:*13*
  91:*20*
  103:*1*
  125:*5*
  127:*12*
  137:*14*
surplus
  110:*14,*
*16  141:6*
surprise
  129:*1*
surprising
ly
  138:*22*
swear
  6:*21*
  7:*7*
switch
  107:*2*
swore
  144:*9*
sworn
  7:*13*
  12:*13*
  146:*4,*
*15*
  147:*21*
Syracuse
  2:*5*
system
  19:*3*
  26:*19*

< T >

take
  5:*7*
  13:*4*
  39:*6*
  41:*18*
  48:*5*
  53:*21*
  55:*4*
  60:*19*
  85:*10,*
*13*
  87:*19*
  101:*8*
  107:*25*
  108:*7,*
*17*
  127:*11*
  135:*19,*
*23, 25*
taken
  5:*9*
  6:*8*
  35:*9*
  41:*20*
  42:*3*
  127:*1*
  145:*4*
talked
  82:*9, 10*
talking
  19:*7*
  33:*11,*
*12*
  37:*25*
  42:*16*
  62:*24*
  63:*4, 23*
  67:*16*
  70:*18,*
*21, 23*
  73:*4*
  76:*2*
  80:*23*

88:*8*
  100:*19*
  106:*22*
  114:*8*
  121:*1*
  123:*24*
  124:*1*
  125:*5*
  126:*13,*
*16*
  128:*2*
  130:*2*
  139:*5, 6,*
*7*
talks
  106:*23*
tasks
  78:*15*
  79:*2*
team
  78:*3, 7*
Technicall
y  88:*2*
  140:*4*
tell
  8:*20*
  10:*15*
  13:*1*
  23:*11*
  24:*5*
  48:*16*
  52:*9*
  57:*17*
  74:*1*
  112:*22*
  118:*14*
  123:*8*
  125:*6*
  140:*12*
  144:*10*
telling
  85:*7*

tells
  86:12
Ten
  54:2, 3
ten-
minute
  53:22
  135:25
terms
  42:13
  69:5, 6
  81:17
  89:1
  90:15
  98:3
testified
  7:14
  9:13, 19
  13:14
  50:7
  92:2
  110:6
  122:8
  124:8
testify
  10:2
  11:21
  12:21
  146:4
testifying
  144:9
testimony
  6:15
  7:7
  8:21
  9:2, 6,
18   10:3,
7   11:8
  71:21
  87:15
  103:9
  130:18

136:14
  146:5, 9
Thank
  6:1, 7,
20   7:5,
15, 16
  8:16
  18:21
  21:2, 4
  27:7
  30:16
  31:16
  48:6
  51:5, 25
  54:11,
12   81:1
  84:3
  86:23
  87:4, 6,
12, 18
  88:15
  116:16
  127:10
  136:4,
11, 16
  142:10,
11
  143:12,
14, 18
Thanks
  39:9
Thanksgivi
ng   143:9
That'd
  142:18
theory
  74:12
thereof
  145:11
thing
  55:8
  71:14
  101:17

things
  59:19
  67:2
  86:12
  89:2
  132:5
think
  31:19
  50:7, 23
  51:4
  58:19
  73:5
  79:2
  85:25
  86:1
  101:8
  109:11
  110:6
  118:5
  121:6
  134:13
  141:4
thinking
  85:22
third
  25:4
  85:17,
18
  86:19,
22
  107:16
  135:20
third-
party
  106:15
  107:4, 8,
19
Thirty
  86:3
thirty-
seven
  139:10

thought
  14:11
  23:20
  121:22
  128:6
threaten
  84:21
three
  10:8
  25:1, 5,
20
  90:18
  93:15
thrown
  141:16
throws
  141:9
Thursday
  1:18
  147:2
TIME
  1:19, 20
  5:4
  11:14
  19:25
  21:20
  26:9
  28:18,
21, 23
  29:6, 10
  34:6
  35:9
  36:22
  37:15,
17, 23
  38:18
  44:20
  45:2
  46:23,
24   54:5,
8   60:19
  62:8
  64:7

78:14,
21
  80:17,
18   81:1,
4, 5
  86:6
  87:7, 10
  97:18
  104:8
  113:2
  117:13
  131:23
  136:5, 8
  137:12
  141:13
  142:24,
25
  143:2,
19
  145:5
  146:9
timeframe
  26:18
timely
  26:24
  27:3
times
  8:18
  9:15
  70:16
  89:15
  108:17,
18   124:8
Timmel
  37:23
  38:4, 16,
17   46:24
today
  7:24
  12:22
  13:7, 21
  14:19
  142:15

Today's
  5:3
tomorrow
  142:17
tool
  51:15
toolbar
  51:15, 21
top
  51:21
total
  20:17,
  23, 24
  21:1
  109:25
  112:2
totality
  19:23
totally
  71:13
track
  129:16
trained
  100:1

transcript
  8:12
  10:18,
  21    11:1
  143:1, 6
  145:8
  146:8
transcript
ion
  10:24
trial
  83:11,
  17, 22
tribunal
  13:14
triggered
  115:6, 25

trip
  8:25
true
  58:15
  61:18
  106:4
  110:10
  113:10
  120:4
  125:12
  145:7
  146:8
  147:19
truth
  7:8, 9
  10:15
  144:10
  146:4
truthful
  14:15, 18

truthfully
  12:22
try
  11:14
  15:5
  51:3
trying
  63:8
  66:23
  70:24
  116:11,
  16
  121:5
  128:5
  141:3, 8
turned
  113:22
tweaks
  37:4
two
  8:19
  10:8

23:4
31:1
34:17
53:3
62:20
99:18
128:8
129:11
135:9,
19
140:16
type
  8:25
  32:9
  33:2, 8
  139:23
  140:19
types
  34:12
  40:14,
  23    67:2
  132:5
  139:13
Typically
  139:13

< U >

ultimately
  26:6
unable
  92:3
unaware
  49:6
  83:9

understand
  10:15,
  19    11:3,
  8, 10, 18
  12:11,
  15, 19
  15:15

17:22
20:22
21:13
63:8, 17
70:24
74:8
80:15
98:9
141:8
understand
ing
  11:23
  41:2
  57:8
  74:11
  82:19
  90:9
  97:14
  120:22

Understood
  11:16
  40:22
  86:23
  134:5
undertakin
g   79:3
underwrite
r   99:11
underwriti
ng   99:10
undoubtedl
y
  124:19
  125:18

unexpected
  49:9, 12
unexpected
ly   49:5
unfair
  77:13

Unfortunat
ely
  54:22
unit
  80:3
UNITED
  1:1
  5:10
unknowledg
eable
  65:7
Unsecured
  2:20
unstayed
  120:2
  125:9
updated
  43:8
  81:17
  128:15
upper
  128:4
use
  32:18
  73:15
  106:15
  107:3, 8
  128:8
  143:3
usually
  26:3
  135:20
utilize
  107:16
utilizing
  61:8

< V >
valid
  58:22
  74:13
  76:25

value
 108:*18*
 130:*19*
values
 47:*11*
 109:*24*
variable
 141:*15*
varies
 29:*11*
various
 88:*20*
vary
 141:*5*
vast
 112:*6*
vehicles
 110:*1*
versus
 78:*6*
vicarious
 69:*1*
 74:*1, 3,
8, 12*
vicariousl
y   74:*6,
9*
Victim
 24:*2, 7,
16*   30:*8*
 131:*17*
videoconfe
rence
 144:*9*
View
 51:*24*
 68:*17*
 78:*11*
 95:*13*
violation
 119:*11*

< W >

wait
 107:*6*
waived
 50:*1*
want
 8:*9*
 16:*14*
 17:*12,
22*
 22:*14*
 33:*15*
 37:*6, 25*
 48:*2*
 51:*11,
14*
 53:*19*
 54:*1, 2*
 85:*12,
15*
 86:*12,
13*
 114:*7, 9*
 131:*8*
 142:*13,
14, 23*
wanted
 23:*19*
wants
 53:*22*
way
 15:*1*
 16:*24*
 40:*2*
 58:*6, 7*
 59:*19*
 66:*24*
 85:*17,
18*
 86:*19*
 101:*14*
 112:*16*
 115:*14,
20*

138:*7*
 145:*11*
weâ
 46:*25*
welcome
 138:*24*
well
 5:*25*
 14:*9, 13*
 15:*15*
 25:*11*
 26:*3, 8,
17*
 31:*16*
 32:*2*
 33:*23*
 36:*8*
 40:*19*
 49:*25*
 52:*18*
 64:*4*
 66:*13,
23*
 67:*13*
 69:*4*
 74:*3*
 79:*8, 23*
 81:*4*
 88:*11*
 95:*21*
 96:*2*
 101:*8*
 102:*14*
 105:*4*
 121:*18*
 123:*18*
 124:*25*
 130:*3*
 131:*19*
 133:*7*
 140:*4*
 143:*16*

went
 36:*8*
 39:*11*
 45:*6, 8*
 89:*20*
 134:*3*
we're
 23:*24*
 54:*6, 9,
23*   56:*5*
 63:*23*
 67:*16*
 85:*7*
 87:*8, 11*
 107:*24*
 111:*9*
 125:*5*
 136:*6, 9*
 138:*25*
 143:*19*
WESTERN
 1:*2*
 5:*11*
 96:*14*
we've
 11:*19*
 35:*25*
 125:*13*
 140:*24*
wheel
 51:*22*
Whoops
 128:*5*
window
 30:*15*
 59:*21*
WITNESS
 1:*17*
 6:*22*
 7:*13*
 8:*8*
 11:*22*
 15:*13,

20*
 16:*11*
 17:*10*
 21:*20*
 27:*16,
18*   28:*4*
 29:*1*
 31:*12,
24*
 32:*25*
 33:*3*
 36:*18*
 37:*2*
 39:*11*
 40:*8*
 41:*13*
 43:*2, 6*
 44:*3*
 46:*8*
 47:*21*
 48:*20*
 49:*12*
 52:*12*
 53:*22,
25*   55:*6,
12*
 56:*17*
 57:*5, 13,
16*
 58:*19*
 59:*2, 5,
17, 25*
 60:*11*
 61:*12,
15, 25*
 62:*3*
 63:*17*
 65:*19*
 66:*23*
 67:*25*
 69:*21*
 70:*5*
 71:*12*

72:3, 11, 21, 23
73:3, 8, 19
74:15, 17, 20
75:8
76:12
77:6
79:21
80:23
81:3, 11, 14  82:8, 13, 25
83:3
84:11, 25
85:25
86:3, 10, 14, 16
91:17
92:25
94:14
95:18
97:4, 20, 24
100:19
102:5, 13, 23
103:1, 22, 25
104:4
105:1, 18, 24
106:2, 9, 19
109:11, 16
111:7
112:22
113:15
114:17, 20

115:11, 20
116:8
118:5, 24
119:1, 10, 18, 23
120:9
121:1, 18
122:14
123:3, 5, 8  124:8, 13
126:6, 16, 24
129:3
131:13, 14
132:18
133:7, 16
135:3, 6, 16
136:3
137:21
139:1, 2, 4, 9, 11
141:3
142:1, 25
143:11
**witnesses**
65:24
66:1
83:6, 7
**witness's**
85:20
**words**
26:5
84:21

**work**
8:8, 9
25:6, 7
26:1
31:19
32:5, 20, 25  33:8, 16  34:1
64:10, 24  65:6
80:10
93:15
108:21
**worked**
36:9
98:10, 13
100:7
104:17
**worker**
108:19
**workers**
108:18
**working**
22:3
27:4
78:10
98:8
143:4
**worth**
19:11
**would've**
23:4
25:7
37:15
46:15
**Wow**  52:3
**writing**
65:22
**written**
10:18
42:2
56:12,

18  89:7
96:2
113:17
125:20

**< Y >**
**Yeah**
12:7
16:22, 25  19:2
30:19
51:5
52:23
55:6, 9
56:5
59:17
67:10
69:5
70:14
73:5
74:3, 17
75:2
77:6
81:4
82:8
83:2, 18
86:10, 11  88:1
89:14
92:10
95:5
96:5
97:12, 20
99:25
101:18
105:1
106:2
110:22
123:22
125:2
129:3
130:21

133:7
134:2
135:12
137:21
139:3
140:13
142:18, 19
143:10, 11
**year**
19:13, 18, 22
89:4
110:7, 14, 21
111:3, 8, 9, 16
116:4
120:5
131:20, 22
132:7, 21
133:11
134:3, 22
135:22
139:25
140:16
141:5, 13, 19
**yearly**
129:7
**years**
10:8
19:11
31:4
32:22
57:22
58:3, 10
59:20
90:18

98:*9, 13*
99:*9*
115:*7*
121:*1, 6, 8, 20, 24*
123:*10*
135:*4, 8*
138:*20*
140:*16*
**Yep**
49:*7*
103:*24*
**yes/no**
28:*5*
**yesterday**
142:*24*
**YORK**
1:*2*
2:*5*
5:*6, 7, 10, 11*
8:*15*
9:*23*
12:*2*
74:*12*
96:*14*
**youâ**
81:*9*
**Yup**
68:*23*

**< Z >**
**ZIEHL**
2:*13*
**zone**
86:*6*
**zoom**
15:*16*
**zoomed**
16:*2*