1       UNITED STATES BANKRUPTCY COURT

2        WESTERN DISTRICT OF NEW YORK

3  _____

4  IN RE:                    Case No: 20-10322 (CLB)

5  THE DIOCESE OF BUFFALO, N.Y.,

6          Debtor.              Chapter 11

7  _____

8  THE DIOCESE OF BUFFALO, N.Y.,

9          Plaintiff,        Adv. No: 20-01016

10       v.

11  JMH 100 DOE, ET AL.,            Chapter 11

12          Defendants.

13  _____

14                  DEPOSITION

15  _____

16

17  WITNESS:        MELISSA POTZLER

18  DATE:           Wednesday, November 15, 2023

19  START TIME:     11:00 a.m.

20  END TIME:       2:17 P.m.

21  REMOTE LOCATION:   Remote Legal platform

22  REPORTER:        Jaime Godinez, CER-1260

23  JOB NO.:         21028

24

25

```
 1                A P P E A R A N C E S

 2

 3        BOND, SCHOENECK & KING

 4        One Lincoln Center

 5        Syracuse, New York 13202

 6        By:  BRENDAN SHEEHAN, ESQUIRE

 7        By:  CHARLES SULLIVAN, ESQUIRE

 8        By:  JUSTIN KRELL, ESQUIRE

 9             bsheehan@bsk.com

10        Appearing for The Diocese of Buffalo, N.Y.

11

12        PACHULSKI STANG ZIEHL & JONES LLP

13        10100 Santa Monica Boulevard, 13th Floor

14        Los Angeles, California 90067

15        By:  BRITTANY M. MICHAEL, ESQUIRE

16        By:  IAIN A.W. NASATIR, ESQUIRE

17        By:  ILAN SCHARF, ESQUIRE

18             bmichael@pszjlaw.com

19        Appearing for Official Committee of Unsecured

20        Creditors

21

22   ALSO PRESENT:

23        Lisa Petras, Paralegal, Pachulski Stang

24        Sarah Schroeter, Notary Public

25
```

1                 I N D E X   O F   T E S T I M O N Y

2

3    EXAMINATION OF MELISSA POTZLER:                    PAGE

4        By Ms. Michael                                  10

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              I N D E X   O F   E X H I B I T S

2                   (Available for download)

3

4    EXHIBIT   DESCRIPTION                        PAGE

5    1         Declaration of Melissa Potzler       20

6    2         Objections and Responses to          98

7              Committee's Interrogatories

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    FEDERAL STIPULATIONS

2

3               IT IS HEREBY STIPULATED AND AGREED by and

4     between the attorneys for the respective parties that

5     the presence of the Referee be waived;

6               IT IS FURTHER STIPULATED AND AGREED that all

7     objections, except as to form, are reserved until the

8     time of trial;

9               IT IS FURTHER STIPULATED AND AGREED that this

10    deposition may be utilized for all purposes as provided

11    by the Federal Rules of Civil Procedure;

12               AND FURTHER STIPULATED AND AGREED that all

13    rights provided to all parties by the Federal Rules of

14    Civil Procedure shall not be deemed waived and the

15    appropriate sections of the Federal Rules of Civil

16    Procedure shall be controlling with respect thereto.

17

18

19

20

21

22

23

24

25

1                    FEDERAL REMOTE STIPULATIONS

2

3          IT IS HEREBY STIPULATED, by and between the

4    attorneys of record for all parties to the above-

5    entitled action, that:

6          Pursuant to Rule 30(b)(4) of the Federal Rules

7    of Civil Procedure, this deposition will be conducted by

8    remote videoconference with the oath being administered

9    remotely and a court reporter creating an accurate

10   written record; that, if necessary, the parties agree

11   that each witness can be identified with picture

12   identification;

13         No attorney, nor any party or witness, shall

14   capture any still photographs, nor record, by video or

15   audio, any part of these deposition proceedings;

16         Each attorney agrees to instruct their witness

17   that there is to be no communication with anyone outside

18   of the identified and participating group, by chat,

19   text, email, or other means during the deposition;

20         There shall be no other person in the room

21   with the witness during their deposition;

22         Any phone or electronic device in the room

23   with a witness shall be identified and not read,

24   referred to, or otherwise used during the witness'

25   deposition, unless agreed to by all counsel on record.

1                    P R O C E E D I N G S

2                    THE REPORTER:  Good morning.  We are now

3    on the record.  Today's date is November 15th, 2023, and

4    the time is approximately 11:00 a.m. Eastern.  My name

5    is Jaime Godinez, and I'm the officer designated by

6    Remote Legal, 11 Broadway, Suite 456, New York, New

7    York, to take the record of this proceeding.

8                    This is the deposition of Melissa

9    Potzler, taken in the matter of In Re: The Diocese of

10   Buffalo, New York, Case Number 20-10322, filed in the

11   United States Bankruptcy Court, Western District of New

12   York.

13                   Would all counsel please identify

14   themselves for the record, starting with the noticing

15   attorney, and state who they represent.

16                   MS. MICHAEL:  Hello.  I am Brittany

17   Michael, from the law firm, Pachulski Stang Ziehl &

18   Jones, and I represent the Committee of Unsecured

19   Creditors.

20                   THE REPORTER:  And Mr. Sheehan, can you

21   state your appearance.

22                   MR. SHEEHAN:  Yes.  Good morning.

23   Brendan Sheehan of Bond, Schoeneck & King, on behalf of

24   The Diocese of Buffalo, and here with me is Charles

25   Sullivan.

1                    THE REPORTER:  Thank you.  And would all

2    observers please identify themselves for the record.

3                    MR. NASATIR:  Iaian Nasatir, Pachulski

4    Stang, for the Committee.

5                    THE REPORTER:  And Ms. Michael, could you

6    please identify the other attorneys for the record,

7    please.

8                    MS. MICHAEL:  Yes.  Ilan Scharf, also

9    Pachulski Stang, for the Committee.  And Lisa Petrus,

10   who is a paralegal at Pachulski Stang, for the

11   Committee.

12                   THE REPORTER:  Thank you so much.

13                   And Mr. Sheehan, could you please have

14   Mr. Sullivan's appearance stated on the record.

15                   MR. SULLIVAN:  Yes.  Charles Sullivan,

16   Bond, Schoeneck & King, one of the attorneys for The

17   Diocese of Buffalo.

18                   THE REPORTER:  Thank you.

19                   And will the notary please identify

20   herself for the record.

21                   THE NOTARY PUBLIC:  Good morning.  My

22   name is Sarah Schroeter, I'm a notary public for Remote

23   Legal.

24                   THE REPORTER:  Thank you.

25                   This deposition is being taken remotely

1  and is being conducted pursuant to the procedural rules

2  and laws of the state which governs this matter.  As

3  such, all parties agree to this means of capturing the

4  official record, which may include recording by audio

5  and/or audiovisual means, and agree not to oppose

6  admission of this proceeding on the basis of the

7  personnel, or method by which the testimony in this

8  proceeding was captured.

9            Do the parties so stipulate?

10            MS. MICHAEL:  Yes, on behalf of the

11  Committee.

12            THE REPORTER:  And Mr. Sheehan?

13            MR. SHEEHAN:  Yes.

14            THE REPORTER:  Thank you.

15            Would the notary please swear in the

16  witness.

17            THE NOTARY PUBLIC:  Good morning, Ms.

18  Potzler.

19            MS. POTZLER:  Good morning.

20            THE NOTARY PUBLIC:  Would you please

21  state and spell your name for the record.

22            MS. POTZLER:  Yes.  It's Melissa Potzler,

23  M-E-L-I-S-S-A, P, as in Peter, O-T, as in Tom, Z, as in

24  zebra, L-E-R.

25            THE NOTARY PUBLIC:  Thank you.  Ms.

1 Potzler, would you please raise your right hand.  Do you

2 swear or affirm that the testimony you are about to give

3 will be the truth, the whole truth, and nothing but the

4 truth?

5          MS. POTZLER:  I do.

6 WHEREUPON,

7          M E L I S S A   P O T Z L E R

8 having been called as a witness, being duly sworn by the

9 notary public present, testified as follows:

10          THE NOTARY PUBLIC:  Thank you.

11          THE REPORTER:  Thank you so much.

12          Counsel, you may begin.

13          MS. MICHAEL:  Thank you.

14               EXAMINATION

15 BY MS. MICHAEL:

16     Q    Good morning, Ms. Potzler.

17     A    Good morning.

18     Q    Have you ever been deposed before?

19     A    I have.

20     Q    How many times?

21     A    Just once.

22     Q    Apologies.  I think the audio cut out there.

23 Do you mind repeating that last answer?

24     A    I've been deposed once before.

25          MS. MICHAEL:  Are others hearing her

1  response?  I'm not getting any audio.

2              THE REPORTER:  This is the reporter.  I'm

3  hearing her response.

4              MS. MICHAEL:  I'm not hearing you,

5  either.

6              THE REPORTER:  Okay.  Just give me one

7  second.  Let me go ahead and go off the record.  The

8  time is now 11:04 a.m. Eastern, and we're off the

9  record.

10      (Off the record.)

11              THE REPORTER:  The time is now 11:05 a.m.

12  Eastern, and we're back on the record.

13              Mr. Krell, can you please state your

14  appearance on the record.

15              MR. KRELL:  Sure.  Justin Krell, attorney

16  for Bond, Schoeneck & King.

17              THE REPORTER:  Thank you so much.

18              Ms. Michael, you may proceed.

19              MS. MICHAEL:  Thank you.  Apologies for

20  that.

21  BY MS. MICHAEL:

22      Q    I believe the last question that I did not

23  hear the answer to was, how many times have you been

24  deposed?

25      A    I've been deposed once.

1     Q    Okay.  And do you understand that you are

2  under oath?

3     A    Yes, I do.

4     Q    And do you understand that when you're under

5  oath your testimony is the same as if you were

6  testifying in court?

7     A    Yes.

8     Q    And because you are under oath, you have an

9  obligation to tell the truth.  Do you understand that?

10     A    Yes.

11     Q    Everything we say here is on the record and

12  will appear in a written transcript.  Have you seen a

13  deposition transcript before?

14     A    Yes.

15     Q    Okay.  A transcript will be provided to you,

16  and you will have an opportunity to review it, make

17  changes to your testimony, as recorded in the

18  transcript, before the expiration of the allotted time

19  for your review and signature.  Do you understand that?

20     A    Yes.

21     Q    If you make changes to your transcript, that

22  is something we may comment on at the hearing on this

23  matter.  Do you understand that?

24     A    Yes.

25     Q    And it's important, as we get going, that you

1  understand my questions.  If you do not understand a

2  question, will you let me know?

3      A    Yes, I will.

4      Q    It is also important that we have a clear

5  transcript, so that we do not talk over each other.  Do

6  you understand that?

7      A    Yes.

8      Q    Are you comfortable that you understand the

9  deposition process?

10     A    Yes, I am.

11     Q    And you are testifying in this matter as a

12  fact witness, not an expert witness, correct?

13     A    Correct.

14     Q    All right.  And where are you located?

15     A    Currently, or where do I work?

16     Q    Currently.

17     A    I'm at the offices of Bond, Schoeneck & King

18  on Delaware Avenue in Buffalo, New York.

19     Q    And who is in the room with you?

20     A    Brendan Sheehan and Charles Sullivan.

21     Q    Is there anyone in the room that we cannot see

22  on the video screen?

23     A    No, there is not.

24     Q    And do you understand that you are not allowed

25  to contact anyone else about the subject of this

1    deposition after you have been sworn?

2        A    Yes.

3        Q    And do you understand that it is my position

4    that if you do have discussions with anyone else,

5    including your counsel, now that you've been sworn in,

6    I'm entitled to inquire about those communications?

7        A    Yes.

8        Q    And is there any reason you cannot testify

9    competently and truthfully today?

10       A    No, there's not.

11       Q    Great.  And what's your educational

12   background?

13       A    I have a bachelor's degree, a JD degree, and

14   an LLM degree.

15       Q    And where do you have those degrees from?

16       A    Bachelor's degree is from the University of

17   South Carolina.  The JD and LLM are from the University

18   of Buffalo.

19       Q    And how are you currently employed?

20       A    I am the chancellor, chief compliance officer,

21   child protection policy coordinator, and in-house

22   counsel for The Diocese of Buffalo.

23       Q    That's a lot of positions.

24       A    Yes.

25       Q    And how long have you been in your current

1  role?

2      A     About 11 months.

3      Q     Okay.  And did you hold any positions at The

4  Diocese of Buffalo prior to your current role?

5      A     Not at the Diocese central offices.  I did

6  work for a diocesan parish for 10 years.

7      Q     And what parish is that?

8      A     Nativity of our Lord in Orchard Park, New

9  York.

10     Q     And what was your role with that parish?

11     A     I was the parish life coordinator, so I

12  coordinated the volunteers, any events that we had.  I

13  was responsible for social media, the bulletins, the

14  website.

15     Q     And was that a paid or voluntary position?

16     A     It was paid.

17     Q     And have you ever been a party to a lawsuit

18  personally?

19     A     I have been a party in an asbestos case.

20     Q     And have you ever testified in court?

21     A     No.

22     Q     And you said earlier that you've been deposed

23  once before.  What was the subject matter of that

24  deposition?

25     A     I was a witness in a personal injury car

1    accident.

2         Q    And have you ever been subject to a

3    disciplinary proceeding?

4         A    No.

5         Q    Have you ever had a grievance filed against

6    you?

7         A    No.

8         Q    And what did you review -- did you review any

9    materials to prepare for your deposition today?

10        A    I reviewed some of the information from the

11   IRCP program.  That's it, actually.

12        Q    What materials from the IRCP program did you

13   review?

14        A    There was a write-up of the whole program that

15   was meant to summarize and finalize everything that

16   occurred.  So when I started at the Diocese they gave me

17   that, just so I would know what happened in the past.

18        Q    And did you do anything else to prepare for

19   your deposition?

20        A    I did speak with our attorneys, as a

21   deposition prep.  That's it.

22        Q    And going back, you said you worked, prior to

23   your employment with the Diocese, with a parish for 10

24   years?

25        A    Correct.

1      Q    Was that the 10 years immediately preceding

2  your starting this job?

3      A    Yes.

4      Q    And have you had any other employment since --

5      A    Yes, I -- I'm sorry.

6      Q    Go ahead.

7      A    Yeah.  For the -- before the 10 years at the

8  parish, I worked for eight years as a defense attorney

9  with the 18B Panel.  And I worked for the Erie County

10 District Attorney's office prior to that.

11     Q    And how long did you work at the Erie County

12 District Attorney's office?

13     A    One year exactly.

14     Q    And did you have any other jobs post-law

15 school, other than those that you've already stated?

16     A    No.

17     Q    And prior to your employment with either the

18 parish or the Diocese, did you have any other

19 relationship with the Diocese?

20     A    No, just as a faithful Catholic.  Regular

21 parishioner, volunteer at my church.

22     Q    All right.  Now turning to the state court

23 actions against the Diocese, have you had any

24 experience, prior to the bankruptcy filing, working on

25 any of the Child Victim's Act which I'm going to refer

1    to as CVA going forward?  Do you have any experience

2    working on the CVA cases prior to the bankruptcy?

3        A    No.

4        Q    Have you reviewed any of the pleadings in the

5    CVA cases?

6        A    I have some of them, yes.

7        Q    Okay.  Which ones have you reviewed?

8        A    The ones that were against my personal parish.

9    When I worked there I looked them up on E-file and

10   reviewed those.  Not as a diocesan employee, as the

11   parish employee.

12       Q    Have you reviewed any other CVA actions?

13       A    I review them regularly in my current

14   position.

15       Q    How many have you reviewed in your current

16   position?

17       A    I wouldn't even hazard a guess, because it

18   just -- when something comes up, I'll go in and look.

19   So I would say maybe -- maybe 10 of them.  The actual

20   pleadings, I mean, on E-file.

21       Q    Right.

22       A    Yeah.

23       Q    Like the complaints?

24       A    Yes.

25       Q    And what about those 10 made you need to

1   review those?

2              MR. SHEEHAN:  Objection, to the extent

3   that answering would call for any privileged

4   information, I'll instruct you not to answer.  If you

5   can answer answer without divulging any privileged

6   information, you may do so.

7              THE WITNESS:  Generally speaking, if a

8   question came up about a specific case, they know that

9   I'm the one that can get access to it, and know how to

10  get in there, that's when I would look it up.  It would

11  either come up during the mediation, or concerning a

12  specific priest, or a complainant.  That's what would

13  cause me to need to look it up.

14  BY MS. MICHAEL:

15      Q    Okay.  Do you know how many CVA actions there

16  are currently in which the Diocese is a defendant?

17      A    Approximately 891.

18      Q    Apologies.  Let me repeat my question.  Do you

19  know how many CVA actions are currently pending in which

20  the Diocese is a named defendant?

21      A    I do not know that.  No.

22      Q    And do you know that of 891 CVA actions

23  against related entities, the Diocese is not a named

24  defendant in all of those actions?

25              MR. SHEEHAN:  Objection to form.  You can

1   answer if you know.

2                   THE WITNESS:  I don't know.

3   BY MS. MICHAEL:

4        Q    And have you reviewed any of the priest files

5   related to any of those CVA actions?

6        A    Yes.  Many, many of them.

7        Q    All right.  Have you reviewed priest files

8   related to all of the CVA actions?

9        A    No, I cannot say all of them.  No.

10       Q    And are you generally familiar with the claims

11  that are asserted against parishes in those CVA actions?

12       A    Generally, yes.

13       Q    And against schools?

14       A    Not so much with the schools.

15       Q    What about summer camps?

16       A    No.

17                  MS. MICHAEL:  And now, turning to the

18  documents now.  This is my first time using this

19  platform.  It seems pretty -- kind of -- pretty

20  intuitive, but hopefully I do this right.

21                  So I am now going to share and mark as Exhibit

22  1 Ms. Potzler's declaration.

23       (Exhibit 1 marked for identification.)

24                  MS. MICHAEL:  How do -- I'm missing the

25  button to mark it as Exhibit 1.

1          THE REPORTER:  I went ahead and marked

2     that for you.

3          MS. MICHAEL:  Okay.  Great.  Thank you.

4     BY MS. MICHAEL:

5     Q    Okay.  Ms. Potzler, can you describe the

6     process involved in preparing this declaration?

7     A    We had legal discussions.  I reviewed, like I

8     said, the IRCP program summary.  And then I read over

9     the -- the declaration, and we made, you know, slight

10    modifications, and I signed it.

11    Q    And who did you work with in preparing the

12    declaration?

13    A    Our chief operating officer, Grayson Walter,

14    Charlie Sullivan, Steve Donato, Steve Donato, Brendan

15    Sheehan.  Our chief financial officer, Ellen

16    Musialowski.  I believe that was it.

17    Q    And who provided you the information that's

18    contained in the declaration.

19          MR. SHEEHAN:  Objection.  To the extent

20    that answering these questions could divulge attorney-

21    client privilege information, I instruct you not to

22    answer it.  You can answer it to the extent that

23    answering will not do so.

24          THE WITNESS:  The IRCP information I had

25    myself.  The chief operating officer supplied some

1  information about personnel numbers.  And the chief

2  financial officer supplied information about the self-

3  insured program.

4  BY MS. MICHAEL:

5     Q    Did someone else prepare an initial draft of

6  the declaration for you?

7              MR. SHEEHAN:  We're going to assert the

8  same objection with respect to attorney-client

9  privilege.  You can answer if doing so will not involve

10 attorney-client information.  If doing so would --

11             THE WITNESS:  Yeah.

12             MR. SHEEHAN:  -- involve such --

13             THE WITNESS:  I can't answer --

14             MR. SHEEHAN:  -- information --

15             THE WITNESS:  -- that.

16             MR. SHEEHAN:  -- then don't answer.

17 BY MS. MICHAEL:

18    Q    Okay.  Do you plan on doing anything further

19 before the hearing on the Diocese motion for a

20 preliminary injunction, in terms of your expected

21 testimony?

22             MR. SHEEHAN:  Objection.  It calls for

23 speculation.  Again, to the extent answering would

24 divulge a prospective attorney-client privilege

25 information, I instruct you not to do so.  You can

1   answer, if you can.

2                    THE WITNESS:  I cannot answer that.

3                    MS. MICHAEL:  Okay.  Turning to paragraph

4   7, and I can -- you should all be following me now; is

5   that correct?  Do you all see paragraph 7, too?

6                    MR. SHEEHAN:  We do not.

7                    THE WITNESS:  No.

8                    MR. SHEEHAN:  We do not.  Oh, there we

9   go.  We do now.

10                   THE WITNESS:  It's currently cut off.  I

11  can't see all of it.

12                   MR. SHEEHAN:  The right margin and the

13  bottom of the paragraph are obliterated.

14                   THE REPORTER:  This is the reporter.

15  Everybody is able to zoom in and out of the document.

16  So if you want to zoom out, you'd be able to see the

17  paragraph, Mr. Sheehan.

18                   MR. SHEEHAN:  Okay.  Thank you.  Would it

19  be helpful --

20                   THE WITNESS:  No, I can see it now.

21                   MR. SHEEHAN:  Okay.

22                   THE WITNESS:  Yeah.

23                   MR. SHEEHAN:  Okay.  We can now see

24  paragraph 7.  Thank you.

25  BY MS. MICHAEL:

```
 1        Q    Paragraph 7, you discuss staffing reductions

 2   The Diocese of Buffalo has undergone.  What precipitated

 3   the staffing reductions?

 4        A    The filing of the Chapter 11.  And dwindling

 5   resources.

 6        Q    And I believe the statement states that the

 7   reductions began in 2019.  Is it correct that those

 8   reductions began before the bankruptcy filing?

 9        A    True.  Uh-huh.  That's why I said dwindling

10   resource.

11        Q    When did the planning process for those

12   staffing reductions begin?

13        A    I don't know.  I wasn't privy to that.  I

14   wasn't here then.

15        Q    And were any of the eliminated positions ones

16   that would have been involved in the reorganization?

17        A    Absolutely.  Especially the non-ministerial

18   staff.

19             MR. SULLIVAN:  Shouldn't we object to the

20   form of the question?  It's not what the paragraph says.

21   It doesn't say that the staffing reduction began in '19.

22   It was just a --

23             MS. MICHAEL:  Apologies, Charlie, can you

24   speak louder?  I'm not sure that we're getting what you

25   said on the record.
```

1          MR. SULLIVAN:  Okay.  Just, objection to

2     the form of that question.  The paragraph does not say,

3     as I'm reading the words on the page, that any staffing

4     reductions began in 2019.  It just relates it to a 2019

5     level.

6          MS. MICHAEL:  I'll repeat my question.

7     BY MS. MICHAEL:

8     Q     Were any of the eliminated positions ones that

9     would have been involved in the reorganization?

10    A     Yes, mostly non-ministerial staff.

11    Q     Can you describe those specific positions,

12    please?

13    A     Mostly secretaries, file clerks, that type of

14    employee.

15    Q     Okay.  How many secretaries were eliminated?

16    A     I don't know those numbers.

17    Q     And how many file clerks were eliminated?

18    A     I don't know those numbers.

19    Q     And were any of the eliminated positions ones

20    that would've been involved in the defense of abuse

21    actions?

22          MR. SHEEHAN:  Objection to form.  You can

23    answer, if you can.

24          THE WITNESS:  I don't really know.  I

25    know, personally, now we have such a shortage of non-

1  ministerial staff that we ourselves are doing a lot of

2  the secretarial filing work ourselves.

3  BY MS. MICHAEL:

4      Q    Turning now -- apologies.  One additional

5  question there.

6           What kind of filing work do you do?

7      A    I do a lot of filing with the priest files.

8  The -- so any document that needs to go into the

9  priests' files in the archives, because as chancellor

10  I'm responsible for the archives, I actually do that

11  filing largely myself.

12      Q    And earlier you said, "We do a lot of that

13  filing now."  Who are the other individuals included in

14  that "we"?

15      A    The vicar general does it.  The chief

16  operating officer has done some of it.  Vice chancellor

17  has done a huge amount of it.

18      Q    And for each of those individuals, what filing

19  work do they do?

20      A    Basically, outside of the chief operating

21  officer, the vicar general, myself, and the vice

22  chancellor do the filing related to all of the

23  individual priests' personnel files.

24      Q    And just help me understand this a little.

25  Those are for current priests?

1      A      Current and deceased.

2      Q      What new files are being filed in the deceased

3   priests' files?

4      A      Anything that has to do with the Chapter 11 or

5   the CVA.  Usually it's not filing, a lot of times it's

6   retrieving the files and looking for documents.

7      Q      And I under -- in the last year, has there

8   been a significant amount of that filing necessary.

9                    THE WITNESS:  Yes.

10                    MR. SHEEHAN:  Objection.  You can answer.

11                    THE WITNESS:  Yes.  There's been a huge

12   amount of that filing.  With different bankruptcy

13   issues.  As well as the attorney general settlement

14   issues.

15   BY MS. MICHAEL:

16      Q      And what are those issues that have come up in

17   the past year?

18                    MR. SHEEHAN:  Objection to form.  You can

19   answer.

20                    THE WITNESS:  We did an extensive file

21   review for insurance coverage.  We also did -- I'm in

22   the files literally every day, doing something either

23   for the Chapter 11 or the attorney general settlement,

24   because we're in the middle of our audit right now.

25   BY MS. MICHAEL:

1    Q    For the Chapter 11, my understanding is the

2    majority of the priests' files were produced well over a

3    year ago.  Can you describe what additional work in the

4    files you've been doing over the last year?

5                    MR. SHEEHAN:  Objection to form.  You can

6    answer, if you know.

7                    MR. SULLIVAN:  And privilege.

8                    MR. SHEEHAN:  And instruct you, to the

9    extent that answering would divulge attorney-client

10   privilege, I instruct you not to do so.  If you can

11   answer, you can answer without doing so.

12                   THE WITNESS:  I cannot answer that

13   question.

14   BY MS. MICHAEL:

15   Q    And my understanding is that the settlement

16   with the attorney general was also completed almost a

17   year.  Can you describe what you're doing in the files

18   related to the attorney general settlement for the past

19   year?

20   A    Yes.  We're in the middle of our audit right

21   now for the attorney general settlement.  And it has

22   been nonstop retrieving information from those files, to

23   prove our compliance, for our independent auditor.

24   Q    I believe I have moved your screen to the end

25   of paragraph 11 of Exhibit 1.  Is that what you are

1  seeing?

2              MR. SHEEHAN:  Yes.

3  BY MS. MICHAEL:

4      Q    At the end of this paragraph you list

5  departments that have been eliminated.  Did any of these

6  departments play a role in the CVA litigation?

7              MR. SHEEHAN:  Objection to form.  You can

8  answer, if you know.

9              THE WITNESS:  Camp Turner has.  The --

10  I'm not sure about the others.  I know Camp Turner has.

11  BY MS. MICHAEL:

12      Q    And what role did Camp Turner play in the CVA

13  litigation?

14      A    There are cases against Camp Turner.

15      Q    All right.  And you said you've been in your

16  position, was it 22 months?  Is that correct?

17      A    No, about 11.

18      Q    Apologies.  Who was in your role prior to you?

19      A    As chancellor, it was Sister Regina Murphy.

20  There was no in-house counsel.  There was no child

21  protection policy coordinator.  And there was no chief

22  compliance officer.

23      Q    Okay.  And prior to the bankruptcy filing, how

24  much time did Sister Regina -- Murry, is that correct?

25      A    Murphy.  Murphy.

1      Q    Murphy.  How much time did Sister Regina

2   Murphy spend administering the abuse actions, on a

3   monthly basis?

4               MR. SHEEHAN:  Objection to form.  You can

5   answer.

6               THE WITNESS:  This is a guess, but I'm

7   thinking at least 50 percent of her time.

8   BY MS. MICHAEL:

9      Q    And did that include abuse actions for which

10  the Diocese was not a party?

11     A    That, I don't know.

12     Q    And what would you be required to spend if the

13  abuse actions from which the Diocese is not a party move

14  forward?

15     A    It would be a significant amount of time,

16  because there are very few people allowed access to the

17  personnel files, and I am the chief person that's

18  responsible for them.  So I would be the one getting all

19  the information for the actions to go forward.

20     Q    And what would that involve that has not

21  already been done in the productions in the bankruptcy

22  case?

23               MR. SHEEHAN:  Objection to form.

24  Objection, to the extent you have to divulge attorney-

25  client information.  If you can answer without doing so,

1    you may answer.

2                THE WITNESS:  I cannot answer that.

3    BY MS. MICHAEL:

4        Q    And in -- turning now, bringing you to

5    paragraph 10 of your declaration, you note, "I

6    anticipate that Mr. Suchan" -- is that correct?

7        A    Suchan.

8        Q    "Suchan, Ms. Musialowski, and I" --

9        A    Correct.

10       Q    -- "would also need to spend a significant

11   amount of time to assist the bishop in addressing such

12   matters."

13               What are the "such matters" that you're

14   referring to there?

15       A    Any individual suit that went forward, we

16   would all be working on the case.  We have to monitor it

17   for how it's going to affect the bankruptcy, from a

18   financial standpoint, for Ms. Musialowski.  Rich Suchan

19   is the chief operating officer, is involved in

20   everything that's happening with the Diocese.

21               And then, I would have to be -- I would spend

22   a huge amount of time just making sure that issues

23   aren't conflicting between the Diocese, the individual

24   parishes, and the lawsuits, and any rulings that might

25   come out of those cases.

1      Q    And turning to paragraph 10, further down, it

2  says, "Mr. Scholl and I will need to coordinate the

3  efforts of the multiple law firms that the Diocese and

4  related entities would rely upon as defense counsel."

5           Why would you have to coordinate the efforts

6  of law firms with respect to abuse actions to which the

7  Diocese is not a party?

8      A    For the same reasons I stated before, why I

9  would be involved in those cases.  And our insurance

10 program, Mr. Scholl, works with all of those.  So I, as

11 in-house counsel, have to be kept up to date in

12 everything that's happening through the insurance

13 program.

14     Q    And have you ever coordinated abuse actions

15 before?

16     A    No.

17              MR. SHEEHAN:  Objection to form.

18 BY MS. MICHAEL:

19     Q    What role do you currently have with respect

20 to the Diocese restructuring efforts?

21              MR. SHEEHAN:  Objection, to the extent

22 that answering would require you divulge attorney-client

23 privilege information, I instruct you not to do so.  You

24 can answer to the extent you're able to do so without

25 divulging that information.

```
 1                    THE WITNESS:  I -- I will say that I am
 2   at all of the mediations, any meeting we have regarding
 3   the bankruptcy I'm a part of.  I'm the one that supplies
 4   all the information relating to the priest personnel
 5   files in the cases.
 6   BY MS. MICHAEL:
 7        Q    Are there any other tasks relating to the
 8   reorganization you're responsible for?
 9        A    Not directly, no.
10        Q    And approximately how much time each month do
11   you spend on the reorganization?
12        A    Probably at least 50 percent.
13        Q    And how many hours is that?
14        A    A month, that would be -- 20 hours a week --
15   80 hours a month.
16        Q    And how much time do you specifically spend
17   attending mediation or negotiations with the Committee
18   or insurance carriers?
19                    MR. SHEEHAN:  Objection to form.  You can
20   answer, if you know.
21                    THE WITNESS:  Every time we have a
22   mediation session, I'm here for the duration, so it's
23   nine, 10 hours a day, twice a month, or two days a
24   month, I should say.
25   BY MS. MICHAEL:
```

1    Q    And how much time do you spend meeting with
2  bankruptcy counsel or internal diocesan staff regarding
3  the bankruptcy?
4    A    Once or twice a week with counsel.  And then,
5  internally, with staff, at least every week, probably
6  several times a week.  It comes up in almost every
7  meeting that we have.
8    Q    And approximately how many hours are spent on
9  those discussions specific to the bankruptcy?
10    A    Per week, in the meetings, probably five a
11  week.  In the in-house meetings with counsel, it's
12  probably another 10.
13    Q    Apologies.  I want to make sure that I'm
14  tracking that right.  You spend 10 hours a week meeting
15  with counsel regarding the bankruptcy?
16    A    Well, with different meetings that we have,
17  Zoom meetings, calls, things like that.  It depends on
18  the week and what issue has come up.
19    Q    And about how many hours a week do you spend
20  reviewing, preparing, or producing documents related to
21  the bankruptcy?
22    A    That's a hard one to estimate, because it all
23  depends on what issue has come up that week.  So I would
24  say, I'm working 40 hours a week, at least 15 are
25  actually me in the files.

1      Q    And can any of those tasks be handled by other

2  staff members of the Diocese?

3      A    No, because the files, per canon law, are

4  secret.  And I don't mean that in a secretive way.  I

5  mean, they're private.  They're only allowed access by

6  the bishop, the vicar general, or the chancellor.

7      Q    Do your outside counsel also have access to

8  those files?

9      A    When we grant permission to them.  The bishop

10  is entitled to grant permission to them, so yes.

11      Q    Could the bishop grant permission to other

12  staff within the Diocese, as well?

13      A    They could -- he technically could, but it's

14  very frowned upon, and it's never done.  Even as vice

15  chancellor I wasn't given access to the files, until I

16  became chancellor.  I'm responsible, as chancellor, per

17  canon law, for safeguarding the privacy of those files.

18      Q    And how would your ability to complete those

19  tasks be impacted if the state court actions move

20  forward?

21      A    There would be several more meetings with

22  counsel.  There would be more times when I had to go

23  into the files and gather documents, to prepare for

24  litigation.  There would be, I can imagine, fielding

25  hundreds of questions from various sources.  It would be

1    a monumental task.

2        Q    So what, in addition to going into the files

3    and meeting with counsel, would that involve --

4                   MR. SHEEHAN:  Objection.

5                   MS. MICHAEL:  -- for you?

6                   MR. SHEEHAN:  Objection to form.  You can

7    answer, if you know.

8                   THE WITNESS:  Yeah.  I'm not sure exactly

9    what you mean.

10   BY MS. MICHAEL:

11       Q    You -- I asked what would be impacted if the

12   state -- if the abuse actions moved forward, and you

13   mentioned going into the files, and additional meetings

14   with counsel.  I'm asking, are there any other

15   additional tasks you have to undertake?

16       A    Well, going into the -- I would be monitoring

17   all of the litigation, as in-house counsel.  I would

18   have to monitor each and every single case.  And going

19   into the files sounds simpler than it actually is.  It's

20   me going through the entire file, finding all the

21   relevant information.  It takes hours to do that.

22       Q    And how many files remain that have not

23   already been produced to your outside counsel?

24                   MR. SHEEHAN:  Objection to form.  You can

25   answer, if you know.

1                THE WITNESS:  That I don't know.  That

2  was before my time.  So I don't know.

3  BY MS. MICHAEL:

4     Q    Uh-huh.  So when you're currently reviewing

5  files, those may be files that outside counsel also

6  already have access to?

7                MR. SULLIVAN:  I'm going to object to

8  form.  I don't know what outside counsel you're

9  referring to.  And also, the documents that are produced

10  in the bankruptcy are completely unavailable in CVA

11  actions, per the agreement, stipulation which has been

12  entered into.

13                So any discovery that proceeds -- so

14  again, objection to form, because it presupposes that

15  those documents may be available, and they're not.

16                MS. MICHAEL:  Okay.  I'm not sure that's

17  relevant.  My question -- I'll repeat my question.

18  BY MS. MICHAEL:

19     Q    Outside counsel would be any counsel, the

20  Diocese employees, that is not you or anyone else who is

21  in-house at the Diocese.  I'm asking if there are files

22  that have not already been produced to your outside

23  counsel.

24                MR. SHEEHAN:  Objection to form.  You can

25  answer, if you know.

 1                    THE WITNESS:  I don't know.  That was

 2  before my time.

 3  BY MS. MICHAEL:

 4      Q    Okay.  Does Bishop Fisher maintain timesheets,

 5  or otherwise record his time?

 6      A    I do not believe he does, no.

 7      Q    And have you spoken to Bishop Fisher regarding

 8  his role in administering the abuse actions if the stay

 9  is lifted.

10                    MR. SHEEHAN:  Objection, to the extent

11  that answering would call for attorney-client privilege,

12  I'd instruct you not to answer.  If you can answer

13  without doing so, you may.

14                    THE WITNESS:  I can't answer that.

15  BY MS. MICHAEL:

16      Q    And how much time was Bishop Fisher required

17  to spend administering abuse actions, prior to the

18  bankruptcy filing, on a monthly basis?

19      A    Bishop Fisher wasn't here then.  And I wasn't

20  here then.  So I don't know.

21      Q    Do you know how much time the previous bishop

22  was required to spend administering abuse actions, prior

23  to the bankruptcy filing?

24      A    Any -- any idea.

25      Q    And has Bishop Fisher told you how much time

 1  he would have to spend administering abuse actions to

 2  which the Diocese to which he is not a party, if the

 3  actions are permitted to go forward?

 4      A    That wouldn't be something that he would

 5  mandate.

 6      Q    And has Bishop Fisher told you what he would

 7  be required to do if the abuse actions to which the

 8  Diocese is not a party go forward?

 9      A    As in-house counsel, that would be attorney-

10  client privilege.

11      Q    And did Bishop Fisher make important decisions

12  regarding strategic and policy considerations for the

13  abuse actions to which the Diocese was not a party,

14  prior to the bankrupt -- well, did Bishop Fisher or the

15  previous bishop make important decisions regarding

16  strategic and policy considerations for the abuse

17  actions to which the Diocese was not a party, prior to

18  the bankruptcy?

19              MR. SHEEHAN:  I'm going to object to the

20  form of the question, ask you to restate it.  It's

21  pretty hard to follow.  I know -- to the extent you can

22  answer it, go ahead.

23              THE WITNESS:  I would have no idea what

24  the previous bishop has done.  I know that Bishop Fisher

25  is in almost all of the meetings that I was talking

1    about, that -- that take so much time with me.  He is

2    there.  He's at the mediation sessions.  He has, you

3    know, meetings that I probably don't even know about

4    regarding the mediations.  So he has spent a huge amount

5    of time on this.

6    BY MS. MICHAEL:

7        Q    And if the abuse actions go forward, what is

8    your basis for asserting that Bishop Fisher will have to

9    make important decisions regarding strategic and policy

10   considerations for those actions?

11       A    Well, as the bishop, he is on the board of all

12   of the individual parishes, so he's responsible.  So he

13   has to be aware of every single action that's happening

14   with an individual parish, as a board member.

15       Q    Is the bishop responsible for decisions

16   related to the parish's involvement in the bankruptcy

17   case?

18                MR. SHEEHAN:  Objection to the form.  You

19   can answer, if you can.

20                THE WITNESS:  I'm not exactly sure what

21   you mean.

22   BY MS. MICHAEL:

23       Q    Would the bishop be responsible for deciding

24   what individual parishes contribute to the bankruptcy

25   case?

1     A    Contribute monetarily, or --

2     Q    Monetarily, yes.  To any eventual settlement

3 of bankruptcy.

4                 MR. SULLIVAN:  Privilege.

5                 MR. SHEEHAN:  Objection to form, to the

6 extent --

7                 MS. MICHAEL:  Charlie, if you're

8 speaking, you need to speak loud enough that we can hear

9 it on the record.

10                 MR. SULLIVAN:  I'm sorry, what did you

11 say?

12                 MS. MICHAEL:  We couldn't hear what you

13 were just saying on the record.

14                 MR. SULLIVAN:  We objected to the form,

15 and objected to the extent that it solicits material

16 that's covered by the attorney-client privilege.

17                 MS. MICHAEL:  I'm not asking about

18 anything related to attorney-client privilege.  I'm

19 asking --

20                 MR. SULLIVAN:  You're going far afield to

21 anything that's relevant to the motion that's before the

22 court.  You're exploring matters relating to the

23 mediation --

24                 MS. MICHAEL:  Charlie, I --

25                 MR. SULLIVAN:  -- and privilege of a

1    potential settlement --

2                     MS. MICHAEL:  -- it's --

3                     MR. SULLIVAN:  -- and it goes way beyond

4    the scope of what's permissible in this deposition.

5    Especially since it solicits privileged information.

6                     MS. MICHAEL:  Thank you.  I'm going to

7    repeat the question.

8    BY MS. MICHAEL:

9        Q    Is Bishop Fisher responsible for making

10   decisions for the parishes related to their monetary

11   contribution to any settlement in the bankruptcy case?

12                    MR. SHEEHAN:  We repeat the objection.

13                    THE WITNESS:  Can I answer?

14                    MR. SHEEHAN:  You can answer, if you

15   know.

16                    THE WITNESS:  He is involved in nearly

17   all of the meetings where we discuss those matters.  If

18   he's in town, and available, he is there, and making

19   decisions.

20   BY MS. MICHAEL:

21       Q    And if the abuse actions go forward, when

22   would Bishop Fisher need to make the strategic and

23   policy decisions in those abuse actions?

24                    MR. SHEEHAN:  Objection to form.  Calls

25   for speculation.  You can answer, if you know.

1              THE WITNESS:  As a board member of every

2  individual parish, I would assume that he would be

3  involved from the very beginning.

4  BY MS. MICHAEL:

5      Q    And what is Bishop Fisher's current role with

6  respect to tasks related to the Diocese restructuring

7  efforts?

8      A    I'm not sure.  That's kind of vague.  Again, I

9  reiterate that he's at all the mediation sessions when

10  he's in town.  He's at all of the meetings where we

11  discuss restructuring.  He is in all of the -- almost

12  all of the calls with counsel.

13      Q    And so let's break that down.  How much time

14  does Bishop Fisher spend in participating in mediation

15  in the bankruptcy proceeding, on a monthly basis?

16      A    Nine, 10 hours, two days a month, he's here,

17  participating.  And then, all of the -- the calls that

18  we have.  He's on the weekly calls with outside counsel.

19  He's on the -- the pop-up calls that we have to address

20  specific issues.  He's at our senior staff meetings,

21  when we're just having lengthy discussions about

22  restructuring.

23      Q    And how much time, on a monthly basis, does

24  Bishop Fisher spend viewing, preparing, or producing

25  documents in the Chapter 11 case?

1      A    He doesn't produce the documents, that would

2  be my job, and counsels' job.  But he knows what we're

3  producing, he's aware of everything that's happening.

4      Q    And is it your belief that Bishop Fisher will

5  not be able to undertake his tasks related to the

6  restructuring if the abuse actions move forward?

7            MR. SHEEHAN:  Objection to form.  You can

8  answer, if you know.

9            THE WITNESS:  Yes, it is absolutely my

10  belief.  The man is --

11  BY MS. MICHAEL:

12     Q    On what do you base that?

13     A    The man is stretched so thin right now, he

14  doesn't have a second to breathe.  He's constantly being

15  pulled from one issue to another.  I don't know how he

16  could possibly handle having to participate in the

17  individual abuse actions in state court.

18     Q    And is any of your testimony based on

19  privileged information you received from the bishop?

20     A    Regarding what?

21     Q    Regarding his roles and responsibilities?

22            MR. SHEEHAN:  Objection.

23            THE WITNESS:  Yeah.

24            MR. SULLIVAN:  And also, to the extent

25  that the question is seeking to solicit a waiver of

1  privilege, that would be objectionable.

2  BY MS. MICHAEL:

3      Q    Is there any responsibilities that Bishop

4  Fisher currently has that he could delegate?

5              MR. SHEEHAN:  Objection to form.  You can

6  answer, if you know.

7              THE WITNESS:  He can't delegate the fact

8  that he is on the board of all of the individual

9  parishes.  So no.

10  BY MS. MICHAEL:

11     Q    And if the abuse actions go forward, what

12  would the responsibility of the individual pastors of

13  those parishes be?

14             MR. SHEEHAN:  Objection to form.  You can

15  answer, if you know.

16             THE WITNESS:  They would be the ones

17  responsible -- actually, I don't know.  I can't answer

18  that.

19  BY MS. MICHAEL:

20     Q    And does -- outside of the context of the

21  Chapter 11 case, or the abuse actions, is Bishop Fisher

22  involved in the day-to-day management of each parish?

23             MR. SHEEHAN:  Objection to form.  You can

24  answer.

25             THE WITNESS:  To some extent, yes, he is.

```
 1   Because he has to approve, canonically, certain things
 2   that parishes do and don't do.  So yes, he is involved
 3   in the day-to-day.
 4   BY MS. MICHAEL:
 5       Q    Can you specify those things --
 6                   MR. SULLIVAN:  Objection to form.
 7                   MS. MICHAEL:  -- parishes --
 8                   THE WITNESS:  I'm sorry, what?
 9   BY MS. MICHAEL:
10       Q    Can you specify those things that Bishop
11   Fisher must be involved in at the parish level on the
12   day-to-day?
13                   MR. SHEEHAN:  Objection to form.  You can
14   answer, if you know.
15                   MR. SULLIVAN:  Yeah, and specifically the
16   form objection.  What do you mean by day-to-day?  I
17   think the witness has testified about certain canonical
18   obligations.  I mean, it's -- you know, what is day-to-
19   day?  Is it decisions on the ground?  If you could
20   amplify that, it would be better.
21                   MS. MICHAEL:  Okay.  Going forward, I
22   would appreciate if the witness asked for clarification,
23   and counsel stuck to formal objections.  But I will
24   clarify.
25   BY MS. MICHAEL:
```

1     Q   I am asking, outside of the context of the

2   Chapter 11 case, and the abuse actions, in what context

3   does Bishop Fisher get involved in the management of

4   individual parishes?

5     A   He is responsible for assigning all cleric

6   personnel to the parishes.  He's responsible for

7   assigning priests, deacons, pastors, parochial vicars.

8   He's responsible for okaying certain financial

9   expenditures.  He's responsible for trustee

10   appointments, I believe.  So he is involved.

11       He's responsible if the parish needs to change

12   their use.  There are several canonical decrees that he

13   is responsible for with all of the parishes.

14       MR. SULLIVAN:  Excuse me, Ms. Brittany.

15   I want to take a break and confer with Mr. Sheehan

16   outside of the room, if we may.

17       MS. MICHAEL:  Sure.

18       THE REPORTER:  Ms. Michael, would you

19   like to go off the record?

20       MS. MICHAEL:  Yes, please.

21       THE REPORTER:  Okay.  The time is now

22   11:54 a.m. Eastern, and we are off the record.

23   (Off the record.)

24       THE REPORTER:  The time is now 12:02 p.m.

25   Eastern, and we're back on the record.  You may proceed.

 1                    MS. MICHAEL:  Thank you.

 2  BY MS. MICHAEL:

 3      Q    Ms. Potzler, did you discuss anything with

 4  your counsel during this break?

 5      A    I did not.

 6      Q    Okay.  Going back to our previous discussion,

 7  is it your belief that Bishop Fisher will be involved in

 8  reviewing document productions in the abuse actions?

 9                    MR. SHEEHAN:  Objection.  You can answer,

10  if you know.

11                    THE WITNESS:  I don't know.  Sorry.

12  BY MS. MICHAEL:

13      Q    And will Bishop Fisher be involved in

14  attending depositions where he is not the deponent in

15  any of these actions?

16                    MR. SHEEHAN:  Objection.  You can answer,

17  if you know.

18                    THE WITNESS:  I don't know.

19  BY MS. MICHAEL:

20      Q    Will Bishop Fisher be involved in reviewing

21  pleadings in the abuse actions?

22      A    Excuse me.  I'm sorry.  He may.  That may come

23  up at some point, yes.

24      Q    Okay.  What pleadings will Bishop Fisher be

25  involved in reviewing?

1          MR. SHEEHAN:  Objection.  You can answer,
2    if you know.
3          THE WITNESS:  That calls for speculation.
4    I wouldn't know.
5    BY MS. MICHAEL:
6     Q    And what strategic decisions would Bishop
7    Fisher be involved in making?
8          MR. SULLIVAN:  Objection to form.  On
9    behalf of the Diocese or on behalf of what party?
10   BY MS. MICHAEL:
11    Q    I'm referring to Ms. Potzler's statement that
12   Bishop Fisher would be involved in making strategic
13   decisions in the abuse actions.  I'm now saying, what
14   strategic decisions would Bishop Fisher be involved in
15   making in the abuse action?
16    A    Well, being on the board of every individual
17   parish, he would have to make decisions as to -- excuse
18   me -- strategic decisions -- excuse me, I'm sorry --
19   litigation, as well as any potential future financial
20   impact on each individual parish.
21    Q    And can you specify what those strategic
22   decisions he'd be involved in are?
23          MR. SHEEHAN:  Objection to form.  You can
24   answer.
25          THE WITNESS:  Well, just an as example,

```
 1   if a parish faces a suit, there is the absolute

 2   potential that they're going to wind up filing

 3   bankruptcy as well.  So he would be involved in all of

 4   that.

 5   BY MS. MICHAEL:

 6       Q    Can you explain what you mean when you say,

 7   "all of that"?

 8       A    He's responsible for the financial viability

 9   of the parishes, to some extent.  So he would be

10   involved in whether or not bankruptcy filings were in

11   the offing.

12       Q    Would he be involved in decisions to file

13   motions to dismiss in the individual abuse actions?

14              MR. SHEEHAN:  Objection.  You can answer,

15   if you know.

16              THE WITNESS:  I don't know.

17              MR. SULLIVAN:  And again, would it be on

18   behalf of the parishes or the Diocese?  Because they're

19   -- we also asserted in the pleadings that there are

20   collateral estoppel impact upon the Diocese.  So --

21              MS. MICHAEL:  Mr. Sullivan --

22              MR. SULLIVAN:  -- in terms of that --

23              MS. MICHAEL:  -- are you objecting?

24              MR. SULLIVAN:  -- Yes, I am.  To the form

25   of the question.
```

1          MS. MICHAEL:  Okay.

2          MR. SULLIVAN:  To the form of the

3   question.  I have to illustrate the objection.

4   BY MS. MICHAEL:

5      Q    Ms. Potzler, you can answer the question.

6   Would Bishop Fisher be involved in the decision to file

7   a motion to dismiss in an abuse action?

8      A    He would be involved in those decisions.

9      Q    All right.  And would Bishop Fisher be

10   involved in the decision to file a motion for summary

11   judgment in each individual abuse action?

12      A    Yes.

13      Q    Okay.  And would Bishop Fisher be involved in

14   settlement discussions in each individual abuse action?

15          MR. SHEEHAN:  Objection.  You can answer,

16   if you know.

17          THE WITNESS:  That, I don't know.  Most

18   likely he would, because he's been involved in all of

19   the decision making processes so far.

20   BY MS. MICHAEL:

21      Q    Can you specify what decision making processes

22   so far he has been involved in?

23          MR. SHEEHAN:  Objection, to the extent

24   that answering would call for attorney-client privilege,

25   I instruct you not to answer.  If you can do so without

1    doing so, you can answer.

2                    THE WITNESS:  I can't.  That would

3    violate attorney-client privilege.

4    BY MS. MICHAEL:

5        Q    So to clarify, you're refusing to answer what

6    decisions thus far Bishop Fisher has been involved in,

7    on the basis of privilege?

8        A    Yes.  Because I'm his in-house counsel.

9        Q    And is Bishop Fisher involved in non-abuse

10   litigation against parishes, for example, if someone

11   slips and falls, and sues on that basis?

12       A    I don't know that answer.

13       Q    Okay.  In a slip and fall litigation against a

14   parish, would Bishop Fisher be involved in a motion to

15   file to motion to dismiss?

16                   MR. SHEEHAN:  Objection.  You can answer,

17   if you know.

18                   THE WITNESS:  I don't know.

19   BY MS. MICHAEL:

20       Q    Have there been any slip and fall lawsuits

21   against the parishes since you've been in your position?

22       A    I'm sure there has, but that doesn't come

23   through me.

24       Q    Who does that go through?

25       A    John Scholl.

1      Q    Okay.  So you have no involvement in

2  litigation against parishes that -- for slip and falls?

3      A    There are times when I will see that they

4  could come to me with a case, because they've come to me

5  with cases that do not involve slip and falls, so I can

6  see that happening in the future.  But it has not

7  happened to this point.

8      Q    What kinds of cases, besides slip and falls

9  and abuse, have they brought to you?

10      A    Discrimination cases, lease cases.  I believe

11  that's all I've had.  So several lease cases, and a few

12  discrimination cases.

13      Q    And what's your involvement in those

14  discrimination cases?

15      A    Basically, offering my opinion, as in-house

16  counsel, as to the direction we should take.  Basically,

17  that's it.

18      Q    Okay.  And what's your involvement in those

19  lease cases?

20      A    I've been reviewing the leases, and giving

21  advice as to whether or not they've been breached.

22      Q    And do you work -- in the lease cases, is

23  there outside counsel hired by the parish or the Diocese

24  to defend or prosecute in those cases?

25      A    The ones that I have recently looked at, no.

```
 1    I'm sure there are some others that they've probably
 2    hired outside counsel.
 3        Q    And in the discrimination cases, is there
 4    outside counsel hired to defend the parish?
 5        A    Yes.
 6        Q    Do you work directly with that outside
 7    counsel?
 8        A    Sometimes I do, sometimes I don't.  It depends
 9    on the case.
10        Q    If you don't, who does?
11        A    Probably John Scholl.  I know the vicar
12    general's been involved.  I'm sure the bishop has been
13    apprised.  The chief operating officer is also aware.
14    The chief financial officer is aware when we have
15    lawsuits of any nature.
16        Q    But who works directly with the outside
17    counsel?
18        A    John Scholl.
19        Q    And what determines cases that are brought to
20    you versus cases that Mr. Scholl oversees?
21        A    I think they're just if there is an
22    interesting question of fact or law, they tend to bring
23    them up to me.  It's on a case by case basis.
24        Q    And is Bishop Fisher involved in any of the
25    discrimination cases?
```

1       A    He is apprised of all of them.  I believe he

2    reads the pleadings.  I'm not sure.  I -- you know, I

3    don't know that for a fact.  He is aware of all of that.

4    And we have had discussions at meetings regarding those

5    cases.

6       Q    And would Bishop Fisher be involved in the

7    decision to file a motion to dismiss in one of those

8    discrimination cases?

9            MR. SHEEHAN:  Objection, to the extent

10   answering will call for attorney-client privilege, I

11   instruct you not to answer.  You can answer it without

12   doing so, if not.

13           THE WITNESS:  I have seen him be involved

14   in the discussions, yes.

15   BY MS. MICHAEL:

16      Q    And is Bishop Fisher involved in any decision

17   to file a motion for summary judgment in the

18   discrimination cases?

19      A    That --

20           MR. SHEEHAN:  Sorry.  The same objection,

21   with respect to privilege.

22           THE WITNESS:  And I don't know.

23   BY MS. MICHAEL:

24      Q    For the motions to dismiss, does Bishop Fisher

25   have to be involved?  You said he's been involved in

1   those discussions, some of those discussions, but do you

2   require Bishop Fisher's sign-off on those motions to

3   dismiss?

4           MR. SHEEHAN:  Objection, to the extent

5   answering would call for attorney-client privilege, I'd

6   instruct you not to answer.  If you can answer without

7   doing so, you may.

8           THE WITNESS:  I cannot answer that.

9   BY MS. MICHAEL:

10      Q   So to clarify, you cannot tell us if Bishop

11  Fisher's permission is required to file a motion to

12  dismiss in a discrimination, on the basis of attorney-

13  client privilege?

14      A   That.  And the fact that I'm not sure.  It

15  depends on the case, and on canon law.

16      Q   When does canon law require Bishop Fisher to

17  be involved in the decision to file a motion to dismiss?

18      A   I don't know.  That's why I said I can't

19  answer that.  Because I know -- I'm not a canon lawyer.

20  There is very specific rules regarding these issues, but

21  I don't know specifically what they are.

22      Q   Moving to Father Karalus -- am I pronouncing

23  that right?

24      A   Yes.

25      Q   Does Father Karalus maintain timesheets, or

1    otherwise record his time?

2        A    I don't know.

3        Q    Have you spoken to Father Karalus regarding

4    his role in administering the abuse actions prior to the

5    bankruptcy?

6        A    Not specifically, no.

7        Q    Okay.  Do you know how much time Father

8    Karalus spent administering the abuse actions prior to

9    the bankruptcy?

10       A    I do not.

11       Q    And has Father Karalus told you how much time

12   he will have to spend administering the abuse actions to

13   which the Diocese is not a party, if the actions are

14   permitted to go forward?

15       A    We haven't had any conversations directly

16   relating to that.

17       Q    And what role would Father Karalus have

18   regarding the abuse actions that the Diocese is not a

19   party to, if they are permitted to go forward?

20            MR. SHEEHAN:  Objection.  You can answer.

21            THE WITNESS:  I'm just assuming here, but

22   I think that he would be called to testify in several of

23   them, as his role of vicar general, he is taking over

24   from -- some of the duties of former employees that were

25   heavily involved in the abuse actions.

1  BY MS. MICHAEL:

2      Q    And who are those former employees whose

3  duties he has taken over?

4      A    Auxiliary Bishop Grosz, who was extensively

5  involved, from what I can tell by the files.  Father

6  Karalus has taken over several of those duties.  I'm not

7  sure which ones, but I know that those have been given

8  to him, so he would be heavily involved, if there's a --

9  excuse me -- if it's based on the fact Bishop Grosz was

10  so heavily involved, I'm assuming that Father Karalus

11  would be called to testify.

12     Q    And other than testifying, how else would

13  Father Karalus be involved in the abuse actions to which

14  the Diocese is not a party?

15             MR. SHEEHAN:  Objection.  You can answer,

16  if you know.

17             THE WITNESS:  Well, just on a day-to-day

18  basis, I'm in his office all of the time, talking about

19  specific cases, and he is at all of the meetings where

20  we discuss the cases.  So he spends many, many hours a

21  week dealing with it.

22  BY MS. MICHAEL:

23     Q    And what is his role in dealing with the

24  cases?  Does he make decisions?

25     A    Sometimes.

1      Q    And in what areas does he make decisions?

2              MR. SHEEHAN:  Objection, to the extent

3      answering would call for you to divulge attorney-client

4      privilege information, I instruct you not to do so.  If

5      you can answer without doing so, you may.

6              THE WITNESS:  I cannot answer that.

7      BY MS. MICHAEL:

8      Q    So to clarify, you cannot answer Father

9      Karalus's role in making decisions regarding abuse

10     actions on the basis of attorney-client privilege?

11     A    Yes.

12             MR. SHEEHAN:  I believe your question was

13     more specific than that, regarding which decisions.

14     BY MS. MICHAEL:

15     Q    Okay.  So to clarify, you cannot answer which

16     decisions Father Karalus is responsible for regarding

17     abuse actions on the basis of attorney-client privilege?

18     A    Yeah, it's a case by case basis.  So

19     frequently we're talking about -- you know, I'm giving

20     him legal advice.

21     Q    Uh-huh.  And on the basis of attorney-client

22     privilege, you cannot tell me in what scenarios Father

23     Karalus is the one responsible for making decisions

24     regarding those abuse actions?

25     A    Again, it's a case by case basis, so if he's

1  asking me for my opinion as to how the -- we should

2  proceed legally, no, I can't answer that.

3      Q    I'm not asking in a specific case what legal

4  advice he has asked for.  I am asking, overall, when is

5  he responsible for making decisions in abuse actions?

6      A    Well, as the vicar general, he's responsible

7  whenever the bishop is absent.  So if Bishop Fisher

8  isn't here, for whatever reason, he's responsible for

9  making all of those decisions.  He's the second in

10  command of the Diocese.

11      Q    So when Bishop Fisher is present, does Father

12  Karalus have any responsibility for making decisions in

13  abuse actions?

14      A    He is at all the meetings where we discuss the

15  actions that we're taking, and making decisions, so to

16  that extent, yes.

17      Q    To the extent that he is present at meetings,

18  then he is involved?  Am I understanding --

19      A    Right.

20      Q    -- that correctly?

21      A    Because at the meetings we are deciding which

22  action to pursue.

23      Q    And what role does Father Karalus have with

24  respect to the Diocese restructuring efforts?

25      A    That, I can't really answer, because he's not

1   part of the restructuring, the mediation, he's not part

2   of the weekly calls.  So I can't really answer that.

3        Q    Does Father Karalus review, prepare, or

4   produce any of the documents related to the

5   restructuring efforts?

6        A    I don't know.

7        Q    All right.  Turning now to Mr. Suchan.  Does

8   Mr. Suchan maintain timesheets or otherwise record his

9   time?

10        A    I believe he may.  I'm not sure.

11        Q    Have you spoken to Mr. Suchan regarding --

12   apologies.

13        A    I'm sorry, repeat?

14        Q    Oh, I thought I heard you saying something

15   else.

16             Have you spoken to Mr. Suchan regarding his

17   role in administering abuse actions prior to the

18   bankruptcy filings?

19        A    I know he was involved.  I don't know to what

20   extent.

21        Q    And how much time was Mr. Suchan required to

22   spend, prior to the bankruptcy filing, administering

23   abuse actions?

24        A    I would have no way of knowing that.

25        Q    Has Mr. Suchan told you how much time he will

1  have to spend administering abuse actions to which the

2  Diocese is not a party if these actions are permitted to

3  go forward?

4          MR. SHEEHAN:  Objection to form.  You can

5  answer, if you know.

6          THE WITNESS:  I don't know.  He has not

7  specifically -- we have not had that conversation,

8  specifically, as to how much time -- additional time, he

9  thought he would have to spend.  It would be very heavy

10 time, just on my own approximation.

11 BY MS. MICHAEL:

12     Q    And what is the basis for your -- for that

13 approximation?

14     A    He is even more involved than I am with the

15 bankruptcy.  He is in every meeting, every phone call.

16 He is heavily involved in the negotiations, as to how

17 much our related entities will be contributing.  He is

18 involved in all the communications to the individual

19 entities.  I would say at least 70 percent of his day is

20 spent involved with the bankruptcy litigation.

21     Q    And how would that -- let me restart that

22 question.

23          What would Mr. Suchan's involvement with the

24 abuse actions be for actions to which the Diocese is not

25 a party, if those are allowed to go forward?

```
 1                    MR. SHEEHAN:  Objection.  You can answer,
 2    if you know.
 3                    THE WITNESS:  I don't know specifically.
 4    I know that he would be involved -- he's the one that
 5    keeps the records on the databases of all of the
 6    different cases going forward.  So when anyone needs
 7    information, they go to him, because he's tracking all
 8    of it.
 9    BY MS. MICHAEL:
10        Q    Can you explain in a little bit more detail
11    what exactly he's tracking?
12        A    All the individual claimants, all the
13    individual parishes, all the individual accusers.  How
14    much has been paid out with the IRCP program.  I believe
15    he may be tracking which cases are duplicative.  That
16    type of thing.
17        Q    And what would his tracking responsibilities
18    be for the abuse actions, if they went forward, if the
19    Diocese is not a party to those actions?
20                    MR. SHEEHAN:  Objection.  You can answer,
21    if you know.
22                    THE WITNESS:  I'm just speculating here,
23    but I'm assuming that he would be the one keeping track
24    of each case that went forward, database-wise, and
25    correlating and communicating with everyone, database-
```

1    wise, so that we're all on the same page.

2                    So he has, like I said, huge lists of

3    databases that he maintains, so these would be more

4    databases for him to bring up, what's happening when,

5    which parish this one is happening at, which parish is

6    at this point in the litigation.

7    BY MS. MICHAEL:

8        Q    And does your counsel also track the

9    information that Mr. Suchan tracks, regarding the

10   claims, and the litigation?

11                   MR. SHEEHAN:  Objection, to the extent

12   answering would call for attorney-client privilege, I

13   instruct you not to answer.

14                   THE WITNESS:  I can't answer that.

15   BY MS. MICHAEL:

16       Q    To clarify, you cannot answer whether your

17   counsel also tracks claims in state court actions on the

18   basis of attorney-client privilege?

19       A    Correct.

20       Q    And does Mr. Suchan have a role with any of

21   the related entities?

22                   MR. SHEEHAN:  Objection to form.  You can

23   answer.

24                   THE WITNESS:  Yeah.  I'm not sure exactly

25   what you mean.

BY MS. MICHAEL:

Q    Does he have any role at individual parishes?

A    Not a specific role, but he is involved with every parish, to the extent that he is frequently receiving phone calls, questions, regarding the Chapter 11.  He is the one that is heading up the committee that is communicating to the individual parishes, trying to determine the extent that they will participate in the settlement, that type of thing.

Q    But Mr. Suchan is not an employee of any individual parish; is that correct?

A    Correct.

Q    And he is not a board member of any of the individual parishes?

A    I don't believe so.  But I'm guessing.  I'm guessing there.

Q    Is it your belief that Mr. Suchan would not be able to undertake both the tasks needed to administer the abuse actions to which the Diocese is not a party, and the tasks related to the Diocese restructuring efforts?

A    Correct.

Q    On what do you base that belief?

A    The fact that he's already working, like, 60, 70 hours a week, and is ridiculously stretched thin.

1    Q   Have you ever discussed this with him?

2    A   Not specifically.  It's just from my

3  observations, and the amount of work that we're doing on

4  these issues every day.

5    Q   And are there any tasks, besides tracking,

6  that Mr. Suchan would be responsible for with the abuse

7  actions?

8          MR. SHEEHAN:  Objection.  You can answer,

9  if you know.

10          THE WITNESS:  Well, he is, like I said,

11  responsible for determining the contributions of each

12  individual entity towards the settlement.

13  BY MS. MICHAEL:

14    Q   Okay.  Does Ms. Musialowski maintain

15  timesheets, or otherwise record her time?

16    A   I don't know.

17    Q   And have you spoken to Ms. Musialowski

18  regarding her role in administering the abuse actions

19  prior to the bankruptcy filing?

20    A   No.  She wasn't employed by the Diocese at

21  that point.

22    Q   And who was in her role prior to her?

23    A   I'm not exactly sure.

24    Q   Do you know how much time the previous CFO

25  spent administering abuse actions, prior to the

1    bankruptcy filing?

2        A    I would have no way of knowing that.

3        Q    Uh-huh.  And has Ms. Musialowski told you how

4    much time she will have to spend administering abuse

5    actions to which the Diocese is not a party, if those

6    actions are permitted to go forward?

7        A    We have not had that conversation.

8        Q    Okay.  What role would Ms. Musialowski have in

9    administering the abuse actions to which the Diocese is

10   not a party, if those actions are permitted to go

11   forward?

12               MR. SHEEHAN:  Objection.  You can answer,

13   if you know.

14               THE WITNESS:  I don't know.

15   BY MS. MICHAEL:

16       Q    And what role does Ms. Musialowski currently

17   have with respect to the Diocese reorganization efforts?

18       A    She is in all the meetings that I previously

19   discussed.  She is in all of the mediations.  And she is

20   -- outside Mr. Suchan, she is responsible for the

21   committee that is determining which -- what each entity

22   will be responsible for, settlement-wise.

23       Q    Who are --

24       A    It's a huge time --

25       Q    Got it.

1      A    I was just going to say, it's a huge time

2  commitment for both of them.

3      Q    Who are the members of that committee?

4           MR. SHEEHAN:  Objection, to the extent

5  that answering would call for attorney-client privilege,

6  I instruct you not to answer.

7           THE WITNESS:  Can't answer that.

8  BY MS. MICHAEL:

9      Q    For the record, you're refusing to answer, on

10  the basis of attorney-client privilege, who the members

11  of the committee that are determining the related

12  entities' contribution is?

13      A    Correct.

14      Q    Okay.  But Ms. Musialowski is a member of that

15  committee, correct?

16      A    Yes.

17      Q    And Mr. Suchan is a member of that committee,

18  correct?

19      A    Yes.

20      Q    And how many other members of that committee

21  are there?

22           MR. SULLIVAN:  Objection.  Again, this is

23  going beyond the scope of this deposition, as well,

24  which is limited to the issues involved in this motion.

25  BY MS. MICHAEL:

1      Q    I'll restate my question.  How any other

2    members of that committee are there?

3      A    I honestly don't know how many people.  I'm

4    not on that committee.

5      Q    Is Bishop Fisher on that committee?

6                MR. SHEEHAN:  Objection.  Once again,

7    object to the extent that answering will call for

8    attorney-client privilege, and on the basis that this

9    line of questioning is beyond the scope of this

10   deposition.

11               MS. MICHAEL:  I'll restate the question.

12   BY MS. MICHAEL:

13     Q    Is Bishop Fisher on that committee?

14     A    I can't answer that.

15     Q    So for the record, you cannot tell me if

16   Bishop Fisher's on the committee that Mr. Suchan and Ms.

17   Musialowski are on, on the basis of attorney-client

18   privilege?

19     A    Correct.  The reason I know that Suchan and

20   Musialowski are on there is because I've discussed that

21   with them.  I am not on the committee.

22     Q    I just want to clarify then, that your answer

23   to whether Bishop Fisher is on that committee is that

24   you cannot respond due to attorney-client privilege?

25     A    Correct.

1       Q    Okay.  Is Father Karalus on that committee?

2              MR. SULLIVAN:  I assert the same

3    privilege -- the same objection.

4              THE WITNESS:  Correct.  I can't answer

5    that.

6    BY MS. MICHAEL:

7       Q    All right.  So to clarify for the record, you

8    cannot answer if Father Karalus is on the committee that

9    Ms. Musialowski and Mr. Suchan are on, to determine the

10   related entities' contribution, on the basis of

11   attorney-client privilege?

12      A    Correct.

13             MR. SULLIVAN:  So let's just clarify some

14   points here.  We're drilling down --

15             MS. MICHAEL:  Mr. Sullivan, are you

16   testifying?

17             MR. SULLIVAN:  I am actually stating an

18   objection.  And what we're -- you're -- and objection

19   also, on the basis of matters that are being addressed

20   in mediation.  So we're talking now about --

21             MS. MICHAEL:  Okay.  I've heard your

22   objection, Mr. Sullivan.  I'd like to go back to asking

23   questions of the witness.

24             MR. SCHARF:  Just a question, Mr.

25   Sullivan, are you -- I thought Mr. Sheehan was defending

1   the witness.  It seems we have two people interposing

2   objections.  I think one is enough.

3                    MR. SULLIVAN:  Well, then why are you

4   speaking?

5                    MR. SCHARF:  I'm asking --

6                    MS. MICHAEL:  Ms. Potzler --

7                    MR. SCHARF:  I guess we'll both agree

8   that neither you or I will speak.

9                    MR. SULLIVAN:  Okay.  But I -- I guess

10  what I'm pointing out, and Mr. Sheehan is not directly

11  involved in the mediation, so he doesn't have firsthand

12  knowledge of this, but what we're talking about here,

13  discussions are happening in the context of mediation.

14  I do think that we are --

15                   MS. MICHAEL:  Mr. Sullivan, I think that

16  you're veering into coaching your witness.  So I'm going

17  to ask that I can continue asking questions of the

18  witness, and that you simply state your objections for

19  the record.

20                   MR. SULLIVAN:  Fine.

21  BY MS. MICHAEL:

22     Q    All right.  Ms. Potzler, you mentioned -- we

23  were discussing Ms. Musialowski, and her involvement in

24  the restructuring efforts.  You mentioned that she was

25  on the committee, which took a significant amount of

1    time, of her time, to determine the related entities'

2    contribution to the bankruptcy.

3              Is that committee solely responsible for

4    determining that contribution?

5         A    Again --

6              MR. SHEEHAN:  Objection, to the extent --

7    objection to any question regarding the composition or

8    the activities of that committee, both to the extent it

9    calls for attorney-client privilege, or any type of

10   mediation privilege in any way.  And on the grounds that

11   it's beyond the scope of the subject matter of this

12   deposition.

13             THE WITNESS:  So for all those reasons, I

14   can't answer that.

15   BY MS. MICHAEL:

16        Q    All right.  So for the record, Ms. Potzler,

17   just to clarify, you are not a member of that committee,

18   correct?

19        A    Correct.

20        Q    Okay.  Yet, the committee's composition, and

21   authority, it is your position that you cannot answer

22   questions regarding those issues because of attorney-

23   client privilege?

24             MR. SHEEHAN:  And we objected on the

25   grounds of --

```
 1              MS. MICHAEL:  I would --

 2              MR. SHEEHAN:  -- mediation privilege.

 3              MS. MICHAEL:  -- like Ms. Potzler to

 4   answer my question, please.

 5   BY MS. MICHAEL:

 6       Q    Is it your position that you cannot answer my

 7   question regarding the composition or authority of that

 8   committee on the basis of attorney-client privilege?

 9       A    I'm going to go with the basis of mediation

10   privilege.

11       Q    Okay.  So it is your position that, on the

12   basis of mediation privilege, you cannot discuss the

13   composition or authority of the committee that Ms.

14   Musialowski and Mr. Suchan sit on?

15       A    Correct.

16       Q    How often does that committee meet?

17       A    I don't know.  I'm not on it.

18       Q    Uh-huh.  Approximately how many hours per

19   month do those committee members spend doing work for

20   that committee?

21       A    That would be pure speculation on my part.  I

22   have no idea.

23       Q    Is Ms. Musialowski involved in reviewing,

24   preparing, or producing documents?

25       A    Financial documents?
```

1    Q    Sorry.

2    A    Financial documents?

3    Q    Go ahead.

4    A    Financial documents, yes, she would be

5    involved in preparing those.

6    Q    Is it your belief that Ms. Musialowski would

7    not be able to undertake both the tasks needed to

8    administer the abuse actions to which the Diocese is not

9    a party, and the tasks related to the Diocese

10    restructuring efforts?

11    A    Yes.

12    Q    And what is the basis of that belief?

13    A    I see the -- the time commitments that are

14    involved already.  There's -- I don't see how we could

15    possibly add individual lawsuits on top of what anyone

16    at the Diocese is doing, because we are stretched so

17    thin right now.

18    Q    Have you ever discussed this with her?

19    A    No.  Not this specific issue, no.

20    Q    Moving to Mr. Scholl Mr. Scholl maintain

21    timesheets or otherwise record his time?

22    A    I have no idea.

23    Q    Have you spoken to Mr. Scholl regarding his

24    role in administering the abuse actions prior to the

25    bankruptcy?

     1        A     No, I have not.

     2        Q     And has Mr. Scholl told you how much time he

     3   will have to spend administering abuse actions to which

     4   the Diocese is not a party, if those actions are

     5   permitted to go forward?

     6              MR. SHEEHAN:  Objection to form.  You can

     7   answer, if you know.

     8              THE WITNESS:  I don't know.

     9   BY MS. MICHAEL:

    10        Q     And has Mr. Scholl told you how much time he

    11   would spend?

    12        A     No.

    13        Q     And why would Mr. Scholl -- what would Mr.

    14   Scholl's responsibilities regarding abuse actions to

    15   which the Diocese is not a party be, if the actions are

    16   permitted to go forward?

    17        A     Well, he's responsible for the indemnification

    18   of the parishes in any type of action.  So he would be

    19   involved in every one of them.

    20        Q     And what do you mean when you say he's

    21   responsible for the indemnification of the parishes?

    22        A     He runs our self-insurance program.

    23        Q     And what indemnification obligations does the

    24   Diocese have to the parishes?

    25              MR. SHEEHAN:  Objection, to the extent it

1   calls for a legal conclusion. You can answer, if you

2   know.

3           THE WITNESS: I don't know that. You

4   would have to ask Mr. Scholl that.

5   BY MS. MICHAEL:

6     Q   And what role does Mr. Scholl currently have,

7   with respect to the Diocese restructuring efforts?

8     A   Again, I'm not sure at this point what role he

9   has. He would be brought in, obviously, if there were

10   individual actions against the parishes. At this point,

11   I don't know what role he's playing.

12     Q   Is Mr. Scholl involved in the mediations in

13   the Chapter 11 case?

14     A   He's not physically present at them. I don't

15   know if he has other roles to play behind the scenes

16   that I don't know about.

17     Q   Is it your belief that Mr. Scholl would not be

18   able to undertake both the tasks needed to administer

19   the abuse actions to which the Diocese is not a party,

20   and the tasks he's required to do related to the Diocese

21   restructuring efforts?

22     A   I would have to speculate, so I -- I don't

23   think he would be able to do both, but I don't have a

24   basis for that, so that's speculation on my part.

25     Q   Other than the individuals we've already

1   discussed, are there any other personnel that would be

2   responsible for administering abuse actions to which the

3   Diocese is not a party?

4                MR. SHEEHAN:  Objection to the form.

5                You can answer.

6                THE WITNESS:  I -- I mean, there are, you

7   know, clerical roles and secretarial roles and support

8   staff, which would all be heavily involved to some

9   extent.

10  BY MS. MICHAEL:

11       Q    And how would they be involved?

12       A    Doing their support staff, their -- their --

13  you know, if we need something copied, if we need

14  something -- a letter written, if we need -- you know,

15  what support staff does.

16       Q    And approximately how many hours per month do

17  you believe those support staff would have to dedicate

18  to those tasks?

19       A    That all depends on what happens with the

20  cases, how far -- I -- I wouldn't know specifically.

21       Q    And are any of those support staff also

22  involved in the Diocese reorganization efforts?

23       A    To the extent of typing letters, keeping

24  minutes, things like that, yes.

25       Q    Approximately how many hours per week do they

1    spend on those reorganization tasks?

2         A    Depends on the week.  It depends on the issue

3    that's come up.  I couldn't qualify or quantify that.

4         Q    In what context do those support staff take

5    minutes?

6         A    If we have a -- there are certain meetings

7    where the bishop's secretary will go in and take

8    minutes.  I'm not sure which ones.  I just -- I've seen

9    her do it.

10        Q    And those are meetings related to the

11   reorganization?

12        A    I don't know.  I -- I said I'm not sure which

13   one.

14             MS. MICHAEL:  I'm at a good breaking

15   point.  I can keep going, but I'm mindful that you all

16   are a hour ahead of me.  I don't know if you want to

17   take a break to have some lunch or we -- you want to

18   keep going.  Just let me know.

19             MR. SHEEHAN:  Do you have a sense of how

20   much time you have for additional questions?

21             MS. MICHAEL:  I'm about halfway through

22   my outline, if that --

23        (Witness and Counsel confer.)

24             MR. SULLIVAN:  I wouldn't mind a quick

25   break.  As long as it's not too long.  You know, maybe

1    just enough to grab some food, because you're right,

2    it's 12:43.

3               MS. MICHAEL:  So how long are you

4    proposing?

5               MR. SHEEHAN:  Would half an hour be

6    possible?

7               MS. MICHAEL:  Yes, that works.

8               MR. SHEEHAN:  Okay.  So we'll come back

9    at 1:15 our time.

10              MS. MICHAEL:  Yes.

11              MR. SHEEHAN:  Okay.  Great.  Thank you.

12              THE REPORTER:  Okay.  The time is now

13   12:43 p.m., Eastern, and we're off the record.

14       (Off the record.)

15              THE REPORTER:  The time is now 1:19 p.m.,

16   Eastern, and we're back on the record.

17              You may proceed.

18              MS. MICHAEL:  Thank you.

19   BY MS. MICHAEL:

20       Q    Ms. Potzler, did you have any discussions with

21   your counsel while we were on break?

22       A    Just about lunch.

23       Q    Did you guys eat something good?

24       A    Yes, we split a turkey wrap.  It was very

25   good.

1      Q    All right.  So, Ms. Potzler, turning back to

2    your declaration, I am going to direct the screen to

3    paragraph 12.  Can you see paragraph 12 in front of you

4    now?

5      A    Yes.

6      Q    Is it your understanding that if abuse actions

7    to which the Diocese is not a party are allowed to

8    proceed, Diocese personnel would likely be deposed?

9      A    Yes.

10     Q    Which personnel do you believe would be

11   deposed?

12              MR. SHEEHAN:  Objection.

13              You can answer, if you know.

14              THE WITNESS:  I don't know.  I'm just

15   assuming that possibly the bishop, the vicar general,

16   Rich Suchan is the chief operating officer.

17   BY MS. MICHAEL:

18     Q    Why do you think they would be deposed?

19     A    The vicar general, because, as I said

20   previously, he's taken over some of the roles of

21   Auxiliary Bishop Grosz.  Rich Suchan, because he has

22   been so heavily involved in all aspects of these issues.

23   And the bishop, as a member of the board of each parish.

24     Q    And do you understand at what stage in abuse

25   actions these diocesan witnesses are likely to be

1   deposed?

2        A    I wouldn't have any idea.  I don't know.

3        Q    Do you understand that no abuse actions have

4   been set for trial?

5        A    Yes.

6        Q    And is it your understanding that these same

7   individuals would likely be at trial witnesses?

8                  MR. SHEEHAN:  Objection to form.

9                  You can answer, if you know.

10                 THE WITNESS:  I don't know.  I don't know

11  how that would play out.

12  BY MS. MICHAEL:

13       Q    Are there any other diocesan personnel that

14  you believe may be deposed in abuse actions?

15       A    I would think John Scholl may be.  Possibly

16  our chief financial officer; probably not, but possibly.

17  I'm sure there are others, I just -- I wouldn't know who

18  else.

19       Q    And why do you think Mr. Scholl would be

20  deposed?

21       A    For the insurance -- self-insurance program

22  and the indemnification that may occur.

23       Q    And why do you think the chief financial

24  officer would be deposed?

25       A    Just because she's heavily involved with the

1   insurance program as well, so I'm just guessing that

2   they might need to speak with her.

3       Q    And in what context would the insurance

4   program come up in the abuse action?

5                MR. SHEEHAN:  Objection.

6                You can answer.

7                THE WITNESS:  I'm assuming it would come

8   up based on the -- the fact that we're a self-insured

9   program and that we indemnify the individual parishes

10  against legal actions.

11  BY MS. MICHAEL:

12      Q    And when you say you indemnify the parishes,

13  is there a contract that requires the Diocese to

14  indemnify the parishes?

15      A    That would be --

16                MR. SHEEHAN:  Objection.  Calls for legal

17  conclusion.

18                You can answer, if you know.

19                THE WITNESS:  I don't know.

20  BY MS. MICHAEL:

21      Q    Have you ever seen a contract that would

22  require the Diocese to indemnify the parishes?

23      A    No.

24      Q    In your experience, would someone in your role

25  typically have seen a contract that obligates the

1    Diocese to indemnify another party?

2                    MR. SHEEHAN:  Objection.  Calls for

3    speculation.

4                    You can answer if you know.

5                    THE WITNESS:  I don't know.  I don't know

6    if every other Diocese has in-house counsel, so I don't

7    know how it works.  I've only been in this position a

8    year, so.

9    BY MS. MICHAEL:

10       Q    Do you typically review contracts that

11   obligate the Diocese in relationships with other

12   entities?

13       A    I do, frequently.  Not all the time.  And

14   those are more likely new contracts that we are dealing

15   with that I would review.

16       Q    So, as part of your role, did you ever review

17   legacy contracts regarding the Diocese legal

18   obligations?

19                    MR. SHEEHAN:  Objection.  Based on the

20   question calls for attorney-client privilege.  I

21   instruct not to answer.  If you can do so without

22   divulging such information, you can answer.

23                    THE WITNESS:  As I stated in the past, I

24   have reviewed lease contracts.  So, yes, to that extent.

25   And then I've also -- I'm sorry.  I've also reviewed

1  contracts with vendors that we are currently employing.

2  BY MS. MICHAEL:

3      Q    And going back to what we were discussing

4  before, if Mr. Scholl or the CFO were to testify in

5  abuse actions, you believe this would be due to their

6  knowledge of the insurance program, correct?

7      A    Yeah, that's what I assume.  I don't know that

8  for a fact.  That's -- you know, there may be other

9  issues that they would have to testify regarding.

10      Q    And what other issues might those be?

11      A    I just said there may be.  I don't know.

12      Q    Moving to paragraph 13.  Can you now see

13  paragraph 13 --

14      A    Yeah.

15      Q    -- at least the beginning of it?

16      A    Well, I could for a minute.  Hold on.

17              MR. SHEEHAN:  Yeah.  Could we give the

18  moment -- the witness a moment to read this paragraph?

19              MS. MICHAEL:  Sure.

20              MR. SHEEHAN:  Let me know when you're

21  ready for this half.

22              THE WITNESS:  Okay.  Okay.  I'm ready.

23              MR. SHEEHAN:  Okay.  Thank you.

24              THE WITNESS:  Okay.  Ready to proceed.

25  BY MS. MICHAEL:

1      Q    In paragraph 13 of your declaration, you refer

2  to the risk of collateral estoppel.  What is your basis

3  -- what is the basis for your understanding of the risk

4  of collateral estoppel?

5      A    If there are factual issues that are

6  adjudicated during one of the state court actions, that

7  could have consequences regarding the Diocese itself.

8  Whether or not it's -- whether or not there was

9  knowledge, whether or not something is covered by

10  insurance, there are various issues that could be

11  factually asserted that would have a negative effect on

12  the Diocesan cases.

13      Q    And what is the basis of your understanding of

14  the risk of adverse precedent?

15      A    Well, if we have a ruling in one of the state

16  court cases, it's going to naturally affect any future

17  ruling on the same issues in the bankruptcy case.

18      Q    In what way would it affect the same issue in

19  the bankruptcy case?

20              MR. SHEEHAN:  Objection.  Calls for a

21  conclusion.

22              You can answer, if you know.

23              THE WITNESS:  I don't know.  I mean,

24  that's -- that would be speculating on my part.

25  BY MS. MICHAEL:

```
 1        Q    And what is the basis for your understanding
 2   of the risk of vicarious liability?
 3        A    If we -- if in the state court actions, they
 4   find that the -- the Diocese was also at fault, then we
 5   would wind up vicariously liable for the actions in the
 6   individual state court actions.
 7        Q    And what is your basis for your understanding
 8   of the -- what is the basis for your understanding of
 9   the risk of imputed admissions?
10        A    Once again, if something is admitted, as far
11   as a state court case, and it can be transferred on, for
12   lack of a better word, to the diocesan cases.
13        Q    And can you please explain how the Diocese can
14   have collateral estoppel risk from an action to which it
15   is not a party?
16             MR. SHEEHAN:  Objection.  Calls for legal
17   conclusion.
18                  You can answer, if you know.
19                  THE WITNESS:  I can't answer that.
20   BY MS. MICHAEL:
21        Q    And can you please explain how the Diocese can
22   have adverse precedent risk from an action to which it
23   is not a party?
24             MR. SHEEHAN:  Objection.  Calls for legal
25   conclusion.
```

1           You can answer, if you know.

2           THE WITNESS:  Nope.  Can't answer that.

3   BY MS. MICHAEL:

4       Q    Can you please explain how the Diocese can

5   have vicarious liability risk from an action to which it

6   is not a party?

7       A    No.

8       Q    And can you please explain how the Diocese can

9   have imputed admissions risk from an action to which it

10  is not a party?

11          MR. SHEEHAN:  Objection.  Calls for legal

12  conclusion.

13          You can answer, if you know.

14          THE WITNESS:  No.

15  BY MS. MICHAEL:

16      Q    Can you please explain how the bishop or other

17  diocesan employees testimony could have a direct impact

18  on the liability or value of identical claims asserted

19  in the Chapter 11 case?

20          MR. SHEEHAN:  Objection to form.

21          You can answer, if you know.

22          THE WITNESS:  Yeah.  I -- could you

23  please restate that?

24  BY MS. MICHAEL:

25      Q    Sure.  In your declaration, you state that the

1  bishop or other diocesan employees testimony could have

2  a direct impact on the viability and value of identical

3  claims asserted in the Chapter 11 case.  Can you please

4  explain how?

5      A    Well, if -- if someone testifies, they're --

6  they're -- you know, it's going to be on the record, so

7  that can be used in future cases against the Diocese.

8      Q    How could it be used?

9          MR. SHEEHAN:  Objection.  Calls for legal

10  conclusion.

11          You can answer, if you know.

12          THE WITNESS:  I -- I don't know if -- I

13  don't know how to answer that.

14  BY MS. MICHAEL:

15      Q    Except for the example of diocesan employees

16  testimony, are there any other examples of imputed

17  admissions, vicarious liability, adverse precedent, or

18  collateral estoppel that could be used against the

19  Diocese in the Chapter 11 case?

20          MR. SHEEHAN:  Objection to form.

21          You can answer, if you know.

22          THE WITNESS:  I don't know.

23  BY MS. MICHAEL:

24      Q    Except for those related to insurance

25  coverage, are there any examples of adverse findings or

1   determinations that could result from the abuse actions?

2                MR. SHEEHAN:  Objection to form.

3                You can answer, if you know.

4                THE WITNESS:  I would be speculating, so

5   I don't know.

6   BY MS. MICHAEL:

7      Q    To your knowledge, has the Diocese ever been

8   found liable as a result of a state court judgment

9   against one of its parishes where the Diocese was not a

10  party to that action?

11     A    I don't know.

12     Q    Are you aware of any instances in which

13  collateral estoppel or res judicata has been applied to

14  the Diocese when it was not a party to the original

15  action?

16     A    I'm not aware of any.

17     Q    All right.  Moving to paragraph 16.  In

18  paragraph 16 --

19           MR. SHEEHAN:  Sorry, could we take a

20  moment and allow the witness to read this paragraph,

21  please?

22           MS. MICHAEL:  Sure.  I'm going to ask

23  specific questions, not about the whole paragraph, but I

24  was going to ask questions about the sentences.  But if

25  you'd like to read the whole paragraph first, that's

1    fine.

2                    MR. SHEEHAN:  Yes, if we could, just

3    briefly.

4                    MR. SULLIVAN:  Take your time.

5                    THE WITNESS:  Okay.  I'm ready.

6    BY MS. MICHAEL:

7        Q    At the beginning of the paragraph, you state

8    that the parishes understand their contributions are

9    earmarked for, "(i) the purchase of policies of

10   insurance covering the Diocese and the Related Entities

11   as co-insured and (ii) the payment of any defense costs

12   and claims for losses that are subject to a deductible

13   or self-insured retention before coverage under the

14   shared insurance policies becomes available."

15                   What is your basis for that statement?

16       A    Well, I -- that's what I was told when I asked

17   how our -- the self-insured policy works, that's what

18   was told to me.

19       Q    And who told you that?

20       A    Actually, I asked that a long time ago, so I

21   don't remember my original basis for that knowledge.

22   But in context of this, John Scholl has told me that.

23       Q    And earmarked can be a legal expression.  Is

24   that how you were using it here?

25       A    No, I -- I wouldn't say it was used as a legal

1  expression here.

2      Q    What does the term earmarked mean to you?

3      A    That it is set aside specifically for those

4  purposes and only those purposes.

5      Q    Are there any documents that support the

6  parish's understanding that you describe in the

7  statement?

8      A    I wouldn't be privy to that.

9      Q    Do you understand that the parish's will --

10 the parish's contribution will be sufficient to cover

11 the premiums needed to purchase the policies and payment

12 of defense and losses not covered by insurance?

13     A    I wouldn't know that.

14              MR. SHEEHAN:  Objection to form.

15              You can answer.

16              THE WITNESS:  Sorry.  I don't know.

17 BY MS. MICHAEL:

18     Q    Are there any contracts between the Diocese

19 and any related entities regarding the use of their

20 contributions?

21              MR. SHEEHAN:  Objection.  Calls for legal

22 conclusion.

23              You can answer, if you know.

24              THE WITNESS:  I don't know.

25 BY MS. MICHAEL:

1    Q    In the statement, you say, "some of the

2  policies have self-insured retentions and deductibles."

3  Which policies are those?

4    A    I don't know.  That's what I was told.

5    Q    And who told you that?

6    A    That's been a while.  I -- probably John

7  Scholl, but I'm not sure.

8    Q    And how much are the self-insured retentions?

9    A    I don't know.

10    Q    And how much are the deductibles?

11    A    I don't know.

12    Q    Are there any aggregates?

13    A    That's well beyond my scope of employment.

14    Q    Turning to paragraph 19.  I'll pause so you

15  can read.

16             MR. SHEEHAN:  I'm so sorry.  Which

17  paragraph?

18             MS. MICHAEL:  Nineteen.

19             MR. SHEEHAN:  Okay.  Take a moment to

20  read.

21             THE WITNESS:  Okay.

22  BY MS. MICHAEL:

23    Q    You say, "reserves (sic) will be quickly

24  dissipated if the preliminary injunction isn't granted."

25             How quickly?

1          MR. SHEEHAN:  Objection to form.

2          You can answer, if you know.

3          THE WITNESS:  I don't, and it depends on

4    which cases go forward and at what point, so I -- I

5    wouldn't be able to answer about that.

6    BY MS. MICHAEL:

7      Q    If the cases that do not name the Diocese as a

8    defendant and do not implicate the Catholic Mutual and

9    National Catholic --

10          MS. MICHAEL:  -- Iain, if you want to

11   jump in here with the full name of that --

12   BY MS. MICHAEL:

13     Q    -- insurance policies are the ones that go

14   forward, then how quickly will those reserves be

15   dissipated?

16     A    Again, that's --

17          MR. SHEEHAN:  Objection to form.

18          You can answer, if you know.

19          THE WITNESS:  I don't know.  That's

20   beyond my scope of employment.

21   BY MS. MICHAEL:

22     Q    So for paragraph 19, are your statements here

23   just based on what you've been told by Mr. Scholl and

24   others?

25     A    Not entirely, because I know how much money we

1    have in there, and I know how much defense costs would

2    be, roughly.  So it's pretty self-explanatory.

3        Q    How much would defense costs be?

4        A    I meant in the aggregate, what they would be.

5    Defending a matter such as this would be much worse than

6    defending a matter like a -- a personal injury matter,

7    which costs us roughly 12 grand per case for defense

8    costs.

9        Q    And what is your basis for your conclusion

10   that abuse actions would be greater defense costs than

11   the ones you're comparing them to?

12       A    Well, these are not, you know, typical slip

13   and falls, where it's routine, mundane, run of the mill

14   type of action.  This is much more detailed -- much more

15   detailed and much more time consuming.  Attorneys fees

16   would be much greater.

17       Q    What aspects of it make it more detailed?

18       A    All of --

19            MR. SHEEHAN:  Objection to form.

20            You can answer.

21            THE WITNESS:  All of the -- the different

22   players involved.  All of the different considerations

23   that have to be made.  All of the different people that

24   may be called to testify.

25   BY MS. MICHAEL:

```
1        Q    Who are the different players involved?

2        A    Well, it depends --

3        Q    As opposed to --

4        A    That depends on the case.

5        Q    And who are the different -- what are the

6   different details involved as opposed to a slip and

7   fall?

8        A    Well, a slip and fall is pretty run of the

9   mill.  These are, you know, actions that affected

10  several people.  It's not just one claimant.  It's --

11  that's hard to state.  But it's -- obviously the legal

12  issues are much more in detail.  The coverage issues are

13  much more detailed.

14       Q    What aspects of the legal issues make them

15  much more detailed?

16            MR. SHEEHAN:  Objection.  Form.

17            You can answer.

18            THE WITNESS:  That would call for

19  speculation on my part.

20  BY MS. MICHAEL:

21       Q    What aspects of the insurance make it much

22  more detailed?

23       A    The --

24            MR. SHEEHAN:  Objection to form.

25            You can answer.
```

1          THE WITNESS:  The fact that we're self-

2    insured.  There are questions about coverage, that type

3    of thing.

4    BY MS. MICHAEL:

5        Q    Is the coverage different?  Are you self-

6    insured for slip and falls?

7        A    That's beyond my scope of employment.

8        Q    Okay.  And have you ever -- do you have any

9    experience in defending abuse actions?

10       A    No.

11       Q    And going back to paragraph 16.  I'll bring

12    that -- is paragraph 16 based on your personal knowledge

13    or knowledge -- or purely information you were told?

14          MR. SHEEHAN:  You need to read the

15    paragraph again?

16          THE WITNESS:  No.  It -- I mean, it

17    depends on what aspect you're talking about.

18    BY MS. MICHAEL:

19       Q    Which aspects of paragraph 16 are based on

20    your personal knowledge?

21       A    Well, I -- as I said before, I talked about

22    this months ago, before this ever came up.  So some of

23    it's based on my personal knowledge.  The 10.9 million

24    is based on my personal knowledge.  Let's see.  And then

25    just conversations I've had in the past about how the

```
1   self-insurance program works.  I'm looking.  So, you
2   know, some of it is conversations that I've had, you
3   know, a year ago when I was starting the job and
4   learning.  So I don't know specifically.  The 10.9
5   million figure itself, I -- I asked specifically the
6   chief financial officer for that number.  So that was
7   told to me by her.  Otherwise, it's just stuff I've
8   accumulated over the past year.
9              MS. MICHAEL:  And for the record, and I
10  apologize again, this is a new platform for me.  Who
11  added the underline to the sentence with the 10.9
12  million?
13             THE WITNESS:  No idea.
14             MR. SHEEHAN:  It was not us.
15             MR. KRELL:  I did it by accident.  I
16  didn't know everyone could see that.  I was just
17  scrolling the document.  I don't know how to undo it.
18             MS. MICHAEL:  Okay.  I just -- I was
19  curious where it came from.
20             MR. KRELL:  It was an accident.  Don't
21  know how I did it.  My apologies.  And I don't know how
22  to undo it.
23             MS. MICHAEL:  That's fine.
24             All right.  I'm going to turn now to the
25  Diocese's responses to the committee's first set of
```

1    interrogatories.  I'd like to mark this as Exhibit 2.

2        (Exhibit 2 marked for identification.)

3            MS. MICHAEL:  Thank you.

4    BY MS. MICHAEL:

5        Q    Ms. Potzler, did you review the Diocese's

6    responses to the committee's first set of

7    interrogatories in conjunction with the supplementary

8    injunction motion?

9        A    Yes.

10       Q    And turning to page 16, Ms. Potzler, is that

11   your signature --

12       A    Yes.

13       Q    -- verifying the truth and accuracy of this

14   document?

15       A    Yes.

16       Q    Ms. Potzler, are you prepared to testify

17   regarding the discovery responses?

18       A    Yes.

19            MR. SHEEHAN:  Just to clarify for the

20   record, it's regarding accuracy according to the best of

21   her knowledge, information and belief for the document.

22            MS. MICHAEL:  Understood.

23   BY MS. MICHAEL:

24       Q    Ms. Potzler, were you involved in the

25   preparation of the responses?

```
 1     A    No.  Not specifically, no.

 2     Q    What was your involvement, if at all?

 3          MR. SHEEHAN:  Objection to the extent

 4  answering would call for attorney client-privilege.  I

 5  instruct her not to answer.

 6          If you can answer without divulging that

 7  information, you can do so.

 8          THE WITNESS:  Yeah, I can't answer that.

 9  BY MS. MICHAEL:

10     Q    Okay.  Did you review this document prior to

11  signing it?

12     A    I did.

13     Q    Did you provide any comments on this document

14  prior to signing it?

15          MR. SHEEHAN:  Objection to the extent

16  answering the question would call for attorney-client

17  privilege.

18          I instruct you not to answer.  If you can

19  do so without divulging that information, you can do so.

20          THE WITNESS:  I cannot answer that.

21  BY MS. MICHAEL:

22     Q    Who else was involved in preparing this

23  document?

24          MR. SHEEHAN:  Objection to the extent

25  answering the question would call for attorney-client
```

1   privilege.

2                   I instruct you not to answer.  If you can

3   do so without divulging that information, you can do so.

4                   THE WITNESS:  I cannot answer that.

5   BY MS. MICHAEL:

6       Q    So to clarify for the record, you cannot

7   describe who was involved in preparing the Diocese

8   discovery responses on the basis of attorney-client

9   privilege?

10      A    Correct.

11      Q    Turning to Interrogatory No. 9.  I'll give you

12  a moment to review the interrogatory and the response.

13      A    Okay.

14      Q    In the interrogatory response, it refers to

15  the -- it, "refers the Committee to the complaints filed

16  in the Abuse Actions and the proofs of claim filed by

17  Abuse Claimants, all or most of which assert common

18  questions of law and fact against the Diocese and the

19  Related Entities, as well as to proofs of claims" --

20  "proofs of claim filed by the Related Entities."

21              Can you please describe how those documents

22  support your contention that the Diocese risks

23  indemnification liability if the abuse actions are

24  prosecuted?

25                  MR. SHEEHAN:  Objection.

1          You can answer, if you know.

2          THE WITNESS:  I don't know, and I'm not

3  exactly sure what documents you're referring to.

4  BY MS. MICHAEL:

5     Q    The documents that you referred to in the

6  response.  You say, "the complaints filed in the abuse

7  actions and the proofs of claim filed by abuse

8  claimants.  As well as the proofs of claim filed by

9  Related Entities."

10    A    I'm sorry.  There -- there are similar issues

11  of fact regarding the knowledge, regarding coverage, in

12  all of these cases.

13    Q    And how do those similar issues of fact create

14  a risk of indemnification liability for the Diocese?

15    A    Well, if in the state court action, you know,

16  we are found liable, then it's going to flow over to the

17  Diocese for indemnification for the parishes.

18    Q    Are there any other facts that support the

19  Diocese potential risk of indemnification liability?

20          MR. SHEEHAN:  Objection.

21          You can answer.

22          THE WITNESS:  I don't know at this point.

23  BY MS. MICHAEL:

24    Q    Are there any other documents that support the

25  alleged risk of indemnification liability?

 1      A     I --

 2                    MR. SHEEHAN:  Objection to form.

 3                    You can answer.

 4                    THE WITNESS:  I don't know.

 5                    MS. MICHAEL:  Turning now to

 6      Interrogatory No. 11.  I will pause and give you a

 7      moment to read the interrogatory and response.

 8                    THE WITNESS:  Okay.

 9      BY MS. MICHAEL:

10      Q    This interrogatory response similarly refers

11      the committee to the complaints and proofs of claim as

12      support for the assertion, "that the Diocese risks res

13      judicata based on decisions in the Abuse Actions to

14      which the Diocese is not a party."

15                    How do those documents support that

16      contention?

17      A    If --

18                    MR. SHEEHAN:  Objection.

19                    You can answer.

20                    THE WITNESS:  In the state court actions,

21      if there's a finding of law, that would be adverse to

22      our diocesan cases because so many of the complaints

23      filed in state court and the proofs of claims raise the

24      same issues of law.  There's a real risk that it would

25      be detrimental to the Diocese and to reaching a

1    satisfactory conclusion in the reorganization.

2    BY MS. MICHAEL:

3        Q    Are there any other facts that support that

4    contention?

5                MR. SHEEHAN:  Objection.  Form.

6                You can answer.

7                THE WITNESS:  At this point, no.

8    BY MS. MICHAEL:

9        Q    Are there any --

10       A    Not that I'm aware of.

11       Q    Are there any other documents that support

12   that contention?

13       A    Not that I'm aware of.

14       Q    Turning now to Interrogatory Number 12.  I'll

15   give you a moment to read the interrogatory and

16   response.

17       A    Okay.

18       Q    The -- this interrogatory also, "refers the

19   Committee to the complaints and proofs of claim as

20   support for the assertion that the Diocese risks a

21   finding of issue preclusion based on the decisions and

22   the Abuse Actions to which the Diocese is not a party."

23            How do those documents support that

24   contention?

25       A    In the same way as I answered previously, if

1   there is a finding in the state court, it's obviously

2   going to affect the diocesan case.

3       Q    Are there any other facts that support that

4   contention?

5               MR. SHEEHAN:  Objection to form.

6               You can answer.

7               THE WITNESS:  I don't know.

8   BY MS. MICHAEL:

9       Q    Are there any other documents that support

10  that contention?

11      A    I don't know.

12      Q    The motion discusses piecemeal litigation and

13  inconsistent judgments.  Your declaration does not

14  mention piecemeal litigation or inconsistent judgments.

15  Are those issues that you have knowledge about?

16      A    To an extent, yes.

17      Q    Can you explain the meaning of piecemeal

18  litigation as that term is used in the motion?

19      A    I am not the one that wrote that, but if we

20  have a ruling in one court that is directly opposed to a

21  ruling in a separate court, you know, obviously there's

22  going to be a problem with the competing rulings.

23      Q    And what would the problem be?

24      A    When it comes to the diocesan case we're going

25  to have to show, well, this court held this way, this

1    court held this way, now we have to settle the answer

2    all over again.  We're duplicating our efforts; that

3    type of thing.

4         Q    Can you explain how the abuse actions that do

5    not name the Diocese and only seek a judgment based on

6    the acts and omissions of non-debtors involve common

7    questions of law and fact with claims against the

8    Diocese based on its own acts and omissions?

9                   MR. SHEEHAN:  Objection.

10                   You can answer, if you know.

11                   THE WITNESS:  I don't know.

12   BY MS. MICHAEL:

13        Q    Can you identify what common questions of law

14   are implicated in both the abuse actions and the proofs

15   of claim in the bankruptcy?

16                   MR. SHEEHAN:  Objection.

17                   You can answer, if you know.

18                   THE WITNESS:  Not at this point in time.

19   BY MS. MICHAEL:

20        Q    Was there a point in time when you could

21   identify those?

22        A    No.

23        Q    Can you identify what common questions of fact

24   are implicated in the proofs of claim and the abuse

25   actions?

1      A      To the extent that there are questions of

2    indemnification, there are questions of knowledge on the

3    part of the Diocese and the parishes themselves.  There

4    are questions as to when something was reported and who

5    know -- who knew what at what point.  Those types of

6    issues.

7      Q      Can you clarify what you mean when you say

8    questions of indemnification?

9      A      With the self-insurance program.  We would

10   have to -- the Diocese would have to use that to

11   indemnify the parishes against any possible outcomes.

12   And then there is also the risk that insurance companies

13   could start disclaiming claims.

14     Q      At what stage in an abuse action would

15   questions about indemnification arise?

16     A      That's not my field of law.  I don't know.

17     Q      You mentioned common questions of fact about

18   who knew what.  Who's the who you're referring to there?

19     A      Whether or not --

20            MR. SHEEHAN:  Objection.

21            THE WITNESS:  Sorry.

22            MR. SHEEHAN:  You can answer.

23            THE WITNESS:  I meant whether or not the

24   Diocese was aware of the abuse.  Whether the parish

25   itself was aware of the abuse.

1  BY MS. MICHAEL:

2      Q    Would those be the same question?  Whether the

3  Diocese knew or the parish knew?

4      A    Well, if the -- that brings up the question of

5  coverage and indemnification again, so.

6      Q    How?

7      A    If the Diocese was aware and did nothing, then

8  we'd be liable.  And if the parish did not report to the

9  Diocese, then there's a problem with coverage.

10     Q    You said then you'd be liable, but not in an

11  action in which the Diocese is not a named party,

12  correct?

13               MR. SHEEHAN:  Objection.

14               You can answer.

15               THE WITNESS:  I meant as far as

16  indemnification.

17  BY MS. MICHAEL:

18     Q    Beyond indemnification questions in the state

19  court actions, if the Diocese is not a party, is there a

20  common question of fact regarding who knew what?

21               MR. SHEEHAN:  Objection.

22               You can answer, if you know.

23               THE WITNESS:  I'm just assuming again.

24  But, yeah, there would be common questions in all of the

25  cases.

 1                    MR. SHEEHAN:  That's her question.  A

 2     common question with what?

 3                    MS. MICHAEL:  I'm sorry, can you repeat

 4     your question?

 5                    MR. SHEEHAN:  I was trying to clarify

 6     your prior question.  Yes, there are common questions in

 7     the actions in which Diocese is not named.  And I was

 8     asking, a common question with what?  Meaning with this

 9     statement or claim -- by that claim -- the question was

10     not clear, so --

11     BY MS. MICHAEL:

12         Q    My question, as written in this speech-to-text

13     function, was, is there a common question of fact

14     regarding who knew what?

15                    MR. SHEEHAN:  Objection to form.

16                    You can answer, if you know.

17                    THE WITNESS:  I don't know.

18     BY MS. MICHAEL:

19         Q    If the -- if one parish is found liable to

20     Plaintiff A for a large sum and a defense verdict is

21     entered for Plaintiff B, each arising from separate

22     instances of abuse, do you view those as inconsistent

23     judgments?

24                    MR. SHEEHAN:  Objection.

25                    You can answer, if you know.

```
 1                    THE WITNESS:  No, I can't answer that.
 2    BY MS. MICHAEL:
 3        Q    Do you agree that fact finders may reach
 4    different conclusions based on different facts in cases?
 5        A    Yes.
 6        Q    Do you agree that the acts of abuse are not
 7    uniform across all 800 plus cases?
 8        A    Yes.
 9        Q    To the extent there is piecemeal litigation
10    against non-debtor parties, what is the burden that
11    creates on the bankruptcy estate?
12        A    We would have to defend.  So there'd be the
13    indemnification.  We have to pay the defense costs.  The
14    further legal costs are depleting the reserves that we
15    have to do a just and equitable distribution to the
16    actual complainants.
17        Q    I understand those are the issues you've
18    raised about the litigation going forward, generally.
19    My specific question is, to the extent there's piecemeal
20    litigation, the example you gave earlier of one court
21    ruling one thing and another court ruling another, what
22    is the impact of that on the bankruptcy estate?
23                    MR. SHEEHAN:  Objection to form.
24                    You can answer, if you know.
25                    THE WITNESS:  Then the issue would have
```

1   to be re-adjudicated if we wind up -- you know, in our

2   settlement options, if there's two disparaging rulings,

3   a conclusion would have to be made as to the correct one

4   in the bankruptcy settlement.

5                    MS. MICHAEL:  All right.  I'd like to

6   take a brief, let's say 10-minute break, just to go over

7   my notes.  I'm at the end of my planned questions.  I'd

8   just like to go over my notes to see if there's any

9   cleanup questions I need to ask.

10                   MR. SHEEHAN:  Sure.

11                   MR. SULLIVAN:  Yes.  You said a 10?

12                   MS. MICHAEL:  Yeah.  Reconvene at 2:15

13  your time?

14                   MR. SULLIVAN:  That sounds fine.

15                   THE REPORTER:  Okay.  The time is now

16  2:02 p.m., Eastern, and we're off the record.

17       (Off the record.)

18                   THE REPORTER:  The time is now 2:14 p.m.,

19  Eastern, and we're back on the record.

20                   You may proceed.

21                   MS. MICHAEL:  Just a few final questions.

22  BY MS. MICHAEL:

23       Q    Ms. Potzler, when you use the word

24  indemnification, do you mean the obligation of the self-

25  insured program to pay defense costs and liability of

1    any self-insured program participants, including the

2    Diocese?

3         A    Correct.

4         Q    And have you reviewed the proofs of claim that

5    the parishes and other related entities filed in the

6    Chapter 11 bankruptcy?

7         A    Not all 800 of them, but many of them, yes.

8         Q    Just to clarify, the proofs of claim that were

9    filed by the parishes and related entities, not the

10   abused claimants?

11        A    No, I have not.

12             MS. MICHAEL:  All right.  That is all of

13   the questions that I have.  We'd like to establish a

14   time for Ms. Potzler to review the transcript and sign

15   it, after which we can use the unsigned version if we

16   have not received a signed version back.  Does a week

17   from today work?

18             MR. SHEEHAN:  I guess the question is,

19   when will we receive the transcript?

20             THE REPORTER:  So for the transcript, we

21   can try to get it to you as soon as possible.  When are

22   you expecting it by?

23             MS. MICHAEL:  Tomorrow.

24             THE REPORTER:  Ms. Michael, when are you

25   -- tomorrow?

```
 1              MS. MICHAEL:  Yes.

 2              THE REPORTER:  Okay.  I believe we can

 3    get it to you by tomorrow.  We'll have a rough draft

 4    that you'll be able to download within a couple of

 5    hours, but we'll try to get it to you as soon as

 6    possible.  I believe we can get it to you by tomorrow,

 7    but not 100 percent.  I can have the office reach out to

 8    you with more information regarding that, but we will

 9    definitely get it to you ASAP.

10              MS. MICHAEL:  Sure.  Just to clarify, our

11    discussions were whether we needed it today or if

12    tomorrow was okay, and we had said tomorrow was okay.

13              THE REPORTER:  Okay.  It won't be

14    available today.  I know that.  It most likely will be

15    available tomorrow.

16       (Witness and Counsel confer.)

17              MR. SHEEHAN:  Brittany, I think that's

18    probably workable.  You're suggesting next Wednesday?

19              MS. MICHAEL:  Yes.

20              MR. SHEEHAN:  Yeah, I think we can do

21    that.  As long as the transcript is available by the end

22    of the day tomorrow, that should be work.

23              MS. MICHAEL:  We can -- if it's not

24    available, we can give an extra day.  But I'm assuming

25    you're going to want this done before Thanksgiving
```

1    either way.  But if you need that extra day, if the

2    transcript takes an extra day, that's fine with us too.

3                    MR. SHEEHAN:  Sure.  Understood.  Thank

4    you.

5                    THE REPORTER:  Okay.  And the time is now

6    2:17 p.m., Eastern, and we're off the record.

7              (Proceedings concluded at 2:17 p.m.)

8                    (Read and Sign requested.)

9                         *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              CERTIFICATE OF NOTARY PUBLIC

2

3    State of Ohio    )

4    County of Summit )

5

6         I hereby certify that on the 15th day of November

7    2023, before me, a RON notary public for the State of

8    Ohio, MELISSA POTZLER, remotely appeared via

9    videoconference, and prior to testifying, swore an oath,

10   to tell the truth.

11

12        DATED this 15th day of November 2023.

13

14                              /s/

15                   _____

16                   Sarah Schroeter

17                   RON Notary Public, State of Ohio

18                   Commission No.:  2020-RE-823171

19                   Commission Expiration:  11/29/2025

20

21

22

23

24

25

1          CERTIFICATE OF REPORTER

2

3          I, Jamie Godinez, hereby certify:

4          That the foregoing proceedings were taken

5    before me at the time and place therein set forth;

6          That the proceedings were recorded by me and

7    thereafter formatted into a full, true, and correct

8    transcript of same;

9          I further certify that I am neither counsel

10   for nor related to any parties to said action, nor in

11   any way interested in the outcome thereof.

12

13          DATED, this 15th day of November 2023.

14

15

16          _____

17          Jamie Godinez, CER-1260

18          Certified Electronic Reporter

19

20

21

22

23

24

25

1           A C K N O W L E D G E M E N T

2

3           I do hereby certify that having been first

4    duly sworn to testify to the truth, I gave the above

5    testimony on November 15, 2023.

6

7           I further certify that the foregoing

8    transcript is a true and correct transcript of the

9    testimony given by me at the time and placed specified.

10

11

12                          _____

13                          MELISSA POTZLER

14

15   Sworn to before me this ____ day of _____, 20__

16

17

18   _____

19   Notary Public

20

21

22

23

24

25

E R R A T A   S H E E T

Deponent:  MELISSA POTZLER

Deposition Date:  Wednesday, November 15, 2023

PAGE   LINE   CHANGE FROM/TO   REASON FOR CHANGE

_____ _____ _____ _____

_____ _____ _____ _____

_____ _____ _____ _____

_____ _____ _____ _____

_____ _____ _____ _____

_____ _____ _____ _____

_____ _____ _____ _____

_____ _____ _____ _____

_____ _____ _____ _____

_____ _____ _____ _____

_____ _____ _____ _____

_____ _____ _____ _____

_____ _____ _____ _____

Under penalties of perjury, I declare that I have

read the foregoing deposition and hereby affix my

signature that same is true and correct, except as noted

above.

_____        _____

MELISSA POTZLER                  Date

Sworn to before me this ____ day of _____, 20__

_____

Notary Public

**WORD INDEX**

**< 1 >**
**1** 4:5
20:22, 23, 25
28:25
**1:15**
79:9
**1:19**
79:15
**10** 3:4
15:6
16:23
17:1, 7
18:19, 25 31:5
32:1
33:23
34:12, 14
43:16
110:11
**10.9**
96:23
97:4, 11
**100**
1:11
112:7
**10100**
2:13
**10-minute**
110:6
**11** 1:6, 11 7:6
15:2
24:4
27:4, 23
28:1, 25
29:17
43:25
45:21

47:2
65:6
76:13
87:19
88:3, 19
102:6
111:6

**11/29/2025**
114:19
**11:00**
1:19
7:4
**11:04**
11:8
**11:05**
11:11
**11:54**
47:22
**12** 80:3
94:7
103:14
**12:02**
47:24
**12:43**
79:2, 13
**13**
84:12, 13 85:1
**13202**
2:5
**13th**
2:13
**15** 1:18
34:24
116:5
117:1
**15th**
7:3
114:6, 12
115:13

**16**
89:17, 18
96:11, 12, 19
98:10
**18B** 17:9
**19**
24:21
92:14
93:22

**< 2 >**
**2** 4:6
98:1, 2
**2:02**
110:16
**2:14**
110:18
**2:15**
110:12
**2:17**
1:20
113:6, 7
**20** 4:5
33:14
116:15
117:1
**20-01016**
1:9
**20-10322**
1:4
7:10
**2019**
24:7
25:4
**2020-RE-823171**
114:18
**2023**
1:18
7:3
114:7,

**12**
115:13
116:5
117:1
**21028**
1:23
**22** 29:16

**< 3 >**
**30(b)(4**
6:6

**< 4 >**
**40** 34:24
**456** 7:6

**< 5 >**
**50** 30:7
33:12

**< 6 >**
**60** 65:24

**< 7 >**
**7** 23:4, 5, 24
24:1
**70**
62:19
65:25

**< 8 >**
**80** 33:15
**800**
109:7
111:7
**891**
19:17, 22

**< 9 >**
**9** 100:11
**90067**

**2:14**
**98** 4:6

**< A >**
**a.m**
1:19
7:4
11:8, 11
47:22
**A.W** 2:16
**ability**
35:18
**able**
23:15, 16
32:24
44:5
65:18
74:7
76:18, 23 93:5
112:4
**absent**
60:7
**absolute**
50:1
**Absolutely**
24:17
44:9
**abuse**
25:20
30:2, 9, 13 32:6, 14
36:12
38:8, 17, 22 39:1, 7, 13, 16
40:7
42:21, 23 44:6, 17

45:*11, 21*  47:*2*  48:*8, 21*  49:*13, 15*  50:*13*  51:*7, 11, 14*  53:*9*  57:*4, 8, 12, 18, 25*  58:*13*  59:*9, 17, 24*  60:*5, 13*  61:*17, 23*  62:*1, 24*  63:*18*  65:*19*  66:*6, 18, 25*  67:*4, 9*  74:*8, 24*  75:*3, 14*  76:*19*  77:*2*  80:*6, 24*  81:*3, 14*  82:*4*  84:*5*  89:*1*  94:*10*  96:*9*  100:*16, 17, 23*  101:*6, 7*  102:*13*  103:*22*  105:*4, 14, 24*  106:*14, 24, 25*

108:*22*  109:*6*
**abused** 111:*10*
**access** 19:*9*  30:*16*  35:*5, 7, 15*  37:*6*
**accident** 16:*1*  97:*15, 20*
**accumulated** 97:*8*
**accuracy** 98:*13, 20*
**accurate** 6:*9*
**accusers** 63:*13*
**Act** 17:*25*
**action** 6:*5*  40:*13*  49:*15*  51:*7, 11, 14*  60:*22*  75:*18*  82:*4*  86:*14, 22*  87:*5, 9*  89:*10, 15*  94:*14*  101:*15*  106:*14*  107:*11*  115:*10*
**actions** 17:*23*  18:*12*

19:*15, 19, 22, 24*  20:*5, 8, 11*  25:*21*  30:*2, 9, 13, 19*  32:*6, 14*  35:*19*  36:*12*  37:*11*  38:*8, 17, 22*  39:*1, 3, 7, 13, 17*  40:*7, 10*  42:*21, 23*  44:*6, 17*  45:*11, 21*  47:*2*  48:*8, 15, 21*  49:*13*  50:*13*  57:*4, 8, 12, 13, 18, 25*  58:*13*  59:*10, 17, 24*  60:*5, 13, 15*  61:*17, 23*  62:*1, 2, 24*  63:*18, 19*  64:*17*  65:*19*  66:*7, 18, 25*  67:*5, 6, 9, 10*

74:*8, 24*  75:*3, 4, 14, 15*  76:*10, 19*  77:*2*  80:*6, 25*  81:*3, 14*  82:*10*  84:*5*  85:*6*  86:*3, 5, 6*  89:*1*  94:*10*  95:*9*  96:*9*  100:*16, 23*  101:*7*  102:*13, 20*  103:*22*  105:*4, 14, 25*  107:*19*  108:*7*

**activities** 72:*8*
**acts** 105:*6, 8*  109:*6*
**actual** 18:*19*  109:*16*
**add** 74:*15*
**added** 97:*11*
**addition** 36:*2*
**additional** 26:*4*

28:*3*  36:*13, 15*  62:*8*  78:*20*
**address** 43:*19*
**addressed** 70:*19*
**addressing** 31:*11*
**adjudicated** 85:*6*
**administer** 65:*18*  74:*8*  76:*18*
**administered** 6:*8*
**administering** 30:*2*  38:*8, 17, 22*  39:*1*  57:*4, 8, 12*  61:*17, 22*  62:*1*  66:*18, 25*  67:*4, 9*  74:*24*  75:*3*  77:*2*
**admission** 9:*6*
**admissions** 86:*9*  87:*9*  88:*17*
**admitted**

86:*10*
**Adv** 1:*9*
**adverse**
85:*14*
86:*22*
88:*17,
25*
102:*21*
**advice**
53:*21*
59:*20*
60:*4*
**affect**
31:*17*
85:*16,
18* 104:*2*
**affirm**
10:*2*
**affix**
117:*1*
**afield**
41:*20*
**aggregate**
94:*4*

**aggregates**
92:*12*
**ago**
28:*3*
90:*20*
96:*22*
97:*3*
**agree**
6:*10*
9:*3, 5*
71:*7*
109:*3, 6*
**AGREED**
5:*3, 6,
9, 12*
6:*25*
**agreement**
37:*11*

**agrees**
6:*16*
**ahead**
11:*7*
17:*6*
21:*1*
39:*22*
74:*3*
78:*16*
**AL** 1:*11*
**alleged**
101:*25*
**allotted**
12:*18*
**allow**
89:*20*
**allowed**
13:*24*
30:*16*
35:*5*
62:*25*
80:*7*
**amount**
26:*17*
27:*8, 12*
30:*15*
31:*11,
22* 40:*4*
66:*3*
71:*25*
**amplify**
46:*20*
**and/or**
9:*5*
**Angeles**
2:*14*
**answer**
10:*23*
11:*23*
19:*4, 5*
20:*1*
21:*22*
22:*9, 13,*

*16* 23:*1,
2* 25:*23*
27:*10,
19* 28:*6,
11, 12*
29:*8*
30:*5, 25*
31:*1, 2*
32:*24*
33:*20*
36:*7, 25*
37:*25*
38:*12,
14*
39:*22*
40:*19*
42:*13,
14, 25*
44:*8*
45:*6, 15,
17, 24*
46:*14*
48:*9, 16*
49:*1, 24*
50:*14*
51:*5, 15,
25* 52:*1,
5, 12, 16*
55:*11*
56:*6, 8,
19*
57:*20*
58:*15*
59:*5, 6,
8, 15*
60:*2, 25*
61:*2*
62:*5*
63:*1, 20*
64:*13,
14, 16,
23* 66:*8*
67:*12*

68:*6, 7,
9* 69:*14,
22* 70:*4,
8* 72:*14,
21* 73:*4,
6* 75:*7*
76:*1*
77:*5*
80:*13*
81:*9*
82:*6, 18*
83:*4, 21,
22*
85:*22*
86:*18,
19* 87:*1,
2, 13, 21*
88:*11,
13, 21*
89:*3*
91:*15,
23* 93:*2,
5, 18*
94:*20*
95:*17,
25* 99:*5,
6, 8, 18,
20*
100:*2, 4*
101:*1,
21*
102:*3,
19*
103:*6*
104:*6*
105:*1,
10, 17*
106:*22*
107:*14,
22*
108:*16,
25*
109:*1, 24*

**answered**
103:*25*
**answering**
19:*3*
21:*20,
23*
22:*23*
28:*9*
32:*22*
38:*11*
51:*24*
55:*10*
56:*5*
59:*3*
64:*12*
68:*5*
69:*7*
99:*4, 16,
25*

**anticipate**
31:*6*
**Apologies**
10:*22*
11:*19*
19:*18*
24:*23*
26:*4*
29:*18*
34:*13*
61:*12*
97:*21*
**apologize**
97:*10*
**appear**
12:*12*

**appearance**
7:*21*
8:*14*
11:*14*
**appeared**
114:*8*

Appearing 2:10, 19
applied 89:13
appointments 47:10
appreciate 46:22
apprised 54:13 55:1
appropriate 5:15
approve 46:1
approximately 7:4 19:17 33:10 34:8 73:18 77:16, 25
approximation 62:10, 13
archives 26:9, 10
areas 59:1
arising 108:21
ASAP 112:9
asbestos 15:19
aside 91:3
asked 36:11 46:22 60:4

90:16, 20 97:5
asking 36:14 37:21 41:17, 19 47:1 60:1, 3, 4 70:22 71:5, 17 108:8
aspect 96:17
aspects 80:22 94:17 95:14, 21 96:19
assert 22:7 70:2 100:17
asserted 20:11 50:19 85:11 87:18 88:3
asserting 40:8
assertion 102:12 103:20
assigning 47:5, 7
assist 31:11
assume 43:2 84:7
assuming 57:21 58:10

63:23
80:15
82:7
107:23
112:24
attending 33:17 48:14
attorney 6:13, 16 7:15 11:15 17:8 21:20 27:13, 23 28:16, 18, 21 30:24 39:9 56:12 72:22 99:4
attorney-client 22:8, 10, 24 28:9 32:22 38:11 41:16, 18 51:24 52:3 55:10 56:5 59:3, 10, 17, 21 64:12, 18 68:5, 10 69:8, 17, 24 70:11 72:9

73:8
83:20
99:16, 25 100:8
attorneys 5:4 6:4 8:6, 16 16:20 94:15

Attorney's 17:10, 12
audio 6:15 9:4 10:22 11:1
audiovisual 9:5
audit 27:24 28:20
auditor 28:23
authority 72:21 73:7, 13
Auxiliary 58:4 80:21
Available 4:2 37:15 42:18 90:14 112:14, 15, 21, 24
Avenue 13:18
aware 40:13 44:3

54:13, 14 55:3
89:12, 16
103:10, 13
106:24, 25 107:7

< B >

bachelor's 14:13, 16
back 11:12 16:22 47:25 48:6 70:22 79:8, 16 80:1 84:3 96:11 110:19 111:16

background 14:12
bankrupt 39:14

BANKRUPTCY 1:1 7:11 17:24 18:2 24:8 27:12 29:23 30:21 31:17 33:3 34:2, 3,

*9, 15, 21*
37:*10*
38:*18,*
*23*
39:*18*
40:*16,*
*24*  41:*3*
42:*11*
43:*15*
50:*3, 10*
57:*5, 9*
61:*18,*
*22*
62:*15,*
*20*
66:*19*
67:*1*
72:*2*
74:*25*
85:*17,*
*19*
105:*15*
109:*11,*
*22*
110:*4*
111:*6*
**base**
44:*12*
65:*23*
**based**
44:*18*
58:*9*
82:*8*
83:*19*
93:*23*
96:*12,*
*19, 23,*
*24*
102:*13*
103:*21*
105:*5, 8*
109:*4*

**Basically**
26:*20*
53:*15, 16*
**basis**
9:*6*
30:*3*
38:*18*
40:*8*
43:*15,*
*23*  52:*7,*
*11*
54:*23*
56:*12*
58:*18*
59:*10,*
*17, 18,*
*21, 25*
62:*12*
64:*18*
68:*10*
69:*8, 17*
70:*10,*
*19*  73:*8,*
*9, 12*
74:*12*
76:*24*
85:*2, 3,*
*13*  86:*1,*
*7, 8*
90:*15,*
*21*  94:*9*
100:*8*
**began**
24:*7, 8,*
*21*  25:*4*
**beginning**
43:*3*
84:*15*
90:*7*
**behalf**
7:*23*
9:*10*

49:*9*
50:*18*
**belief**
44:*4, 10*
48:*7*
65:*17,*
*23*  74:*6,*
*12*
76:*17*
98:*21*
**believe**
11:*22*
21:*16*
24:*6*
28:*24*
38:*6*
47:*10*
53:*10*
55:*1*
59:*12*
61:*10*
63:*14*
65:*15*
77:*17*
80:*10*
81:*14*
84:*5*
112:*2, 6*
**best**
98:*20*
**better**
46:*20*
86:*12*
**beyond**
42:*3*
68:*23*
69:*9*
72:*11*
92:*13*
93:*20*
96:*7*
107:*18*

**bishop**
31:*11*
35:*6, 9,*
*11*  38:*4,*
*7, 16, 19,*
*21, 25*
39:*6, 11,*
*14, 15,*
*24*  40:*8,*
*11, 15,*
*23*  42:*9,*
*22*  43:*5,*
*14, 24*
44:*4, 19*
45:*3, 21*
46:*10*
47:*3*
48:*7, 13,*
*20, 24*
49:*6, 12,*
*14*  51:*6,*
*9, 13*
52:*6, 9,*
*14*
54:*12,*
*24*  55:*6,*
*16, 24*
56:*2, 10,*
*16*  58:*4,*
*9*  60:*7,*
*11*  69:*5,*
*13, 16,*
*23*
80:*15,*
*21, 23*
87:*16*
88:*1*
**bishop's**
78:*7*
**bit**
63:*10*
**bmichael@p**

**szjlaw.com**
2:*18*
**board**
40:*11,*
*14*  43:*1*
45:*8*
49:*16*
65:*13*
80:*23*
**BOND**
2:*3*
7:*23*
8:*16*
11:*16*
13:*17*
**bottom**
23:*13*
**Boulevard**
2:*13*
**breached**
53:*21*
**break**
43:*13*
47:*15*
48:*4*
78:*17,*
*25*
79:*21*
110:*6*
**breaking**
78:*14*
**breathe**
44:*14*
**BRENDAN**
2:*6*
7:*23*
13:*20*
21:*14*
**brief**
110:*6*
**briefly**
90:*3*

bring
54:22
64:4
96:11
bringing
31:4
brings
107:4
BRITTANY
2:15
7:16
47:14
112:17
Broadway
7:6
brought
53:9
54:19
76:9
bsheehan@b
sk.com
2:9
BUFFALO
1:5, 8
2:10
7:10, 24
8:17
13:18
14:18,
22   15:4
24:2
bulletins
15:13
burden
109:10
button
20:25

< C >

California
2:14

call
19:3
38:11
51:24
55:10
56:5
59:3
62:15
64:12
68:5
69:7
95:18
99:4, 16,
25
called
10:8
57:22
58:11
94:24
calls
22:22
34:17
42:24
43:12,
17, 18,
19   49:3
61:2
65:5
72:9
76:1
82:16
83:2, 20
85:20
86:16,
24
87:11
88:9
91:21
Camp
29:9, 10,
12, 14
camps
20:15

canon
35:3, 17
56:15,
16, 19
canonical
46:17
47:12
canonicall
y   46:1
capture
6:14
captured
9:8
capturing
9:3
car
15:25
Carolina
14:17
carriers
33:18
Case
1:4
7:10
15:19
19:8
30:22
31:16
36:18
40:17,
25
42:11
43:25
45:21
47:2
53:4
54:9, 23
56:15
59:18,
25   60:3
63:24
76:13
85:17,

19
86:11
87:19
88:3, 19
94:7
95:4
104:2, 24
cases
18:2, 5
29:14
31:25
32:9
33:5
53:5, 8,
10, 11,
12, 14,
19, 22,
24   54:3,
19, 20,
25   55:5,
8, 18
58:19,
20, 24
63:6, 15
77:20
85:12,
16
86:12
88:7
93:4, 7
101:12
102:22
107:25
109:4, 7
Catholic
17:20
93:8, 9
cause
19:13
Center
2:4
central
15:5

CER-1260
1:22
115:17
certain
46:1, 17
47:8
78:6
CERTIFICAT
E   114:1
115:1
Certified
115:18
certify
114:6
115:3, 9
116:3, 7
CFO
66:24
84:4

chancellor
14:20
26:9, 16,
22
29:19
35:6, 15,
16
change
47:11
117:1
changes
12:17, 21
Chapter
1:6, 11
24:4
27:4, 23
28:1
43:25
45:21
47:2
65:5
76:13
87:19

88:3, *19*
111:6
**CHARLES**
2:7
7:24
8:15
13:20
**Charlie**
21:14
24:23
41:7, *24*
**chat**
6:18
**chief**
14:20
21:*13,*
*15, 25*
22:1
26:*15,*
*20*
29:21
30:17
31:*19*
54:*13,*
*14*
80:16
81:*16,*
*23*   97:6
**child**
14:21
17:25
29:20
**church**
17:21
**Civil**
5:*11, 14,*
*15*   6:7
**claim**
100:*16,*
*20*
101:7, *8*
102:11
103:19

105:*15,*
*24*
108:9
111:4, *8*
**claimant**
95:10
**claimants**
63:12
100:17
101:8
111:10
**claims**
20:10
64:10,
17
87:18
88:3
90:12
100:19
102:23
105:7
106:13
**clarificat**
**ion**
46:22
**clarify**
46:24
52:5
56:10
59:8, *15*
64:16
69:22
70:7, *13*
72:17
98:19
100:6
106:7
108:5
111:8
112:10
**CLB**   1:4
**cleanup**
110:9

**clear**
13:4
108:10
**cleric**
47:5
**clerical**
77:7
**clerks**
25:13, *17*
**client**
21:21
30:25
39:10
56:13
72:23
**client-**
**privilege**
99:4
**coaching**
71:16
**co-**
**insured**
90:11

**collateral**
50:20
85:2, *4*
86:14
88:18
89:13
**come**
19:11
27:16
31:25
34:18,
*23*
48:22
52:22
53:4
78:3
79:8
82:4, *7*

**comes**
18:18
34:6
104:24
**comfortabl**
**e**   13:8
**command**
60:10
**comment**
12:22
**comments**
99:13

**Commission**
114:*18,*
*19*

**commitment**
68:2
**commitment**
**s**   74:13
**Committee**
2:19
7:18
8:4, *9,*
*11*   9:11
33:17
65:6
67:21
68:3, *11,*
*15, 17,*
*20*   69:*2,*
*4, 5, 13,*
*16, 21,*
*23*   70:*1,*
*8*   71:25
72:3, *8,*
*17*   73:*8,*
*13, 16,*
*19, 20*
100:15
102:11
103:19

**Committee'**
**s**   4:7
72:20
97:25
98:6
**common**
100:17
105:6,
*13, 23*
106:17
107:*20,*
*24*
108:2, *6,*
*8, 13*
**communicat**
**ing**
63:25
65:7
**communicat**
**ion**   6:17
**communicat**
**ions**
14:6
62:18
**companies**
106:12
**comparing**
94:11
**competentl**
**y**   14:9
**competing**
104:22
**complainan**
**t**   19:12
**complainan**
**ts**
109:16

**complaints**
18:23
100:15
101:6
102:11,

*22*
  103:*19*
**complete**
  35:*18*
**completed**
  28:*16*

**completely**
  37:*10*

**compliance**
  14:*20*
  28:*23*
  29:*22*
**composition**
  n   72:*7,*
*20*   73:*7,*
*13*

**concerning**
  19:*11*
**concluded**
  113:7

**conclusion**
  76:*1*
  82:*17*
  85:*21*
  86:*17,*
*25*
  87:*12*
  88:*10*
  91:*22*
  94:*9*
  103:*1*
  110:3
**conclusions**
  s   109:*4*
**conducted**
  6:7   9:*1*
**confer**
  47:*15*

78:*23*
  112:*16*
**conflicting**
  g   31:*23*
**conjunction**
  n   98:7
**consequences**
  es   85:7
**considerations**
  39:*12,*
*16*
  40:*10*
  94:*22*

**constantly**
  44:*14*
**consuming**
  94:*15*
**contact**
  13:*25*
**contained**
  21:*18*

**contention**
  100:*22*
  102:*16*
  103:*4,*
*12, 24*
  104:*4, 10*
**context**
  45:*20*
  47:*1, 2*
  71:*13*
  78:*4*
  82:*3*
  90:*22*
**continue**
  71:*17*
**contract**
  82:*13,*
*21, 25*

**contracts**
  83:*10,*
*14, 17,*
*24*   84:*1*
  91:*18*

**contribute**
  40:*24*
  41:*1*
**contributing**
  ng   62:*17*
**contribution**
  on
  42:*11*
  68:*12*
  70:*10*
  72:*2, 4*
  91:*10*
**contributions**
  ons
  66:*11*
  90:*8*
  91:*20*
**controlling**
  g   5:*16*
**conversation**
  on   62:7
  67:7
**conversations**
  ons
  57:*15*
  96:*25*
  97:*2*

**coordinate**
  32:*2, 5*
**coordinated**
  d   15:*12*
  32:*14*
**coordinator**
  r   14:*21*
  15:*11*
  29:*21*

**copied**
  77:*13*
**correct**
  13:*12,*
*13*
  16:*25*
  23:*5*
  24:7
  29:*16,*
*24*   31:*6,*
*9*   64:*19*
  65:*11,*
*12, 22*
  68:*13,*
*15, 18*
  69:*19,*
*25*   70:*4,*
*12*
  72:*18,*
*19*
  73:*15*
  84:*6*
  100:*10*
  107:*12*
  110:*3*
  111:*3*
  115:7
  116:*8*
  117:*1*
**correctly**
  60:*20*
**correlating**
  g   63:*25*
**costs**
  90:*11*
  94:*1, 3,*
*7, 8, 10*
  109:*13,*
*14*
  110:*25*
**counsel**
  6:*25*
  7:*13*

10:*12*
  14:*5, 22*
  29:*20*
  32:*4, 11*
  34:*2, 4,*
*11, 15*
  35:*7, 22*
  36:*3, 14,*
*17, 23*
  37:*5, 8,*
*19, 23*
  39:*9*
  43:*12,*
*18*
  46:*23*
  48:*4*
  52:*8*
  53:*16,*
*23*   54:*2,*
*4, 7, 17*
  64:*8, 17*
  78:*23*
  79:*21*
  83:*6*
  112:*16*
  115:*9*
**counsels**
  44:*2*
**County**
  17:*9, 11*
  114:*4*
**couple**
  112:*4*
**COURT**
  1:*1*
  6:*9*
  7:*11*
  12:*6*
  15:*20*
  17:*22*
  35:*19*
  41:*22*
  44:*17*

64:*17*
85:*6, 16*
86:*3, 6,*
*11*   89:*8*
101:*15*
102:*20,*
*23*
104:*1,*
*20, 21,*
*25*
105:*1*
107:*19*
109:*20,*
*21*
**cover**
91:*10*
**coverage**
27:*21*
88:*25*
90:*13*
95:*12*
96:*2, 5*
101:*11*
107:*5, 9*
**covered**
41:*16*
85:*9*
91:*12*
**covering**
90:*10*
**create**
101:*13*
**creates**
109:*11*
**creating**
6:*9*
**Creditors**
2:*20*
7:*19*
**curious**
97:*19*
**current**
14:*25*

15:*4*
18:*13,*
*15*
26:*25*
27:*1*
43:*5*
**Currently**
13:*15,*
*16*
14:*19*
19:*16,*
*19*
23:*10*
32:*19*
37:*4*
45:*4*
67:*16*
76:*6*
84:*1*
**cut**
10:*22*
23:*10*
**CVA**
18:*1, 2,*
*5, 12*
19:*15,*
*19, 22*
20:*5, 8,*
*11*   27:*5*
29:*6, 12*
37:*10*

< D >
**database**
63:*25*
**databases**
63:*5*
64:*3, 4*
**database-**
**wise**
63:*24*
**DATE**
1:*18*

7:*3*
32:*11*
117:*1*
**DATED**
114:*12*
115:*13*
**day**
27:*22*
33:*23*
46:*19*
62:*19*
66:*4*
112:*22,*
*24*
113:*1, 2*
114:*6,*
*12*
115:*13*
116:*15*
117:*1*
**days**
33:*23*
43:*16*
**day-to**
46:*18*
**day-to-**
**day**
45:*22*
46:*3, 12,*
*16*   58:*17*
**deacons**
47:*7*
**dealing**
58:*21,*
*23*   83:*14*
**Debtor**
1:*6*
**deceased**
27:*1, 2*
**deciding**
40:*23*
60:*21*

**decision**
51:*6, 10,*
*19, 21*
55:*7, 16*
56:*17*
**decisions**
39:*11,*
*15*   40:*9,*
*15*
42:*10,*
*19, 23*
46:*19*
49:*6, 13,*
*14, 17,*
*18, 22*
50:*12*
51:*8*
52:*6*
58:*24*
59:*1, 9,*
*13, 16,*
*23*   60:*5,*
*9, 12, 15*
102:*13*
103:*21*
**Declaratio**
**n**   4:*5*
20:*22*
21:*6, 9,*
*12, 18*
22:*6*
31:*5*
80:*2*
85:*1*
87:*25*
104:*13*
**declare**
117:*1*
**decrees**
47:*12*
**dedicate**
77:*17*

**deductible**
90:*12*
**deductible**
**s**   92:*2,*
*10*
**deemed**
5:*14*
**defend**
53:*24*
54:*4*
109:*12*
**defendant**
19:*16,*
*20, 24*
93:*8*

**Defendants**
1:*12*
**defending**
70:*25*
94:*5, 6*
96:*9*
**defense**
17:*8*
25:*20*
32:*4*
90:*11*
91:*12*
94:*1, 3,*
*7, 10*
108:*20*
109:*13*
110:*25*

**definitely**
112:*9*
**degree**
14:*13,*
*14, 16*
**degrees**
14:*15*

Delaware 13:18

delegate 45:4, 7

departments 29:5, 6

depends 34:17, 23 54:8 56:15 77:19 78:2 93:3 95:2, 4 96:17

depleting 109:14

deponent 48:14 117:1

deposed 10:18, 24 11:24, 25 15:22 80:8, 11, 18 81:1, 14, 20, 24

DEPOSITION 1:14 5:10 6:7, 15, 19, 21, 25 7:8 8:25 12:13 13:9 14:1 15:24 16:9, 19,

21 42:4 68:23 69:10 72:12 117:1

depositions 48:14

describe 21:5 25:11 28:3, 17 91:6 100:7, 21

DESCRIPTION 4:4

designated 7:5

detail 63:10 95:12

detailed 94:14, 15, 17 95:13, 15, 22

details 95:6

determinations 89:1

determine 65:8 70:9 72:1

determines 54:19

determining 66:11 67:21 68:11 72:4

detrimental 102:25

device 6:22

different 27:12 34:16 63:6 94:21, 22, 23 95:1, 5, 6 96:5 109:4

diocesan 15:6 18:10 34:2 80:25 81:13 85:12 86:12 87:17 88:1, 15 102:22 104:2, 24

DIOCESE 1:5, 8 2:10 7:9, 24 8:17 14:22 15:4, 5 16:16, 23 17:18, 19, 23 19:16, 20, 23 22:19 24:2 30:10, 13 31:20,

23 32:3, 7, 20 35:2, 12 37:20, 21 39:2, 8, 13, 17 43:6 49:9 50:18, 20 53:23 57:13, 18 58:14 60:10, 24 62:2, 24 63:19 65:19, 20 66:20 67:5, 9, 17 74:8, 9, 16 75:4, 15, 24 76:7, 19, 20 77:3, 22 80:7, 8 82:13, 22 83:1, 6, 11, 17 85:7 86:4, 13, 21 87:4, 8 88:7, 19 89:7, 9, 14 90:10 91:18 93:7 100:7, 18, 22

101:14, 17, 19 102:12, 14, 25 103:20, 22 105:5, 8 106:3, 10, 24 107:3, 7, 9, 11, 19 108:7 111:2

Diocese's 97:25 98:5

direct 80:2 87:17 88:2

direction 53:16

directly 33:9 54:6, 16 57:15 71:10 104:20

disciplinary 16:3

disclaiming 106:13

discovery 37:13 98:17 100:8

Discrimination 53:10, 12, 14 54:3, 25 55:8, 18 56:12

discuss
24:*1*
42:*17*
43:*11*
48:*3*
58:*20*
60:*14*
73:*12*
discussed
66:*1*
67:*19*
69:*20*
74:*18*
77:*1*
discusses
104:*12*

discussing
71:*23*
84:*3*

discussion
48:*6*
discussion
s   14:*4*
21:*7*
34:*9*
43:*21*
51:*14*
55:*4, 14*
56:*1*
71:*13*
79:*20*
112:*11*
dismiss
50:*13*
51:*7*
52:*15*
55:*7, 24*
56:*3, 12,
17*
disparagin
g   110:*2*

dissipated
92:*24*
93:*15*
distributi
on
109:*15*
DISTRICT
1:*2*
7:*11*
17:*10, 12*
divulge
21:*20*
22:*24*
28:*9*
30:*24*
32:*22*
59:*3*
divulging
19:*5*
32:*25*
83:*22*
99:*6, 19*
100:*3*
document
23:*15*
26:*8*
48:*8*
97:*17*
98:*14,
21*
99:*10,
13, 23*
documents
20:*18*
27:*6*
34:*20*
35:*23*
37:*9, 15*
43:*25*
44:*1*
61:*4*
73:*24,*

*25*   74:*2,
4*   91:*5*
100:*21*
101:*3, 5,
24*
102:*15*
103:*11,
23*   104:*9*
DOE   1:*11*
doing
22:*9, 10,
18*   26:*1*
27:*22*
28:*4, 11,
17*
30:*25*
38:*13*
52:*1*
55:*12*
56:*7*
59:*5*
66:*3*
73:*19*
74:*16*
77:*12*
Donato
21:*14*
download
4:*2*
112:*4*
draft
22:*5*
112:*3*
drilling
70:*14*
due
69:*24*
84:*5*
duly
10:*8*
116:*4*
duplicatin
g   105:*2*

duplicativ
e   63:*15*
duration
33:*22*
duties
57:*24*
58:*3, 6*
dwindling
24:*4, 9*

< E >
earlier
15:*22*
26:*12*
109:*20*
earmarked
90:*9, 23*
91:*2*
Eastern
7:*4*
11:*8, 12*
47:*22,
25*
79:*13,
16*
110:*16,
19*   113:*6*
eat
79:*23*
educationa
l   14:*11*
effect
85:*11*
efforts
32:*3, 5,
20*   43:*7*
60:*24*
61:*5*
65:*21*
67:*17*
71:*24*
74:*10*
76:*7, 21*

77:*22*
105:*2*
E-file
18:*9, 20*
eight
17:*8*
either
11:*5*
17:*17*
19:*11*
27:*22*
113:*1*

electronic
6:*22*
115:*18*

eliminated
24:*15*
25:*8, 15,
17, 19*
29:*5*
Ellen
21:*15*
email
6:*19*
employed
14:*19*
66:*20*
employee
18:*10,
11*
25:*14*
65:*10*
employees
37:*20*
57:*24*
58:*2*
87:*17*
88:*1, 15*
employing
84:*1*

employment
  16:23
  17:4, 17
  92:13
  93:20
  96:7
entered
  37:12
  108:21
entire
  36:20
entirely
  93:25
entities
  19:23
  32:4
  62:17,
19
  64:21
  68:12
  70:10
  72:1
  83:12
  90:10
  91:19
  100:19,
20
  101:9
  111:5, 9
entitled
  6:5
  14:6
  35:10
entity
  66:12
  67:21
equitable
  109:15
Erie
  17:9, 11

Especially

24:17
42:5
ESQUIRE
  2:6, 7,
8, 15, 16,
17
establish
  111:13
estate
  109:11,
22
estimate
  34:22
estoppel
  50:20
  85:2, 4
  86:14
  88:18
  89:13
ET   1:11
events
  15:12
eventual
  41:2
Everybody
  23:15
exactly
  17:13
  36:8
  40:20
  63:11
  64:24
  66:23
  101:3
EXAMINATIO
N   3:3
  10:14
example
  49:25
  52:10
  88:15
  109:20

examples
  88:16, 25
Excuse
  47:14
  48:22
  49:17,
18   58:9
EXHIBIT
  4:4
  20:21,
23, 25
  28:25
  98:1, 2
expected
  22:20
expecting
  111:22
expenditur
es   47:9

experience
  17:24
  18:1
  82:24
  96:9
expert
  13:12

expiration
  12:18
  114:19
explain
  50:6
  63:10
  86:13,
21   87:4,
8, 16
  88:4
  104:17
  105:4
exploring
  41:22

expression
  90:23
  91:1
extensive
  27:20
extensivel
y   58:4
extent
  19:2
  21:19,
22
  22:23
  28:9
  30:24
  32:21,
24
  38:10
  39:21
  41:6, 15
  44:24
  45:25
  50:9
  51:23
  55:9
  56:4
  59:2
  60:16,
17
  61:20
  64:11
  65:4, 8
  68:4
  69:7
  72:6, 8
  75:25
  77:9, 23
  83:24
  99:3, 15,
24
  104:16
  106:1
  109:9, 19

extra
  112:24
  113:1, 2

< F >
faces
  50:1
fact
  13:12
  45:7
  54:22
  55:3
  56:14
  58:9
  65:24
  82:8
  84:8
  96:1
  100:18
  101:11,
13
  105:7,
23
  106:17
  107:20
  108:13
  109:3
facts
  101:18
  103:3
  104:3
  109:4
factual
  85:5
factually
  85:11
faithful
  17:20
fall
  52:13,
20   95:7,
8

falls
  52:11
  53:2, 5,
8   94:13
  96:6
familiar
  20:10
far
  41:20
  51:19,
22   52:6
  77:20
  86:10
  107:15
Father
  56:22,
25   57:3,
7, 11, 17
  58:5, 10,
13   59:8,
16, 22
  60:11,
23   61:3
  70:1, 8
fault
  86:4
FEDERAL
  5:1, 11,
13, 15
  6:1, 6
fees
  94:15
field
  106:16
fielding
  35:24
figure
  97:5
file
  25:13,
17
  27:20
  36:20

50:12
51:6, 10
52:15
55:7, 17
56:11, 17
filed
  7:10
  16:5
  27:2
  100:15,
16, 20
  101:6, 7,
8
  102:23
  111:5, 9
files
  20:4, 7
  26:7, 9,
23   27:2,
3, 6, 22
  28:2, 4,
17, 22
  30:17
  33:5
  34:25
  35:3, 8,
15, 17,
23   36:2,
13, 19,
22   37:5,
21   58:5
filing
  17:24
  24:4, 8
  26:2, 6,
7, 11, 13,
18, 22
  27:5, 8,
12
  29:23
  38:18,
23   50:2
  61:22

66:19
67:1
filings
  50:10
  61:18
final
  110:21
finalize
  16:15
financial
  21:15
  22:2
  31:18
  47:8
  49:19
  50:8
  54:14
  73:25
  74:2, 4
  81:16,
23   97:6
find
  86:4
finders
  109:3
finding
  36:20
  102:21
  103:21
  104:1
findings
  88:25
Fine
  71:20
  90:1
  97:23
  110:14
  113:2
firm
  7:17
firms
  32:3, 6

first
  20:18
  89:25
  97:25
  98:6
  116:3
firsthand
  71:11
Fisher
  38:4, 7,
16, 19,
25   39:6,
11, 14,
24   40:8
  42:9, 22
  43:14,
24   44:4
  45:4, 21
  46:11
  47:3
  48:7, 13,
20, 24
  49:7, 12,
14   51:6,
9, 13
  52:6, 9,
14
  54:24
  55:6, 16,
24
  56:16
  60:7, 11
  69:5, 13,
23
Fisher's
  43:5
  56:2, 11
  69:16
five
  34:10
Floor
  2:13

flow
  101:16
follow
  39:21
following
  23:4
follows
  10:9
food
  79:1
foregoing
  115:4
  116:7
  117:1
form
  5:7
  19:25
  24:20
  25:2, 22
  27:18
  28:5
  29:7
  30:4, 23
  32:17
  33:19
  36:6, 24
  37:8, 14,
24
  39:20
  40:18
  41:5, 14
  42:24
  44:7
  45:5, 14,
23   46:6,
13, 16
  49:8, 23
  50:24
  51:2
  62:4
  64:22
  75:6
  77:4

81:*8*
87:*20*
88:*20*
89:*2*
91:*14*
93:*1, 17*
94:*19*
95:*16, 24*
102:*2*
103:*5*
104:*5*
108:*15*
109:*23*
**formal**
46:*23*
**formatted**
115:*7*
**former**
57:*24*
58:*2*
**forth**
115:*5*
**forward**
18:*1*
30:*14, 19*
31:*15*
35:*20*
36:*12*
39:*3, 8*
40:*7*
42:*21*
44:*6*
45:*11*
46:*21*
57:*14, 19* 62:*3, 25* 63:*6, 18, 24*
67:*6, 11*
75:*5, 16*

93:*4, 14*
109:*18*
**found**
89:*8*
101:*16*
108:*19*

**frequently**
59:*19*
65:*4*
83:*13*
**FROM/TO**
117:*1*
**front**
80:*3*
**frowned**
35:*14*
**full**
93:*11*
115:*7*
**function**
108:*13*
**FURTHER**
5:*6, 9, 12*
22:*18*
32:*1*
109:*14*
115:*9*
116:*7*
**future**
49:*19*
53:*6*
85:*16*
88:*7*

**< G >**
**gather**
35:*23*
**general**
26:*15, 21*
27:*13,*

*23*
28:*16, 18, 21*
35:*6*
57:*23*
60:*6*
80:*15, 19*
**Generally**
19:*7*
20:*10, 12*
109:*18*
**general's**
54:*12*
**getting**
11:*1*
24:*24*
30:*18*
**give**
10:*2*
11:*6*
84:*17*
100:*11*
102:*6*
103:*15*
112:*24*
**given**
35:*15*
58:*7*
116:*9*
**giving**
53:*20*
59:*19*
**go** 11:*7*
17:*6*
18:*18*
23:*9*
26:*8*
30:*19*
35:*22*
39:*3, 8, 22* 40:*7*
42:*21*

45:*11*
47:*19*
52:*24*
57:*14, 19* 62:*3, 25* 63:*7*
67:*6, 10*
70:*22*
73:*9*
74:*3*
75:*5, 16*
78:*7*
93:*4, 13*
110:*6, 8*
**Godinez**
1:*22*
7:*5*
115:*3, 17*
**goes**
42:*3*
**going**
12:*25*
16:*22*
17:*25*
18:*1*
20:*21*
22:*7*
31:*17*
36:*2, 13, 16, 18, 20* 37:*7*
39:*19*
41:*20*
42:*6*
46:*21*
48:*6*
50:*2*
63:*6*
68:*1, 23*
71:*16*
73:*9*
78:*15, 18* 80:*2*

84:*3*
85:*16*
88:*6*
89:*22, 24*
96:*11*
97:*24*
101:*16*
104:*2, 22, 24*
109:*18*
112:*25*
**Good**
7:*2, 22*
8:*21*
9:*17, 19*
10:*16, 17*
78:*14*
79:*23, 25*
**governs**
9:*2*
**grab**
79:*1*
**grand**
94:*7*
**grant**
35:*9, 10, 11*
**granted**
92:*24*
**Grayson**
21:*13*
**Great**
14:*11*
21:*3*
79:*11*
**greater**
94:*10, 16*
**grievance**
16:*5*

Grosz
  58:4, 9
  80:21
ground
  46:19
grounds
  72:10, 25
group
  6:18
guess
  18:17
  30:6
  71:7, 9
  111:18
guessing
  65:15,
  16    82:1
guys
  79:23

< H >
half
  79:5
  84:21
halfway
  78:21
hand
  10:1
handle
  44:16
handled
  35:1
happened
  16:17
  53:7
happening
  31:20
  32:12
  40:13
  44:3
  53:6
  64:4, 5
  71:13

happens
  77:19
hard
  34:22
  39:21
  95:11
hazard
  18:17
heading
  65:6
hear
  11:23
  41:8, 12
heard
  61:14
  70:21
hearing
  10:25
  11:3, 4
  12:22
  22:19
heavily
  57:25
  58:8, 10
  62:16
  77:8
  80:22
  81:25
heavy
  62:9
he'd
  49:22
held
  104:25
  105:1
Hello
  7:16
help
  26:24
helpful
  23:19

hired
  53:23
  54:2, 4
hold
  15:3
  84:16
honestly
  69:3
hopefully
  20:20
hour
  78:16
  79:5
hours
  33:13,
  14, 15,
  23    34:8,
  14, 19,
  24
  36:21
  43:16
  58:20
  65:25
  73:18
  77:16,
  25   112:5
huge
  26:17
  27:11
  31:22
  40:4
  64:2
  67:24
  68:1
hundreds
  35:25

< I >
Iaian
  8:3
IAIN
  2:16
  93:10

idea
  38:24
  39:23
  73:22
  74:22
  81:2
  97:13
identical
  87:18
  88:2
identifica
tion
  6:12
  20:23
  98:2

identified
  6:11, 18,
  23
identify
  7:13
  8:2, 6,
  19
  105:13,
  21, 23
ii   90:11
ILAN
  2:17
  8:8

illustrate
  51:3
imagine
  35:24
immediatel
y    17:1
impact
  49:20
  50:20
  87:17
  88:2
  109:22

impacted
  35:19
  36:11
implicate
  93:8

implicated
  105:14,
  24
important
  12:25
  13:4
  39:11,
  15    40:9
imputed
  86:9
  87:9
  88:16
include
  9:4
  30:9
included
  26:13
including
  14:5
  111:1
inconsiste
nt
  104:13,
  14
  108:22
indemnific
ation
  75:17,
  21, 23
  81:22
  100:23
  101:14,
  17, 19,
  25
  106:2, 8,
  15
  107:5,

*16, 18*
109:*13*
110:*24*
**indemnify**
82:*9, 12,*
*14, 22*
83:*1*
106:*11*
**independen**
**t** 28:*23*

**individual**
26:*23*
31:*15,*
*23*
40:*12,*
*14, 24*
43:*2*
44:*17*
45:*8, 12*
47:*4*
49:*16,*
*20*
50:*13*
51:*11,*
*14*
62:*18*
63:*12,*
*13* 65:*2,*
*7, 11, 14*
66:*12*
74:*15*
76:*10*
82:*9*
86:*6*
**individual**
**s** 26:*13,*
*18*
76:*25*
81:7
**informatio**
**n** 16:*10*
19:*4, 6*

21:*17,*
*21, 24*
22:*1, 2,*
*10, 14,*
*25*
28:*22*
30:*19,*
*25*
32:*23,*
*25* 33:*4*
36:*21*
42:*5*
44:*19*
59:*4*
63:*7*
64:*9*
83:*22*
96:*13*
98:*21*
99:*7, 19*
100:*3*
112:*8*
**in-house**
14:*21*
29:*20*
32:*11*
34:*11*
36:*17*
37:*21*
39:*9*
52:*8*
53:*15*
83:*6*
**initial**
22:*5*

**injunction**
22:*20*
92:*24*
98:*8*
**injury**
15:*25*
94:*6*

**inquire**
14:*6*
**instances**
89:*12*
108:*22*
**instruct**
6:*16*
19:*4*
21:*21*
22:*25*
28:*8, 10*
32:*23*
38:*12*
51:*25*
55:*11*
56:*6*
59:*4*
64:*13*
68:*6*
83:*21*
99:*5, 18*
100:*2*
**insurance**
27:*21*
32:*9, 12*
33:*18*
81:*21*
82:*1, 3*
84:*6*
85:*10*
88:*24*
90:*10,*
*14*
91:*12*
93:*13*
95:*21*
106:*12*
**insured**
22:*3*
96:*2, 6*
110:*25*

**interested**
115:*11*
**interestin**
**g** 54:*22*
**internal**
34:*2*

**internally**
34:*5*
**interposin**
**g** 71:*1*
**Interrogat**
**ories**
4:*7*
98:*1, 7*
**Interrogat**
**ory**
100:*11,*
*12, 14*
102:*6, 7,*
*10*
103:*14,*
*15, 18*
**intuitive**
20:*20*
**involve**
22:*9, 12*
30:*20*
36:*3*
53:*5*
105:*6*
**involved**
21:*6*
24:*16*
25:*9, 20*
31:*19*
32:*9*
42:*16*
43:*3*
45:*22*
46:*2, 11*
47:*3, 10*

48:*7, 13,*
*20, 25*
49:*7, 12,*
*14, 22*
50:*3, 10,*
*12* 51:*6,*
*8, 10, 13,*
*18, 22*
52:*6, 9,*
*14*
54:*12,*
*24* 55:*6,*
*13, 16,*
*25*
56:*17*
57:*25*
58:*5, 8,*
*10, 13*
60:*18*
61:*19*
62:*14,*
*16, 18,*
*20* 63:*4*
65:*3*
68:*24*
71:*11*
73:*23*
74:*5, 14*
75:*19*
76:*12*
77:*8, 11,*
*22*
80:*22*
81:*25*
94:*22*
95:*1, 6*
98:*24*
99:*22*
100:7
**involvemen**
**t** 40:*16*
53:*1, 13,*
*18*

62:*23*
71:*23*
99:*2*
**IRCP**
16:*11*,
*12*  21:*8*,
*24*  63:*14*
**issue**
34:*18*,
*23*
44:*15*
74:*19*
78:*2*
85:*18*
103:*21*
109:*25*
**issues**
27:*13*,
*14, 16*
31:*22*
43:*20*
56:*20*
66:*4*
68:*24*
72:*22*
80:*22*
84:*9, 10*
85:*5, 10,*
*17*
95:*12,*
*14*
101:*10,*
*13*
102:*24*
104:*15*
106:*6*
109:*17*
**its**
89:*9*
105:*8*

**< J >**

**Jaime**
1:*22*
7:*5*
**Jamie**
115:*3, 17*
**JD**
14:*13, 17*
**JMH**  1:*11*
**JOB**
1:*23*
17:*2*
44:*2*
97:*3*
**jobs**
17:*14*
**John**
52:*25*
54:*11,*
*18*
81:*15*
90:*22*
92:*6*
**JONES**
2:*12*
7:*18*
**judgment**
51:*11*
55:*17*
89:*8*
105:*5*
**judgments**
104:*13,*
*14*
108:*23*
**judicata**
89:*13*
102:*13*
**jump**
93:*11*
**JUSTIN**
2:*8*
11:*15*

**< K >**
**Karalus**
56:*22,*
*25*  57:*3,*
*8, 11, 17*
58:*6, 10,*
*13*
59:*16,*
*23*
60:*12,*
*23*  61:*3*
70:*1, 8*
**Karalus's**
59:*9*
**keep**
78:*15, 18*
**keeping**
63:*23*
77:*23*
**keeps**
63:*5*
**kept**
32:*11*
**kind**
20:*19*
26:*6*
43:*8*
**kinds**
53:*8*
**KING**
2:*3*
7:*23*
8:*16*
11:*16*
13:*17*
**knew**
106:*5,*
*18*
107:*3,*
*20*
108:*14*

**know**
13:*2*
16:*17*
19:*8, 9,*
*15, 19,*
*21, 22*
20:*1, 2*
21:*9*
24:*13*
25:*16,*
*18, 24,*
*25*  28:*6*
29:*8, 10*
30:*11*
33:*20*
36:*7, 25*
37:*1, 2,*
*8, 25*
38:*1, 20,*
*21*
39:*21,*
*24*  40:*3*
42:*15,*
*25*  44:*8,*
*15*  45:*6,*
*15, 17*
46:*14,*
*18*
48:*10,*
*11, 17,*
*18*  49:*2,*
*4*  50:*15,*
*16*
51:*16,*
*17*
52:*12,*
*17, 18*
54:*11*
55:*2, 3,*
*22*
56:*18,*
*19, 21*
57:*2, 7*

58:*7, 16*
59:*19*
61:*6, 19*
62:*5, 6*
63:*2, 3,*
*4, 21*
66:*9, 16,*
*24*
67:*13,*
*14*  69:*3,*
*19*
73:*17*
75:*7, 8*
76:*2, 3,*
*11, 15,*
*16*  77:*7,*
*13, 14,*
*20*
78:*12,*
*16, 18,*
*25*
80:*13,*
*14*  81:*2,*
*9, 10, 17*
82:*18,*
*19*  83:*4,*
*5, 7*
84:*7, 8,*
*11, 20*
85:*22,*
*23*
86:*18*
87:*1, 13,*
*21*  88:*6,*
*11, 12,*
*13, 21,*
*22*  89:*3,*
*5, 11*
91:*13,*
*16, 23,*
*24*  92:*4,*
*9, 11*
93:*2, 18,*

*19, 25*
94:*1, 12*
95:*9*
97:*2, 3,
4, 16, 17,
21*
101:*1, 2,
15, 22*
102:*4*
104:*7,
11, 21*
105:*10,
11, 17*
106:*5,
16*
107:*22*
108:*16,
17, 25*
109:*24*
110:*1*
112:*14*
**knowing**
61:*24*
67:*2*
**knowledge**
71:*12*
84:*6*
85:*9*
89:*7*
90:*21*
96:*12,
13, 20,
23, 24*
98:*21*
101:*11*
104:*15*
106:*2*
**knows**
44:*2*
**KRELL**
2:*8*
11:*13,*

*15*
97:*15, 20*

**< L >**
**lack**
86:*12*
**large**
108:*20*
**largely**
26:*11*
**law**
7:*17*
32:*3, 6*
35:*3, 17*
54:*22*
56:*15,
16*
100:*18*
102:*21,
24*
105:*7,
13*
106:*16*
**laws**    9:*2*
**lawsuit**
15:*17*
**lawsuits**
31:*24*
52:*20*
54:*15*
74:*15*
**lawyer**
56:*19*
**learning**
97:*4*
**lease**
53:*10,
11, 19,
22*    83:*24*
**leases**
53:*20*
**legacy**
83:*17*

**Legal**
1:*21*
7:*6*
8:*23*
21:*7*
59:*20*
60:*3*
76:*1*
82:*10,
16*
83:*17*
86:*16,
24*
87:*11*
88:*9*
90:*23,
25*
91:*21*
95:*11,
14*
109:*14*
**legally**
60:*2*
**lengthy**
43:*21*
**L-E-R**
9:*24*
**letter**
77:*14*
**letters**
77:*23*
**level**
25:*5*
46:*11*
**liability**
86:*2*
87:*5, 18*
88:*17*
100:*23*
101:*14,
19, 25*
110:*25*

**liable**
86:*5*
89:*8*
101:*16*
107:*8,
10*
108:*19*
**life**
15:*11*
**lifted**
38:*9*
**limited**
68:*24*
**Lincoln**
2:*4*
**line**
69:*9*
117:*1*
**Lisa**
2:*23*
8:*9*
**list**
29:*4*
**lists**
64:*2*
**literally**
27:*22*

**litigation**
29:*6, 13*
35:*24*
36:*17*
49:*19*
52:*10,
13*    53:*2*
62:*20*
64:*6, 10*
104:*12,
14, 18*
109:*9,
18, 20*

**little**
26:*24*
63:*10*
**LLM**
14:*14, 17*
**LLP**    2:*12*
**located**
13:*14*
**LOCATION**
1:*21*
**long**
14:*25*
17:*11*
78:*25*
79:*3*
90:*20*
112:*21*
**look**
18:*18*
19:*10, 13*
**looked**
18:*9*
53:*25*
**looking**
27:*6*
97:*1*
**Lord**
15:*8*
**Los**    2:*14*
**losses**
90:*12*
91:*12*
**lot**
14:*23*
26:*1, 7,
12*    27:*5*
**loud**
41:*8*
**louder**
24:*24*
**lunch**
78:*17*

79:22

< M >
maintain
38:4
56:25
61:8
66:14
74:20
maintains
64:3
majority
28:2
making
31:22
42:9, 18
49:7, 12,
15
51:19,
21   59:9,
23   60:5,
9, 12, 15
man
44:10, 13

management
45:22
47:3
mandate
39:5
margin
23:12
mark
20:21,
25   98:1
marked
20:23
21:1
98:2
material
41:15
materials
16:9, 12

matter
7:9
9:2
12:23
13:11
15:23
72:11
94:5, 6
matters
31:12,
13
41:22
42:17
70:19
mean
18:20
35:4, 5
36:9
40:21
46:16,
18   50:6
64:25
75:20
77:6
85:23
91:2
96:16
106:7
110:24
meaning
104:17
108:8
means
6:19
9:3, 5
meant
16:15
94:4
106:23
107:15
media
15:13

mediation
19:11
33:17,
22   40:2
41:23
43:9, 14
61:1
70:20
71:11,
13
72:10
73:2, 9,
12

mediations
33:2
40:4
67:19
76:12
meet
73:16
meeting
33:2
34:1, 7,
14   36:3
62:15
meetings
34:10,
11, 16,
17
35:21
36:13
39:25
40:3
42:17
43:10,
20   55:4
58:19
60:14,
17, 21
67:18
78:6, 10

MELISSA
1:17
3:3
4:5
7:8
9:22
114:8
116:13
117:1
M-E-L-I-S-
S-A   9:23
member
40:14
43:1
65:13
68:14,
17
72:17
80:23
members
35:2
68:3, 10,
20   69:2
73:19
mention
104:14
mentioned
36:13
71:22,
24
106:17
method
9:7
MICHAEL
2:15
3:4
7:16, 17
8:5, 8
9:10
10:13,
15, 25
11:4, 18,
19, 21

19:14
20:3, 17,
24   21:3,
4   22:4,
17   23:3,
25
24:23
25:6, 7
26:3
27:15,
25
28:14
29:3, 11
30:8
31:3
32:18
33:6, 25
36:5, 10
37:3, 16,
18   38:3,
15   40:6,
22   41:7,
12, 17,
24   42:2,
6, 8, 20
43:4
44:11
45:2, 10,
19   46:4,
7, 9, 21,
25
47:17,
18, 20
48:1, 2,
12, 19
49:5, 10
50:5, 21,
23   51:1,
4, 20
52:4, 19
55:15,
23   56:9
58:1, 22

59:7, *14*
62:11
63:*9*
64:7, *15*
65:1
66:13
67:*15*
68:8, *25*
69:11,
*12* 70:6,
*15, 21*
71:*6, 15,
21*
72:15
73:*1, 3,
5* 75:*9*
76:5
77:*10*
78:14,
*21* 79:*3,
7, 10, 18,
19*
80:17
81:*12*
82:*11,
20* 83:*9*
84:*2, 19,
25*
85:*25*
86:*20*
87:*3, 15,
24*
88:*14,
23* 89:*6,
22* 90:6
91:*17,
25*
92:*18,
22* 93:*6,
10, 12,
21*
94:*25*
95:*20*

96:4, *18*
97:*9, 18,
23* 98:*3,
4, 22, 23*
99:*9, 21*
100:*5*
101:*4,
23*
102:*5, 9*
103:*2, 8*
104:*8*
105:*12,
19*
107:*1,
17*
108:*3,
11, 18*
109:*2*
110:*5,
12, 21,
22*
111:*12,
23, 24*
112:*1,
10, 19, 23*
**middle**
27:*24*
28:*20*
**mill**
94:*13*
95:*9*
**million**
96:*23*
97:*5, 12*
**mind**
10:*23*
78:*24*
**mindful**
78:*15*
**ministeria
l** 26:*1*
**minute**
84:*16*

**minutes**
77:*24*
78:*5, 8*
**missing**
20:*24*
**modificati
ons**
21:*10*
**moment**
84:*18*
89:*20*
92:*19*
100:*12*
102:7
103:*15*

**monetarily**
41:*1, 2*
**monetary**
42:*10*
**money**
93:*25*
**Monica**
2:*13*
**monitor**
31:*16*
36:*18*

**monitoring**
36:*16*
**month**
33:*10,
14, 15,
23, 24*
43:*16*
73:*19*
77:*16*
**monthly**
30:*3*
38:*18*
43:*15, 23*
**months**
15:*2*

29:*16*
96:*22*

**monumental**
36:*1*
**morning**
7:*2, 22*
8:*21*
9:*17, 19*
10:*16, 17*
**motion**
22:*19*
41:*21*
51:*7, 10*
52:*14,
15* 55:*7,
17*
56:*11,
17*
68:*24*
98:*8*
104:*12,
18*
**motions**
50:*13*
55:*24*
56:*2*
**move**
30:*13*
35:*19*
44:*6*
**moved**
28:*24*
36:*12*
**Moving**
56:*22*
74:*20*
84:*12*
89:*17*
**multiple**
32:*3*
**mundane**
94:*13*

**Murphy**
29:*19,
25* 30:*1,
2*
**Murry**
29:*24*
**Musialowsk
i** 21:*16*
31:*8, 18*
66:*14,
17* 67:*3,
8, 16*
68:*14*
69:*17,
20* 70:*9*
71:*23*
73:*14,
23* 74:*6*
**Mutual**
93:*8*

**< N >**
**N.Y** 1:*5,
8* 2:*10*
**name**
7:*4*
8:*22*
9:*21*
93:*7, 11*
105:*5*
**named**
19:*20,
23*
107:*11*
108:7
**NASATIR**
2:*16*
8:*3*
**National**
93:*9*
**Nativity**
15:*8*

naturally
 85:16
nature
 54:15
nearly
 42:16
necessary
 6:10
 27:8
need
 18:25
 19:13
 31:10
 32:2
 41:8
 42:22
 77:13,
 14   82:2
 96:14
 110:9
 113:1
needed
 65:18
 74:7
 76:18
 91:11
 112:11
needs
 26:8
 47:11
 63:6
negative
 85:11
negotiatio
ns
 33:17
 62:16
neither
 71:8
 115:9
never
 35:14

NEW    1:2
 2:5
 7:6, 10,
 11
 13:18
 15:8
 83:14
 97:10
nine
 33:23
 43:16
Nineteen
 92:18
non
 25:25
non-abuse
 52:9
non-
debtor
 109:10
non-
debtors
 105:6
non-
ministeria
l   24:17
 25:10
nonstop
 28:22
Nope
 87:2
Notary
 2:24
 8:19, 21,
 22   9:15,
 17, 20,
 25   10:9,
 10
 114:1, 7,
 17
 116:19
 117:1

note
 31:5
noted
 117:1
notes
 110:7, 8
noticing
 7:14
November
 1:18
 7:3
 114:6,
 12
 115:13
 116:5
 117:1
Number
 7:10
 97:6
 103:14
numbers
 22:1
 25:16, 18

< O >
oath
 6:8
 12:2, 5,
 8   114:9
object
 24:19
 37:7
 39:19
 69:7
objected
 41:14,
 15   72:24
objecting
 50:23
Objection
 19:2, 25
 21:19
 22:8, 22

25:1, 22
 27:10,
 18   28:5
 29:7
 30:4, 23,
 24
 32:17,
 21
 33:19
 36:4, 6,
 24
 37:14,
 24
 38:10
 40:18
 41:5
 42:12,
 24   44:7,
 22   45:5,
 14, 23
 46:6, 13,
 16   48:9,
 16   49:1,
 8, 23
 50:14
 51:3, 15,
 23
 52:16
 55:9, 20
 56:4
 57:20
 58:15
 59:2
 62:4
 63:1, 20
 64:11,
 22   66:8
 67:12
 68:4, 22
 69:6
 70:3, 18,
 22   72:6,
 7   75:6,

25   77:4
 80:12
 81:8
 82:5, 16
 83:2, 19
 85:20
 86:16,
 24
 87:11,
 20   88:9,
 20   89:2
 91:14,
 21   93:1,
 17
 94:19
 95:16,
 24   99:3,
 15, 24
 100:25
 101:20
 102:2,
 18
 103:5
 104:5
 105:9,
 16
 106:20
 107:13,
 21
 108:15,
 24
 109:23
objectiona
ble   45:1

Objections
 4:6
 5:7
 46:23
 71:2, 18
obligate
 83:11

obligates 82:*25*

obligation 12:*9* 110:*24*

obligations 46:*18* 75:*23* 83:*18*

obliterated 23:*13*

observations 66:*3*

observers 8:*2*

obviously 76:*9* 95:*11* 104:*1, 21*

occur 81:*22*

occurred 16:*16*

offering 53:*15*

office 17:*10, 12* 58:*18* 112:7

officer 7:*5* 14:*20* 21:*13, 15, 25* 22:*2* 26:*16, 21* 29:*22* 31:*19* 54:*13, 14*

80:*16* 81:*16, 24*  97:*6* offices 13:*17* 15:*5* Official 2:*19* 9:*4* offing 50:*11* Oh  23:*8* 61:*14* Ohio 114:*3, 8, 17* Okay 11:*6* 12:*1, 15* 15:*3* 18:*7* 19:*15* 21:*3, 5* 22:*18* 23:*3, 18, 21, 23* 25:*1, 15* 29:*23* 37:*16* 38:*4* 46:*21* 47:*21* 48:*6, 24* 51:*1, 13* 52:*13* 53:*1, 18* 57:*7* 59:*15* 66:*14* 67:*8* 68:*14* 70:*1, 21* 71:*9*

72:*20* 73:*11* 79:*8, 11, 12* 84:*22, 23, 24* 90:*5* 92:*19, 21*  96:*8* 97:*18* 99:*10* 100:*13* 102:*8* 103:*17* 110:*15* 112:*2, 12, 13* 113:*5* okaying 47:*8* omissions 105:*6, 8* once 10:*21, 24* 11:*25* 15:*23* 34:*4* 69:*6* 86:*10* ones 18:*7, 8* 24:*15* 25:*8, 19* 45:*16* 53:*25* 58:*7* 78:*8* 93:*13* 94:*11* operating 21:*13, 25*

26:*16, 20* 31:*19* 54:*13* 80:*16* opinion 53:*15* 60:*1* opportunity 12:*16* oppose 9:*5* opposed 95:*3, 6* 104:*20* options 110:*2* Orchard 15:*8* original 89:*14* 90:*21* O-T  9:*23* outcome 115:*11* outcomes 106:*11* outline 78:*22* outside 6:*17* 26:*20* 35:*7* 36:*23* 37:*5, 8, 19, 22* 43:*18* 45:*20* 47:*1, 16* 53:*23* 54:*2, 4, 6, 16* 67:*20*

overall 60:*4* oversees 54:*20*

< P >

P.m 1:*20* 47:*24* 79:*13, 15* 110:*16, 18* 113:*6*, 7 PACHULSKI 2:*12, 23* 7:*17* 8:*3, 9, 10* PAGE 3:*3* 4:*4* 25:*3* 64:*1* 98:*10* 117:*1* paid 15:*15, 16*  63:*14* Panel 17:*9* paragraph 23:*3, 5, 13, 17, 24*  24:*1, 20*  25:*2* 28:*25* 29:*4* 31:*5* 32:*1* 80:*3* 84:*12, 13, 18*

85:*1*
89:*17,*
*18, 20,*
*23, 25*
90:7
92:*14,*
*17*
93:*22*
96:*11,*
*12, 15, 19*
**Paralegal**
2:*23*
8:*10*
**parish**
15:*6, 7,*
*10, 11*
16:*23*
17:*8, 18*
18:*8, 11*
40:*14*
43:*2*
45:*22*
46:*11*
47:*11*
49:*17,*
*20* 50:*1*
52:*14*
53:*23*
54:*4*
64:*5*
65:*4, 11*
80:*23*
106:*24*
107:*3, 8*
108:*19*
**parishes**
20:*11*
31:*24*
40:*12,*
*24*
42:*10*
45:*9, 13*
46:*2, 7*

47:*4, 6,*
*13* 50:*9,*
*18*
52:*10,*
*21* 53:*2*
63:*13*
65:*2, 7,*
*14*
75:*18,*
*21, 24*
76:*10*
82:*9, 12,*
*14, 22*
89:*9*
90:*8*
101:*17*
106:*3,*
*11*
111:*5, 9*
**parishione**
**r** 17:*21*
**parish's**
40:*16*
91:*6, 9,*
*10*
**Park**
15:*8*
**parochial**
47:*7*
**part**
6:*15*
33:*3*
61:*1*
73:*21*
76:*24*
83:*16*
85:*24*
95:*19*
106:*3*
**participan**
**ts** 111:*1*

**participat**
**e** 44:*16*
65:*8*
**participat**
**ing**
6:*18*
43:*14, 17*
**parties**
5:*4, 13*
6:*4, 10*
9:*3, 9*
109:*10*
115:*10*
**party**
6:*13*
15:*17,*
*19*
30:*10,*
*13* 32:*7*
39:*2, 8,*
*13, 17*
49:*9*
57:*13,*
*19*
58:*14*
62:*2, 25*
63:*19*
65:*19*
67:*5, 10*
74:*9*
75:*4, 15*
76:*19*
77:*3*
80:*7*
83:*1*
86:*15,*
*23* 87:*6,*
*10*
89:*10,*
*14*
102:*14*
103:*22*

107:*11,*
*19*
**pastors**
45:*12*
47:*7*
**pause**
92:*14*
102:*6*
**pay**
109:*13*
110:*25*
**payment**
90:*11*
91:*11*
**penalties**
117:*1*
**pending**
19:*19*
**people**
30:*16*
69:*3*
71:*1*
94:*23*
95:*10*
**percent**
30:*7*
33:*12*
62:*19*
112:*7*
**perjury**
117:*1*
**permissibl**
**e** 42:*4*
**permission**
35:*9, 10,*
*11* 56:*11*
**permitted**
39:*3*
57:*14,*
*19* 62:*2*
67:*6, 10*
75:*5, 16*

**person**
6:*20*
30:*17*
**personal**
15:*25*
18:*8*
94:*6*
96:*12,*
*20, 23, 24*

**personally**
15:*18*
25:*25*
**personnel**
9:*7*
22:*1*
26:*23*
30:*17*
33:*4*
47:*6*
77:*1*
80:*8, 10*
81:*13*
**Peter**
9:*23*
**Petras**
2:*23*
**Petrus**
8:*9*
**phone**
6:*22*
62:*15*
65:*5*
**photograph**
**s** 6:*14*

**physically**
76:*14*
**picture**
6:*11*
**piecemeal**
104:*12,*

*14, 17*
109:*9, 19*
**place**
115:*5*
**placed**
116:*9*
**Plaintiff**
1:*9*
108:*20,
21*
**plan**
22:*18*
**planned**
110:*7*
**planning**
24:*11*
**platform**
1:*21*
20:*19*
97:*10*
**play**
29:*6, 12*
76:*15*
81:*11*
**players**
94:*22*
95:*1*
**playing**
76:*11*
**pleadings**
18:*4, 20*
48:*21,
24*
50:*19*
55:*2*
**please**
7:*13*
8:*2, 6,
7, 13, 19*
9:*15, 20*
10:*1*
11:*13*
25:*12*

47:*20*
73:*4*
86:*13,
21*  87:*4,
8, 16, 23*
88:*3*
89:*21*
100:*21*
**plus**
109:*7*
**point**
48:*23*
53:*7*
64:*6*
66:*21*
76:*8, 10*
78:*15*
93:*4*
101:*22*
103:*7*
105:*18,
20*  106:*5*
**pointing**
71:*10*
**points**
70:*14*
**policies**
90:*9, 14*
91:*11*
92:*2, 3*
93:*13*
**policy**
14:*21*
29:*21*
39:*12,
16*  40:*9*
42:*23*
90:*17*
**pop-up**
43:*19*
**position**
14:*3*
15:*15*

18:*14,
16*
29:*16*
52:*21*
72:*21*
73:*6, 11*
83:*7*
**positions**
14:*23*
15:*3*
24:*15*
25:*8, 11,
19*
**possible**
79:*6*
106:*11*
111:*21*
112:*6*
**possibly**
44:*16*
74:*15*
80:*15*
81:*15, 16*
**post-law**
17:*14*
**potential**
42:*1*
49:*19*
50:*2*
101:*19*
**POTZLER**
1:*17*
3:*3*
4:*5*
7:*9*
9:*18, 19,
22*  10:*1,
5, 16*
21:*5*
48:*3*
51:*5*
71:*6, 22*
72:*16*

73:*3*
79:*20*
80:*1*
98:*5, 10,
16, 24*
110:*23*
111:*14*
114:*8*
116:*13*
117:*1*
**Potzler's**
20:*22*
49:*11*
**precedent**
85:*14*
86:*22*
88:*17*
**preceding**
17:*1*
**precipitat
ed**  24:*2*

**preclusion**
103:*21*
**preliminar
y**  22:*20*
92:*24*
**premiums**
91:*11*
**prep**
16:*21*
**preparatio
n**  98:*25*
**prepare**
16:*9, 18*
22:*5*
35:*23*
61:*3*
**prepared**
98:*16*
**preparing**
21:*6, 11*
34:*20*

43:*24*
73:*24*
74:*5*
99:*22*
100:*7*
**presence**
5:*5*
**PRESENT**
2:*22*
10:*9*
60:*11,
17*  76:*14*
**presuppose
s**  37:*14*
**pretty**
20:*19*
39:*21*
94:*2*
95:*8*
**previous**
38:*21*
39:*15,
24*  48:*6*
66:*24*

**previously**
67:*18*
80:*20*
103:*25*
**priest**
19:*12*
20:*4, 7*
26:*7*
33:*4*
**priests**
26:*9, 23,
25*  27:*3*
28:*2*
47:*7*
**prior**
15:*4*
16:*22*
17:*10,*

17, 24
18:2
29:18,
23
38:17,
22
39:14,
17   57:4,
8   61:17,
22
66:19,
22, 25
74:24
99:10,
14
108:6
114:9
**privacy**
35:17
**private**
35:5
**privilege**
21:21
22:9, 24
28:7, 10
32:23
38:11
39:10
41:4, 16,
18, 25
45:1
51:24
52:3, 7
55:10,
21   56:5,
13   59:4,
10, 17,
22
64:12,
18   68:5,
10   69:8,
18, 24
70:3, 11

72:9, 10,
23   73:2,
8, 10, 12
83:20
99:17
100:1, 9
**privileged**
19:3, 5
42:5
44:19
**privy**
24:13
91:8
**Probably**
33:12
34:5, 10,
12   40:3
54:1, 11
81:16
92:6
112:18
**problem**
104:22,
23   107:9
**procedural**
9:1
**Procedure**
5:11, 14,
16   6:7
**proceed**
11:18
47:25
60:2
79:17
80:8
84:24
110:20

**proceeding**
7:7
9:6, 8

16:3
43:15
**proceedings**  6:15
113:7
115:4, 6
**proceeds**
37:13
**process**
13:9
21:6
24:11
**processes**
51:19, 21
**produce**
44:1
61:4
**produced**
28:2
36:23
37:9, 22
**producing**
34:20
43:24
44:3
73:24
**productions**  30:21
48:8
**program**
16:11,
12, 14
21:8
22:3
32:10,
13
63:14
75:22
81:21
82:1, 4,
9   84:6
97:1
106:9

110:25
111:1
**pronouncing**  56:22
**proofs**
100:16,
19, 20
101:7, 8
102:11,
23
103:19
105:14,
24
111:4, 8
**proposing**
79:4
**prosecute**
53:24

**prosecuted**
100:24
**prospective**  22:24

**protection**
14:21
29:21
**prove**
28:23
**provide**
99:13
**provided**
5:10, 13
12:15
21:17
**Public**
2:24
8:21, 22
9:17, 20,
25   10:9,
10
114:1, 7,
17

116:19
117:1
**pulled**
44:15
**purchase**
90:9
91:11
**pure**
73:21
**purely**
96:13
**purposes**
5:10
91:4
**Pursuant**
6:6   9:1
**pursue**
60:22

< Q >
**qualify**
78:3
**quantify**
78:3
**question**
11:22
13:2
19:8, 18
24:20
25:2, 6
26:5
28:13
37:17
39:20
42:7
44:25
50:25
51:3, 5
54:22
59:12
62:22
69:1, 11
70:24

72:7
73:4, 7
83:20
99:16, 25
107:2, 4, 20
108:1, 2, 4, 6, 8, 9, 12, 13
109:19
111:18
**questioning** 69:9
**questions**
13:1
21:20
35:25
65:5
70:23
71:17
72:22
78:20
89:23, 24 96:2
100:18
105:7, 13, 23
106:1, 2, 4, 8, 15, 17
107:18, 24
108:6
110:7, 9, 21
111:13
**quick**
78:24
**quickly**
92:23, 25 93:14

**< R >**
**raise**
10:1
102:23
**raised**
109:18
**reach**
109:3
112:7
**reaching**
102:25
**read**
6:23
21:8
84:18
89:20, 25
92:15, 20
96:14
102:7
103:15
113:8
117:1
**reading**
25:3
**re-adjudicated** 110:1
**reads**
55:2
**ready**
84:21, 22, 24
90:5
**real**
102:24
**really**
25:24
60:25
61:2

**reason**
14:8
60:8
69:19
117:1
**reasons**
32:8
72:13
**receive**
111:19
**received**
44:19
111:16
**receiving**
65:5
**Reconvene**
110:12
**record**
6:4, 10, 14, 25
7:3, 7, 14 8:2, 6, 14, 20
9:4, 21
11:7, 9, 10, 12, 14
12:11
24:25
38:5
41:9, 13
47:19, 22, 23, 25 57:1
61:8
66:15
68:9
69:15
70:7
71:19
72:16
74:21
79:13,

14, 16
88:6
97:9
98:20
100:6
110:16, 17, 19
113:6
**recorded**
12:17
115:6
**recording**
9:4
**records**
63:5
**reduction**
24:21
**reductions**
24:1, 3, 7, 8, 12
25:4
**refer**
17:25
85:1
**Referee**
5:5
**referred**
6:24
101:5
**referring**
31:14
37:9
49:11
101:3
106:18
**refers**
100:14, 15
102:10
103:18

**refusing**
52:5
68:9
**regarding**
33:2
34:2, 15
38:7
39:12, 15 40:4, 9 44:20, 21 55:4
56:20
57:3, 18
59:9, 13, 16, 24
61:11, 16 64:9
65:5
66:18
72:7, 22
73:7
74:23
75:14
83:17
84:9
85:7
91:19
98:17, 20
101:11
107:20
108:14
112:8
**Regina**
29:19, 24 30:1
**Regular**
17:20
**regularly**
18:13
**reiterate**
43:9

related
19:23
20:5, 8
26:22
28:18
32:4
34:20
40:16
41:18
42:10
43:6
44:5
61:4
62:17
64:21
65:20
68:11
70:10
72:1
74:9
76:20
78:10
88:24
90:10
91:19
100:19,
20
101:9
111:5, 9
115:10
**relates**
25:4
**relating**
33:4, 7
41:22
57:16
**relationsh
ip** 17:19
**relationsh
ips**
83:11
**relevant**
36:21

37:17
41:21
**rely**
32:4
**remain**
36:22
**remember**
90:21
**REMOTE**
1:21
6:1, 8
7:6
8:22
**remotely**
6:9
8:25
114:8
**reorganiza
tion**
24:16
25:9
33:8, 11
67:17
77:22
78:1, 11
103:1
**repeat**
19:18
25:6
37:17
42:7, 12
61:13
108:3
**repeating**
10:23
**report**
107:8
**reported**
106:4
**REPORTER**
1:22
6:9
7:2, 20

8:1, 5,
12, 18,
24  9:12,
14
10:11
11:2, 6,
11, 17
21:1
23:14
47:18,
21, 24
79:12,
15
110:15,
18
111:20,
24
112:2,
13
113:5
115:1, 18
**represent**
7:15, 18
**requested**
113:8
**require**
32:22
56:2, 16
82:22
**required**
30:12
38:16,
22  39:7
56:11
61:21
76:20
**requires**
82:13
**res**
89:13
102:12
**reserved**
5:7

**reserves**
92:23
93:14
109:14
**resource**
24:10
**resources**
24:5
**respect**
5:16
22:8
32:6, 19
43:6
55:21
60:24
67:17
76:7
**respective**
5:4
**respond**
69:24
**response**
11:1, 3
100:12,
14
101:6
102:7,
10
103:16
**Responses**
4:6
97:25
98:6, 17,
25  100:8
**responsibi
lities**
44:21
45:3
63:17
75:14
**responsibi
lity**

45:12
60:12
**responsibl
e** 15:13
26:10
30:18
33:8
35:16
40:12,
15, 23
42:9
45:17
47:5, 6,
8, 9, 11,
13  50:8
59:16,
23  60:5,
6, 8
66:6, 11
67:20,
22  72:3
75:17,
21  77:2
**restart**
62:21
**restate**
39:20
69:1, 11
87:23
**restructur
ing**
32:20
43:6, 11,
22  44:6
60:24
61:1, 5
65:20
71:24
74:10
76:7, 21
**result**
89:1, 8

**retention**
90:*13*

**retentions**
92:*2, 8*

**retrieving**
27:*6*
28:*22*

**review**
12:*16,*
*19*  16:*8,*
*13*
18:*13*
19:*1*
27:*21*
61:*3*
83:*10,*
*15, 16*
98:*5*
99:*10*
100:*12*
111:*14*

**reviewed**
16:*10*
18:*4, 7,*
*10, 12,*
*15*  20:*4,*
*7*  21:*7*
83:*24,*
*25*  111:*4*

**reviewing**
34:*20*
37:*4*
48:*8, 20,*
*25*
53:*20*
73:*23*

**Rich**
31:*18*
80:*16, 21*

**ridiculous
ly**  65:*25*

**right**
10:*1*
13:*14*
17:*22*
18:*21*
20:*7, 20*
23:*12*
27:*24*
28:*20*
29:*15*
34:*14*
44:*13*
51:*9*
56:*23*
60:*19*
61:*7*
70:*7*
71:*22*
72:*16*
74:*17*
79:*1*
80:*1*
89:*17*
97:*24*
110:*5*
111:*12*

**rights**
5:*13*

**risk**
85:*2, 3,*
*14*  86:*2,*
*9, 14, 22*
87:*5, 9*
101:*14,*
*19, 25*
102:*24*
106:*12*

**risks**
100:*22*
102:*12*
103:*20*

**role**
15:*1, 4,*

*10*  29:*6,*
*12, 18*
32:*19*
38:*8*
43:*5*
57:*4, 17,*
*23*
58:*23*
59:*9*
60:*23*
61:*17*
64:*20*
65:*2, 3*
66:*18,*
*22*  67:*8,*
*16*
74:*24*
76:*6, 8,*
*11*
82:*24*
83:*16*

**roles**
44:*21*
76:*15*
77:*7*
80:*20*

**RON**
114:*7, 17*

**room**
6:*20, 22*
13:*19,*
*21*  47:*16*

**rough**
112:*3*

**roughly**
94:*2, 7*

**routine**
94:*13*

**Rule**  6:*6*

**Rules**
5:*11, 13,*
*15*  6:*6*

9:*1*
56:*20*

**ruling**
85:*15,*
*17*
104:*20,*
*21*
109:*21*

**rulings**
31:*24*
104:*22*
110:*2*

**run**
94:*13*
95:*8*

**runs**
75:*22*

**< S >**

**safeguardi
ng**  35:*17*

**Santa**
2:*13*

**Sarah**
2:*24*
8:*22*
114:*16*

**satisfacto
ry**  103:*1*

**saying**
41:*13*
49:*13*
61:*14*

**says**
24:*20*
32:*2*

**scenarios**
59:*22*

**scenes**
76:*15*

**SCHARF**
2:*17*
8:*8*

70:*24*
71:*5, 7*

**SCHOENECK**
2:*3*
7:*23*
8:*16*
11:*16*
13:*17*

**Scholl**
32:*2, 10*
52:*25*
54:*11,*
*18, 20*
74:*20,*
*23*  75:*2,*
*10, 13*
76:*4, 6,*
*12, 17*
81:*15,*
*19*  84:*4*
90:*22*
92:*7*
93:*23*

**Scholl's**
75:*14*

**school**
17:*15*

**schools**
20:*13, 14*

**Schroeter**
2:*24*
8:*22*
114:*16*

**scope**
42:*4*
68:*23*
69:*9*
72:*11*
92:*13*
93:*20*
96:*7*

**screen**
13:*22*

28:*24*
80:*2*
**scrolling**
97:*17*
**second**
11:*7*
44:*14*
60:*9*
**secret**
35:*4*
**secretarial** 26:*2*
77:*7*
**secretaries** 25:*13*, *15*
**secretary**
78:*7*
**secretive**
35:*4*
**sections**
5:*15*
**see**
13:*21*
23:*5*, *11*, *16*, *20*, *23* 53:*3*, *6* 74:*13*, *14* 80:*3*
84:*12*
96:*24*
97:*16*
110:*8*
**seeing**
29:*1*
**seek**
105:*5*
**seeking**
44:*25*
**seen**
12:*12*
55:*13*

78:*8*
82:*21*, *25*
**self**
22:*2*
96:*1*, *5*
110:*24*
**self-explanatory** 94:*2*
**self-insurance**
75:*22*
81:*21*
97:*1*
106:*9*
**self-insured**
82:*8*
90:*13*, *17* 92:*2*, *8* 111:*1*
**senior**
43:*20*
**sense**
78:*19*
**sentence**
97:*11*
**sentences**
89:*24*
**separate**
104:*21*
108:*21*
**session**
33:*22*
**sessions**
40:*2*
43:*9*
**set**
81:*4*
91:*3*
97:*25*
98:*6*
115:*5*

**settle**
105:*1*

**settlement**
27:*13*, *23*
28:*15*, *18*, *21*
41:*2*
42:*1*, *11*
51:*14*
65:*9*
66:*12*
110:*2*, *4*
**settlement-wise**
67:*22*
**share**
20:*21*
**shared**
90:*14*
**SHEEHAN**
2:*6*
7:*20*, *22*, *23* 8:*13*
9:*12*, *13*
13:*20*
19:*2*, *25*
21:*15*, *19* 22:*7*, *12*, *14*, *16*, *22*
23:*6*, *8*, *12*, *17*, *18*, *21*, *23*
25:*22*
27:*10*, *18* 28:*5*, *8* 29:*2*, *7* 30:*4*, *23*
32:*17*,

*21*
33:*19*
36:*4*, *6*, *24*
37:*24*
38:*10*
39:*19*
40:*18*
41:*5*
42:*12*, *14*, *24*
44:*7*, *22*
45:*5*, *14*, *23*
46:*13*
47:*15*
48:*9*, *16*
49:*1*, *23*
50:*14*
51:*15*, *23*
52:*16*
55:*9*, *20*
56:*4*
57:*20*
58:*15*
59:*2*, *12*
62:*4*
63:*1*, *20*
64:*11*, *22* 66:*8*
67:*12*
68:*4*
69:*6*
70:*25*
71:*10*
72:*6*, *24*
73:*2*
75:*6*, *25*
77:*4*
78:*19*
79:*5*, *8*, *11*

80:*12*
81:*8*
82:*5*, *16*
83:*2*, *19*
84:*17*, *20*, *23*
85:*20*
86:*16*, *24*
87:*11*, *20* 88:*9*, *20* 89:*2*, *19* 90:*2*
91:*14*, *21*
92:*16*, *19* 93:*1*, *17*
94:*19*
95:*16*, *24*
96:*14*
97:*14*
98:*19*
99:*3*, *15*, *24*
100:*25*
101:*20*
102:*2*, *18*
103:*5*
104:*5*
105:*9*, *16*
106:*20*, *22*
107:*13*, *21*
108:*1*, *5*, *15*, *24*
109:*23*
110:*10*
111:*18*

112:17,
20    113:3
**shortage**
  25:25
**show**
  104:25
**sic**
  92:23
**sign**
  111:14
  113:8
**signature**
  12:19
  98:11
  117:1
**signed**
  21:10
  111:16
**significan
t**    27:8
  30:15
  31:10
  71:25
**signing**
  99:11, 14
  112:5
**sign-off**
  56:2
**similar**
  101:10,
13
**similarly**
  102:10
**simpler**
  36:19
**simply**
  71:18
**single**
  36:18
  40:13
**Sister**
  29:19,
24    30:1

**sit**
  73:14
**slight**
  21:9
**slip**
  52:13,
20    53:2,
5, 8
  94:12
  95:6, 8
  96:6
**slips**
  52:11
**social**
  15:13
**solely**
  72:3
**solicit**
  44:25
**solicits**
  41:15
  42:5
**soon**
  111:21
  112:5
**sorry**
  17:5
  41:10
  46:8
  48:11,
22
  49:18
  55:20
  61:13
  74:1
  83:25
  89:19
  91:16
  92:16
  101:10
  106:21
  108:3

**sounds**
  36:19
  110:14
**sources**
  35:25
**South**
  14:17
**speak**
  16:20
  24:24
  41:8
  71:8
  82:2
**speaking**
  19:7
  41:8
  71:4
**specific**
  19:8, 12
  25:11
  34:9
  43:20
  56:20
  58:19
  59:13
  60:3
  65:3
  74:19
  89:23
  109:19
**specifical
ly**
  33:16
  46:15
  56:21
  57:6
  62:7, 8
  63:3
  66:2
  77:20
  91:3
  97:4, 5
  99:1

**specified**
  116:9
**specify**
  46:5, 10
  49:21
  51:21
**speculate**
  76:22
**speculatin
g**    63:22
  85:24
  89:4
**speculatio
n**    22:23
  42:25
  49:3
  73:21
  76:24
  83:3
  95:19
**speech-to-
text**
  108:12
**spell**
  9:21
**spend**
  30:2, 12
  31:10,
21
  33:11,
16    34:1,
14, 19
  38:17,
22    39:1
  43:14,
24
  57:12
  61:22
  62:1, 9
  67:4
  73:19
  75:3, 11
  78:1

**spends**
  58:20
**spent**
  34:8
  40:4
  57:8
  62:20
  66:25
**split**
  79:24
**spoken**
  38:7
  57:3
  61:11,
16
  66:17
  74:23
**staff**
  24:18
  25:10
  26:1
  34:2, 5
  35:2, 12
  43:20
  77:8, 12,
15, 17,
21    78:4
**staffing**
  24:1, 3,
12, 21
  25:3
**stage**
  80:24
  106:14
**standpoint**
  31:18
**STANG**
  2:12, 23
  7:17
  8:4, 9,
10

START
 1:19
 106:13
started
 16:16
starting
 7:14
 17:2
 97:3
state
 7:15, 21
 9:2, 21
 11:13
 17:22
 35:19
 36:12
 44:17
 64:17
 71:18
 85:6, 15
 86:3, 6,
 11
 87:25
 89:8
 90:7
 95:11
 101:15
 102:20,
 23
 104:1
 107:18
 114:3, 7,
 17
stated
 8:14
 17:15
 32:8
 83:23
statement
 24:6
 49:11
 90:15
 91:7

92:1
 108:9

statements
 93:22
STATES
 1:1
 7:11
 24:6
stating
 70:17
stay
 38:8
Steve
 21:14
stipulate
 9:9

STIPULATED
 5:3, 6,
 9, 12
 6:3
stipulatio
n    37:11
STIPULATIO
NS    5:1
 6:1
strategic
 39:12,
 16    40:9
 42:22
 49:6, 12,
 14, 18, 21
stretched
 44:13
 65:25
 74:16
stuck
 46:23
stuff
 97:7
subject
 13:25

15:23
 16:2
 72:11
 90:12
Suchan
 31:6, 7,
 8, 18
 61:7, 8,
 11, 16,
 21, 25
 64:9, 20
 65:10,
 17    66:6
 67:20
 68:17
 69:16,
 19    70:9
 73:14
 80:16, 21
Suchan's
 62:23
sues
 52:11
sufficient
 91:10

suggesting
 112:18
suit
 31:15
 50:1
Suite
 7:6
SULLIVAN
 2:7
 7:25
 8:15
 13:20
 21:14
 24:19
 25:1
 28:7

37:7
 41:4, 10,
 14, 20,
 25    42:3
 44:24
 46:6, 15
 47:14
 49:8
 50:17,
 21, 22,
 24    51:2
 68:22
 70:2, 13,
 15, 17,
 22, 25
 71:3, 9,
 15, 20
 78:24
 90:4
 110:11,
 14

Sullivan's
 8:14
sum
 108:20
summarize
 16:15
summary
 21:8
 51:10
 55:17
summer
 20:15
Summit
 114:4
supplement
ary    98:7
supplied
 21:25
 22:2
supplies
 33:3

support
 77:7, 12,
 15, 17,
 21    78:4
 91:5
 100:22
 101:18,
 24
 102:12,
 15
 103:3,
 11, 20,
 23
 104:3, 9
Sure
 11:15
 24:24
 29:10
 31:22
 34:13
 36:8
 37:16
 40:20
 43:8
 47:17
 52:22
 54:1, 12
 55:2
 56:14
 58:7
 61:10
 64:24
 66:23
 76:8
 78:8, 12
 81:17
 84:19
 87:25
 89:22
 92:7
 101:3
 110:10

| | | | | |
|---|---|---|---|---|
| 112:*10* | 59:*19* | **testify** | **Thanksgivi** | 7:*4* |
| 113:*3* | 70:*20* | 14:*8* | **ng** | 11:*8, 11* |
| **swear** | 71:*12* | 57:*22* | 112:*25* | 12:*18* |
| 9:*15* | 96:*17* | 58:*11* | **thereof** | 20:*18* |
| 10:*2* | **task** | 84:*4, 9* | 115:*11* | 29:*24* |
| **swore** | 36:*1* | 94:*24* | **thereto** | 30:*1, 7,* |
| 114:*9* | **tasks** | 98:*16* | 5:*16* | *15* |
| **sworn** | 33:*7* | 116:*4* | **thin** | 31:*11,* |
| 10:*8* | 35:*1, 19* | | 44:*13* | *22* |
| 14:*1, 5* | 36:*15* | **testifying** | 65:*25* | 33:*10,* |
| 116:*4,* | 43:*6* | 12:*6* | 74:*17* | *16, 21* |
| *15* 117:*1* | 44:*5* | 13:*11* | **thing** | 34:*1* |
| **Syracuse** | 65:*18,* | 58:*12* | 63:*16* | 37:*2* |
| 2:*5* | *20* 66:*5* | 70:*16* | 65:*9* | 38:*2, 5,* |
| | 74:*7, 9* | 114:*9* | 96:*3* | *16, 21,* |
| **< T >** | 76:*18,* | **testimony** | 105:*3* | *25* 40:*1,* |
| **take** | *20* | 9:*7* | 109:*21* | *5* 43:*13,* |
| 7:*7* | 77:*18* | 10:*2* | **things** | *23* |
| 40:*1* | 78:*1* | 12:*5, 17* | 34:*17* | 47:*21,* |
| 47:*15* | **technicall** | 22:*21* | 46:*1, 5,* | *24* 57:*1,* |
| 53:*16* | **y** 35:*13* | 44:*18* | *10* 77:*24* | *7, 11* |
| 78:*4, 7,* | **tell** | 87:*17* | **think** | 58:*18* |
| *17* | 12:*9* | 88:*1, 16* | 10:*22* | 61:*9, 21,* |
| 89:*19* | 56:*10* | 116:*5, 9* | 46:*17* | *25* 62:*8,* |
| 90:*4* | 58:*5* | **text** | 54:*21* | *10* |
| 92:*19* | 59:*22* | 6:*19* | 57:*22* | 66:*15,* |
| 110:*6* | 69:*15* | **Thank** | 71:*2, 14,* | *24* 67:*4,* |
| **taken** | 114:*10* | 8:*1, 12,* | *15* | *24* 68:*1* |
| 7:*9* | **tend** | *18, 24* | 76:*23* | 72:*1* |
| 8:*25* | 54:*22* | 9:*14, 25* | 80:*18* | 74:*13,* |
| 58:*3, 6* | **term** | 10:*10,* | 81:*15,* | *21* 75:*2,* |
| 80:*20* | 91:*2* | *11, 13* | *19, 23* | *10* |
| 115:*4* | 104:*18* | 11:*17,* | 112:*17,* | 78:*20* |
| **takes** | **terms** | *19* 21:*3* | *20* | 79:*9, 12,* |
| 36:*21* | 22:*20* | 23:*18,* | **thinking** | *15* |
| 113:*2* | 50:*22* | *24* 42:*6* | 30:*7* | 83:*13* |
| **talk** | **testified** | 48:*1* | **thought** | 90:*4, 20* |
| 13:*5* | 10:*9* | 79:*11,* | 61:*14* | 94:*15* |
| **talked** | 15:*20* | *18* | 62:*9* | 105:*18,* |
| 96:*21* | 46:*17* | 84:*23* | 70:*25* | *20* |
| **talking** | **testifies** | 98:*3* | **TIME** | 110:*13,* |
| 39:*25* | 88:*5* | 113:*3* | 1:*19, 20* | *15, 18* |
| 58:*18* | | | 5:*8* | 111:*14* |

113:5
115:5
116:9
**times**
10:20
11:23
27:5
34:6
35:22
53:3

**timesheets**
38:4
56:25
61:8
66:15
74:21
**today**
14:9
16:9
111:17
112:11,
14
**Today's**
7:3
**told**
38:25
39:6
57:11
61:25
67:3
75:2, 10
90:16,
18, 19,
22 92:4,
5 93:23
96:13
97:7
**Tom** 9:23
**Tomorrow**
111:23,
25

112:3, 6,
12, 15, 22
**top**
74:15
**town**
42:18
43:10
**track**
63:23
64:8
**tracking**
34:14
63:7, 11,
15, 17
66:5
**tracks**
64:9, 17

**transcript**
12:12,
13, 15,
18, 21
13:5
111:14,
19, 20
112:21
113:2
115:8
116:8
**transferre
d** 86:11
**trial**
5:8
81:4, 7
**True**
24:9
115:7
116:8
117:1
**trustee**
47:9
**truth**
10:3, 4

12:9
98:13
114:10
116:4

**truthfully**
14:9
**try**
111:21
112:5
**trying**
65:7
108:5
**turkey**
79:24
**turn**
97:24
**Turner**
29:9, 10,
12, 14
**turning**
17:22
20:17
23:3
26:4
31:4
32:1
61:7
80:1
92:14
98:10
100:11
102:5
103:14
**twice**
33:23
34:4
**two**
33:23
43:16
71:1
110:2

**type**
25:13
63:16
65:9
72:9
75:18
94:14
96:2
105:3
**types**
106:5
**typical**
94:12
**typically**
82:25
83:10
**typing**
77:23

**< U >**
**Uh-huh**
24:9
37:4
59:21
67:3
73:18
**unavailabl
e** 37:10
**undergone**
24:2
**underline**
97:11

**understand**
12:1, 4,
9, 19, 23
13:1, 6,
8, 24
14:3
26:24
80:24
81:3
90:8

91:9
109:17
**understand
ing**
28:1, 15
60:18
80:6
81:6
85:3, 13
86:1, 7,
8 91:6

**Understood**
98:22
113:3
**undertake**
36:15
44:5
65:18
74:7
76:18
**undo**
97:17, 22
**uniform**
109:7
**UNITED**
1:1
7:11

**University**
14:16, 17
**Unsecured**
2:19
7:18
**unsigned**
111:15
**use**
47:12
91:19
106:10
110:23
111:15

Usually 27:5
utilized 5:10

< V >
vague 43:8
value 87:18
88:2
various 35:25
85:10
veering 71:16
vendors 84:1
verdict 108:20
verifying 98:13
version 111:15, 16
versus 54:20
viability 50:8
88:2
vicar 26:15, 21  35:6
54:11
57:23
60:6
80:15, 19
vicarious 86:2
87:5
88:17
vicariousl y  86:5

vicars 47:7
Vice 26:16, 21  35:14
Victim's 17:25
video 6:14
13:22
videoconfe rence 6:8
114:9
view 108:22
viewing 43:24
violate 52:3
voluntary 15:15
volunteer 17:21
volunteers 15:12

< W >
waived 5:5, 14
waiver 44:25
Walter 21:13
want 23:16
34:13
47:15
69:22
78:16, 17

93:10
112:25
way 35:4
42:3
61:24
67:2
72:10
85:18
103:25
104:25
105:1
113:1
115:11
website 15:14
Wednesday 1:18
112:18
117:1
week 33:14
34:4, 5, 6, 10, 11, 14, 18, 19, 23, 24
58:21
65:25
77:25
78:2
111:16
weekly 43:18
61:2
well 27:13
28:2
34:16
35:12
36:16
39:14
40:11

49:16, 19, 25
50:3
58:17
60:6
66:10
68:23
71:3
75:17
82:1
84:16
85:15
88:5
90:16
92:13
94:12
95:2, 8
96:21
100:19
101:8, 15
104:25
107:4
went 21:1
31:15
63:18, 24
we're 11:8, 12
22:7
24:24
27:24
28:20
43:21
44:2
47:25
59:19
60:15
64:1
66:3
70:14, 18, 20
71:12

79:13, 16  82:8
96:1
104:24
105:2
110:16, 19  113:6
WESTERN 1:2
7:11
we've 76:25
wind 50:2
86:5
110:1
wise 64:1
WITNESS 1:17
6:11, 13, 16, 21, 23, 24
9:16
10:8
13:12
15:25
19:7
20:2
21:24
22:11, 13, 15
23:2, 7, 10, 20, 22
25:24
27:9, 11, 20
28:12
29:9
30:6
31:2
33:1, 21

36:*8*
37:*1*
38:*1, 14*
39:*23*
40:*20*
42:*13,
16*   43:*1*
44:*9, 23*
45:*7, 16,
25*   46:*8,
17, 22*
48:*11,
18*   49:*3,
25*
50:*16*
51:*17*
52:*2, 18*
55:*13,
22*   56:*8*
57:*21*
58:*17*
59:*6*
62:*6*
63:*3, 22*
64:*14,
24*
66:*10*
67:*14*
68:*7*
70:*4, 23*
71:*1, 16,
18*
72:*13*
75:*8*
76:*3*
77:*6*
78:*23*
80:*14*
81:*10*
82:*7, 19*
83:*5, 23*
84:*18,
22, 24*

85:*23*
86:*19*
87:*2, 14,
22*
88:*12,
22*   89:*4,
20*   90:*5*
91:*16,
24*
92:*21*
93:*3, 19*
94:*21*
95:*18*
96:*1, 16*
97:*13*
99:*8, 20*
100:*4*
101:*2,
22*
102:*4, 8,
20*
103:*7*
104:*7*
105:*11,
18*
106:*21,
23*
107:*15,
23*
108:*17*
109:*1,
25*
112:*16*
**witnesses**
80:*25*
81:*7*
**word**
86:*12*
110:*23*
**words**
25:*3*
**work**
13:*15*

15:*6*
17:*11*
21:*11*
26:*2, 6,
19*   28:*3*
53:*22*
54:*6*
66:*3*
73:*19*
111:*17*
112:*22*
**workable**
112:*18*
**worked**
16:*22*
17:*8, 9*
18:*9*
**working**
17:*24*
18:*2*
31:*16*
34:*24*
65:*24*
**works**
32:*10*
54:*16*
79:*7*
83:*7*
90:*17*
97:*1*
**worse**
94:*5*
**would've**
25:*20*
**wrap**
79:*24*
**write-up**
16:*14*
**written**
6:*10*
12:*12*
77:*14*
108:*12*

**wrote**
104:*19*

**< Y >**
**Yeah**
17:*7*
18:*22*
22:*11*
23:*22*
36:*8*
44:*23*
46:*15*
59:*18*
64:*24*
84:*7, 14,
17*
87:*22*
99:*8*
107:*24*
110:*12*
112:*20*
**year**
17:*13*
27:*7, 17*
28:*3, 4,
17, 19*
83:*8*
97:*3, 8*
**years**
15:*6*
16:*24*
17:*1, 7,
8*
**YORK**
1:*2*
2:*5*
7:*6, 7,
10, 12*
13:*18*
15:*9*

**< Z >**

**zebra**
9:*24*
**ZIEHL**
2:*12*
7:*17*
**zoom**
23:*15,
16*   34:*17*