| | |
|---|---|
| In re: | |
| The Diocese of Buffalo, N.Y., | Case No. 20-10322 (CLB) |
| Debtor. | Chapter 11 |
| | |
| The Diocese of Buffalo, N.Y., | |
| Plaintiff, | |
| v. | Adversary No. 20-01016 |
| JMH 100 Doe, *et al.*[1] | |
| Defendants. | |

**OMNIBUS REPLY OF THE DIOCESE OF BUFFALO, N.Y. TO:
(I) THE OPPOSITION OF THE OFFICAL COMMITTEE OF THE
UNSECURED CREDITORS; (II) THE LG CVA VICTIMS'
OBJECTION; (III) OBJECTION OF CREDITORS ABUSE SURVIVORS, MADONNA
BISHOP, ET AL.; AND (IV) OBJECTION OF CERTAIN SEXUAL ABUSE
CLAIMANTS TO THE DIOCESE'S MOTION FOR ENTRY
OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 362(a)
<u>ENJOINING THE PROSECUTION OF CERTAIN STATE COURT LAWSUITS</u>**

The Diocese of Buffalo, N.Y. (the "Diocese"), by and through its undersigned counsel, hereby files this omnibus reply (this "Reply") to: (i) the *Opposition Of The Official Committee Of Unsecured Creditors To Debtors Motion For Entry Of An Order Pursuant To 11 U.S.C. §§ 105(A) And 362(A) Enjoining The Prosecution Of Certain State Court Lawsuits* [Adv. Pro. Docket No. 305] (the "Committee Objection"); (ii) the *LG CVA Victims' Objection to the Motion filed by the Debtor/Plaintiff for an Order Enjoining the Prosecution of Sexual Abuse Actions until April 15,*

---

[1] A full list of the Defendants in this in this adversary proceeding is attached as Exhibit A to the Diocese's complaint, which has been redacted protect the privacy interests of survivors.

1

*2024 Pursuant to 11 U.S.C. §§105(a) and 362* [Adv. Pro. Docket No. 308] (the "LG Claimant Objection"); (iii) *Objection filed by Interested Party The Official Committee of Unsecured Creditors). Filed on behalf of Creditors Abuse Survivors, Madonna Bishop, et al.* [Adv. Pro. Docket No. 309] (the "Madonna Bishop Objection"); and (iv) *Response filed on behalf of Interested Party Certain Abuse Survivors* [Adv. Pro. Docket No. 316] (the "Interested Party Objection", and together with the Committee Objection, the LG Claimant Objection, and the Madonna Bishop Objection, collectively, the "Objections"), and respectfully states as follows:

## PRELIMINARY STATEMENT

On October 23, 2023, the Diocese filed its *Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 362(a) Enjoining the Prosecution of Certain State Court Lawsuits* [Adv. Pro. Docket No. 288] (the "Motion").[2] Through the Motion, the Diocese is seeking entry of one or more orders: (i) confirming that the automatic stay provided by Section 362(a) of the Bankruptcy Code enjoins the prosecution of (a) all Abuse Actions that name the Diocese as a defendant, consistent with the Second Circuit's recent binding decision in *In re Fogarty*, 39 F.4th 62, 71 (2d Cir. 2022), and (b) any and all Abuse Actions that threaten to diminish, recover against, collect, or to obtain possession or control of, any property of the Diocese's bankruptcy estate (including, without limitation, any rights to insurance coverage); and (ii) enjoining the prosecution of all Abuse Actions against the Related Entities in aid of the Diocese's restructuring efforts pursuant to section 105(a) of the Bankruptcy Code, to the extent such prosecution is not already stayed by operation of the automatic stay.

The Diocese filed for relief under chapter 11 of the Bankruptcy Code in order to address abuse claims against the Catholic Family, for the benefit of all survivors, while at the same time

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

allowing the Diocese and the Related Entities to continue to support the religious, charitable, and humanitarian mission and good works of the Catholic Church in Western New York. The Diocese continues to believe that an organized chapter 11 process, which would require a continuation of the stay of the Abuse Actions, provides the best opportunity for a fair and equitable resolution of abuse claims and a successful reorganization.

Additionally, although the Committee is attempting to create the perception that mediation is at an impasse, the reality is that mediation is progressing and, in fact, further mediation sessions are scheduled for Wednesday and Thursday, November 29 and 30, 2023. Further, while mediation with Judge Kaplan brought the parties together to outline positions, the parties did not begin addressing substantive mediation issues until after the appointment of Judge NeMoyer earlier this year. Since Judge Patrick NeMoyer was appointed as an additional mediator in the Case, the parties have had multiple sessions of in-person mediation. As set forth in the Motion, and what can only be attributed to positive mediation progress, the Diocese has publicly committed, subject to receiving the Committee's consent, to propose a chapter 11 plan of reorganization where the Catholic Family would collectively contribute up to $100 million to a settlement trust for survivors, exclusive of any additional insurance contributions. Moreover, at recent a mediation session in which the Committee did not participate, the Diocese was able to make significant progress toward increasing the amount its major insurers would be willing to contribute to a global settlement in addition to the $100 million provided by the Catholic Family.

Accordingly, for the reasons set forth herein, the Diocese submits that mediation is making progress, and the Court's issuing of a preliminary injunction enjoining the further prosecution of any Abuse Actions at least through and including April 15, 2024, provides the parties with the best path towards resolving this Chapter 11 Case, is in the best interest of all creditors, and is necessary

to avoid the dissipation of Diocesan assets and to facilitate further mediation and the successful reorganization of the Diocese without undue distraction or delay.

## THIS REPLY

### I. The Committee's Purported Concessions

1. At the outset of the Committee Objection, in an effort to avoid addressing the potential impact litigating Abuse Actions which allege abuse occurring any time after July 1, 1986 would have on the Diocese's estate, including shared insurance assets, the Committee purports to concede on behalf of itself *and all Abuse Claimants*, and that a stay of such Abuse Actions, is proper and warranted pursuant to section 363(a)(3) of the Bankruptcy Code, or at least that the Committee does not oppose the continued stay of such Abuse Actions. The Committee also purports to concede, not just for itself, but for *all Abuse Claimants*, and in a shameless attempt to avoid the otherwise inescapable conclusion that section 363(a)(3) automatically stays collection actions that threaten shared insurance assets, that no Abuse Claimant will enforce any judgment or settlement against a Related Entity without this Court's prior approval. The Court should afford no weight whatsoever to the Committee's purported concessions.

2. First, as this Court held previously in connection with approving the prior stipulated stay of litigation, *which the Committee supported*, the Committee may negotiate and enter into compromises as an agent for the survivors it represents, but "any particular creditor may reject the Committee's stipulation . . ." *In re The Diocese of Buffalo, N.Y.,* 623 B.R. 354, 357-58 (Bankr. W.D.N.Y. 2020). Moreover, "the right to reject a stipulation becomes meaningless unless potential objectors receive proper notice of the existence of the agreement." *Id.* at 358. Here, the Committee is attempting to sidestep the Diocese's legitimate concerns that prosecution of the Abuse Actions will violate the automatic stay of section 362 by making purported "concessions"

4
16847310.3 11/27/2023
Case 1-20-01016-CLB, Doc 324, Filed 11/27/23, Entered 11/27/23 16:40:48, Description: Main Document , Page 4 of 17

on behalf of more than 800 Abuse Claimants. However, there is no suggestion that any of these Abuse Claimants, much less *all of them*, have even been put on notice that the Committee is offering to have all post-July 1, 1986 claimants stand down, or to limit recourse against the insurance assets shared between the Diocese and its Related Entities. Indeed, the LG Claimant Objection makes clear that at least some Abuse Claimants do not agree to even the limited and insufficient protections that the Committee purports to offer on behalf of all Abuse Claimants. LG Claimant Objection at p. 4.

3. Second, in a clear departure from its statutory obligation to advocate on behalf of the interests of *all creditors*, in their capacity *solely as creditors of the Diocese*, the Committee adopts a position that will confer an unfair benefit upon only that subset of the Abuse Claimants who the Committee does not concede should be stayed: those whose abuse is alleged to occur wholly before July 1, 1986 and those who filed their Abuse Actions after the Petition Date and who, abiding by Section 362(a)(1) of the Bankruptcy Code, do not name the Diocese as a defendant (notwithstanding the almost universal existence of a companion proof of claim filed against the Diocese in this Chapter 11 Case based on the same abuse allegations). This approach is clearly contrary to the Court's prior observation that "[f]airness demands, however, that similar creditors experience similar impact from any injunctive relief" and that "[a]ll should share equal opportunity for access to state court, if and when such access is allowed." *In re Diocese of Buffalo, N.Y.*, 642 B.R. 350, 353 (Bankr. W.D.N.Y. 2022).

4. The Committee's proposed approach will not only result in disparate treatment and inconsistent judgments (as Committee counsel previously argued to the Court), but also carries substantial risk of harm to the Diocese and its bankruptcy estate. The Committee does not take into account the risk that if Abuse Claimants with alleged abuse occurring prior to July 1, 1986,

5

16847310.3 11/27/2023
Case 1-20-01016-CLB, Doc 324, Filed 11/27/23, Entered 11/27/23 16:40:48, Description: Main Document , Page 5 of 17

are allowed to proceed with state court litigation, and if such litigation results in adverse findings or decisions made by state court, those findings and decisions may also be used by those and other Abuse Claimants to establish Diocesan liability and/or by Insurers to deny insurance coverage in connection with both the specific occurrences that are the subject of the Abuse Action being litigated, as well as other abuse claims involving, for example, the same perpetrator and/or policies of insurance. Moreover, also as previously acknowledged by Committee counsel, should Abuse Claimants receive favorable decisions from the state court resulting in meaningful judgments, those Abuse Claimants will insist on favorable treatment for their liquidated claims in any chapter 11 plan of reorganization. (*See* Hr'g Tr. p.73-83, March 4, 2021, Adv. Pro. Docket No. 137)

## II. The Committee's Prior Support of an Injunction Has Been Inconsistent

5. The Committee's position with respect to the legal and practical considerations governing a stay of the Abuse Actions has been, at best, inconsistent. Upon the initial filing of this Adversary Proceeding, the Committee, which is itself not a party to any of the Abuse Actions against the Related Entities, vehemently objected to any suggestion that the Abuse Actions were stayed automatically pursuant to section 362 of the Bankruptcy Code, as well as to any imposition of a preliminary injunction pursuant to section 105 of the Bankruptcy Code [Adv. Pro. Docket No. 13]. The Court, understanding the necessity for implementing a stay of the Abuse Actions, entered a decision and order granting a short preliminary injunction over the Committee's objection [Adv. Pro. Docket No. 70]. Thereafter, the Committee, upon further reflection and negotiations with the Diocese, agreed to a stipulation staying to 11 U.S.C. § 105(a), which was approved by the Court [Adv. Pro. Docket Nos. 92 and 95]. Following the Court's ruling that the Committee's stipulation could not bind objecting abuse claimants represented by the Lipsitz firm, the Committee argued that all Abuse Actions should be stayed because, among other things, a stay would (a) avoid a race

6

16847310.3 11/27/2023
Case 1-20-01016-CLB, Doc 324, Filed 11/27/23, Entered 11/27/23 16:40:48, Description: Main Document, Page 6 of 17

to the courthouse by survivors to compete for the same assets, (b) provide for production of critical documents, (c) allow survivors to share equitably in a distribution without prejudicing survivors who come forward shortly before the bar date, (d) protect assets of related parties from depletion, and (e) set the framework for a mediation of all claims and, ultimately, a global resolution of this Chapter 11 Case. (*See* Hr'g Tr. p.73-83, March 4, 2021, Adv. Pro. Docket No. 137)

6. In the Committee Objection, the Committee, despite its prior statements made to the Court in support of a stay, asserts that it only supported a stay of litigation at the beginning of the Chapter 11 Case to allow the Diocese to gather information regarding shared insurance. The record shows otherwise. The Committee has supported the stay throughout the administration of the Chapter 11 Case for the same reasons that the Diocese submits still exist and justify the issuance of a preliminary injunction and a continuation of the Litigation Stay. In fact, the only change in circumstance the Committee can offer for why the Abuse Actions should no longer be stayed, is the Committee's own reversal of its prior position.

7. The Committee is now trying to downplay its prior support for a stay. However, as recently as June 12, 2023, on the record of the hearing on the Diocese's third motion seeking to extend the stay (the "June Hearing") (*See* Hr'g Tr. p.14-15, June 12, 2023, Adv. Pro. Docket No. 281), the Committee, through its counsel, advised the Court that it had concerns that allowing the state court actions to proceed against the Parishes would require the expenditure of resources that would otherwise be available for settlement, and stated:

> Part of our analysis, frankly, include the cost benefit analysis. The Parishes have assets that are available for, for some compensation of survivors. If there's litigation going forward against the Parishes, there will be expenditure of those resources. And part of our calculus is always a cost benefit analysis: Does it make sense to ask them to expend those resources and diminish the amount available for ultimate settlement versus does it make sense to have a stay? And

7

right now, given where we are, we request to have the stay remain in place.

8. Additionally, on the record of the June Hearing, the Committee raised the same concerns that the Diocese raises with the Court regarding a "a race to the courthouse" (*Id.* at p. 15):

> Part of what we are concerned about, your Honor -- I'd like to reiterate from the time we filed our papers the last time this was an issue -- is right now we're talking about approximately a dozen claims being allowed to go forward because those are the only claims that only identify the parish as a defendant.
>
> And, so, the concern, though, is if it does, then it may cause a race to courthouse. It may cause the calculus to shift from the cost benefit analysis of how much can we help to benefit survivors of the group to, well, there's a dozen cases going forward, I don't want them to be first in line, I'm going to go try to get my judgment, too. So, that is part of the difficulty we all face here. Part of it is the race to the courthouse problem.

9. The Committee's current proposal for permitting only those Abuse Claimants that allege abuse prior to July 1, 1986 and who do not name the Diocese as a defendant, to continue prosecuting the Abuse Actions is also inconsistent with its prior position taken at the June Hearing. At the June Hearing, the Committee clearly recognized that allowing even just a dozen or so cases to proceed with litigation had the potential to create disparate treatment amongst Abuse Claimants when it advised the Court (*Id*. at p. 16) that:

> But we feel that having a dozen or so cases try to jump the line ahead of everybody else would ultimately have a potential detrimental [effect] on the overall group of survivors.

This concern is magnified even more when the Committee proposes to allow hundreds of Abuse Actions to go forward, while several hundred others will continue to be stayed under the Committee's proposal.

10. In its objection, other than the Committee taking the position that by allowing the State Court Actions to proceed it will likely put pressure on the insurance carriers to make a meaningful settlement offer, the Committee does not provide the Court with any evidence or justification for its complete abandonment and reversal of its prior concerns for supporting the stay, which were presented to this Court only five months ago. Nothing the Committee has argued resolves the prior concerns voiced by the Committee in support of the prior stipulated stay because such concerns still exist, and the Committee is disingenuous in advising the Court otherwise.

### III. The Committee's Insurance Coverage Analysis is Misguided

11. The Committee asserts that a vast majority of the Abuse Actions assert direct claims against the Related Entitles independent of any alleged liability of the Diocese and, therefore assumes that the Abuse Actions can proceed because the Diocese's insurance coverage will not be impacted. In support of this assertion, the Committee attaches as Exhibit B to the Committee Objection the pleadings of two Abuse Actions. A review of those pleadings, however, confirms that claims alleged by the Abuse Claimants threaten to have a direct impact on the Diocese's liability and its potential insurance coverage. In fact, the plaintiff in the complaint attached as Exhibit B-1 to the Committee Objection alleges abuse by Father Hendricks from approximately 1979 through 1983. *See* Complaint at ¶ 11. That plaintiff also filed a proof of claim, designated as confidential claim no. 788, against the Diocese alleging the same abuse as the basis for their claim against the Diocese and attached the complaint to the proof of claim in support thereof. Further, the plaintiff in the complaint attached as Exhibit B-2 to the Committee Objection alleges abuse by Father Mako from approximately 1965 through 1967. *See* Complaint at ¶ 81. That plaintiff also filed a proof of claim, designated as confidential claim no. 322, against the Diocese alleging the same abuse as the basis for their claim against the Diocese and attached the complaint

to the proof of claim in support thereof. Thus, if even just those two specifically selected Abuse Actions are allowed to go forward, because of the direct impact on the Diocese, the Diocese would be required to actively defend those actions and the payment of such defense costs and claims for losses would be subject to a deductible or self-insured retention paid by the Dioceses before coverage under the shared insurance policies becomes available. In addition, if those plaintiffs were to show, through litigation, that Diocesan personnel were not just negligent in their failure to prevent abuse but had actual notice of the abuse and failed to take remedial action, Insurers might be expected to deny coverage not just for the specific claim being litigated, but also for all subsequent claims involving abuse committed by the same perpetrator against other survivors.

12. Conveniently, the Committee argues that proceeding with the State Court Actions that allege abuse from 1973 to 1986, will have no impact on insurance coverage because, according to the Committee's analysis those polices in effect at the time have no aggregate limits and defense costs do not reduce available coverage. However, the Committee fails to disclose to the Court that all of the 1973-1986 policies are subject to *per occurrence limits* and the Diocese's interest in those insurance policies will still be negatively impacted through the depletion of any such per occurrence limits that reduce available coverage for the Diocese's own exposure to the same abuse claims.

13. As illustrated in the Motion, if an Abuse Claimant alleges that they were abused on two occasions in 1974, his or her claim would implicate a policy issued by Commercial Insurance of Newark, NJ, which provides coverage subject to a limit of $500,000 per occurrence and $250,000 per person. Under established New York law, two occurrence limits would be triggered. *See Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 21 N.Y.3d 139 (2013) (each incident of sexual abuse constitutes a separate occurrence). Based on this

10
16847310.3 11/27/2023
Case 1-20-01016-CLB, Doc 324, Filed 11/27/23, Entered 11/27/23 16:40:48, Description: Main Document , Page 10 of 17

precedent, the Diocese would contend that the per person sublimits apply on a per occurrence basis, thus two per person sublimits apply. However, the insurer may contend that the $250,000 per person sublimit restricts coverage to $250,000, no matter how many insureds claim coverage under the policy and regardless of whether the survivor was subject to multiple occurrences of abuse. Therefore, if a $1 million judgment is entered against a parish that is alleged to be jointly or severally liable with the Diocese and the insurers' coverage position prevails, the entirety of the available policy proceeds would be used to satisfy (and even then, only partially) the parish's liability, exhausting the limits of coverage and leaving the Diocese effectively uninsured with respect to its own liability to the same Abuse Claimant arising out of the same occurrence(s) of abuse.

## IV. Continued Mediation is the Best Path Forward

14. Although, mediation has not yet achieved a global settlement, the Committee's characterization that mediation has been categorically unsuccessful is simply unjustified, and the only conclusion the Court can draw from the Committee's assertion is just that the demands advanced by the Committee in mediation have not been uniformly and unconditionally agreed to by the Diocese and its Insurers. The absence of total capitulation by adversarial parties is not indicative that a mediation process has failed. Far from it. The Diocese disagrees with any contention that mediation has been unsuccessful and has and will continue to mediate with all parties in good faith. As has been stated before, the Diocese believes that mediation is the most efficient and effective way to resolve issues surrounding the extent and severity of Abuse Claims, Diocesan and Related Entity liability, and the amount of insurance coverage available to respond to such liabilities.

11

15. As set forth in the Motion, substantive mediation has been ongoing for less than ten months at this point. Within that short time period, the Diocese has made vigorous attempts to advance negotiations among the parties toward a reasonable and mutually acceptable resolution, with its most recent offer of a collective contribution from the Catholic Family of up to $100 million to a settlement trust for survivors, exclusive of any additional insurance contributions. The Committee, however, views such offer from the Diocese as being "negotiated through litigation." The Committee hides behind the mediation privilege when it suggests that there is any gamesmanship or publicity stunt associated with the Catholic Family's recent announcement of a $100 million commitment to a survivor trust as part of a confirmed chapter 11 plan. The Committee, however, cannot, without violating its duty of candor to the Court, faithfully represent that the negotiations of the Catholic Family in mediation were materially inconsistent in magnitude with the now publicly-stated commitment to fund at least $100 million towards a settlement trust under a plan of reorganization.

16. Essentially ignoring the Diocese's most recent offer of $100 million and advising this Court to give it **no weight**, the Committee has now refused to extend the Stipulated Stay, ostensibly because the Committee believes allowing litigation to move forward against the Related Entities will create pressure on the Catholic Family to put even more settlement money on the negotiating table, as well as to exert leverage over the Diocese's insurers. But just five months ago the Committee argued to the Court that state court litigation will likely cause the Diocese and the Related Entities to drain valuable estate resources because the Diocese's and the Related Entities' attention will be shifted away from mediation to costly, time-consuming, and protracted litigation.

12

16847310.3 11/27/2023
Case 1-20-01016-CLB, Doc 324, Filed 11/27/23, Entered 11/27/23 16:40:48, Description: Main Document , Page 12 of 17

17. Moreover, the Committee's comparison to the settlement reached in the Diocese of Syracuse case is misplaced. While it may be true that the Syracuse Diocese settled its liability to abuse claimants for a similar amount of $100 million, and while that case does involve fewer claimants, the Committee conveniently ignores the settlement between the Rochester Diocese and its committee which involves nearly 500 claimants and where that diocese and its related entities will be contributing only $55 million. As is often the case in any bankruptcy proceeding, creditor recovery is dictated by varied, and complex factors, including the ability of the Catholic Family to pay. The number of claimants is not the sole, or even a determining factor. (*See* Diocese of Rochester, Case No. 19-20905-PRW, Catholic Family contribution of $55 million with approximately 475 abuse claimants.)

18. The Committee is fully aware of the Diocese's available assets as reflected in its schedules filed with this Court, other documents provided to the Committee throughout the administration of the Chapter 11 Case, and the numerous mediation sessions that have occurred to date.[3] Nevertheless, the Committee somehow still believes that the controlling factor for a fair and equitable settlement directly relates to the amount being paid per claimant, not the amount of funds available to pay all claimants.

## V. The Diocese is Not Seeking an Advisory Opinion with Respect to *In re Fogarty*

19. As stated above, although the Committee has purportedly conceded that actions naming the Diocese are stayed, the Committee urges the Court not to consider the impact of the

---

[3] As an example of the Committee's overreach, the Committee disingenuously suggests that to the Diocese has some degree of control over the grant making functions of the Mother Cabrini Health Foundation. This is a red herring. In fact, as an example of the Diocese's lack of control, upon becoming a debtor in bankruptcy, the Diocese was informed that the Mother Cabrini Health Foundation would no longer consider the Diocese itself to be eligible to receive grants. The Diocese also conducted a thorough investigation of potential claims and/or strategies for avoidance action recovery from the Mother Cabrini Health Foundation and ultimately determined that it did not represent a feasible source of recovery. Moreover, if the Committee truly believed otherwise, it would undoubtedly have requested derivative standing to bring any such claims prior to the expiration of the window to do so expired under section 546 of the Bankruptcy Code.

13

16847310.3 11/27/2023
Case 1-20-01016-CLB, Doc 324, Filed 11/27/23, Entered 11/27/23 16:40:48, Description: Main Document , Page 13 of 17

Second Circuit's "bright line rule" as articulated in *Fogarty* with respect to any attempts by Abuse Claimants to sever the Diocese from actions in which it is named in order to proceed against non-debtor Related Entities. The Committee offers as the basis for this argument that doing so would be an advisory opinion as, the Committee asserts, no such attempt to sever has been made. But this is absolutely untrue.

20. As set forth in the LG CVA Victims Objection, a majority of LG CVA Victims with pending state court actions that named the Diocese as a defendant have already filed motions in their respective Abuse Actions seeking to sever their claims against the Diocese and proceed against the non-debtor Related Entities, but such motions have been stayed by the prior Orders of this Court imposing a preliminary injunction. Thus, the Diocese submits that putting aside the Court's ruling on the continuance of the preliminary injunction, the recent controlling guidance from the Second Circuit in *Fogarty* makes clear that section 362(a)(1) provides a "bright-line rule" that automatically stays any action or proceeding in which the debtor is named as a defendant and any litigant that wishes to proceed against a non-debtor party must first seek relief from this Court under section 362(d) to modify or lift the stay.

21. Therefore, Diocese submits that the Court must apply the ruling in *Fogarty* to this case because even if Abuse Claimants who named the Diocese as a party in their Abuse Actions sought to sever the Diocese as a party in a transparent attempt to circumvent the automatic stay, as the LG CVA Victims are attempting to do, such Abuse Claimants must first seek the appropriate relief from this Court.

## VI. The Diocese has Met its Burden for a Preliminary Injunction

22. Consistent with the Court's prior ruling that "[t]o obtain a preliminary injunction, a plaintiff must demonstrate: (1) either a likelihood that he will succeed on the merits of his claim,

14

16847310.3 11/27/2023
Case 1-20-01016-CLB, Doc 324, Filed 11/27/23, Entered 11/27/23 16:40:48, Description: Main Document, Page 14 of 17

or that the merits present serious questions for litigation and the balance of hardships tips decidedly toward the plaintiff; and (2) that without the injunction, he will likely suffer irreparable harm before the court can rule upon his claim." *In re Diocese of Buffalo, N.Y.*, 618 B.R. 400, 407 (Bankr. W.D.N.Y. 2020), the Diocese submits that it has demonstrated a likelihood of success and that absent continued injunctive relief, the Diocese, as well as certain Abuse Claimants, will be irreparably harmed.

23. As stated above and in the Motion, mediation is progressing with the recent assistance of Judge NeMoyer. Despite the commitment of the Catholic Family to provide $100 million to fund a settlement trust, demonstrating the Diocese's and the entire Catholic Family's seriousness in resolving this Case, the Committee asserts that the Diocese does not cite to any "progress" being made through mediation, while at the same time the Committee appears to be hiding behind the mediation privilege to claim that no progress has occurred.

24. The Diocese remains confident that continued good faith mediation, with the next sessions scheduled for Wednesday and Thursday, November 29 and 30, 2023, will ultimately result in a settlement and a confirmed plan of reorganization. The Committee, however, asserts that a plan containing third-party releases that is contested by the Survivors is unlikely to be confirmed, thus limiting the likelihood of a successful reorganization and, as a result, an injunction of the State Court Actions must be denied. The problem with the Committee's assertion is that the Diocese has proposed no such plan and believes that a successful reorganization is still attainable through a mediation process and should occur in this Case. Accordingly, the Diocese submits that it has demonstrated a likelihood of success that warrants a continued stay of the Abuse Actions.

25. The Diocese and those Abuse Claimants with Abuse Actions that are clearly subject to the automatic stay and/or, pursuant to the Committee's proposed concession, allege abuse

15

16847310.3 11/27/2023
Case 1-20-01016-CLB, Doc 324, Filed 11/27/23, Entered 11/27/23 16:40:48, Description: Main Document , Page 15 of 17

subsequent to July 1, 1986, will suffer immediate, irreparable harm if other Abuse Actions are allowed to proceed with litigation at this time.

26. As argued in the Motion, should the Abuse Actions proceed the Diocese will, among other things, be subject to indemnification claims asserted by the Related Entities. In the Committee Objection, in an attempt to discredit the Diocese's exposure to such claims, the Committee makes several unsupported assumptions. First, the Committee assumes that the Related Entities cannot establish the legal justification for common law indemnification claims under New York law. However, the Committee should not speculate as to arguments and burdens of proof that have not yet been litigated.

27. Second, the Committee further assumes that, as a matter of law, the Related Entities are not entitled to indemnification from the Diocese because the Related Entities prospective liability to the Survivors is the result of their own breaches of duty. However, the Committee has not put forth any evidence to support such an assumption. Conversely, certain of the Related Entities have already filed proofs of claim against the Diocese on the basis of indemnification and contribution from the Diocese which, absent an objection, are presumptively valid claims under section 502(a) of the Bankruptcy Code.

28. Further, the Committee argues that no indemnification obligation exists because the Diocese has not identified any contractual obligation to indemnify the Related Parties. However, as a matter of longstanding practice spanning approximately 50 years, the Diocese, through its insurance office, collects funds from Related Entities which are then pooled and earmarked specifically for (i) the purchase of joint policies of insurance covering the Diocese and the Related Entities as co-insureds and (ii) the payment of any defense costs and claims for losses that are subject to a deductible or self-insured retention before coverage under the shared insurance policies

16
16847310.3 11/27/2023
Case 1-20-01016-CLB, Doc 324, Filed 11/27/23, Entered 11/27/23 16:40:48, Description: Main Document , Page 16 of 17

becomes available. Therefore, the Related Entities have a legitimate reliance expectation based on prior practice and a failure to recognize this reliance would result in unjust enrichment to the Diocese.

29. Accordingly, the Diocese submits that for the reasons set forth in the Motion and in this Reply, it will suffer irreparable harm should the Court not issue a preliminary injunction.

WHEREFORE, for the reasons set forth above, the Diocese respectfully requests that this Court overrule the Objections in their entirety and enter an order in substantially the form attached to the Motion as *Exhibit C*, issuing a preliminary injunction enjoining the further prosecution of any Abuse Actions at least through and including April 15, 2024, setting a deadline to answer the Diocese's complaint in this action, and providing such other and further relief as the Court may deem just and proper.

Dated: November 27, 2023        BOND, SCHOENECK & KING, PLLC

By:   */s/ Stephen A. Donato*
Stephen A. Donato
Charles J. Sullivan
Grayson T. Walter
One Lincoln Center
Syracuse, NY 13202-1355
Telephone:   (315) 218-8000
Fax:   (315) 218-8100
Emails:   sdonato@bsk.com
      csullivan@bsk.com
      gwalter@bsk.com

*Attorneys for The Diocese of Buffalo, N.Y.*